UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X

           :

DR. RUTH C. MAY and DR. DONNA E.       :
LEDGERWOOD, *on behalf of themselves and all other*  :
*similarly situated*,

           :

        Plaintiffs,      :

           :

     -v-      :

           :

BARCLAYS PLC and BARCLAYS BANK PLC,    :

           :

        Defendants.    :

           :

---------------------------------------------------------------------X

23-cv-2583 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

      Presently before the Court are the competing motions of Ruth C. May, Donna E.
Ledgerwood, Justin Reed, Jeffrey Knapp, and Mark Howarth (collectively, the "May Group"),
Kenny Baker ("Baker"), and Robert Romano ("Romano") seeking appointment as lead plaintiff
in a class action securities case against Barclays PLC and Barclays Bank PLC (collectively
"Barclays" or "Defendants") brought pursuant to the Private Securities Litigation Reform Act of
1995 (the "PSLRA"), 15 U.S.C. § 78u–4(a)(3)(B).  Dkt. Nos. 17, 20, 23.  The May Group,
Baker, and Romano each also moves for approval of their respective attorneys as lead counsel.
*Id.*  In addition, Romano and Baker move to consolidate this case (the "May Action") with a
related case pending before this Court, *Kenny Baker v. Barclays PLC*, *et al*., Case
No. 23-cv-4881 (LJL) (S.D.N.Y.) (the "Baker Action").  Dkt. Nos. 20, 23.

      For the reasons that follow, the Court appoints the May Group as lead plaintiff and
appoints the May Group's counsel, Mazin A. Sbaiti and Jonathan Bridges of Sbaiti & Company
PLLC, as lead counsel.  It also consolidates Case Nos. 23-cv-2583 and 23-cv-4881.

**BACKGROUND**

Case Nos. 23-cv-2583 and 23-cv-4881 are related actions that arise out of the same set of events.  The Court describes the allegations common to both complaints and then describes the material differences between the two complaints.

I.     **Allegations Common to the May Action and the Baker Action**

Barclays is a global bank headquartered in London, England that provides a number of financial services, including the offer and sale of securities in the Southern District of New York.  Dkt. No. 1 ("May Compl.") ¶ 3; Dkt. No. 2 ("Barker Compl.") ¶ 15, *Kenny Baker, individually and on behalf of all others similarly situated v. Barclays PLC*, *et al*., Case No. 23-cv-4881 (LJL) (S.D.N.Y.).  For many years, the firm was classified as a "well-known seasoned issuer" ("WKSI") of securities by the Securities and Exchange Commission ("SEC") and, as a result, was able to take advantage of SEC rules that permit issuers with that status to register their securities offerings on shelf registration statements that become effective immediately upon filing.  May Compl. ¶¶ 9–10; Barker Compl. ¶ 55.  As such, WKSI status confers a significant benefit upon those who are eligible for it and who maintain it; issuers need not wait the lengthy process for the SEC's Division of Corporation Finance to review a registration statement and to declare it effective, during which time market conditions might change and the offering might become less attractive.  *See* May Compl. ¶ 10; Baker Compl. ¶ 48; *see also* 17 C.F.R. § 230.405 ("Automatic shelf registration statement"); *id.* § 230.462(e).  Under Securities Act Rule 405, a WKSI is an issuer that meets the registrant requirements of SEC Form S-3 or Form F-3 (for foreign issuers) and either (1) "[a]s of a date within 60 days of determination date, has a worldwide market value of its outstanding voting and non-voting common equity held by non-affiliates of $700 million or more," or (2) "as of a date within 60 days of the determination date,

has issued in the last three years at least $1 billion aggregate principal amount of non-convertible securities, other than common equity, in primary offerings for cash, not exchange, registered under the [Securities] Act."  Baker Compl. ¶ 47; *see* 17 C.F.R. § 230.405 ("Well-known seasoned issuer").  However, an issuer is considered an "ineligible issuer," and is thereby unable to benefit from Rule 405 and WKSI status, if the issuer, among other things, has violated (or has a subsidiary that has violated) the antifraud provisions of the federal securities laws (or is the subject of a judicial or administrative decree or order prohibiting certain conduct or activities involving the anti-fraud provisions of federal securities laws) within the last three years.  May Compl. ¶ 11; Baker Compl. ¶ 49; *see* 17 C.F.R. § 230.405 ("Ineligible issuer").

On May 10, 2017, the SEC commenced public administrative and cease-and-desist proceedings against a subsidiary of Barclays arising out of its former wealth and investment management business.  May Compl. ¶ 12; Baker Compl. ¶ 55.  The SEC Order had an immediate practical effect on Barclays: Barclays automatically became an ineligible issuer under Rule 405 and lost its status as a WKSI for a period of three years.  May Compl. ¶ 14; Baker Compl. ¶ 56.  As a result, Barclays could no longer file automatically effective shelf registration statements or use an automatic shelf registration statement it had previously filed, and was required to pay filing fees on a "pay-as-you-go" basis at the time of each takedown off of the shelf.  May Compl. ¶ 15; Baker Compl. ¶ 57.  As a practical matter, Barclays was required to quantify the total amount of securities it planned to offer in order to pay the registration fees for those securities in advance; it also could not sell off of the shelf registration statement more securities than it had registered on that shelf.  May Compl. ¶ 15; Baker Compl. ¶ 58.

On February 12, 2018, Barclays filed an amended registration statement to convert its prior 2016 WKSI shelf to a non-WKSI shelf (the "2018 Shelf"), which was declared effective on

March 30, 2018.  May Compl. ¶ 19; Baker Compl. ¶ 59.  On June 14, 2019, Barclays filed another shelf registration statement for a new non-WKSI shelf (the "2019 Shelf") to replace the 2018 Shelf.  May Compl. ¶ 17; Baker Compl. ¶ 60.  The 2019 Shelf was declared effective on August 1, 2019 and registered $20.76 billion of debt securities.  May Compl. ¶¶ 8, 17; Baker Compl. ¶ 61.  Pursuant to the terms of both the 2018 Shelf and the 2019 Shelf, Barclays was required to track on a real-time basis the aggregate amount of securities that were offered and sold from each respective shelf in order to ensure that it did not offer or sell any securities in excess of what had been registered.  May Compl. ¶¶ 8, 18–19; Baker Compl. ¶ 62.

These lawsuits grow out of Barclays's failure to properly track the number of securities that it sold pursuant to each shelf registration statement.  On or around March 9, 2022, Barclays concluded that it had offered and sold securities in excess of what had been registered on the 2019 Shelf.  May Compl. ¶ 20; Baker Compl. ¶ 76.  It notified regulators on March 14, 2022, that it had over-issued securities, that it did not have sufficient capacity to support further sales from inventory, and that it would suspend further sales of certain exchange-trade notes ("ETNs") including Barclays Bank PLC iPath Series B S&P 500 VIX Short-Term Futures ETN ("VXX ETNs").  May Compl. ¶ 22; Baker Compl. ¶ 77.

An SEC order charging Barclays in connection with the sale of unregistered securities found that, "[a]t the time of the registration of both the 2018 Shelf and the 2019 Shelf, certain [Barclays] personnel recognized the need to accurately record relevant information about securities that were offered or sold so as to track the aggregate amount of securities that were cumulatively offered and sold from each respective Shelf on a real-time basis" to ensure that Barclays did not offer or sell any securities in excess of the securities that were registered.  May Compl. ¶ 21 (alteration in original) (quoting SEC, *Order Instituting Cease and Desist*

*Proceedings Pursuant to Section 8a of The Securities Act of 1933 and Section 21c of The Securities Exchange Act of 1934* ¶ 5, File No. 3-21181 (Sept. 29, 2022) ("SEC Order")).

However, no internal control was established to address this issue, and the number of securities that were offered and sold was not tracked. *Id.* ¶ 20 (quoting SEC Order ¶ 30); Baker Compl. ¶ 67. As a result, Barclays offered and sold approximately $1.3 billion of securities in excess of what was registered with the SEC on the 2018 Shelf. May Compl. ¶ 21 (quoting SEC Order ¶ 6); Baker Compl. ¶ 81. In addition, beginning on or around January 28, 2021 and continuing until on or around March 9, 2022, Barclays offered and sold approximately $16.37 billion of securities in excess of what was registered with the SEC on the 2019 Shelf. May Compl. ¶ 22 (quoting SEC Order ¶ 7); Baker Compl. ¶ 82. On March 14, 2022, Barclays reported the issue to regulators, May Compl. ¶ 22; Baker Compl. ¶ 77, and on March 28, 2022, Barclays publicly disclosed details concerning the internal control issues related to, and the potential financial impact of, the over-issuance, Baker Compl. ¶ 79. Barclays paid the SEC penalties of $200,000,000 and disgorgement of $149,731,011 with pre-judgment interest. May Compl. ¶ 23.

The plaintiffs in both the May Action and the Baker Action seek to represent purchasers of VXX ETNs. VXX ETNs are highly complex products that are designed to track Chicago Board Options Exchange Volatility Index (VIX) futures. Baker Compl. ¶ 41. On August 1, 2022, before the market opened, Barclays commenced a rescission offer for $17.6 billion of over-issued securities that were sold pursuant to the 2018 and 2019 Shelfs. May Compl. ¶ 25; Baker Compl. ¶ 83. The SEC Form 42B5 filed in connection with that offering disclosed that from February 18, 2021 through March 2022, Barclays sold approximately $16.37 billion of unregistered securities in excess of the maximum $20.8 billion of securities registered pursuant to the 2019 Shelf and sold an additional $1.27 billion of unregistered securities in excess of the

maximum aggregate amount registered pursuant to the 2018 Shelf.  Baker Compl. ¶¶ 84–85.

However, members of the putative class who purchased VXX ETNs were unable to participate in

the offering.  *See* May Compl. ¶ 31; Baker Compl. ¶ 86.

## II.    Allegations Specific to the May Action

The May Action was filed on May 27, 2023 by a married couple, Ruth C. May and

Dr. Donna E. Ledgerwood, on behalf of a putative class of all persons and entities that purchased

VXX ETNs issued without a proper registration statement between June 26, 2019, and March 14,

2022 (the "May Class Period"), and who were damaged thereby.  *See generally* Dkt. No. 1.[1]  The

complaint in the May Action (the "May Complaint") brings causes of action under Sections 5,

11, and 12 of the Securities Act of 1933 (the "Securities Act").  *See id.*, Causes of Action ¶¶ 1–

16.

Plaintiffs May and Ledgerwood allege that the 2018 and 2019 Shelfs contained material

misrepresentations regarding the aggregate amount of securities intended to be registered and

sold.  *Id.*, Causes of Action ¶ 8.  They further allege that the Shelfs omitted the material facts

(1) of the "true amount" of securities to be issued and (2) that no internal controls were in place

around the real-time tracking of securities being offered or sold.  *Id.*  Plaintiffs May and

Ledgerwood claim that they purchased VXX ETNs that can be traced back to the initial offering

and that should have been registered.  *Id.*, Causes of Action ¶¶ 9-10.  The May and Ledgerwood

seek rescission and compensation for the VXX ETNs which were sold without a proper and

---

[1] The May Complaint defines the class as "[a]ll purchasers of the Securities during the Class Period."  May Compl. ¶ 19.  "Securities," in turn, is defined as "all securities that had been issued without the proper registration statement."  *Id.* ¶ 25.  Nevertheless, the May Complaint only alleges that the plaintiffs suffered an injury from purchases of VXX ETNs, Dkt. 1 at 7–8, and the pleading exclusively refers to VXX investors, *see, e.g.*, Dkt. No. 18 at 1 (construing the May Action as having been brought on behalf of investors in VXX ETNs).  The Court thus construes the May Complaint as being brought on behalf of investors in VXX ETNs only.

effective registration statement in violation of Section 5 of the Securities Act and seek rescission and other damages in connection with their Sections 11 and 12 claims. *Id.*, Causes of Action ¶¶ 2, 6, 16.

### III.   Allegations Specific to the Baker Action

The Baker Action was filed on June 12, 2023, by an individual, Kenny Baker.  *See generally* Baker Compl.  The complaint in the Baker Action (the "Baker Complaint") is brought on behalf of "all persons or entities who purchased or otherwise acquired Barclays Bank PLC iPath Series B S&P 500 VIX Short-Term Futures ETN during the period February 21, 2019 through September 19, 2022 inclusive [(the "Baker Class Period")]."  Baker Compl. ¶ 1.  In addition to Securities Act claims, the Baker Complaint brings claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, as well as Section 20(a) of the Exchange Act, and names twelve officers and directors of Barclays as additional defendants.  *See id.* ¶¶ 198–246.

The Baker Complaint alleges similar misrepresentations to those alleged in the May Complaint, but points to different documents.  Specifically, Baker alleges that during a class period beginning on February 21, 2019, in annual reports filed by Barclays PLC and its subsidiary Barclays Bank PLC ("BBPLC"), Barclays and the Barclays officers and directors named in the Baker Complaint made materially false and misleading statements and failed to disclose material information about Barclays' heightened risk of selling unregistered securities, the over-issuance of securities by BBPLC, and the strength of Barclays' internal controls and procedures.  *Id.* ¶ 88.  It claims that Barclays acted with scienter in failing to install "simple" control procedures to ensure that the "entirely avoidable" over-issuance of billions of dollars of unregistered securities above the maximum amount of securities registered under the 2018 Shelf

and the 2019 Shelf did not occur.  *Id.* ¶ 177.  Baker seeks Exchange Act damages as well as Securities Act rescission.  *See generally id.* ¶¶ 198–246.

## IV.    The Competing Applications

Before the Court are three applications to be appointed lead plaintiff and for approval of each applicant's attorney as lead counsel.  The May Group moves for the Court to appoint as lead plaintiff a group comprised of Ruth C. May, Donna E. Ledgerwood, Justin Reed, Jeffrey Knapp, and Mark Howarth, and to approve their selection of Mazin A. Sbaiti and Jonathan Bridges as lead counsel.  Dkt. No. 17.  Baker moves to be appointed as lead plaintiff and for his selected law firm, Rosca Scarlato LLC, to be approved as lead counsel.  Dkt. No. 23.  Finally, Romano moves to be appointed as lead plaintiff and to have his selection of Berger Montague PC as lead counsel approved.  Dkt. No. 20.

The Court held oral argument on the competing motions on August 3, 2023.  Minute Entry (Aug. 3, 2023).

## LEGAL STANDARD

The PSLRA establishes the framework courts use to select a lead plaintiff in class actions brought under the federal securities laws.  First, the PSLRA requires any prospective lead plaintiff to file a motion for appointment as lead plaintiff within sixty days of the publication of notice of the securities class action.  15 U.S.C. § 78u–4(a)(3)(B)(iii)(I)(aa)[2]; *id.* § 78u-4(a)(3)(A)(i).

---

[2] The PSLRA amended the Securities Act to add substantively identical provisions.  *See* PSLRA, Pub. L. 104–67, 109 Stat 737, 737–43 (codified at 15 U.S.C § 77z–1).  For simplicity, the Court cites the provisions of the Exchange Act throughout this Opinion and Order, which are codified in an earlier section of the United States Code, but the conclusions about the statutory language of the PSLRA apply equally to the provisions that amended the Securities Act as to those that amended the Exchange Act.

Next, the PSLRA lays out standards for choosing one lead plaintiff from among the candidates who file motions.  The PSLRA provides that:

> the court shall adopt a presumption that the most adequate plaintiff in any private action arising under this chapter is the person or group of persons that—
>
>> (aa) has either filed the complaint or made a motion in response to a notice [of the complaint within sixty days of the publication of this notice];
>>
>> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and
>>
>> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

*Id.* § 78u–4(a)(3)(B)(iii)(I).

Once the Court identifies a presumptive lead plaintiff, this presumption:

> may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff—
>
>> (aa) will not fairly and adequately protect the interests of the class; or
>>
>> (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class.

*Id.* § 78u–4(a)(3)(B)(iii)(II).

If the Court finds that the movant with the largest financial interest in the class action is otherwise ineligible for appointment as lead plaintiff, the Court applies the criteria of the PSLRA to the movant with the second-highest financial interest.  This investigation continues until the Court identifies a suitable lead plaintiff.  *See, e.g.*, *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 589 F. Supp. 2d 388, 396 n.7 (S.D.N.Y. 2008).

For purposes of choosing a lead plaintiff under the PSLRA, "[t]he parties moving for lead plaintiff are only required to make a prima facie showing that they meet Rule 23 [of the Federal Rules of Civil Procedure], and courts need only consider the typicality and adequacy requirements."  *Aude v. Kobe Steel, Ltd.*, 2018 WL 1634872, at *3 (S.D.N.Y. Apr. 4, 2018).

Movants can demonstrate typicality by showing that their claims "arise from the same conduct from which the other class members' claims and injuries arise," *In re Crayfish Co. Sec. Litig.*, 2002 WL 1268013, at *5 (S.D.N.Y. June 6, 2002), and they can demonstrate adequacy if they "(1) [have] no conflict of interest with the other members of the class, (2) [have] sufficient interest in the outcome of the case, and (3) [have] selected counsel that is qualified, experienced, and generally able to conduct the litigation in question," *Aude*, 2018 WL 1634872, at *4.  The Court's determination of adequacy and typicality for purposes of appointing a lead plaintiff is not preclusive of a later challenge at the class certification stage with respect to those factors.  *See, e.g.*, *Khunt v. Alibaba Grp. Holding Ltd.*, 102 F. Supp. 3d 523, 536 (S.D.N.Y. 2015) ("[I]n deciding a motion to serve as lead plaintiff, [t]he moving plaintiff must make only a preliminary showing that the adequacy and typicality requirements under Rule 23 have been met. . . .  In fact, a wide ranging analysis under Rule 23 is not appropriate at this initial stage of the litigation and should be left for consideration of a motion for class certification.") (internal quotation marks, citations, and modifications omitted).

While the PSLRA permits a "group of persons" to serve as lead plaintiff, 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I), it does not specify what constitutes an acceptable grouping, *In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 99 (S.D.N.Y. 2005).  "The majority of courts, including those in this District . . . permit[] unrelated investors to join together as a group seeking lead-plaintiff status on a case-by-case basis, if such a grouping would best serve the class." *Varghese*, 589 F. Supp. 2d at 392.

Finally, the PSLRA provides that, "[e]xcept as the court may otherwise permit . . . a person may be a lead plaintiff . . . in no more than 5 securities class actions brought as plaintiff

class actions pursuant to the Federal Rules of Civil Procedure during any 3-year period."

15 U.S.C. § 78u–4(a)(3)(B)(vi).

## DISCUSSION

The Court first addresses the motions of the parties for consolidation.  It then turns to the competing motions for lead plaintiff and lead counsel.

## I.     The Baker and May Actions Should be Consolidated

Romano and Baker move for consolidation of the May and Baker Actions.  *See* Dkt. No. 21 at 6; Dkt. No. 24 at 4.  The May Group does not oppose the motion for consolidation. Dkt. No. 31 at 17.  Under the PSLRA, the Court must decide whether to consolidate related actions before selecting a lead plaintiff.  15 U.S.C. § 78u-4(a)(3)(B)(ii).

A district court may consolidate "actions . . . involv[ing] a common question of law or fact."  Fed. R. Civ. P. 42(a).  The decision to consolidate lies within the "sound discretion" of the Court.  *Ragan v. App Harvest, Inc.*, 2021 WL 5909116, at *9 (S.D.N.Y. Dec. 13, 2021) (quoting *In re UBS Auction Rate Sec. Litig.*, 2008 WL 2796592, at *1 (S.D.N.Y. July 16, 2008)). Consolidation is appropriate where it serves the interest of judicial economy, timeliness, and cost reduction while honoring the "paramount concern of a fair and impartial trial."  *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1284–85 (2d Cir. 1990).  "Consolidation of multiple actions alleging securities fraud is appropriate where those actions relate to the same public statements and reports and where consolidation would not prejudice the defendants."  *Constance Sczesny Tr. v. KPMG LLP*, 223 F.R.D. 319, 322 (S.D.N.Y. 2004) (internal quotation marks and citation omitted).  A court may consolidate two or more actions even if there are "differences in causes of action, defendants, or the class period."  *Kaplan v. Gelfond*, 240 F.R.D. 88, 91 (S.D.N.Y. 2007); *see also Zawatsky Zawatsky v. Vroom, Inc.*, 2021 WL 3498191, at *3; *In re Olsten Corp Sec.*

*Litig.*, 3 F. Supp. 2d 286, 293 (E.D.N.Y. 1998).  Actions need not be identical so long as "the cases present sufficiently common questions of fact and law, and the differences do not outweigh the interests of judicial economy."  *Hom v. Vale, S.A.*, 2016 WL 880201, at *2 (S.D.N.Y. Mar. 7, 2016).  Thus, courts have consolidated Exchange Act and Securities Act class actions when both sets of actions arise from the same or related sets of alleged misleading statements.  *See, e.g.*, *Pinkowitz v. Elan Corp.*, 2002 WL 1822118, at *3 (S.D.N.Y. July 29, 2002).

Consolidation is appropriate here because the complaints in the two actions involve overlapping facts and common questions of law and fact.  The May and the Baker Actions both make claims under the Securities Act in connection with Barclays' sale of unregistered securities, including VXX ETNs.  Both complaints allege class members relied on materially false or misleading statements regarding Barclays' capability for internal controls over financial reporting, which caused Barclays to issue more than $17 billion in unregistered securities, including VXX ETNs.  Although the Baker Action asserts claims against additional defendants, contains different legal claims, and alleges a longer class period, these differences are not fatal to consolidation.  The additional claims in the Baker Action for violations of Sections 10(b) and 20(a) of the Exchange Act arise from the same the alleged misstatements relating to and appearing in the 2018 and 2019 Shelfs that form the basis for the Securities Act claims in both the May and the Baker Actions.  Baker Compl. ¶¶ 5,198–215; May Compl., Causes of Action ¶¶ 1–16.  Both complaints arise from the same facts.  Finally, no party has opposed consolidation, "a consideration which weighs heavily against the potential for prejudice." *Kaplan*, 240 F.R.D. at 91.

**II.     Appointment of Lead Plaintiff**

    **A.     Lead Plaintiff Filing Requirements**

All three movants have filed timely motions and, where applicable, filed appropriate

notice.  To meet the PSLRA's notification and timely filing requirements, the statute explains

that parties must:

> Not later than 20 days after the date on which the complaint is filed, the plaintiff or
> plaintiffs shall cause to be published, in a widely circulated national business-
> oriented publication or wire service, a notice advising members of the purported
> plaintiff class—
>
> > (i) of the pendency of the action, the claims asserted therein, and the
> > purported class period; and
> >
> > (ii) that, not later than 60 days after the date on which the notice is
> > published, any member of the purported class may move the court to serve
> > as lead plaintiff of the purported class.

15 U.S.C. § 78u-4(a)(3)(A)(i)-(ii).  Accordingly, a movant for lead plaintiff must either (1) file

the complaint or (2) make a motion for lead plaintiff associated with the first-filed complaint

within sixty days.  The party that files the complaint must also publish adequate notice in "a

widely circulated national business-oriented publication or wire service."  15 U.S.C.

§ 78u-4(a)(3)(A)(ii).

All three parties satisfy these requirements.  In connection with the filing of the May

Complaint on March 27, 2023, the May Group published notice in Newsfile Corp., a national

wire service, on April 13, 2023.  Dkt. No. 14.  The notice alerted investors to the pendency of the

action and informed them of the June 13, 2023 deadline to seek appointment as lead plaintiff.  *Id.*

Both Romano and Baker filed their motions for appointment as lead plaintiff with the Court on

June 13, 2023, satisfying the requirement to make a motion within sixty-days.  Dkt. Nos. 20, 23.

The May Group argues that Baker failed to meet the notice requirement on the grounds

that Baker's competing complaint, with its longer class period, additional defendants, and new

claims, represented a substantial alteration to the May Complaint, thereby requiring republication. Dkt. No. 31 at 9.  This argument is refuted by the plain language of the PSLRA. First, as then-Chief Judge McMahon explained in *Gutman v. Sillerman*, 2015 WL 13791788 (S.D.N.Y. Dec. 8, 2015), a party can obtain lead plaintiff status "either by filing a timely motion or 'the complaint.'  The choice of article makes a huge difference.  As a simple matter of English syntax, only one complaint can qualify as '*the* complaint'—the article 'the' specifies one particular thing when followed by a singular noun. . . .  As used in the PSLRA, 'the complaint' is the first complaint filed in a federal court." *Id*. at *2 (emphasis in original).  Here, the May Complaint is "the complaint" as it was the first complaint filed in federal court.  Therefore, to move for lead plaintiff, Baker simply had to file a timely motion.  His motion for appointment as lead plaintiff, Dkt. No. 23, filed within sixty days of the May Complaint, satisfies the requirement.

Second, the statute states that, when multiple actions are filed, republication is not required if the competing action "assert[s] substantially the same claim or claims."  15 U.S.C. § 78u-4(a)(3)(A)(ii).  Courts in this district have found that this language "contemplates consolidation."  *Kristal v. Mesoblast Ltd*., No, 2020 WL 7647200, at *1 (S.D.N.Y. Dec. 23, 2020); *see also Tate v. Aterian, Inc*., 2021 WL 3538144, at *1 (S.D.N.Y. Aug. 10, 2021).  As discussed above, the two complaints involved the requisite "common question of law or fact" required by Federal Rule of Civil Procedure 42(a).  The finding that consolidation is appropriate here reflects that the actions state "substantially the same claim."  Additionally, the May Group's nonobjection to Baker's motion for consolidation, Dkt. 31 at 18, undercuts its argument that the two actions are substantially different enough to require Baker to republish notice.  The May Group's posture toward consolidation belies a belief that the two actions are substantially

similar.

Baker was therefore not required to republish notice under the PSLRA.  Accordingly, Baker, the May Group, and Romano all satisfy the PSLRA's first requirement.

### B.    Largest Financial Interest

The PSLRA creates a rebuttable presumption that the most adequate plaintiff will be the "person or group of persons" that (i) "in the determination of the court, has the largest financial interest in the relief sought by the class"; and (ii) "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).  "The PSLRA does not specify a method for calculating which plaintiff has the 'largest financial interest' and neither the Supreme Court nor the Second Circuit has articulated such a method."  *In re Fuwei Films Sec. Litig.*, 247 F.R.D. 432, 436 (S.D.N.Y. 2008) (internal quotation marks and citation omitted). Courts in this district typically consider four factors, known as the *Lax/Olsten* factors, to evaluate financial interest: "(1) the number of shares purchased during the class period; (2) the number of net shares purchased during the class period; (3) the total net funds expended during the class period; and (4) the approximate losses suffered during the class period."  *In re Olsten Corp. Sec. Litig.*, 3 F. Supp. 2d 286, 295 (E.D.N.Y. 1996); *see also Kuriakose v. Fed. Home Loan Mortg. Co.*, 2008 WL 4974839, at *3 (S.D.N.Y. Nov. 24, 2008); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. LaBranche & Co.*, 229 F.R.D. 395, 404 (S.D.N.Y. 2004); *In re Initial Pub. Offering Sec. Litig.*, 214 F.R.D. 117, 121 (S.D.N.Y. 2002).  Generally, courts have considered the fourth factor, the magnitude of the loss suffered, to be the most important factor.  *See, e.g.*, *Kaplan*, 240 F.R.D. at 93; *In re IMAX Sec. Litig.*, 2009 WL 1905033 (S.D.N.Y. June 29, 2009); *Reimer v. Ambac Fin. Grp. Inc.*, 2008 WL 2073931, at *3 (S.D.N.Y. May 9, 2008).  While there is no prescribed method for calculating approximate loss, courts in the Southern District have a

strong preference for the "last-in, first-out" methodology ("LIFO"). *Richman v. Goldman Sachs Grp., Inc.,* 274 F.R.D. 473, 476 (S.D.N.Y. 2011); *see also Sallustro v. CannaVest Corp.*, 93 F. Supp. 3d 265, 270 (S.D.N.Y. 2015).

The May Group and Baker both claim to have suffered the greatest financial loss. Dkt. No. 18 at 2; Dkt. No. 24 at 7. The May Group and Baker have also provided the Court with loss figures for all four *Lax/Olsten* factors. Romano has a reported loss of $695,000, lower than each of Baker and the May Group; while he does not claim that he suffered the greatest financial loss, he argues that he is "presumptively the 'most adequate plaintiff.'" Dkt. No. 21 at 9–10; *see also* Dkt. No. 58 at 52–53 (acknowledging that Romano does not have the largest financial loss but arguing that the Baker and May Group movants "each suffer[s] from disabling defects, either adequacy or typicality or otherwise, that render their motions defective . . . such that [their motions] shouldn't be granted"). Each party contends the other's loss calculations are erroneous. *See* Dkt. No. 29 at 12–13; Dkt. No. 31 at 9–17.

The Court first considers whether the May Group is a proper group to prosecute this action and whether the Court can consider the assignment of shares to Baker in its calculation of financial interest. Having determined that the May Group is a proper group and that it is inappropriate to consider the shares assigned to Baker, the calculation issues fall away and it becomes clear that the May Group has the largest financial interest in the relief.

### 1.    The May Group Is a Proper Group

The May Group claims losses of $2,136,482 or $2,028,496 (depending on the closing market price used), on total shares purchased of 8,496 and net shares purchased of 6,227.56. Dkt. No. 32 ¶ 11. It expended $2,301,077 on the shares. *Id.*[3] The members of the May Group

---

[3] When the May Group filed its memorandum in support of its appointment as lead plaintiff on

claim to have purchased all of their shares in an offering.  As a result, its losses are identical

whether the Court uses the class period proposed in the May Complaint or that proposed in the

Baker Complaint.

Baker argues that the May Group is not a proper group and the members of the May

Group have thus improperly aggregated their shares for the purpose of claiming the largest

financial interest.  Dkt. No. 29 at 7–14.  Baker also argues that the May Group "failed to perform

an actual loss calculation and simply put their 'net funds expended' before the Court, improperly

characterizing their total funds expended as actual losses," *id.* at 6, and "ha[s] not submitted

information regarding their transactions for the longer Class Period," *id.* at 12.  The Court

addresses each argument in turn.

Members of the May Group properly aggregated their shares.  The PSLRA explicitly

allows more than one individual to serve as lead plaintiff.  It states: "[T]he court . . . shall appoint

as lead plaintiff *the member or members* of the purported plaintiff class that the court determines

to be most capable of adequately representing the interests of class members."  15 U.S.C.

§ 78u-4(a)(3)(B)(i) (emphasis added).  That language begs, but does not answer, the question of

the circumstances under which two or more otherwise unrelated persons can be considered

---

June 13, 2023, it alleged a total approximate loss of $2,315,211.52, equivalent to their net funds
expended.  Dkt. No. 18 at 6.  The May Group's expert, Jonathan Bridges, calculated these losses
on a LIFO basis over the class period alleged in the May Complaint, June 26, 2019 to March 14,
2022.  Dkt. No. 19 ¶ 2.  The May Group did not deduct the current market value of the shares, or
account for the VXX 4:1 reverse share split.  Dkt. No. 19-1.  These issues were apparently
remedied with the May Group's subsequent submission on June 27, 2023 from expert David N.
Fuller.  *See* Dkt. No. 32 ¶ 9 (noting that he deducted the closing market price of the May Group's
holdings on both June 26, 2023, the day before his expert declaration was submitted to the Court,
and March 7, 2023, the day of the reverse split); *see also* Dkt. No. 37 at 4 ("Fuller used the
correct methodology: he adjusted holdings for the various reverse splits that have taken place,
took each person's purchases and deducted the sales proceeds from the purchase prices and the
value of the securities for unsold shares, as is required." (footnote omitted)).  Accordingly, the
Court considers those numbers in its analysis.

"members" simply because they consider themselves related for the purposes of a securities class action.  Courts in this District are divided on whether the term "members" allows for aggregation of investors as a group for the purpose of appointing a lead plaintiff and prosecuting the litigation.  Some courts categorically allowed such aggregation.  *See e.g.*, *In re Tarragon Grp. Sec. Litig.*, 2007 WL 4302732, at *2 (S.D.N.Y. Dec. 6, 2007) ("The issue is not whether losses or holdings may be aggregated by members of a group seeking to become the lead plaintiff; indisputably, they may."); *Janbay v. Canadian Solar, Inc.*, 272 F.R.D. 112, 119 (S.D.N.Y. 2010) ("The PSLRA explicitly permits a 'group of persons' to serve as lead plaintiff.").  Other courts have found aggregation contravenes the stated purpose of the PSLRA.  *See, e.g.*, *In re Donnkenny Inc. Sec. Litig.*, 171 F.R.D. 156, 158 (S.D.N.Y 1997) ("To allow lawyers to designate unrelated plaintiffs as a 'group' and aggregate their financial stakes would allow and encourage lawyers to direct the litigation.").

The majority of courts in this District have adopted an intermediate approach, allowing unrelated plaintiffs to join together as a group on "case-by-case basis," so long as the "grouping would best serve the class."  *Elstein v. Net1 UEPS Techs., Inc.*, 2014 WL 3687277, at *1 (S.D.N.Y. July 23, 2014); *see also Varghese* 589 F. Supp. 2d at 392; *Cohen v. Luckin Coffee Inc.*, 2020 WL 3127808, at *3 (S.D.N.Y. June 12, 2020).  Courts look to the five factors identified in *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 589 F. Supp. 2d 388, to determine whether a group is proper under the PSLRA: "(1) the existence of a pre-litigation relationship between group members; (2) involvement of the group members in the litigation thus far; (3) plans for cooperation; (4) the sophistication of its members; and (5) whether the members chose outside counsel, and not vice versa."  *Id.* at 392.  Courts have rejected groups where they appear to be "simply an artifice cobbled together by cooperating counsel for the

obvious purpose of creating a large enough grouping of investors to qualify as 'lead plaintiff,' which can then select the equally artificial grouping of counsel as 'lead counsel,'" *In re Razorfish Inc., Sec. Litig.*, 143 F. Supp. 2d 304, 308 (S.D.N.Y. 2001), where "the aggregation of class members [was] done solely to create an artificially large financial interest," *Cushman v. Fortress Biotech, Inc.*, 2021 WL 7449182, at *4 (E.D.N.Y. Mar. 24, 2021) (quoting *In re Sequans Comm'ns S.A. Sec. Litig*, 289 F. Supp. 3d 416, 425 (E.D.N.Y. 2018)), or where there is no "evidence that the members of the group will act collectively and separately from their lawyers," *In re Tarragon*, 2007 WL 4302732, at *2.  This is because "[a]llowing unrelated plaintiffs to band together in order to manufacture a larger financial interest . . . ensures that the lawyers, who are invariably the matchmakers behind such marriages of convenience, are the true drivers of the litigation [and] creates problems of coordination, risks duplication of effort, and reduces the incentives of any individual group member to carry out its lead plaintiff duties to the fullest extent." *In re Petrobras Sec. Litig.*, 104 F. Supp. 3d 618, 621–22 (S.D.N.Y. 2015).  In contrast, courts have permitted aggregation where, for example, the evidence does not suggest a manipulative purpose.  *See In re Sequans*, 289 F. Supp. 3d at 425 (aggregation proper where, even without aggregation, one member of the group would have the largest financial interest); *Barnet v. Elan Corp.*, 236 F.R.D. 158, 162–63 (S.D.N.Y. 2005) (aggregating purchases of group members where even if the group were to be deconstructed, two of its individual members would still have the largest financial interest).  Courts permit these groups to proceed only where there is an "agreed upon . . . conflict resolution mechanism between co-lead plaintiffs," *Cushman*, 2021 WL 7449182, at *7, the group is small enough that size will not be an "impediment to cohesion," *id.*; *Silverberg v. DryShips Inc.*, 2018 WL 10669653, at *9 (E.D.N.Y. Aug. 21, 2018) (group of five or fewer individuals investors is sufficiently small to be presumed cohesive), and

where the members of the group have submitted evidence that they are "focused on the issues of cooperation and [have] demonstrated an understanding of the need for cooperation on an ongoing basis," *In re Sequans*, 289 F. Supp. 3d at 416.  The proposed plaintiff group bears the burden of proving aggregation is appropriate.  *See Nakamura v. BRF S.A.*, 2018 WL 3217412, at *3 (S.D.N.Y. July 2, 2018).

The May Group satisfies the *Varghese* factors.  This is a somewhat unique case where there is no evidence that an otherwise unrelated group "was cobbled together" for the purpose of creating a large enough grouping of investors to qualify as lead plaintiff.  *In re Razorfish*, 143 F. Supp. 2d at 308.  The motions for lead plaintiff were filed on June 13, 2023.  Dkt. Nos. 17, 20, 23.  Until one day before those filings, the complaint filed by May and Ledgerwood was the only complaint filed against Barclays challenging its statements and disclosures regarding VXX.  It was not until June 12, 2023 that the Baker complaint was filed, *see* Baker Complaint, and, even then, counsel for May and Ledgerwood would not necessarily have known of the need to attract additional group members to have the largest financial interest or have had the time to do so. Notice of the class action was published on April 13, 2023, informing putative class members of the existence of the action, of their rights to seek appointment as lead plaintiff, and of the contact information for the lawyers for May and Ledgerwood if investors had questions.  Dkt. No. 14-1. When the May Group filed its motion for appointment as lead counsel, it stated "[a]t the time this Motion was prepared, no other applicants for lead plaintiff were known to the Named Plaintiffs Group, and they therefore respectfully submit that their financial interest in the case is the largest."  Dkt. No. 18 at 5; *see also* Dkt. No. 37 at 4 ("When the [May Group] moved for appointment, they did not know that there would be any competing motions, did not have any information about Baker's and [Romano's] respective theories or alleged losses, and certainly

did not expect that there would be consideration of post-class period purchases in a proposed 10b-5 class."). Counsel has represented that the three members of the May Group added after the May Complaint was filed—Knapp, Howarth, and Reed—"saw [the PLSRA] notice, read the [May] Complaint, and asked to join" May and Ledgerwood. Dkt. No. 37 at 2. This representation was reiterated at oral argument: Counsel for the May Group stated that Knapp, Howarth, and Reed called his law firm after viewing the PSLRA notice and counsel then introduced them to May and Ledgerwood. Dkt. No. 58 at 20. Those representations find some support in the fact that the agreement among May Group members was signed on June 12, 2023, Dkt. No. 19-9, on the same day the Baker Complaint was filed and before the competing motions for appointment as lead plaintiff were filed—that is, before counsel for the May Group would have known of the specific import of adding additional members to the group. In short, here, there is no evidence that the aggregation of members of the May Group was "done solely to create a large financial interest." *In re Sequans*, 289 F. Supp. 3d at 425; *cf. In re Doral Financial Corp. Sec. Litig.*, 414 F. Supp. 2d 398, 401 (S.D.N.Y. 2006) (rejecting proposed groups because "[n]othing before this Court indicates that these random cumulations of plaintiffs are anything more than an effort to achieve the highest possible 'financial interest' figure to be chosen").

And the May Group aggregation is not "otherwise problematic" nor is there a basis to believe that the group would not "best serv[e] the interests of the class." *In re Sequans*, 289 F. Supp. 3d at 423, 425. With the exception of May and Ledgerwood, who are married to one another, Dkt. No. 18 at 10, there is no evidence of pre-existing relationships between the group members. But "plaintiffs seeking appointment as a group are not required to show a pre-litigation relationship." *Elstein v. Net1 UEPS Techs., Inc.*, 2014 WL 3687277, at *4 (S.D.N.Y. July 23, 2014); *see Luckin Coffee Inc.*, 2020 WL 3127808, at *5 (concluding that the absence of

pre-existing relationships "is a negative factor but not disqualifying").  The individual members

of the May Group appear to be sophisticated.  Each member of the May Group has submitted a

resume to the court, detailing an array of achievements in a variety of fields.  Dkt. Nos. 19-2, 19-

5, 19-6, 19-7, 19-8.  May and Ledgerwood are retired business professors based in Texas, Knapp

is a retired businessperson in the frozen-food and bakery space, Howarth has a Ph.D. in

biomedical engineering and works for the federal government, and Reed is a software engineer

based in Idaho.  Dkt. No. 18 at 9–10; Dkt. No. 19-6.  The group consists of "accomplished,

sophisticated individuals, each with more than $100,000 of losses from VXX transactions during

the class period."  Dkt. No. 18 at 9.  *See, e.g.*, *Galmi v. Teva Pharms. Indus. Ltd*., 302 F. Supp.

3d 485, 494 (D. Conn. 2017) (finding group members sophisticated based on diverse

backgrounds); *Khunt v. Alibaba Grp. Holding Ltd*., 102 F. Supp. 3d 523, 533 (S.D.N.Y. 2015)

(finding group members "sophisticated" based on employment and investment history).  Their

"experience and resources give some confidence that the group members will have the

knowledge and background to appropriately supervise counsel and protect against lawyer-driven

litigation."  *Luckin Coffee Inc.*, 2020 WL 3127808, at *5.  In addition, "[a]ll members of the

Named Plaintiffs Group, including Reed, have selected Mazin A. Sbaiti and Jonathan Bridges of

Sbaiti & Company PLLC as counsel for this litigation," not the other way around.  Dkt. No. 18 at

11.  There is no evidence that "the proposed group has been assembled as a makeshift by

attorneys."  *Varghese*, 589 F. Supp. 2d at 392; *see In re Razorfish*, 143 F. Supp. 2d at 308.  If the

group members had the wits about them to have selected counsel, they presumably have the wits

about them to direct counsel when counsel appears to have gone seriously off course.

The May Group has made a "showing that the group will work together effectively to

pursue the interests of the class, rather than the interests of their lawyers."  *Cushman*, 2021 WL

7449182, at *6.  Although the May Group has not submitted evidence of extensive involvement in the litigation to date, the Court would not necessarily expect the group members to have had lengthy conference calls or meetings at this point of the litigation.  All that has happened is the filing of a complaint and the competing motions for lead plaintiff; the heart of this litigation— namely the filing of an amended complaint, motion practice, and, if the complaint survives motion practice, discovery—will follow the appointment of lead plaintiff.  *See* Dkt. No. 16.  The members of the May Group have submitted an agreement individually signed by each member laying out in some detail how they intend to manage the litigation.  The group will meet by conference call on a monthly basis on the first non-holiday Monday of each month "or more frequently as needed," each member will attend and participate as he or she is able, and decisions will be made on a one-person, one-vote majority basis, when a quorum is present.  *See generally* Dkt. No. 19-9 at ECF p. 1.  There are provisions that give the Court some pause:  decision-making power can be delegated to one or more members so that all members do not need to not attend the meetings, and the agreement can be modified by unanimous vote of the five group members.  *Id.*  It also contains a provision that allows other VXX investors to attend and participate in meetings, which raises privilege concerns.  *Id.*  But counsel can ensure—and has represented to the Court that he will ensure, *see* Dkt. No. 58 at 23–24—that privilege will be protected and the quorum requirement militates against any concerns with absences.  The plan demonstrates that the members of the May Group are "focused on the issues of cooperation and [have] demonstrated an understanding of the need for cooperation on an ongoing basis," *In re Sequans*, 289 F. Supp. 3d at 424, and that they "will be able to function cohesively and to effectively manage the litigation apart from their lawyers," *Varghese*, 589 F. Supp. 2d at 392.

Finally, although the size of the group is close to the outer limits of what should be

considered permissible under the PSLRA, it is not "so large that '[the PSLRA's] express purpose of placing the control of securities class action with a small and finite number of plaintiffs (as opposed to [their] counsel) becomes wholly undermined by' its 'sheer size.'" *Barnet*, 236 F.R.D. at 162 (quoting *Weltz v. Lee*, 199 F.R.D. 129, 133 (S.D.N.Y. 2001)).  There are five members of the May Group, two of whom are married to one another.  Thus, the group is not "so cumbersome as to deliver the control of the litigation into the hands of the lawyers." *Weltz*, 199 F.R.D. at 133.  Nor is it so large as to give rise to free-riding problems and to "reduc[e] the incentive of any individual group member to carry out its lead plaintiff duties" to the extent that the members of the May Group should not be permitted to prosecute this action as a group. *In re Petrobras Sec. Litig.*, 104 F. Supp. 3d at 622.  The members are sophisticated, and every indication is that they will hold counsel accountable and independently represent their own interests and the interests of other putative class members.

The facts of this case are different from those in *Cohen v. Luckin Coffee Inc.*, 2020 WL 3127808, and *Chauhan v. Intercept Pharms.*, 2021 WL 235890, (S.D.N.Y. Jan. 25, 2021), where this Court denied applications for lead plaintiff filed by groups of otherwise unrelated investors. In *Luckin Coffee*, the Court declined to treat as a group a "random assemblage" of five individual investors spread across three continents that had no preexisting relationship, with no evidence that any member was sophisticated, and no plan for dispute resolution or communication across continents.  2020 WL 3127808, at *4.  The group submitted joint declarations with boilerplate claims containing platitudes that would be expected of "*any* person or persons proposing to be lead [plaintiff]," and set forth a generic "obey-the-law" commitment to cooperate, stating that members of the group would "consult with each other and our counsel as we deem necessary to fulfill our fiduciary obligations to the class." *Id.*  In that context, the Court concluded that there

was "every reason to believe that the members agreed to be assembled by counsel and to ratify counsel's representation of them." *Id.*  At the same time, the Court approved a two-member group, notwithstanding the absence of a pre-litigation relationship.  *Id.* at *5.  Each of the members of that group was sophisticated, the members had made plans for "cooperation in the future that include[d] communications with each other," and there was a logic for the formation of the group beyond a lawyer-driven effort to obtain fees.  *Id.* at *5–6.

In *Chauhan*, the two individual investors proposed a group that not only had no pre-existing relationship, but that also was brought together by counsel only after learning of each other's interest in being appointed as lead plaintiff and then—without any cogent explanation—proposed that the Court appoint "two different law firms, each of which [wa]s independently competent, to handle th[e] lawsuit."  *Id.* at *4–5.  The only assurance they provided with respect to future cooperation was the "rote statement" that they had discussed "a shared desire to achieve the best possible results for the Class", their "interests in prosecuting the Action in a collaborative likeminded manner, including resolving any disputes," and "the actions that we will take to continue to ensure that the claims will be zealously and efficiently litigated."  *Id.* at *5.  In short, the facts fit those of Judge Rakoff's paradigm in *In re Razorfish Inc., Securities Litigation*, 143 F. Supp. 2d 304, in which plaintiffs reached a "private agreement as to who would be put forth as lead plaintiff and lead counsel" for the sole purpose of creating a large enough grouping to qualify the investors as lead plaintiff.  *Id.* at 308.  In those circumstances, it was not difficult to conclude that the group would be unable to "act collectively and separately from their lawyers," *In re Tarragon*, 2007 WL 4302732, at *2, and would not be able to "shif[t] control of the litigation from the lawyers to the investors," *Varghese*, 589 F. Supp. 2d at 393.

In this case, by contrast, the *Varghese* factors weigh in favor of permitting the May

Group to proceed as a group under the PLSRA.  Though there is no pre-litigation relationship among most of the members, the members are sophisticated, every indication is that they selected counsel on their own accord, and there are plans in place for efficient and constructive cooperation among the members, who are sufficiently small in number to effectively manage the litigation.  Stated otherwise, the May Group does not appear to have been assembled solely or even primarily for strategic reasons.  On these facts, the Court is prepared to treat the members of the May Group as a "group" under the PSLRA.[4]

### 2. Assignment of Shares to Baker

Baker calculates his losses at approximately $2.66 million during the Baker class period, based upon the purchase of 263,350 total shares and 192,850 net shares on a LIFO basis using a lookback price, and approximately $2 million during the May class period, based upon the purchase of 157,750 total shares and 148,750 net shares on a LIFO basis using a lookback price. Dkt. No. 25-3 at 2.  Baker's calculations, however, include shares that were assigned to him by his wife, Kristi Baker, and KBM Insurance Company, Inc. ("KBM Insurance"), a captive insurance company owned by Baker.  Dkt. No. 24 at 8 n.9.  The May Group and Romano raise several issues with Baker's calculations, including that the calculations improperly include shares assigned to Baker on the eve of the deadline for lead plaintiff motions.  Dkt. No. 31 at 9; Dkt. No. 37 at 9.  The Court finds that it cannot consider the assigned shares in its loss calculations and that this conclusion is dispositive of the question which lead plaintiff has the largest financial interest in the relief.

---

[4] That the Court will treat the May Group as a group under the PLSRA when it has not treated other proposed groups as groups under the PLSRA is the inevitable consequence of the fact that determinations must be made on a "case-by-case" basis, after an evaluation of the best interests of the putative class.  *Varghese*, 589 F. Supp. 2d at 392.

Baker's calculated "financial interest" includes losses suffered directly by him and losses suffered by KBM Insurance and by his wife.  *See* Dkt. No. 24 at 8 n.9.  Baker has submitted a Declaration of Assignment by KBM Insurance to Kenny Baker and a Declaration of Assignment by Kristi Baker to Kenny Baker.  *See* Dkt. No. 25-5.  Both documents are in similar form and neither is dated.  The KBM Declaration of Assignment was purportedly made "in order to efficiently facilitate recovery of the investment losses in the KBM account."  *Id.* at ECF p. 2.  It provides that it "irrevocably assign[ed], transfer[ed]and deliver[ed] to Kenny Baker all rights, title, and interest, free and clear of any liens, security interests, encumbrances, and restrictions of any kind whatsoever, in any and all claims, demands, and causes of action of any kind whatsoever arising from violations of the U.S. federal securities laws, other applicable statutes, and common law doctrines, as may be asserted against Barclays and related parties." *Id.* at ECF p. 3.  The Declaration of Assignment "appoints Kenny Baker as its true and lawful attorney-in-fact for the purpose of exercising all powers relating to such causes of action." *Id.*  In turn, "Kenny Baker agree[d] to remit back to KBM Insurance's KBM Account any proceeds received as a result of this assignment." *Id.*  It is signed by Kenny Baker as "President KBM Insurance Company Inc., An Incorporated Cell," and by "Kenny Baker, Individually." *Id.* at ECF p. 4.  The Kristi Baker Declaration of Assignment is identical to the KBM Insurance Declaration of Assignment with the exception that it provides for the assignment of claims for losses in her IRA investment account and an individual account.  *See id.* at ECF pp. 5–6.  It is signed by Kristi Baker and by Kenny Baker.  *Id.* at ECF p. 7.  Baker's application thus squarely presents the question whether claims assigned to the putative lead plaintiff for purposes of "efficiency," with all recovery to redound to the benefit of the assignor and not the assignee, are properly included in the computation of the assignee's "financial interest in the relief" for purposes of PSLRA.

As an initial matter, it is undisputed that Baker has Article III standing to sue based on the assigned claims even though he has promised to remit any proceeds stemming from litigation back to the assignor. *See Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 285 (2008) ("Lawsuits by assignees, including assignees for collection only, are 'cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process.'" (citation omitted)); *see also W.R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100 (2d Cir. 2008) (holding that an investment adviser could not pursue Securities Act and Exchange Act claims on behalf of its clients because it did not meet "the minimum requirement for an injury-in-fact", namely that "the plaintiff have legal title to, or a proprietary interest in, the claim"). Here, Baker has legal title in the claims, even though the title appears to be "for collection only"; he thus has constitutional standing to bring this case on behalf of both KBM Insurance and Kristi Baker. That fact, however, does not settle whether he has a "financial interest in the relief" under the PLSRA.

Courts both in this District and elsewhere have, without discussion, allowed lead plaintiff movants to include assigned shares in their financial interest calculations. In *In re Paysafe Ltd.*, 2022 WL 1471122 (S.D.N.Y. May 10, 2022), for example, the court included assigned shares in the calculation of the lead plaintiff's total loss. *Id.* at *5 ("CCM has a loss of approximately $2,902,048 via assignments from 101 individuals and entities."). Like the assigned claims at issue here, the assignments in *Paysafe* specifically stated that the "[a]ssignee agree[d] to remit any proceeds received as a result of this assignment to the Assignor." Declaration of Assignment, Dkt. No. 41-2 at 17, *Paysafe,* Case No. 21-cv-10611 (ER) (S.D.N.Y. Dec 10, 2021). Similarly, in *Xu v. FibroGen, Inc.*, 2021 WL 3861454 (N.D. Cal. Aug. 30, 2021), a court in the Northern District of California allowed a lead plaintiff movant to include assigned claims in the

total losses where the assignee agreed to remit any proceeds "received as a result of th[e] assignment" back to the assignor.  Declaration of Assignment, Dkt. No. 30-5 at 2, *Xu v. FibroGen, Inc*, Case No. 21-cv-02623 (EMC) (N.D. Cal. June 11, 2021); *see FibroGen, Inc*., 2021 WL 3861454, at *7 ("The Court finds that the Baltimore F&P's assignment of its claims in this matter to the Baltimore Fund is facially valid and does not raise concerns significant enough to warrant subtracting the Baltimore F&P's losses from those of the Retirement Systems as a whole for purposes of appointing a lead plaintiff.").  And in *Sokolow v. LJM Funds Mgmt., Ltd.*, 2018 WL 3141814, at *6 (N.D. Ill. June 26, 2018), a court in the Northern District of Illinois saw "no reason to exclude losses associated with claims assigned to the investment advisors in the Combined Group from the Combined Group's claimed losses," *id.* at *6, even though the assignments stated the investment fund would "remit back to [the assignor] any proceeds received as a result of th[e] Assignment," Declaration of Assignment, Dkt. No. 97-3 at 2, *Sokolow*, Case No. 18-cv-1039 (RMD) (N.D. Ill. April 24, 2018).  However, none of these courts explicitly examined whether shares signed pursuant to an agreement to remit proceeds back to the assignor could properly be included in a party's "financial interest in relief" under the PSLRA.  This Court thus undertake that task.

 As discussed, the PSLRA creates a rebuttable presumption in favor of the class member with "the largest financial interest in the relief sought by the class."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).  The statute does not define "financial interest" or "relief."  Black's Law Dictionary, both today and in 1990,[5] defined "financial interest" as "an interest equated with money or its equivalent."  *Financial Interest*, Black's Law Dictionary (6th ed. 1990); *see also Financial Interest*, Black's Law Dictionary (11th ed. 2019) ("An interest involving money or its

---

[5] The PLSRA was enacted in 1995.

equivalent.").  Interest is "[t]he most general term that can be employed to denote a right, claim, title, or legal share in something."  *Interest*, Black's Law Dictionary (6th ed. 1990).  Relief "is used as a general designation of the assistance, redress, or benefit which a complainant seeks at the hands of a court."  *Relief*, Black's Law Dictionary (6th ed. 1990); *see also Relief*, Black's Law Dictionary (11th ed. 2019) ("[R]edress or benefit . . . that a party asks of a court.").  The plain meaning of the term "financial interest in the relief" indicates that the drafters of the PLSRA were focused on ensuring that the individual or group of individuals with the greatest *monetary* interest in the outcome of the litigation was presumptively appointed lead plaintiff. Assignments structured as the assignments were here—where all of the proceeds earned through the lawsuit on KBM Insurance's and Kristi Baker's shares were remitted back to KBM Insurance and Kristi Baker—does not give Baker a monetary interest in the proceeds.

Further, this language "'does not appear in isolation' in the statute."  *NexPoint Diversified Real Est. Tr. v. Acis Cap. Mgmt., L.P.*, 2023 WL 5761358, at *4 (2d Cir. Sept. 7, 2023) (quoting *L.S. v. Webloyalty.com, Inc.*, 954 F.3d 110, 115 (2d Cir. 2020)).  The Court must consider the "statutory structure" and purpose.  *Keane v. Velarde*, 2022 WL 3577841, at *4 (S.D.N.Y. Aug. 19, 2022) (quoting *Cuthill v. Blinken*, 990 F.3d 272, 281 (2d Cir. 2021)); *see NexPoint Diversified Real Est. Tr.*, 2023 WL 5761358, at *4 (looking to the "surrounding structure of the statute").  The presumption that Congress established through the PLSRA was that the person or persons who had the most to gain or lose from the litigation would be the most adequate to represent the class.  *See In re Razorfish*, 143 F. Supp. 2d at 307 ("The theory of the[ lead plaintiff] provisions was that if an investor with a large financial stake in the litigation was made lead plaintiff, such a plaintiff—frequently a large institution or otherwise sophisticated investor—would be motivated to act like a 'real' client, carefully choosing counsel and

monitoring counsel's performance to make sure that adequate representation was delivered at a reasonable price."); *In re Donnkenny Inc. Sec. Litigation*, 171 F.R.D. 156, 157–58 (S.D.N.Y. 1997) ("Appointing lead plaintiffs on the basis of financial interest, rather than on a 'first come, first serve' basis, was intended to ensure that institutional plaintiffs with expertise in the securities market and real financial interests in the integrity of the market would control the litigation, not lawyers."); *see also* S.R. Rep. 104-98, *reprinted in* 1995 U.S.C.C.A.N. 679, 690 (1995) (noting that increased representation by institutional investors, who often have the "most to gain" from litigation, would "benefit the class"). Congress enacted the PLSRA to correct what it perceived to be a fundamental deficiency in the then-existing securities litigation: certain individuals had become professional securities plaintiffs and lawyers, not their clients, drove the litigation for their own benefit, not for the benefit of members of the injured class. *See In re Razorfish*, 143 F. Supp. 2d at 306 ("A frequent accompaniment to the use of the securities class action device is lawyer-driven litigation, by which counsel for the putative class seek to realize substantial recoveries for themselves."); *see also Weiss v. Friedman, Billings, Ramsey Grp., Inc.*, 2006 WL 197036, at *2 (S.D.N.Y. Jan. 25, 2006) ("In 1995, Congress enacted the PSLRA to address perceived abuses in securities fraud class actions created by lawyer-driven litigation."). This purpose can be gleaned both from the PLSRA's congressional reports related to the PLSRA, *see, e.g.*, H.R. Rep. No. 104–369, *reprinted in* 1995 U.S.C.C.A.N. 730, 733 (1995) (noting that Congress imposed the PSLRA's largest financial interest requirement to "encourage institutional investors to take a more active role in securities class action lawsuits" because "increasing the role of institutional investors in class actions w[ould] ultimately benefit shareholders and assist courts by improving the quality of representation in securities class actions"), and from the structure of the statute, *see, e.g.*, 15 U.S.C. § 78u-4(a)(2)(A)(ii)

(requiring prospective lead plaintiffs to certify that they "did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action"); 15 U.S.C. § 78u-4(a)(3)(B)(vi) (limiting the number of securities class actions brought by any given lead plaintiff to five every three years).

It would be inconsistent with the statutory structure and purpose of the PSLRA to adopt the notion that Baker would have the Court adopt here: that a party can achieve lead plaintiff status not by virtue of his own transactions during the proposed class period but by virtue of assignments of claims by other class members after the class period has ended and after litigation has commenced. Congress developed a comprehensive statutory scheme to limit the role that professional securities plaintiffs and their counsel played in securities litigation. Baker, however, would have the Court believe that Congress was indifferent to those concerns when a plaintiff acquires a claim through the assignment of claims in the relief, even if the party stood to gain nothing through the assignments, as opposed to the purchase of those same securities. It would result in a large hole in Congress's carefully crafted regulatory scheme, which would undermine the very structure of the PSLRA. *See Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."). Further, as noted, Congress requires prospective lead plaintiffs to certify that they did not purchase securities for the purpose of participating in the litigation as a means to minimize the role of professional lead plaintiffs. The proposition that Baker posits would have it that Congress was concerned with the apparent scourge of professional lead plaintiffs when those plaintiffs acquired their claims in the litigation through the purchase of securities but was indifferent to professional lead plaintiffs who acquired their claims by means

of assignment.  Such an interpretation runs counter to common sense.

Finally, adopting Baker's position would undermine the presumption developed by Congress that the most adequate plaintiff is the one who stands to gain or lose the most through the litigation by permitting any plaintiff to become the presumptive lead plaintiff through an assignment of claims through which the plaintiff's interest in the outcome of the litigation did not increase monetarily.  Carried to its logical conclusion, the proposition for which Baker argues would necessarily undo Congress's intent to convert securities litigation from an attorney-driven endeavor to a client-driven one by permitting anyone—including the attorney herself—to become the presumptive lead plaintiff without ever having bought or sold a single security through the artifice of having prospective class members assign their claims.

During oral argument, counsel for Baker suggested that the assignment of shares from KBM Insurance to Baker was essentially ministerial because KBM Insurance "is not a public-facing insurance company[.] . . .  It is an alter ego of [Baker] . . . because he is the [sole] beneficiary, [the] one hundred percent owner."  Dkt. No. 58 at 45.  He further argued that the assignments were done for "simple expedience instead of having three plaintiffs [in the matter], who are all [essentially] Mr. Baker."  *Id.* at 45–46.  But accepting this argument would require the Court to ignore the fact that KBM Insurance is a different legal entity—and that Baker and his wife are in fact not the same person.  There were reasons why Baker chose to establish KBM Insurance in the corporate form and to invest through that entity.  *See* Dkt. No. 58 at 45 (noting that KBM Insurance was established for "estate planning" purposes).  And with the benefits of legal separation between Baker and KBM Insurance also come the burdens of legal separation—burdens that the Court cannot simply wave away for the sake of expedience.

33

Baker does not argue that, in the alternative, the Court should treat as a group KMB

Insurance, his wife, and himself.  *See id.* at 32 ("[W]e chose not to form a group.").  But even if

Baker did—and the argument were properly before the Court because KBM Insurance and Kristi

Baker had submitted the required declarations—the Court would find that the group was

improper because it appears that the aggregation was motivated by gamesmanship.  *See, e.g.*

*Pirelli Armstrong*, 229 F.R.D. at 411.  The process through which the assignment of claims

unfolded leads to the inference that the assignment was done solely to ensure Baker the largest

financial interest and presumptive lead plaintiff status.  Baker filed a separate action on June 12,

2023.  *See* Baker Complaint.  The certification attached to the Baker Complaint did not make any

mention of the assigned shares.  Baker Complaint, Ex. 1.  At that point, it would have appeared

that Baker had a largest financial interest.  The only other known movants—May and

Ledgerwood—had a much smaller interest.  *Compare* Baker Complaint, Ex. 1, *with* Dkt. Nos. 5,

6.  There were no other apparent movants on the horizon, and thus there was no reason for Baker

to have formed a group.

On June 13, 2023, however, May and Ledgerwood filed their motion for lead plaintiff as

a group together with the other members of the May Group.  Dkt. No. 18.  As a result, Baker lost

the clear advantage that he appeared to have had in terms of his financial interest in the relief; he

no longer had the largest financial interest.  Later that same evening, Baker filed his motion in

support of appointing Baker lead plaintiff.  Dkt. No. 23.  In his memorandum of law, Baker

stated in a footnote that his loss amounts includes "notes purchased by Kristi Baker (Kenny

Baker's wife) and KBM Insurance Company, Inc., an Incorporated Cell (Kenny Baker's

insurance fund), which assigned their claims to Kenny Baker through declarations of

assignments executed prior to the filing of this Motion."  Dkt. No. 24 at 8 n.9.  Baker also filed

an updated certification, which included details of the assignee's trading history along with Baker's personal trading history, which was dated June 9, the same date as the certification filed with the Baker Complaint, that did not reference the assigned shares.  Dkt. No. 25-2.  The text of and the signature on the later certification appeared to be identical to the text and signature on the earlier certification.  Baker also filed two declarations of assignment on June 12, 2023.  Dkt. No. 25-5.  Both of these declarations are undated.  *Id.* at ECF pp. 4, 7.  The timing of the filings suggest that the assignment reflected a last-minute decision by Baker—perhaps driven by his counsel—to ensure that he would still have the largest financial interest in the relief, notwithstanding the May Group's filing.

On July 5, 2023, Paul Scarlato, counsel for Baker, filed a declaration attempting to explain why the initial complaint did not mention the assignee shares and why the Declarations of Assignment were undated.  Dkt. No. 38.  Scarlato stated that his firm intended to file a complaint alleging the longer class period and additional shares no later than Friday, June 9, 2023.  *Id.* ¶ 3.  If that were so, and if the assigned shares were included in that Baker Complaint, then it would follow that the inclusion of the assigned shares may not have been made solely for the manipulative purpose of becoming lead plaintiff.  Scarlato declares that local counsel in New York received the Baker Complaint and supporting documents on June 9, 2023.  *Id.* ¶ 4.  He claims that the ECF filing system was taken down until the evening of Sunday, June 11, 2023, at which point the Baker Complaint was filed, "properly show[ing] up on the docket on Monday, June 12."  *Id.*  Meanwhile, Scarlato states that his firm received the executed assignment paperwork on June 9, 2023 and a "paralegal . . . inadvertently mixed up the documents such that [the] signature line was incorrect and undated."  *Id.* ¶ 7.

That recitation entirely fails to explain why—if the executed assignment paperwork was

received on Friday, June 9—the Baker Complaint made no reference to the assignments.  In his declaration, Scarlato does not explain why the Baker Complaint did not include the assignment of shares, which were apparently received before counsel intended to file the complaint.  At oral argument, counsel for Baker attempted to explain why they assigned shares were not included in the declaration attached to the Baker Complaint, despite the fact that the declarations of assignment were received before the complaint was filed:  He stated that his firm needed to "calculate[e] and confirm[] the numbers before submitting them to the Court. . . .  We kept working through the weekend and then we submitted them on Tuesday with the lead plaintiff's motion."  Dkt. No. 58 at 44–45.  However, as Baker's counsel acknowledged, the Baker Complaint was not accepted for filing on June 9 when counsel first tried to submit it.  There was nothing preventing Baker from using the weekend to revise the Complaint to reflect the assignments which they had already received.

This telling of how the events unfolded is further undermined by when the idea to assign the shares was generated.  Baker's counsel represented that the idea of assigning the shares "came about during the weeks, several weeks before we submitted."  Dkt. No. 58 at 45.  However, Baker's counsel provides no explanation of why the Baker Complaint was not written to reflect the assignments—and why the declarations of assignment were not received well before the complaint was filed—if they had intended for "several weeks" before filing their motion for lead plaintiff to include the shares assigned by KBM Insurance and Kristi Baker.  In sum, the Court concludes based on the evidence before it that the assignment of shares to Baker was done for litigation purposes: to ensure that Baker had the largest financial interest.  As such, the Court would conclude that Baker, KBM Insurance, and Kristi Baker would not merit the appointment as lead plaintiff as a group, even if the issue were properly before it.  *See In Re*

*Razorfish*, 143 F. Supp. 2d at 308 (declining to appoint a group lead plaintiff because the group was "simply an artifice cobbled together . . . for the purpose of creating a large enough grouping of investors to qualify as 'lead plaintiff'").

### 3.    Calculation of Financial Interests

Baker does not ask the Court to consider his motion without the shares assigned to him by KBM Insurance and his wife.  That alone is sufficient for the Court to conclude that the May Group has the largest financial interest.  Still, based on the evidence before the Court, the Court can readily conclude that the May Group has the largest financial interest.  As discussed, the May Group suffered losses of $2,136,482 or $2,028,496 (depending on the closing market price used), on total shares purchased of 8,496 and net shares purchased of 6,227.56.  Dkt. No. 32 ¶ 11.  The May Group's expert calculates Baker's individual net funds expended at less than half of the May Group's, $989,596, regardless of the share price used in the calculations.  *Id.* ¶ 13.  Baker appears to take issue with this calculation:  He argues that the May Group's expert calculated "Baker's net funds expended utilizing sales from *outside the class period*, an approach that is obviously incorrect and contrary to settled case law."  Dkt. No. 36 at 3.  However, the figures presented by Baker's expert are still less than the May Group's losses:  Baker's net funds expended (without deducting the value of any remaining shares[6]) were $1,495,208.60 during the May Class Period and $1,957,843.60 during the Baker Class Period on net shares purchased of 91,000 and 71,500, respectively.  Dkt. No. 38-5 at ECF p. 2.  Thus, based on the evidence available to the Court, even if Baker had requested that the Court consider the shares he purchased alone in its analysis, the May Group would have a larger financial interest in the relief.

---

[6] These figures thus represent the maximum magnitude of Baker's losses and may overstate that amount.

Baker and Romano dispute the May Group's loss amounts on two additional grounds. Neither is meritorious.  First, Baker and Romano states that the May Group "failed to perform an actual loss calculation and simply put their 'net funds expended' before the Court, improperly characterizing their total funds expended as actual losses."  Dkt. No. 29 at 6; *see also* Dkt. No. 34 at 1.  Baker points out that the May Group did not deduct the current market value of the security holding from its loss amount.  Dkt. No. 29 at 6 (noting the May Group's declaration states that the "[c]urrent market value (approximately $28 per share) has not been deducted. Computing those deductions would be relatively straight forward").  In its response, the May Group submitted updated calculations performed by an expert that considers the value of the remaining VXX ETNs.  *See* Dkt. No. 31 at 10–11; Dkt. No. 32 ¶ 11; *see also id.* at ECF p. 13.

This argument lacks merit.  "Courts 'routinely reject criticisms based on errors in certifications, particularly where there is no evidence of bad faith or intent to deceive the court or the parties.'" *Maeshiro v. Yatsen Holding Ltd.*, 2023 WL 4684106, at *9 (S.D.N.Y. July 21, 2023) (quoting *In re SLM Corp. Sec. Litig.*, 2012 WL 209095, at *8 (S.D.N.Y. Jan. 24, 2012) and citing *Siegel v. Boston Beer Co., Inc.*, 2021 WL 5909133, *8 (S.D.N.Y. Dec. 14, 2021), *In re IPO Sec. Litig.*, 227 F.R.D. 65, 98 (S.D.N.Y. 2004), *vacated on other grounds*, 471 F.3d 24 (2d Cir. 2006)).  The same must also be true for the loss calculations, based on these certifications. There is no evidence of bad faith or intent to deceive here.  When it submitted its original application, the May Group gave a figure for its losses that was equivalent to its expenses.  Dkt. No. 19.  That was error with respect to the Section 11 claim.  In a Securities Act case under Section 11, the measure of damages is equal to the price that was paid for a security less any value received from the securities or value that could be received from the securities if they were sold.  *See* 15 U.S.C. § 77k(e) (defining damages available in a Section 11 case as "the difference

between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought").  The May Group did not calculate its damages using the value of the VXX ETNs "as of the time such suit was brought."  But the May Group disclosed this fact:  It told the Court and all other movants that it did not deduct the current market value of the shares.  Dkt. No. 19-1 at ECF p. 1 n.1.  It also disclosed the current market value of those shares: "approximately $28 per share."  *Id.*  There thus was no deceit in the May Group's application.  When Baker challenged the calculation, the May Group promptly provided revised figures.  Dkt. No. 32 ¶ 11.  The Court's analysis is based on the revised figures.  Accordingly, the May Group will not be disqualified by virtue of the error in their initial submission.

Baker's second argument is equally without merit.  Baker alleges that the May Group's loss calculation is incorrect because the group "ha[s] not submitted information regarding their transactions for the longer Class Period."  Dkt. 29 at 12.[7]  The May Group responds, however, that it has no transactions outside of the May Class Period and the figures for the Baker Class

---

[7] Romano argues that the May Group did not submit calculations for Exchange Act damages. Dkt. No. 34 at 2.  However, as the May Group explained at oral argument, the damages figures under the Securities Act will be greater than those under the Exchange Act and thus the Securities Act damage calculations are sufficient for determining the May Group's financial interest in the relief.  *See* Dkt. No. 58 at 10 (arguing that "rescission [damages is] the high watermark" for the May Group (cleaned up)).

Period are identical to those for the May class period.  Dkt. No. 58 at 8.  This representation is sufficient.[8]

## C.    The May Group Is Typical and Adequate

Once the court identifies a presumptive lead plaintiff, that lead plaintiff must make a *prima facie* showing that he or she satisfies the typicality and adequacy requirements of Federal Rule of Civil Procedure 23.  *See Aude v. Kobe Steel, Ltd.*, 2018 WL 1634872, at *3 (S.D.N.Y. Apr. 4, 2018); 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).  "[I]n deciding a motion to serve as lead plaintiff, [t]he moving plaintiff must make only a preliminary showing that the adequacy and typicality requirements under Rule 23 have been met. . . .  In fact, a wide ranging analysis under Rule 23 is not appropriate at this initial stage of the litigation and should be left for consideration of a motion for class certification."  *Khunt v. Alibaba Grp. Holding Ltd.*, 102 F. Supp. 3d 523, 536 (S.D.N.Y. 2015) (cleaned up).

The May Group satisfies the typicality requirement.  "Movants can demonstrate typicality by showing that their claims arise from the same conduct from which the other class members' claims and injuries arise."  *Chauhan*, 2021 WL 235890, at *3 (S.D.N.Y. Jan. 25, 2021) (cleaned-up).  The May Group asserts that the claims of its members meet the typicality requirement of Rule 23, whether viewed individually and collectively.  Dkt. No. 18 at 7–8.  Specifically, the May Group explains that its claims are typical of the class members because its members purchased shares of VXX ETNs during the class period giving rise to claims stemming from the same course of conduct by Barclays.  *Id.*  These facts are sufficient to make a preliminary showing of typicality.  *See Luckin Coffee Inc.*, 2020 WL 3127808, at *6 (finding plaintiffs

---

[8] Because the Court finds that the May Group has the largest financial interest, it does not address the May Group's or Romano's arguments for why Baker's calculations are flawed.

typical where "their injury is of the same kind, and arises out of the same facts, as that of other class members").  Romano argues that the May Group is atypical because the May Complaint defines the class inconsistently and because a member of the May Group, Ledgerwood, purchased shares of VXX ETNs after the rescission offer.  Dkt. No. 28 at 11–12, 11 n.4.  Both claims fail to disqualify Reed and the May Group.  First, while the May Complaint defined the Class as "[a]ll purchasers of the Securities during the Class Period" and defined "Securities" as "all securities that had been issued without the proper registration statement," Dkt. No. 1 ¶¶ 19, 25, the complaint as a whole makes clear the action is related to VXX ETNs.  The second argument is meritless because Ledgerwood did not purchase shares of VXX after the rescission offer.  As counsel for the May Group acknowledges, "it made a transcriptive error of a transaction and miswrote that a transaction occurred in August 2022.  Donna Ledgerwood's certifications confirm that no such transaction occurred in 2022—it occurred in 2020."  Dkt. No. 37 at 10.

The May Group also satisfies the adequacy requirement.  A presumptive lead plaintiff is adequate if they "(1) [have] no conflict of interest with the other members of the class, (2) [have] sufficient interest in the outcome of the case, and (3) [have] selected counsel that is qualified, experienced, and generally able to conduct the litigation in question."  *Chauhan v. Intercept Pharms.*, 2021 WL 235890, at *3 (S.D.N.Y. Jan. 25, 2021) (alterations in original).  Baker argues that the May Group is inadequate because it "does not intend to represent the interests of the entire class, if selected as lead plaintiff" and "objects to the longer class period and 10b-5 claims."  Dkt. No. 36 at 1 n.2.  This argument, however, misstates the May Group's position.  As an initial matter, the May Group questions the longer class period insofar as Barclays had already issued a corrective disclosure, thus undermining Baker's 10b-5 claims.  *See* Dkt. No. 31 at 12.

Additionally, the May Group does not "object[]" to the Rule 10b-5 claims.  In fact, at oral

argument, the May Group's counsel represented that it would bring Rule 10b-5 claims against

Barclays if the May Group is named lead plaintiff, *see* Dkt. No. 58 at 16 ("I can assure the Court

we will bring a 10b-5 claims class."), and that the Rule 10b-5 claims were not included in the

May Complaint because May and Ledgerwood were focused on ensuring a timely filing of their

claims under the Securities Act, which has a shorter statute of limitations than the Exchange Act,

*see id.* at 17.  The Court credits this representation.  To prove a claim under Section 11, the lead

plaintiffs will have to "trace" their purchases of securities to the offering.  *See DeMaria v.*

*Andersen*, 318 F.3d 170, 176 (2d Cir. 2003) (there is a "long-standing practice in this circuit of

[only] permitting suit under § 11 by those who can 'trace' their shares to the allegedly defective

registration statement"); *see also In re Glob. Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 207

(S.D.N.Y. 2003) (Lynch, J.) ("Only those who purchase securities that are subject to allegedly

false registration statement, and not those who buy identical stocks already being traded, can sue

under section 11.").  Tracing, however, is not always a straightforward, or indeed feasible, task.

*See In re Glob. Crossing, Ltd. Sec. Litig.*, 313 Supp. 2d at 208.  In such situations, a Rule 10b-5

claim can serve as an alternative means to recovery.  Thus, the assertion by the May Group's

attorney that the group will bring—and vigorously prosecute—a Rule 10b-5 class, *see* Dkt. No.

58 at 17–18, is credible and the May Group is not inadequate for that reason.[9]

---

[9] Even if the Court did not credit this representation, it would still find the May Group typical
and adequate because "there is no requirement that a court select as lead plaintiff only a movant
with standing to assert every possible claim against every defendant, nor does the presumptive
lead plaintiff fail to satisfy the typicality prong if he or she cannot assert every possible claim."
*In re Fuwei Films Sec. Litig.*, 247 F.R.D. 432, 438 (S.D.N.Y. 2008) (Sullivan, J.).  There is no
evidence on this motion that the May Group would fail to prosecute vigorously the claims on
behalf of those who purchased only in the secondary market.

### D.      Baker is Inadequate

Even if the Court were to conclude that it was appropriate to consider the shares assigned to Baker when calculating his financial interest, the Court would not appoint Baker lead plaintiff because he is inadequate.  As discussed, the declarations of assignment were undated and the process by which the claims were assigned suggest a lawyer-driven attempt to secure Baker's lead plaintiff status.  *See supra* pp. 34–37.  Scarlato, counsel for Plaintiff, characterizes the error in the Declarations of Assignment submitted to the Court as a "minor mistake" and argues that the assignments were not, as the May Group alleged, "lawyer instigated reactions to seeing the [May Group's] motion and recognizing they had been outflanked."  Dkt. No. 38 ¶ 8.  Scarlato contends that "counsel was unaware" of the mistake until the May Group filed its opposition.  *Id.*

Scarlato's declaration raises concerns about Baker's adequacy.  Courts have held that errors in documents submitted in connection with motions for lead plaintiff status raise concerns about a party's adequacy to serve as lead plaintiff.  *See, e.g.*, *Rodriguez v. DraftKings Inc.*, 2021 WL 5282006, at *9 (S.D.N.Y. Nov. 12, 2021) (collecting cases) ("As have other courts in this District presented with similar sloppiness, this Court finds that [the proposed lead plaintiff's] careless errors weigh heavily against his appointment as lead plaintiff.").  For example, in *Rodriguez v. DraftKings Inc.*, the district court held that "a series of basic errors" spoke to "a level of carelessness that rightly calls into doubt [the party's] adequacy to be lead plaintiff."  *Id.* at *9.  Like Scarlato, the candidate for lead plaintiff in *DraftKings* characterized the errors as "minor," though the court found them "numerous and varied."  *Id.*  The nature of assignments here—coming shortly after Baker filed his complaint and shortly after the May Group filed its lead plaintiff motion—suggest that the Declarations of Assignment were a rushed attempt to secure lead plaintiff status for Baker.  This view is reinforced by the undated Declarations of

Assignment.  Given the materiality of the Declarations of Assignment to Baker's motion, Scarlato's characterization of that error as "minor" trivializes the matter.  As is the case here, the proposed lead plaintiff in *DraftKings* was "alerted to the basic errors" through opposition filings.  *Id*.  The *DraftKings* Court stated that "[h]ad [proposed leading plaintiff] been serious about his responsibilities as a budding class representative, he should not have had to have been alerted to these basic errors in the first place."  *Id*.  The same could be said here.  Thus, Baker has not carried his burden of making a preliminary showing that he is an adequate lead plaintiff under Rule 23.[10]

## III.    Lead Counsel

Under the PSLRA, "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class."  15 U.S.C. § 78u-4(a)(3)(B)(v).  The PSLRA "evidences a strong presumption in favor of approving a properly selected lead plaintiff's decisions as to counsel selection and counsel retention."  *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 2008 WL 4128702, at *2 (S.D.N.Y. Sept. 3, 2008) (quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 276 (3d Cir. 2001)); *see, e.g.*, *In re Ply Gem Holdings, Inc., Sec. Litig.*, 2014 WL 12772081, at *2 (S.D.N.Y. Oct. 14, 2014) (same).  The May Group has selected Mazin A. Sbaiti and Jonathan Bridges of Sbaiti & Company PLLC, attorneys from firm highly experienced in securities class action litigation.  The Court sees no reason why these firms would not adequately represent the class.

---

[10] Neither Baker nor Romano has put forth any evidence to rebut the May Group's status as presumptive lead plaintiff.  Thus, the Court appoints the May Group lead plaintiff.

**CONCLUSION**

Baker's and Romano's motions to consolidate the May Action and the Baker Action and the May Group's motion for appointment as lead plaintiff and corresponding motion to appoint Mazin A. Sbaiti and Jonathan Bridges of Sbaiti & Company PLLC as lead counsel are GRANTED.  Accordingly, Baker's and Romano's motions for appointment as lead plaintiff and corresponding motions to appoint their counsel as lead counsel are DENIED.

The Clerk of Court is respectfully directed to consolidate Case Nos. 23-cv-2583 and 23-cv-4881 and to close Dkt. Nos. 17, 20, 23, 41[11] in Case No. 23-cv-2583 and Dkt. No. 5 in Case No. 23-cv-4881.


SO ORDERED.

Dated: September 13, 2023
       New York, New York
                       LEWIS J. LIMAN
              United States District Judge

---

[11] Because the parties had an opportunity to address any arguments not previously raised during oral argument, the Court denies the May Group's letter motion for leave to file a sur-reply.