## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DR. RUTH C. MAY AND DR. DONNA E. LEDGERWOOD, JUSTIN REED, MARK HOWARTH and JEFFREY KNAPP, on behalf of themselves and all others similarly situated, | |
| *Plaintiffs,* | |
| v. | Cause No. 1:23-cv-02583-LJL |
| BARCLAYS PLC AND BARCLAYS BANK PLC, JAMES E. STALEY, TUSHAR MORZARIA, STEVEN EWART, C.S. VENKATAKRISHNAN, TIM THROSBY, ANNA CROSS, NIGEL HIGGINS, ALEX THURSBY, HELEN KEELAN, HELENE VAN DORT, JEREMY SCOTT, MARIA RICHTER, and DOES 1-12, | |
| *Defendants.* | |

### PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs Ruth C. May, Donna E. Ledgerwood, Justin Reed, Jeffrey Cole Knapp, and Mark Howarth ("Plaintiffs") bring this action on behalf of themselves and all other similarly situated under Rule 23 of the Federal Rules of Civil Procedure, against Defendants Barclays PLC and Barclays Bank PLC, as well as James E. Staley, Tushar Morzaria, Steven Ewart, C. S. Venkatakrishnan, Tim Throsby, Anna Cross, Nigel Higgins, Alex Thursby, Helen Keelan, Helene Van Dort, Jeremy Scott, and Maria Richter, for violations of the securities laws of the United States, common law fraud, and for breaches of contract among other causes of action. Plaintiffs pray that this Court certify a nationwide class of purchasers and any subclasses, appoint them Lead Plaintiffs and appoint their counsel Lead Counsel, and enter judgment in their and the Class's favor for damages and all other relief to which they are justly entitled under law or equity.

# I

## PARTIES

1.      Plaintiff Dr. Ruth C. May ("May") is an individual citizen of the state of Texas.

2.      Plaintiff Dr. Donna E. Ledgerwood ("Ledgerwood") is an individual citizen of the state of Texas.

3.      Plaintiff Justin Reed ("Reed") is an individual citizen of the state of Idaho.

4.      Plaintiff Mark Howarth ("Howarth") is an individual citizen of the state of Maryland.

5.      Plaintiff Jeffrey Knapp ("Knapp") is an individual citizen of the state of California.

6.      Defendant Barclays PLC ("BPLC") is a bank holding company headquartered in London, United Kingdom. Through its subsidiaries, it provides various financial services, including investment banking, wealth management, and the offer and sale of securities in this district. Barclays PLC has registered the common shares underlying its American Depository Receipts, which trade on the New York Stock Exchange. It has an obligation to file periodic reports with the Commission pursuant to Section 13(a) of the Exchange Act.

7.      Defendant Barclays Bank PLC ("BBPLC," together with BPLC, "Barclays") is BPLC's wholly owned United States subsidiary, headquartered in New York, New York. BBPLC consists of a corporate and investment banking division, a consumer, cards, and payment division, and a private bank. BPLC and BBPLC between them issued all relevant securities that were the subject of this lawsuit. BBPLC has listed a series of corporate debt securities on U.S. exchanges, each class of which has to have been registered with the Securities Exchange Commission ("SEC",) pursuant to Section 12(b) of the Exchange Act. It has an obligation to file periodic reports with the Commission pursuant to Section 13(a) of the Exchange Act. BBPLC is the issuer

of the iPath Series B S&P 500 VIX Short-Term Futures ETN ("VXX"), a securitized derivative touted to provide retailer investors a hedge to market fluctuations. The VXX is supposedly supposed to mimic the S&P 500 VIX Short-Term Futures Index Total Return (the "VIX").

*Individual Securities Act Defendants*

8.    Defendant James E. Staley ("Staley") is a resident of the state of New York and may be served via personal service or by any means permitted under applicable law. He signed the 2019 Shelf Registration (as defined below). He served as the chief executive officer ("CEO") of Barclays and a director from December 1, 2015, through October 31, 2021. From March 2019 through October 31, 2021, he also served as the CEO of BBPLC and a director on BBPLC's Board of Directors until January 31, 2019. During his tenure, Staley signed a certification pursuant to 17 C.F.R. § 240.13(A)-14(A) that was attached to the 2020 BPLC 20-F as Exhibit 12.1, and a certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. § 1350) that was attached to the 2020 BPLC 20-F as Exhibit 13.1, which contained materially false and misleading statements or omitted material information, and which were incorporated by reference into the 2019 Shelf Registration Statement.

9.    Defendant Tushar Morzaria ("Morzaria") is an individual resident of London, England (United Kingdom), and may be served via personal service or by any means permitted under applicable law. Morzaria served as Barclays' finance director (the most senior finance position at Barclays), a member of its executive committee, and as a director on the BPLC and BBPLC Boards. Morzaria retired from Barclays' Boards, and as Group Finance Director effective April 22, 2022. Currently, Morzaria is chairman of the Global Financial Institutions Group of Barclays' Investment Bank. During his tenure, Morzaria signed Barclays' annual reports and certifications, pursuant to Sarbanes-Oxley Act of 2002 ("SOX"), stating that the financial

information contained in the Company's annual reports was accurate and disclosed any material changes to the Company's internal controls over financial reporting, which were incorporated by reference into the 2019 Shelf Registration Statement.

10.    Defendant C.S. Venkatakrishnan ("Venkatakrishnan" or "Venkat") has served as the CEO of BPLC, a member of its executive committee, and a director on the BPLC Board since November 1, 2021. Venkatakrishnan has also served as the CEO of BBPLC and as a director on the BBPLC Board since November 1, 2021. Prior to his position as CEO, Venkat served as Barclays' Global Head of Markets from October 2020 to October 2021, and the Company's chief risk officer from March 2016 to October 2020, which included the entire time Barclays was an ineligible issuer (May 2017 – May 2020). During his tenure as CEO, Venkat signed Barclays' annual reports and certifications, pursuant to the SOX, stating that the financial information contained in the Company's annual reports was accurate and disclosed any material changes to the Company's internal controls over financial reporting, which were incorporated by reference into the 2019 Shelf Registration. Statement. Venkat was a direct and substantial participant in the scheme.

11.    Defendant Steven Ewart ("Ewart") is an individual resident of Hartford, England (United Kingdom) and may be served via personal service or by any means permitted under applicable law. Following Defendant Ewart's appointment as chief financial officer ("CFO") of BBPLC and required regulatory approval, Defendant Ewart signed the 2019 Shelf Registration Statement. He has served as the CFO of BBPLC since August 10, 2018.

12.    Defendant Nigel Higgins ("Higgins") is an individual resident of London, England (United Kingdom) and may be served via personal service or by any means permitted under applicable law. He has served as the "Group Chairman" at Barclays since May 2019 (a

position known as the "chairman of the board" in the U.S.), and was a director on the Barclays Boards for three months prior to that appointment (starting in March 2019). Defendant Higgins signed the 2019 Shelf Registration Statement.

13.    Defendant Tim Throsby ("Throsby") is an individual resident of London England (United Kingdom) and may be served via personal service or by any means permitted under applicable law. Throsby has served as BBPLC's CEO since January 31, 2019. Following Defendant Throsby's appointment as CEO of BBPLC and required regulatory approval, Defendant Throsby signed the 2019 Shelf Registration Statement.

14.    Defendant Alex Thursby ("Thursby") is an individual resident of Carlisle, England (United Kingdom), and may be served via personal service or by any means permitted under applicable law. He served as a BBPLC non-executive director from April 2018 through April 2021. Defendant Thursby signed the 2019 Shelf Registration Statement.

15.    Defendant Helen Keelan ("Keelen") is an individual resident of Dublin, Ireland (Republic of Ireland) and may be served via personal service or by any means permitted under applicable law. She served as a BBPLC non-executive director from February 2017 through March 2021. Defendant Keelan signed the 2019 Shelf Registration Statement.

16.    Defendant Hélène Vletter-van Dort ("Vletter-van Dort") is an individual resident of Amsterdam, Netherlands, and may be served via personal service or by any means permitted under applicable law. She served as a BBPLC non- executive director from August 2017 until October 2019. Defendant Vletter-van Dort signed the 2019 Shelf Registration Statement.

17.    Defendant Jeremy Scott ("Scott") is an individual resident of London, England (United Kingdom) and may be served via personal service or by any means permitted under applicable law. He served as a BBPLC non-executive director from April 2018 until September

2019.  Defendant Scott signed the 2019 Shelf Registration Statement.

18.    Defendant Maria Richter ("Richter") is an individual resident of New York, New York, and may be served via personal service or by any means permitted under applicable law. She was  a BBPLC non-executive director from April 2018 until September 2019.  Defendant Richter signed the 2019 Shelf Registration Statement.

*Individual Exchange Act Defendants*

19.    Defendants Staley, Venkatakrishnan, Morzaria, Ewart, Throsby and Cross are referred to herein as the "Individual Exchange Act Defendants" and, together with the Company and the Control Person Defendants (defined below), are collectively referred to herein as "Exchange Act Defendants."

20.    The Individual Exchange Act Defendants substantially participated in the scheme pled herein, and made, or caused to be made, material misstatements and omissions that either artificially inflated and/or artificially maintained the price of Barclays' VXX ETNs during the Class Period.

21.    The Individual Exchange Act Defendants, because of their positions within Barclays, possessed the power and authority to control the contents of the Company's reports to the SEC, shareholder letters, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.,* the market. Each of these Individual Exchange Act Defendants was provided with copies of and/or contributed to the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

22.    Because of their positions and their access to material non-public information available to them but not to the public, the Individual Exchange Act Defendants  knew or

recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations and omissions being made were materially misleading. The Individual Exchange Act Defendants are liable for the misleading statements and material omissions pleaded herein.

23.    Each of the Individual Exchange Act Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, acquisition plans, and present and future business prospects, as alleged herein.

24.    In addition, the Individual Exchange Act Defendants  were involved in drafting, producing, reviewing, and/or disseminating the misleading statements and information alleged herein, were aware of, or recklessly disregarded, the misleading statements being issued regarding the Company, and approved or ratified these statements in violation of the federal securities laws.

### *Control Person Defendants*

25.    Defendants Higgins, Staley, Venkatakrishnan, Ewart, Throsby, and Cross are together referred to as the "Control Person Defendants."

### *Authorized Participant Defendants-Does 1-12*

26.    Does 1-12 are "Authorized Participants" who, upon investigation and belief, are large financial institutions who contracted with BBPLC for the right to serve effectively as market makers, and to redeem shares in VXX, and routinely exercised those rights from the inception of VXX until March 14, 2022, when Barclays suspended further sales of VXX. Plaintiffs are at present unaware of the specific persons who serve/d as Authorized Participants and therefore name Does 1-12.

## II.

## JURISDICTION & VENUE

27.    This Court has federal subject matter jurisdiction under 15 U.S.C. § 77v and under 28 U.S.C. §§ 1331, 1332, 1367(a).

28.    There is complete diversity of the parties, the amount in controversy exclusive of interest and costs exceeds $75,000, at least one member of the proposed class is diverse from at least one defendant, and the total amount in controversy for the class exceeds $5,000,000.

29.    Venue is proper in, and Defendants are subject to, the personal jurisdiction of this Court because Defendants transacted business in this district, otherwise maintain facilities and business operations in this district, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. *See* 15 U.S.C. § 77v, 28 U.S.C. § 1391(b); 42 U.S.C. § 2000e-5(f)(3).

## III.

## BACKGROUND FACTS

30.    In a September 29, 2022, SEC Consent Order, Barclays admitted that it had issued $17.7 billion worth of unregistered securities between June 26, 2019, and August 1, 2019, and again between January 28, 2021, and May 23, 2022. *See* document at https://www.sec.gov/litigation/admin/2022/33-11110.pdf (the "SEC Order" or "Consent Decree"). Included among them were a variety of exchange traded securities. One such security was the Barclays Bank PLC iPath Series B S&P 500 VIX Short-Term Futures (Ticker: VXX).

## A.  ABOUT VXX

BPLC, through its subsidiary BBPLC, is the issuer of the VXX security, which most people have been led to believe gives exposure to the CBOE Volatility Index, but as Barclays explains,

VXX is actually "designed to provide exposure to the S&P 500® VIX Short-Term Futures TM Index Total Return" or SPVIXSTR. This is technically a different index from the VIX, but is related, and Plaintiffs will generally refer to it as the "VIX" or the "index" hereinafter for shorthand.

31.    VXX is a securitized derivative—it is synthetic and uncollateralized.

32.    Because VXX is exchange traded on the New York Stock Exchange and is uncertificated, all purchases and sales of, and delivery of, VXX are electronic and necessarily involve the interstate wires.

33.    The VIX and the index generally estimate expected market volatility over the next 30 or 60 days by tracking options linked to the benchmark U.S. S&P 500 stock index. Historically, the VIX tends to be elevated in periods of market distress and lower under normal market conditions, and it often moves sharply higher when stock indices decline significantly.

34.    Underlying VXX is a portfolio composed of the front two-month /VX (VIX) futures that bear continuously changing weights. The potential payouts of these contracts yield an "implied value," which is trackable as the ticker "VXXIV".

35.    The market price of VXX and the implied value are not necessarily identical, much less correlated—and the implied value and the VIX itself are not always identical.

36.    When a holder redeems VXX for a payout, they are entitled to money equal to a calculation rather than their pro rata share of a pool of assets. To wit, Barclays explains that there are no assets to pay VXX holders in the event of a default or redemption, and "[a]ny payment to be made on the [VXX], including any payment at maturity or upon redemption, depends on the ability of Barclays Bank PLC to satisfy its obligations as they come due."[1]

---

[1] https://ipathetn.barclays/details.app;instrumentId=341408

37.     Because VXX is a balance between expiring and later VIX futures, Barclays is forced to sell futures contracts that are closest to their expiration dates and buy the next dated contracts, which is a process called "rolling." Barclays rolls the underlying portfolio on a daily basis and is a material percentage of trading volume—and is as much as 30% of the end-of-day trades.

38.     Thus, every day, in a completely predictable manner, Barclay's enters the VIX futures market to short front-month and go long second-month VIX futures at the market close. This daily futures rebalancing is systematic and predictable by market participants. Every day Barclays will short a predictable number of front month and go long a predictable number of second-month VIX contracts. Because redemptions of VXX are based on the indicative value at market close, Barclays has to trade towards the end of the day to ensure it meets redemptions through something called "TAS" or "Trade at Settlement".

39.     The larger the market cap of VXX the larger and greater number of the trades Barclays has to do at day's end every day to maintain the roll.

40.     During the class period, VXX was the largest of the exchange-traded products keyed to the VIX—more than double the next largest competitor, ProShares.[2]

41.     Based upon the investigation of Plaintiffs' consultants (including a finance professor), Barclay's daily activities actually have an effect on the implied value.[3] Barclays having to go into the market every day to manage the portfolio comes with significant costs—both transactional and market. Since longer-dated futures contracts are often at higher levels than shorter-dated ones (during normal market conditions), the daily rolling activity more often than

---

[2] Source: https://etfdb.com/etfs/volatility/short-term-volatility/
[3] The dynamic that Barclays suffers was examined by Patchara Santawisook in *Price Impact In The VIX Futures Market And Mean-Field Games In Two Order Books*, August 30, 2022 (dissertation of Worcestor Polytechnic Inst)..

not results in losses as Barclays is forced to sell the lower-valued contracts and buy the higher-priced contracts to maintain the required mix for the VXX portfolio.

42.    And both Barclays's position size in the VIX futures markets and the public knowledge that Barclays *has to buy and sell*—means every player in the VIX futures market knows what Barclays is going to do every day, which in turn makes Barclays a price taker when buying and selling.

43.    The transactional and market costs combine to enhance the decline in the implied value of VXX, which in turn causes both the depreciation of the VXX and the rate of depreciation to accelerate the larger the VXX portfolio grows. Thus, the more VXX there is outstanding the more the underlying index and concomitant "indicative value" of VXX itself is negatively affected.

44.    In other words, every time Barclays issues more shares of VXX, it makes Barclays more money both from the inflows and the fees, but it has a material negative impact on that day's VXX holders by dramatically accelerating the losses they incur. These should have to be disclosed under Barclays' prospectuses—but Barclays never does.

45.    Barclays never disclosed this dynamic. Only the most seasoned professional investors have insight into the deep complexity of these derivative dynamics.

46.    Given this complexity, it is notable that retail investors in the United Kingdom and Europe were not allowed to buy and sell VXX. Barclays was only allowed to market VXX to highly sophisticated or qualified institutional investors there.

47.    In the United States, sophisticated traders with special permissions from their brokerages and those who have ISDA membership or an affiliation with an ISDA member are generally the ones who can directly buy or sell VIX options or futures contracts. They use it to hedge the market and to hedge macro-economic or certain non-systemic risks.

48.     Yet, Barclays has marketed VXX broadly in the United States even though it presents *more* risks than the underlying VIX derivatives because (1) VXX is not necessarily keyed to the VIX, creating an additional layer of uncertainty, unpredictability and risk, and (2) VXX is subject to the costs discussed above and the fee Barclays charges, causing it to inherently underperform and depreciate more rapidly than would direct ownership of the underlying futures contracts.

49.     Thus, Barclays course of business that operates a deceit on retail investors continues when one considers that VXX inherently preys upon retail investors.

50.     Barclays only allows someone to redeem VXX if they redeem a large bundle of shares—25,000 shares or more—of VXX.[4] In other words, while institutional investors have two exits: sell into the market or put the shares to Barclays in enormous blocks, retail investors have to hope that a market still exists for their shares when they want to sell in order to make money.

51.     Thus, the existence of a significant pool of retail investors is an integral feature of VXX. The following graphic shows that for the longest period of time, institutional buyers of VXX were few and far between[5]:

---

[4] *See, e.g.,* https://www.sec.gov/Archives/edgar/data/312070/000110465921128505/tm2130761d1_424b2.htm (October 22, 2021, Pricing Supplement) ("Subject to the notification requirements set forth under "Specific Terms of the ETNs — Early Redemption Procedures" in this pricing supplement, you may redeem your [VXX shares] on any redemption date during the term of the [VXX shares]. If you redeem your [VXX shares], you will receive a cash payment in U.S. dollars per [VXX share] equal to the applicable closing indicative value on the applicable valuation date minus the redemption charge. You must redeem at least 25,000 [VXX shares] at one time in order to exercise your right to redeem your [VXX shares] on any redemption date. **If you hold fewer than 25,000 [VXX shares] of the same series or fewer than 25,000 [VXX shares] of a series are outstanding, you will not be able to exercise your right to redeem your ETNs of that series.**") (bolding added).

[5] https://fintel.io/so/us/vxx.



The green spikes are the degree of institutional owners—which clearly spiked between March and June of 2022, which would have been expected as institutions who shorted VXX had to scramble to buy VXX to cover their short positions.

52.     Nothing in the prospectuses warns non-institutional investors in a meaningful way. Instead, the warnings are general, boilerplate, and oblique.

53.     For example, Barclays' prospectuses warn that VXX is supposed to be a short-term investment. But what does "short term" mean? It is not defined. And to a retail investor, short term reasonably means months or a couple of years—e.g., until the event that it is supposed to hedge against. But that is not what Barclays means at all. Institutional investors Lead Counsel consulted with who understood VXX referenced the fact that VXX might be held for hours or a day or two. Retail investors are not given that message at all. And it begs the question: *who holds VXX the rest of the time?*

54.    Barclays's other abstract and generic warnings that VXX is essentially uncollateralized, unsecured debt, or that one can lose their entire investment are meaningless platitudes—the same warnings are on every single prospectus and offering memorandum filed with the SEC.

55.    Equally critical, none of Barclays disclosures about VXX even begin to explain the fundamental realities of Barclay's VXX business and scheme, the proper uses and purposes of trading VXX as a hedging instrument given the warnings, the underlying economics of how Barclays manages VXX (which only highly sophisticated traders with knowledge of how VIX futures work could even begin to understand), the extreme degree of VXX's riskiness, the fact that as large blocks of VXX shares are issued Barclays both makes more money but investor losses accelerate because each new issuance actually causes the underlying indicative value to depreciate more rapidly, thus causing the rate of depreciation to accelerate, or the fact that retail investors are only there as chum to support a liquid market for the sharks to swim in.

56.    Instead, Barclays markets it as a benign option for the average Joe to buy some insurance on their long equity positions. The fact that there has to be market fodder to hold the shares both to have a sufficiently liquid market to buy from and sell into, but also to make the market large enough for Barclays to make its fees and cover its costs for managing the VIX futures portfolio (most of which are relatively fixed) and still make a sizable profit. That is the fraudulent scheme.

**B.  BARCLAYS LOSES ITS STATUS AS A FREQUENT FILER**

57.    For years, Barclays was a "well known seasoned issuer" ("WKSI") of securities.

58.    As such, Barclays was able to issue securities by filing an open-ended shelf registration statement. Whenever Barclays wanted to issue securities, all it had to do was pay the

registration fee, file the proper papers, and the securities were deemed "effective" upon issuance. No prior SEC review was otherwise necessary.

59.     SEC Rule 405 and Instruction I.A. on Form S-3 set forth the requirements for being a WKSI. However, under Rule 405, one can lose WKSI status in a variety of ways—including having been found liable for securities fraud in the prior three years. Having that happen makes one an "ineligible issuer."

60.     On May 10, 2017, the SEC instituted a public administrative and cease-and-desist proceedings against Barclays Capital Inc.—a subsidiary of Barclays. *E.g., In the Matter of Barclays Capital Inc.*, Adm. Proc. File No. 3-17978 (May 10, 2017), Barclays settled with the SEC for $97 million for violations of the anti-fraud provisions of the Exchange Act and of the Advisers Act (15 U.S.C. § 206) related to hidden mutual fund fees.[6]

61.     This was more than Barclay's third securities fraud case. Prior to these proceedings, Barclays had been able to retain its WKSI status because the SEC had issued WKSI waivers to Barclays, but the SEC refused to grant Barclays another waiver after the May 2017 settlement.

62.     Thus, Barclays lost its status as a WKSI.

## C.  THE WORKING GROUP EXPERIMENT GONE WRONG

63.     As a WKSI, Barclays had no need to track the number of securities it issued because there was no cap on the number of securities it could issue under blanket shelf registration. Thus, Barclays lacked any of the formalities and internal controls for doing so.

64.     This was all about to change, and Barclays knew it.

65.     As a non-WKSI, Barclays was required to define and designate the number of securities it planned to register and issue and pay the registration fee up front. It then needed to

---

[6] https://www.sec.gov/litigation/admin/2017/33-10355.pdf.

monitor for how many securities had been issued so as not to exceed the limit.

66.    It is indisputable that Barclays's personnel were well aware of the need to accurately record relevant information about securities that were offered or sold on a real-time basis, thereby ensuring that Barclays did not offer or sell any securities in excess of what had been registered.

67.    Following the May 2017 SEC cease-and-desist proceedings and order, Barclays needed to address its loss of WKSI status with respect to its ongoing securities offerings in the United States. Barclays self-reported to the SEC that around January 2018 [which coincides with the launch of VXX Series B], it formed a working group "that included trading desk heads from the Structured Products Group, personnel from an administrative support function called business management, personnel from the product origination group, a member of the compliance department, and a member of the legal department." (the "Working Group").

68.    The Working Group generally was supposed to ensure that non-registered securities were not issued (i.e., to make sure that more securities than what had been registered were not issued).

69.    The Working Group, in conjunction with the trading desks that would be using the 2018 Shelf to issue their securities, as well as Group Treasury, estimated the total amount of securities that they anticipated offering and selling over the next approximately 18 months. Given that, Barclays knew it would have to register the total amount of securities that it anticipated offering and selling during that period, and pay the registration fees for that amount of securities in advance.

70.    As part of these calculations, the Working Group also determined an initial allocation of fees among the trading desks accessing the 2018 Shelf, with the expectation that these

allocations would be revisited as data regarding actual offers and sales off of the 2018 Shelf became available.

71.    On March 28, 2018, Barclays filed a post-effective amendment, which amended its prior registration statement on Form F-3, and on March 30, 2018, Barclays' post-effective amendment was declared effective as what Plaintiffs have been referring to as the "2018 Shelf."

72.    As reflected in the 2018 Shelf, Barclays anticipated issuing some $21.3 billion worth of securities in only 18 months. So, it paid the filing fees for the 2018 Shelf which covered the offer or sale of approximately $21.3 billion of securities, for a period of approximately 18 months.

73.    As the 2018 Shelf approached its expiration in 2019, the Working Group, aware of this eventuality, reconvened with largely the same membership as in 2018. As during the 2018 WKSI shelf conversion, the Working Group calculated the total amount of securities that they anticipated offering or selling during the three-year duration of what would become the 2019 Shelf and determined an initial allocation of fees among the trading desks accessing the 2019 Shelf.

74.    Unlike during its work in 2018, however, the Working Group's 2019 Shelf work required it to perform "Carry-Over Calculations." The Carry-Over Calculations were necessary because Barclays still had some capacity left in the 2018 Shelf.

75.    Accordingly, the Working Group set about calculating how much capacity was actually left under the 2018 Shelf, estimating how much was available for offers or sales of securities from the 2018 Shelf during the time between when Barclays planned to file its next registration statement (what would become the 2019 Shelf) and when the 2019 Shelf would become effective (the "Gap Period"), and how much capacity, if any, would be left over on the 2018 Shelf after accounting for the anticipated Gap Period offers or sales.

76. These calculations and estimates were essentially performed manually, and as it would later be discovered by the SEC, they were performed incorrectly.

77. Based upon the incorrect manual calculations and estimates, Barclays de-registered a portion of the remaining 2018 Shelf in order to save on fees, and in order to apply some of those fee-savings from the 2018 Shelf to the 2019 Shelf.

78. Plainly, members of the Working Group recognized, discussed and understood the importance of tracking actual offers and sales of securities against the amount of registered securities on a real-time basis. Nevertheless, no internal control was established to track offers and sales of securities, nor was any member of the Working Group or other BBPLC personnel performing that task. Nor does it appear that the Working Group was ever even tasked with coming up with internal controls.

79. Clearly, Barclays decided not to invest in the development, training, infrastructure and technology necessary to establish and implement internal controls that are common to other non-WKSI issuers, as if Barclays thought that it would soon be a WKSI again and such an investment would not be necessary in a few years.

80. Barclays and the Individual Exchange Act Defendants and Control Person Defendants thus knowingly made multiple misrepresentations about the existence of sufficient internal controls to ensure accurate reporting and compliance.

### D. AFFIRMATIVE REPRESENTATIONS AND MISREPRESENTATIONS

81. On February 22, 2018, Barclays filed a shelf registration for over $21.3 billion (the "2018 Shelf"). The 2018 Shelf was exhausted as of June 26, 2019, at the latest. Earlier that year, Barclays became aware of the impending exhaustion of the 2018 Shelf, because Barclays filed a shelf registration statement registering an additional $20.7 billion worth of securities that could be

sold over the ensuing three years (the "2019 Shelf"), which went effective on August 1, 2019.

82.     Barclays/BPLC filed Form 8-A on January 18, 2018, stated that "[t]he Securities [VXX], and any other Securities of this series and of like tenor, are issuable only in registered form without coupons in denominations as specified on the face hereof." (at 15).

83.     Barclays filed Form F-3 on February 22, 2018, stating that:

> Pursuant to Rule 415(a)(6) under the Securities Act, this registration statement will include $25,000,000,000 in maximum aggregate offering price of unsold securities that were previously registered on the registration statement on Form F-3 (File No. 333-216377) filed on March 1, 2017." . It further committed that "The undersigned Registrant hereby undertakes: (1) To file, during any period in which offers or sales are being made, a post-effective amendment to this Registration Statement: …(ii) To reflect in the prospectus any facts or events arising after the effective date of the Registration Statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the Registration Statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the SEC pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than 20 percent change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective Registration Statement; and (iii) To include any material information with respect to the plan of distribution not previously disclosed in the Registration Statement or any material change to such information in the Registration Statement . . . ."

84.     These were false statements when made because Barclays (a) knew that it likely would issue more than that amount, and so it needed proper internal controls to prevent over-issuance, and (b) Barclays knowingly did not put in place all of the things that other issuers have put in place to ensure that they do not over-issue securities; instead, it relied upon a "Working Group" comprised of several of the individuals named herein as defendants.

85.     A nearly identical representation was made by Barclays in its Form F-3, filed on June 14, 2019.

86.    BPLC also filed a Form 20-F in 2018.[7] It stated that the Company "is committed to operating within a strong system of internal control." Barclays described its "improved" internal controls "notably following the completion of the Barclays Internal Controls Enhancement Programme (BICEP)" and that the "Control Environment is monitored by senior management and the Board via various reports, dashboards, and deep dives." And it further stated that the "programme facilitated the resolution of the most material control issues and implemented a system of tracking and reporting risk events and controls issues against a new Controls Maturity Model, which left the Company's internal controls environment in a much stronger position." (p.70).

87.    Critically, BPLC's 2018 20-F went on to state that the Company's "frameworks, policies and standards enable Barclays to meet regulators' expectations relating to internal control and assurance." (at 40).

88.    The 2018 BPLC 20-F stated that the Barclays Board Audit Committee concluded that, "[t]hroughout the year ended 31 December 2018 and to date, the Barclays Group has operated a system of internal control that provides reasonable assurance of effective operations covering all controls including financial and operational controls and compliance with laws and regulations." (at 40).

89.    The 2018 20-F also stated that "Management has assessed the internal control over financial reporting as of 31 December 2018. In making its assessment, management utilized the criteria set out in the 2013 COSO framework and concluded that, based on its assessment, the internal control over financial reporting was effective as of 31 December 2018." (at 41).

---

[7] Form 20-F is akin to a 10-K but for foreign issuers.

90.    This, it turned out, was a complete fabrication. None of the internal controls were established and implemented in a meaningful way, and so the amount of securities that were issued was not being tracked.

91.    On the same date, BBPLC also filed a 2018 20-F. The 20-F was signed by Defendant Ewart. The 2018 BBPLC 20-F was incorporated by reference into the 2018 Shelf. Similar to Barclays, BBPLC represented that "[t]here have been no changes in the Barclays Bank Group's internal control over financial reporting which have materially affected or are reasonably likely to materially affect the Barclays Bank Group's internal control over financial reporting during the year." 2018 BBPLC 20-F at 3.

92.    In its July 23, 2019 pricing supplement for VXX—which Barclays used to issue unregistered VXX shares—Barclays states at pp. 42-43 that the market may be affected by Barclays' purchase/sale decisions, but omits the fact that Barclays' new issuances are likely to cause the indicated value—and thereby the price—to depreciate. It also represented, relevantly, in pages 42-43 in the notes that Barclays could do whatever it wanted with VXX, reserving for itself all rights and powers to manage the VXX market however it wanted, whether directly or through its "affiliate, Barclays Capital, Inc."

93.    Again, the 2019 BPLC 20-F described the Company's "robust internal controls," specifically stating that Company was on track to complete a three-year program at the end of March 2020, known as the Barclays Internal Control Environment Programme or "BICEP," that "was focus[ed] on strengthening the internal control environment," and had left the Company's internal controls environment "in a much stronger position. 2018 BBPLC 20-F at 11.

94.    The 2019 BPLC 20-F further stated that the Company "is committed to operating within a strong system of internal control," and lays out eight "Principal Risks…: Credit risk,

Market risk, Treasury and Capital risk, Operational risk, Model risk, Reputation risk, Conduct risk and Legal risk." The 2019 BPLC 20-F went on to state that the Company's "frameworks, policies and standards enable Barclays to meet regulators' expectations relating to internal control and assurance." 2019 BPLC 20-F at 37.

95.     The 2019 BPLC 20-F stated that the Barclays Board Audit Committee "concluded that, throughout the year ended 31 December 2019 and to date, the Group has operated a sound system of internal control that provides reasonable assurance of financial and operational controls and compliance with laws and regulations." The 2019 BPLC 20-F also stated that "Management has assessed the internal control over financial reporting as of 31 December 2019. In making its assessment, management utilized the criteria set out in the 2013 COSO framework and concluded that, based on its assessment, the internal control over financial reporting was effective as of 31 December 2019." 2019 BPLC 20-F at 38.

96.     Attached as Exhibit 12.1 to the 2019 BPLC 20-F were certifications, pursuant to 17 C.F.R. 240.13(A)-14(A), signed by Defendants Staley and Morzaria, which stated, in relevant part, that "[t]he company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and15d-15(f)) for the company[.]"

97.     On February 14, 2020, BBPLC filed its 2019 20-F.  The 20-F was signed by Defendant Ewart.  The 2019 BBPLC 20-F was incorporated by reference into the 2018 and 2019 Shelf Registrations.  BBPLC represented that "[t]here been no changes in the Barclays Bank Group's internal control over financial reporting which have materially affected or are reasonably

likely to materially affect the Barclays's internal control over financial reporting during the year."
2019 BBPLC 20-F at 15.

98.    Attached as Exhibit 12.1 to the 2019 BBPLC 20-F were certifications, pursuant to
17 C.F.R. 240.13(A)-14(A), signed by Defendants Staley and Ewart. The text of the certifications
was identical to the certifications attached as Exhibit 12.1 to the 2019 Barclays 20- F, and were
false for the same reasons.

99.    Attached as Exhibit 13.1 to the 2019 BBPLC 20-F was a certification, pursuant to
Section 906 of the Sarbanes-Oxley Act of 2002, signed by Defendants Staley and Ewart. The text
of the certifications were identical to the certifications attached as Exhibit 13.1 to the 2019 BPLC
20-F, and were false for the same reasons.

100.    On February 18, 2021, after Barclays exceeded the limit of registered securities
under the August 2019 Shelf, Barclays filed the 2020 BPLC 20-F. The 2020 BPLC 20-F was
signed by Defendant Morzaria. It touted "robust internal controls" specifically stating that Barclays
had recently "successfully completed" a three-year program, known as the Barclays Internal
Control Environment Programme or "BICEP," that "was focus[ed] on strengthening the internal
control environment across the Group," and had left the Company's internal controls environment
"in a much stronger position." 2020 BPLC 20-F at 14.

101.    The 2020 BPLC 20-F further stated that the Company "is committed to operating
within a strong system of internal control," and lays out eight "Principal Risks…: Credit risk,
Market risk, Treasury and Capital risk, Operational risk, Model risk, Reputation risk, Conduct risk
and Legal risk." The 2020 BPLC 20-F went on to state that the Company's "frameworks, policies
and standards enable Barclays to meet regulators' expectations relating to internal control and
assurance." 2020 BPLC 20-F at 39.

102.    The 2020 BPLC 20-F stated that the Barclays Board Audit Committee "concluded that, throughout the year ended 31 December 2020 and to date, the Group has operated a sound system of internal control that provides reasonable assurance of financial and operational controls and compliance with laws and regulations." 2020 BPLC 20-F at 39.

103.    Attached as Exhibit 13.1 to the 2020 BPLC 20-F was a certification, pursuant to Section 906 of the Sarbanes-Oxley Act of 2022, signed by Defendants Staley and Morzaria which attested to the truthfulness of the statements: "The Annual Report on Form 20-F for the year ended December 31, 2020 (the "Report") of Barclays fully complies with the requirements of section 13(a) of the Securities Exchange Act of 1934 and information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Barclays."

104.    Attached as Exhibit 12.1 to the 2020 BPLC 20-F were certifications, pursuant to 17 C.F.R. 240.13(A)-14(A), signed by Defendants Staley and Morzaria, which stated similar representations, as well representations about the veracity of the internal controls.

105.    The above disclosures were repeated in Barclays 2021 BPLC 20-F, 2021 BBPLC 20-F, and 2022 BPLC 20-F filings and 2022 BBPLC 20-F filings.

106.    That Barclays publicly stated it had followed the 2013 COSO protocols, but had not even established the first building block of internal controls under the COSO protocols—adequate monitoring—shows that the representations were false when made, and knowingly so.

107.    There are thousands of non-WKSI issuers in all parts of the world who participate in the U.S. securities market. Barclays cannot claim mere negligence for not implementing the most basic protocols and methods for monitoring issuances that are used by thousands of other issuers worldwide and who do not exceed their Registration caps before filing for a new registration. Barclays's certified representations that it had implemented those controls when it

was faced with the knowledge of the need to do so and how to do so is reckless, if not intentional.

108.    Barclays admitted that its staggering-in-scope violation of securities laws is the result of its failure to put into place any internal controls around the real-time tracking of securities being offered or sold off of its 2018 and 2019 Commission-registered Shelf Registration Statements. For a great read that describes the significance of Barclays' admissions, *see* Matt Levin's "Barclays Lost Track of Its Notes," Bloomberg, October 4, 2022.

E. THE UNREGISTERED ISSUANCES

109.    Barclay's failure to have robust internal controls meant that it miscalculated how much room it had left on the 2018 Shelf. Consequently, it issued $1.3 billion in securities after June 26, 2019, that were unregistered, relying on the 2018 Shelf in error before it switched over to relying on the 2019 Shelf (the "Gap Period").

110.    The SEC requires an issuer like Barclays to have robust internal controls in place to ensure that it does not issue unregistered securities. Barclays is required to keep track of the securities it is selling, and then file a new registration statement and pay an additional  fee whenever it exhausts  the volume of securities covered by a prior shelf registration.

111.    Barclays was aware of this obligation as early as 2017. Indeed, it created a working group to track in real time the securities sold under shelf registrations. But no one was actually tracking the sales, and no internal controls were set in place to accomplish that.

112.    BBPLC 2018 Annual Report on Form 20-F filed on February 21, 2019, BBPLC 2019 Annual Report on Form 20-F filed on February 14, 2020, BBPLC 2020 Annual Report on Form 20-F filed on February 18, 2021, and BBPLC 2021 Annual Report on Form 20-F filed on February 23, 2022, were incorporated by reference into the 2019 Shelf Registration Statement, and represented to investors that BBPLC maintained effective internal controls over financial

reporting.

113.    BPLC 2018 Annual Report on Form 20-F filed on February 21, 2019, BPLC 2019 Annual Report on Form 20-F filed on February 13, 2020, BPLC 2020 Annual Report on Form 20-F filed on February 18, 2021, and BPLC 2021 Annual Report on Form 20-F filed on February 23, 2022, represented to investors that Barclays maintained effective internal controls over financial reporting.

114.    As it turned out, Barclays again started issuing billions in unregistered securities sometime in January 2021—but Barclays did not realize it for an entire *year*.

115.    According to the SEC's *Order Instituting Cease-And- Desist Proceedings Pursuant to Section 8a of The Securities Act of 1933 And Section 21c of The Securities Exchange Act of 1934, Making Findings, And Imposing A Cease-And-Desist Order*:

> On March 8, 2022, a member of Group Treasury reached out to the member of the legal department who had been part of the Working Group, inquiring as to how many securities remained available to be offered and sold off of the 2019 Shelf because Group Treasury was planning on doing a sale of corporate debt securities.

> Over the course of that day and the next, various [Barclays] personnel attempted to calculate the cumulative amount of securities offered and sold from the 2019 Shelf in order to determine the amount of securities that remained available for sale. Over the course of these efforts, it became clear to all involved that there was no internal control in place to track in real time the amount of securities offered and sold against the amount of securities registered.

> On or around March 9, 2022, [Barclays] personnel concluded that securities had been offered and sold in excess of what had been registered on the 2019 Shelf. Shortly thereafter, [Barclays] halted new offers and sales of securities from the 2019 Shelf and, on March 14, 2022, alerted regulators about the over-issuance and disclosed to the market that [Barclays] did not have sufficient issuance capacity to support further sales from inventory and any further issuances of certain ETNs.

https://www.sec.gov/litigation/admin/2022/33-11110.pdf.

116.    The SEC further found that:

At the time of the registration of both the 2018 Shelf and the 2019 Shelf, certain [Barclays] personnel recognized the need to accurately record relevant information about securities that were offered or sold so as to be able to track the aggregate amount of securities that were cumulatively offered and sold from each respective Shelf on a real-time basis, thereby ensuring that [Barclays] did not offer or sell any securities in excess of what had been registered. No internal control was established to address this issue, and the amount of securities that were offered and sold was not tracked.

. . . [B]eginning on or around June 26, 2019, [Barclays] offered and sold securities in excess of the amount remaining on the 2018 Shelf, ultimately leading to [Barclays] offering and selling approximately $1.3 billion of securities in excess of what was registered with the Commission on the 2018 Shelf. *Id.*

117.    The SEC further concluded that:

In addition, due to its failure to establish any internal control to track the amount of securities that were offered or sold on a real-time basis, beginning on or around January 28, 2021, [Barclays] offered and sold securities in excess of what was registered on the 2019 Shelf. These over-issuances continued until on or around March 9, 2022, when [Barclays] discovered this issue. Over the 14-month period of over-issuance, [Barclays] offered and sold approximately $16.37 billion of securities in excess of what was registered with the Commission on the 2019 Shelf.

On March 14, 2022, [Barclays] reported the issue to regulators and disclosed to the market that [BARCLAYS] did not have sufficient issuance capacity to support further sales from inventory and any further issuances of certain exchange-traded notes ("ETNs"). *Id.*

118.    The totality of the findings of fact and subsequent actions in the SEC Order and Consent Decree are incorporated herein by reference. Plaintiffs contend that Barclays is estopped from denying same in these proceedings.

---

119.    As a result of the investigation, Barclays paid the SEC penalties of $200,000,000 and disgorgement of $149,731,011 with pre-judgment interest.

120.    Nothing in the SEC's findings or any other filing suggested that the unregistered securities were somehow ripe for trading.

121.    In fact, it appears that the SEC required Barclays to register all of its unregistered securities, which Barclays announced it had done as of May 23, 2022.

122.    Given the dates, it indisputable that the following issuances of VXX were made without proper registration under Section 5 of the Securities Act:

| Date | Number of Shares | CUSIP | ISN |
|------|------------------|-------|-----|
| July 23, 2019 | 13,227,018[8] | 06746P621 | US06746P6218 |
| February 18, 2021 | 50,000,000[9] | 06746P621 | US06746P6218 |
| April 23, 2021 | 37,493,274[10] | 06747R477 | US06747R4772 |
| May 3, 2021 | 12,500,000[11] [50,000,000][12] | 06747R477 | US06747R4772 |
| October 22, 2021 | 25,000,000[13] [100,000,000][14] | 06747R477 | US06747R4772 |

123.    In other words, well over 150 million shares of VXX [unadjusted for splits]—worth upwards of $2 billion—were issued by Barclays without Registration under Section 5 of the Securities Act.

---

[8]    https://www.sec.gov/Archives/edgar/data/312070/000110465919026252/a19-9233_35424b2.htm (refers to and incorporates 2018 Shelf).

[9]    https://www.sec.gov/Archives/edgar/data/312070/000110465921128505/tm2130761d1_424b2.htm (refers to and incorporates the 2019 Shelf).

[10]    4:1 Reverse split. https://ipathetn.barclays/cms/static/files/ipath/press/2021_VXX_Reverse Split_Press_Release.

[11]    https://www.sec.gov/Archives/edgar/data/312070/000110465921128505/tm2130761d1_424b2.htm (refers to and incorporates the 2019 Shelf).

[12] Split adjusted basis to compare pre-split of April 23, 2021.

[13]    https://www.sec.gov/Archives/edgar/data/312070/000110465921128505/tm2130761d1_424b2.htm (refers to and incorporates the 2019 Shelf).

[14] Split adjusted basis to compare pre-split of April 23, 2021.

*The Reverse Split*

124.    On April 9, 2021, Barclays announced a 4:1 reverse split for VXX to be consummated on April 23, 2021 (the "April 23rd Reverse Split"). For every four shares that an investor held, Barclays would replace it with a single new share ostensibly worth four times the value. For any fractional shares leftover, Barclays would cash them out at a specific calculation roughly equivalent to the indicated value.[15]

125.    Thus, Plaintiff' purchased one new VXX share under a new CUSIP number in exchange for four old ones, effective on April 23, 2021.

126.    This, of course, was after the June 26, 2019 and January 28, 2021 dates when Barclays had exhausted the securities available from the 2018 Shelf and the 2019 Shelf.

127.    On a split-adjusted basis, VXX traded at $27 per share one month after the close of the Barclays Recission Offer on September 12, 2022. The shares hit a new low of $10.71 on March 6, 2023, one day prior to undergoing another one-for-four reverse split.

128.    Plaintiffs contend that they received unregistered shares directly from Barclays, and so they will be able to trace their shares to Barclays and to an unregistered issuance.

129.    Plaintiffs further submit that discovery will allow them to trace their shares via Barclays internal documents and those of Approved Participants, and an analysis will show which VXX shares were sold without a valid registration statement, if same is necessary. However, Barclays has not published the information.

130.    Plaintiffs did not discover and, by the exercise of reasonable diligence, could not possibly have discovered that the shares they purchased were unregistered before, at the very

---

[15] https://ipathetn.barclays/cms/static/files/ipath/press/2021_VXX_Reverse_Split_Press_Release.pdf

earliest, March 28, 2022. Moreover, the shares they purchased were neither sold nor bona fide offered to the public more than three years before the filing of this action.

131.    As of April 23, 2021, the date of the reverse split, around 43% of the VXX shares in the market were unregistered.

132.    As of Barclays announcement on March 14, 2022, that it had issued billions in unregistered securities (but had not yet included VXX among the specific list), between the roughly 37.5 million [post-split] unregistered shares issued via the reverse split on April 23, 2021, and the 37,500,000 unregistered VXX shares issued in May and October of 2021, there were roughly 75,000,000 unregistered VXX shares in the market in total by October 22, 2021. The market value was approximately $2 billion.

133.    It is indisputable that the entire market for VXX contained unregistered VXX shares between April 23, 2021, and May 23, 2022, when Barclays purports to have registered the VXX shares [the "Traceable Period"].

F.  **THE AFTERMATH**

134.    Because of its discovery on March 9, 2022, that it had blown past its 2019 Shelf limit, Barclays announced on March 14, 2022, that it had suspended issuances in VXX.[16]

135.    On March 28, 2022, Barclays filed a Form 6-K with the SEC and publicly disclosed details around its internal control issues, Barclays announced it intended to make a rescission offer to buy back the unregistered securities in the over-issuance at the "purchase price." and an estimate of potential financial impact of the over-issuance at around £450 million ($590 million).[17]

---

[16] https://www.businesswire.com/news/home/20220314005483/en/Barclays-Suspends-Until-Further-Notice-Further-Sales-and-Issuances-of-Two-Series-of-iPath%C2%AE-ETNs-the%E2%80%9CETNs%E2%80%9D

[17] https://www.bloomberg.com/news/articles/2022-03-28/barclays-expects-591-million-loss-on-bond-error-delays-buyback

136.    Thus, Barclays did not define what "eligible securities" meant, and made no representations as to any limitations or conditions it would put on such an offer, nor that it would require strict tracing from investors and holders of VXX for any securities they intended to tender.

137.    The Market for VXX went into the stratosphere as short-sellers scrambled to buy cover for their shorts.

138.    On April 28, 2022, before the market opened for the day, Barclays issued its Q1 2022 Results Announcement, which contained financial results for the three months ended March 31, 2022. A copy of the Q1 2022 RA was filed by Barclays with the SEC as Exhibit 99.1 to a Form 6-K on April 28, 2022. Barclays admitted that the securities sold in excess of the maximum aggregate amount were unregistered, and that there was the potential for civil claims and regulatory enforcement actions to be brought against BBPLC.

139.    Critically, on page 31, Barclays confessed that: "Securities issued in excess of the limit are considered to be 'unregistered securities' for the purposes of US securities law with [] certain purchasers of those securities having the right to require [BBPLC] to repurchase those securities at their original purchase price with compensatory interest and the potential for the certain purchasers to bring civil claims and the SEC and other regulators to take enforcement actions against [BBPLC]."

140.    The Q1 2022 RA also confirmed that Barclays' internal controls were not effective and had a material weakness:

> …management has concluded that, by virtue of the fact that the over-issuance occurred and was not immediately identified, both BPLC and BBPLC had a material weakness in relation to certain aspects of their internal control environment and, as a consequence, their internal control over financial reporting for the year ended 31 December 2021 was not effective under the applicable Committee of Sponsoring Organizations (COSO) Framework. The material weakness that has been identified relates to a failure to monitor issuances of structured notes and ETNs under BBPLC's

> US Shelf during the period in which BBPLC's status changed from a "well-known seasoned issuer" to an "ineligible issuer" for US securities law purposes, and BBPLC was required to pre-register a set amount of securities to be issued under its US Shelf with the SEC. As a result of this failure, BBPLC issued securities in excess of that set amount.

141.    As part of its efforts to resolve the SEC proceedings, Barclays admitted to the over-issuances from the 2018 and 2019 Shelf Registrations, and it agreed to maintain auditable data.

142.    On May 4, 2022, Barclays held its 2022 Annual General Meeting (AGM), where Nigel Higgins, chairman of Barclays, and Defendant Venkatakrishnan addressed investors in their 2022 AGM Statements. Barclays 2022 AGM Statement. In his 2022 AGM Statement, Higgins addressed the over issuance:

> As I have said before, we do not get everything right. Let me say a few words about our recently reported failure to comply with SEC registration requirements, a failure which has cost us hundreds of millions of pounds, and more in reputation. First, all of us here were dismayed that, after so much progress, we had this entirely self-inflicted problem. We have not yet finished the review but I believe that we will find that, in all our complexities, we missed some simple tasks. This is not rocket science and we can and will do better, learning the lessons from this particular issue and applying discipline across all of our controls.  Barclays 2022 AGM Statement.

143.    On July 25, 2022, before the market opened for the day, Barclays issued a press release announcing that BBPLC was expected to commence the rescission offer on August 1, 2022 for a total of approximately "$17.6 billion of relevant securities issued in excess of amounts registered by BBPLC under its U.S. shelf registration statements. Such securities consist of c.U.S.$14.8 billion of structured notes and c.U.S.$2.8 billion of exchange traded notes."  This statement was materially misleading because it suggested that those with Exchange Traded Notes like VXX would be able to redeem, whereas Barclays had to have been intended to deny any such rescission submission by anyone who was not a direct purchaser during one of the unregistered ETN issuances.

---

144.    On August 1, 2022, Barclays commenced a formal rescission offer for all securities that had been issued without the proper registration statement (the "Securities"). The offer expired on September 12, 2022.[18] The offer included an itemized list of the purported Securities that qualified for a rescission claim, which included VXX. The offer did not, however, suggest that strict tracing for VXX holders would be required.

145.    However, while buried in the hundreds of pages of rescission filings, a single paragraph obliquely referenced the possibility that the rescission offer would not afford certain ETN holders a rescission, it did not specifically state that it applied to VXX holders, nor what that would even mean. Consequently, relying on their plain English understanding of the rescission offer that was publicly announced back in March, and having heard nothing publicly announced specifically as to VXX to contravene that understanding, every Plaintiff filed for rescission with Barclays to take advantage of the rescission offer—and did not try to dispose of their shares in the market. Every plaintiff stood to gain far more from rescission than they did from selling even in the then-inflated market for VXX.

### G.  PLAINTIFFS INVEST IN BARCLAYS' "VXX" AND TRY TO RESCIND

146.    Plaintiff May invested via her IRA accounts the following VXX shares:

| Trade Date | Quantity | Share Price | Total |
|---|---|---|---|
| 11/14/2019 | 249 | $18.2520 | $4,544.75 |
| 1/28/2020 | 450 | $13.6600 | $6,147.00 |
| 7/13/2020 | 750 | $35.2177 | $26,413.28 |
| 10/19/2020 | 280 | $23.0674 | $6,458.87 |
| 3/17/2021 | 1,000 | $12.6389 | $12,638.90 |
| 3/19/2021 | 1,000 | $12.9495 | $12,949.50 |

---

[18] https://www.sec.gov/Archives/edgar/data/312070/000119312522207620/d386666d424b5.htm.

| 4/1/2021 | 850 | $11.0050 | $9,354.25 |
| 4/1/2021 | 85 | $11.0350 | $937.98 |
| 4/12/2021 | 1,250 | $10.2258 | $12,782.25 |
| 6/4/2021 | 6 | $33.3681 | $200.21 |
| 6/4/2021 | 815 | $33.3537 | $27,183.27 |

147.    Plaintiff Ledgerwood invested via her IRA Rollover Account in the following VXX shares:

| Trade Date | Quantity | Share Price | Total |
| --- | --- | --- | --- |
| 1/27/2020 | 7,000 | $15.5000 | $108,500.00 |
| 5/13/2020 | 1,500 | $38.8016 | $58,202.40 |
| 5/22/2020 | 1,500 | $34.5750 | $51,862.50 |
| 7/13/2020 | 1,500 | $34.4800 | $51,720.00 |
| 8/10/2020 | 4,000 | $5.8450 | $103,380.00 |
| 10/19/2020 | 3,000 | $23.0768 | $69,230.40 |
| 12/21/2020 | 5,000 | $18.5260 | $92,630.00 |
| 2/8/2021 | 3,500 | $16.3796 | $57,328.60 |
| 2/8/2021 | 2,500 | $16.3750 | $40,937.50 |
| 4/1/2021 | 10,000 | $11.0392 | $110,392.00 |
| 6/4/2021 | 400 | $33.3385 | $13,335.40 |

148.    Plaintiff May relied on the Barclays public statements and attempted to take advantage of the rescission offer by properly submitting nine separate claims to the Barclays portal well in advance of the stated deadline.  Plaintiff Ledgerwood followed the same process and submitted nine claims to the Barclays portal several days prior to the cutoff. On September 17, 2022, Plaintiffs May and Ledgerwood received identically worded emails, one for each claim

submitted, notifying them that all of their claims had been rejected. Both May and Ledgerwood held their shares through the April 23, 2021 reverse split.

149.    Plaintiff Reed made the following purchases of VXX on his personal behalf:

| Trade Date | Quantity | Share Price | Total |
|---|---|---|---|
| 3/20/2020 | 2,000 | $62.21895 | $124,437.90 |
| 7/22/2020 | 8,520 | $29.3192958 | $249,800.40 |
| 7/22/2020 | 8,520 | $29.3158545 | $249,771.08 |
| 7/22/2020 | 8,520 | $29.3526995 | $250,085.00 |
| 7/22/2020 | 8,520 | $29.3177 | $249,786.80 |
| 12/31/2020 | 14,749 | $16.9 | $249,258.10 |

150.    Plaintiff Reed learned of the rescission offer through publicly available information and in reliance thereon submitted requests for rescission through the Barclays online rescission portal. All were denied on or about September 17, 2022.

151.    Reed held his shares through the April 23, 2021, reverse split.

152.    Plaintiff Howarth made the following purchases of VXX shares on his own behalf:

| Trade Date | Quantity | Share Price | Total |
|---|---|---|---|
| 7/22/2020 | 10 | $468.40 | $292.75 |
| 7/23/2020 | 15 | $465.28 | $436.43 |
| 7/24/2020 | 15 | $483.25 | $453.29 |
| 7/27/2020 | 20 | $473.44 | $591.80 |
| 7/28/2020 | 20 | $459.45 | $574.31 |
| 7/29/2020 | 20 | $457.36 | $571.70 |
| 7/31/2020 | 20 | $458.47 | $573.09 |
| 8/3/2020 | 20 | $454.19 | $567.74 |
| 8/4/2020 | 20 | $442.80 | $553.50 |

| | | | |
|---|---|---|---|
| 8/5/2020 | 20 | $432.27 | $540.34 |
| 8/6/2020 | 20 | $435.30 | $544.13 |
| 8/11/2020 | 20 | $423.12 | $528.90 |
| 8/12/2020 | 20 | $415.79 | $519.74 |
| 8/12/2020 | 20 | $406.67 | $508.34 |
| 8/14/2020 | 10 | $409.84 | $256.15 |
| 8/14/2020 | 10 | $409.86 | $256.16 |
| 9/14/2020 | 20 | $521.45 | $652.33 |
| 9/15/2020 | 20 | $402.53 | $503.16 |
| 9/16/2020 | 20 | $393.04 | $491.30 |
| 9/18/2020 | 20 | $382.40 | $478.00 |
| 9/21/2020 | 20 | $408.16 | $510.20 |
| 9/22/2020 | 20 | $410.32 | $512.90 |
| 9/24/2020 | 20 | $420.77 | $525.96 |
| 9/25/2020 | 20 | $420.14 | $525.18 |
| 9/25/2020 | 20 | $410.37 | $512.96 |
| 9/28/2020 | 20 | $409.20 | $511.50 |
| 9/29/2020 | 20 | $395.28 | $494.10 |
| 9/30/2020 | 20 | $393.36 | $491.70 |
| 9/30/2020 | 20 | $390.53 | $488.16 |
| 10/1/2020 | 20 | $396.20 | $495.25 |
| 10/2/2020 | 20 | $408.00 | $510.00 |
| 10/5/2020 | 20 | $406.05 | $507.56 |
| 10/6/2020 | 20 | $396.20 | $495.25 |
| 10/7/2020 | 20 | $396.93 | $496.16 |
| 10/8/2020 | 20 | $385.57 | $481.96 |
| 10/8/2020 | 20 | $378.36 | $472.95 |

| 10/12/2020 | 20 | $354.88 | $443.60 |
|---|---|---|---|
| 10/12/2020 | 100 | $354.03 | $2,212.69 |
| 10/13/2020 | 200 | $351.90 | $4,398.75 |
| 10/15/2020 | 100 | $366.37 | $2,289.81 |
| 10/15/2020 | 50 | $361.89 | $1,130.91 |
| 10/15/2020 | 50 | $353.25 | $1,103.91 |
| 10/16/2020 | 50 | $348.61 | $1,089.41 |
| 10/16/2020 | 50 | $353.71 | $1,105.34 |
| 10/16/2020 | 50 | $350.06 | $1,093.92 |
| 10/19/2020 | 50 | $357.91 | $1,118.47 |
| 10/20/2020 | 50 | $372.09 | $1,162.78 |
| 10/21/2020 | 50 | $366.14 | $1,144.19 |
| 10/22/2020 | 50 | $361.28 | $1,129.00 |
| 10/23/2020 | 50 | $358.17 | $1,119.28 |
| 10/23/2020 | 50 | $355.52 | $1,111.00 |
| 10/23/2020 | 50 | $354.47 | $1,107.72 |
| 10/26/2020 | 50 | $361.44 | $1,129.50 |
| 11/2/2020 | 40 | $407.02 | $1,017.55 |
| 11/2/2020 | 85 | $407.00 | $2,162.39 |
| 11/12/2020 | 500 | $324.11 | $10,128.44 |
| 11/12/2020 | 500 | $321.58 | $10,049.38 |
| 11/13/2020 | 500 | $305.26 | $9,539.38 |
| 11/16/2020 | 250 | $299.28 | $4,676.25 |
| 11/17/2020 | 250 | $295.41 | $4,615.78 |
| 11/18/2020 | 275 | $293.41 | $5,043.13 |
| 11/23/2020 | 275 | $293.48 | $5,044.33 |
| 2/5/2021 | 300 | $265.25 | $4,973.44 |

| 4/9/2021 | 1,000 | $163.28 | $10,205.00 |
| 4/9/2021 | 1,275 | $163.28 | $13,011.46 |
| 4/15/2021 | 1000 | $159.61 | $9,975.63 |
| 5/13/2021 | 400 | $181.48 | $4,537.00 |
| 5/13/2021 | 1,600 | $181.91 | $18,190.27 |

153.    Plaintiff Howarth learned of the rescission offer through publicly available information and, in reliance thereon, submitted 69 requests for rescission through the Barclays online rescission portal. All were denied on or about September 17, 2022.

154.    Howarth held his shares through the April 23, 2021, reverse split.

155.    Plaintiff Knapp made the following investments in the VXX shares:

| Trade Date | Quantity | Share Price | Total |
| --- | --- | --- | --- |
| 9/16/2020 | 16,100 | $24.8600 | $400,246.00 |
| 9/16/2020 | 5,593 | $24.8500 | $138,986.05 |
| 9/16/2020 | 1,200 | $24.8490 | $29,818.80 |
| 9/16/2020 | 2,600 | $24.8498 | $64,609.48 |
| 4/28/2021 | 829 | $39.3350 | $32,608.72 |

156.    Plaintiff Knapp had his trades submitted for rescission, and they too were denied by Barclays on or about September 17, 2022.

157.    Knapp held his shares held through the April 23, 2021, reverse split.

158.    Each Plaintiff contends that had they known before what they know now and understood VXX when they made purchases, and what they understand now, they never would have invested in VXX.

159.    Each Plaintiff has suffered damages due to the acts of the Defendants.

IV.

**CAUSES OF ACTION**

**COUNT ONE**
**SECTION 12(a)(1) OF THE SECURITIES ACT [15 U.S.C. § 77L(A)(1)]**
**Against Barclays & Does 1-12**

160.    Plaintiffs incorporate all factual averments in this Consolidated Class Action Complaint as if fully set forth herein.

161.    Beginning on June 26, 2019, Barclays offered and sold approximately $1.3 billion of securities in excess of what had remained on the 2018 Shelf.

162.    On July 23, 2019, Barclays issued 23,227,018 unregistered shares of VXX into the market bearing CUSIP 06746P621.

163.    On August 1, 2019, Barclays' new 2019 Shelf Registration statement went effective.  Beginning in January 2021, BBPLC offered and sold securities in excess of what was registered on the 2019 Shelf.

164.    On February 18, 2021, Barclays issued 50 million new unregistered shares of VXX into the market bearing CUSIP 06746P621. The prospectus for this referenced the 2019 Shelf but by February 18, 2021, Barclays had exhausted the capacity in the 2019 Shelf.

165.    As of April 23, 2021, over 63 million unregistered shares of VXX were on the market—approximately 43% of the total number of shares then available.

166.    On April 23, 2021, Barclays did a one-for-four reverse split of VXX. Barclays issued 37,493,274 unregistered shares of VXX into the market, issuing one unregistered share of VXX bearing CUSIP 06747R477 in exchange for four shares of VXX bearing CUSIP 06746P621 (and paying out any fractional shares remaining).

167.    Just ten days later, on May 3, 2021, Barclays issued 12,500,000 unregistered shares (adjusted pre-split, this would have been tantamount to 50,000,000 new unregistered shares) bearing CUSIP 06747R477 into the market. There is no publicly available amended prospectus or pricing supplement for this issuance.

168.    On October 22, 2021, Barclays issued 25,000,000 unregistered shares (adjusted pre-split, this would have been tantamount to 100,000,000 new unregistered shares) bearing CUSIP 06747R477 into the market. The amended prospectus/pricing supplement for this referenced the 2019 Shelf but by then Barclays had exhausted the capacity in the 2019 Shelf.

169.    Barclays thus offered and/or sold shares of VXX in violation of Section 5 of the Securities Act.

170.    Based on the foregoing, every person who held Barclays shares prior to April 23, 2021, and held through the following day, received unregistered shares from Barclays and is entitled to rescind them for the consideration paid (e.g., the value of four shares paid to Barclays as consideration).

171.    Therefore, all such persons are persons who "purchased [VXX] from" Barclays.

172.    Barclays has the burden of proving that an exemption to registration applies— meaning, there is a presumption that a security must be registered unless the issuer has fully complied with the terms of an exemption. The securities are void because they were sold without an effective registration statement and no exemption from registration was in effect or would be available. Moreover, Barclays is estopped from asserting any exemption.

173.    But based on the foregoing facts and the applicable law, Barclays cannot claim the benefit of any exemption under the Securities Act or under any SEC rule promulgated thereunder.

174.    Each of the Lead Plaintiffs acquired their VXX shares prior to April 23, 2021, and held shares through the April 23, 2021, surrendering some or all of them for value in the reverse split in exchange for a new, post-split share with a new CUSIP number.

175.    Accordingly, every Plaintiff and Class member who held VXX shares on April 23, 2021, and received a post-split share of VXX, received an unregistered share and acquired such shares of VXX from Barclays directly, and are entitled to rescission or rescisory damages under Section 12(a)(1).

176.    Furthermore, throughout the Class Period, numerous sales of VXX were made on days where Barclays, through its Approved Participants, sold and delivered unregistered shares of VXX directly to Plaintiffs and/or the Class members in violation of Section of 5 of the Securities Act.

177.    Because on such days that Barclays sold more than 50% of the shares on the day(s) members made their purchases, there is a near 100% probability that some of the shares were purchased from Barclays which will be borne out in discovery.

178.    Plaintiffs pray for damages, restitution, and/or all other relief to which they are justly entitled.

179.    Barclays Bank PLC is the issuer of the securities and is therefore liable, and Barclays PLC is the control person and is therefore liable under Section 15 of the Securities Act.

**COUNT TWO**
**SECTION 11 OF THE OF THE SECURITIES ACT [15 U.S.C. § 77K]**
*Against Barclays, Individual Securities Act Defendants, & Does 1-12*

180.    Plaintiffs incorporate all factual averments in this Consolidated Class Action Complaint as if fully set forth herein.

181.    The 2018 and 2019 Shelf Registrations included material misrepresentations.

182.    On February 22, 2018, Barclays filed a registration statement with the SEC for its 2018 Shelf, which was declared effective on March 30, 2018. It stated in no small measure that:

> Pursuant to Rule 415(a)(6) under the Securities Act, this registration statement will include $<u>25,000,000,000 in maximum aggregate offering price</u> of unsold securities that were previously registered on the registration statement on Form F-3 (File No. 333-216377) filed on March 1, 2017." "The undersigned Registrant hereby undertakes: (1) To file, during any period in which offers or sales are being made, a post-effective amendment to this Registration Statement: . . . (ii) To reflect in the prospectus any facts or events arising after the effective date of the Registration Statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a <u>fundamental change in the information</u> set forth in the Registration Statement. Notwithstanding the foregoing, <u>any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the SEC pursuant to Rule 424(b) if, in the aggregate,</u> the changes in volume and price represent no more than 20 percent change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective Registration Statement; and (iii) To include any material information with respect to the <u>plan of distribution</u> not previously disclosed in the Registration Statement or <u>any material change</u> to such information in the Registration Statement . . . ." (emphasis added).

183.    On June 14, 2019, Barclays filed a registration statement with the SEC for its 2019 shelf statement, which was declared effective on August 1, 2019, and included a specification of the maximum aggregate offering price of securities available to be offered or sold off that registration statement. It also stated:

> "The <u>maximum aggregate offering price</u> of all securities issued by the Registrant pursuant to this Registration Statement shall not exceed $<u>20,081,600,000</u> in U.S. dollars or the equivalent at the time of offering in any other currency . . . ." "The undersigned Registrant hereby undertakes: (1) To file, during any period in which offers or sales are being made, a post-effective amendment to this Registration Statement: . . . (ii) To reflect in the prospectus any facts or events arising after the effective date of the Registration Statement (or the most recent post-effective amendment thereof) which, individually or in

the aggregate, represent a <u>fundamental change in the information</u> set forth in the Registration Statement. Notwithstanding the foregoing, <u>any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the SEC pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than 20 percent change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective Registration Statement</u>; and (iii) To include any material information with respect to the <u>plan of distribution</u> not previously disclosed in the Registration Statement or <u>any material change</u> to such information in the Registration Statement . . . ." (emphasis added).

184.    Both the 2018 and 2019 registration statements falsely stated the aggregate amount of securities intended to be registered and sold.

185.    Both registration statements omitted the material fact of the true amount to be issued and/or that no internal controls were in place around the real-time tracking of securities being offered or sold off them.

186.    Plaintiffs acquired VXX securities that were or should have been covered by these registration statements and that were required to be registered.

187.    Beginning on June 26, 2019, Barclays offered and sold approximately $1.3 billion of securities in excess of what had remained on the 2018 Shelf.

188.    On July 23, 2019, Barclays issued 23,227,018 unregistered shares of VXX into the market bearing CUSIP 06746P621. The Pricing Supplement/Amended Prospectus incorporated the 2018 Shelf Registration to become a single Registration Statement under the Securities Act and therefore, for the purposes of this Count, the effective date of the 2018 Registration Statement was July 23, 2019. The prospectus referenced the 2018 Shelf but by June 26, 2019, Barclays had exhausted the capacity in the 2018 Shelf.

189.    On August 1, 2019, Barclays' new 2019 Shelf Registration statement went effective.  Beginning in January 2021, BBPLC offered and sold securities in excess of what was registered on the 2019 Shelf.

190.    On February 18, 2021, Barclays issued 50 million new unregistered shares of VXX into the Market bearing CUSIP 06746P621. The Pricing Supplement/Amended Prospectus incorporated the 2019 Shelf Registration to become a single Registration Statement under the Securities Act, and therefore, the effective date of the Registration statement for such shares was February 18, 2021. The prospectus for this referenced the 2019 Shelf but by February 18, 2021, Barclays had exhausted the capacity in the 2019 Shelf.

191.    As of April 23, 2021, over 63 million unregistered shares of VXX were on the market—approximately 43% of the total number of shares then available.

192.    On April 23, 2021, Barclays issued 37,493,274 unregistered shares of VXX, providing one unregistered share of VXX bearing CUSIP 06747R477 in exchange for four shares of VXX bearing CUSIP 06746P621 (and paying out any fractional shares remaining). Therefore, the effective date of the Registration statement for such shares was April 23, 2021.

193.    The shares sold by Barclays to Plaintiffs on April 23, 2021, would have had to have been issued pursuant to the 2018 Shelf and/or the 2019 Shelf, both of which contain material false and/or misleading statements and omissions.

194.    On May 3, 2021, Barclays issued 12,500,000 unregistered shares (adjusted pre-split, this would have been tantamount to 50,000,000 new unregistered shares) bearing CUSIP 06747R477 into the market. There is no publicly available amended prospectus or pricing supplement for this issuance, but the October 21, 2021, Pricing Supplement for the October 22, 2021, issuance refers to this issuance and its date and references the 2019 Shelf Registration.

195.    On October 22, 2021, Barclays issued 25,000,000 unregistered shares (adjusted pre-split, this would have been tantamount to 100,000,000 new unregistered shares) bearing CUSIP 06747R477 into the market. The Pricing Supplement/Amended Prospectus incorporated the 2019 Shelf Registration to become a single Registration Statement under the Securities Act, and therefore, the effective date of the Registration statement for such shares was October 22, 2021. The amended prospectus / pricing supplement for this referenced the 2019 Shelf but by then Barclays had exhausted the capacity in the 2019 Shelf.

196.    On May 23, 2022, Barclays purported to have registered all outstanding shares.

197.    Both the 2018 and 2019 registration statements contained other false statements and/or omissions about Barclays' internal controls, the number of registered shares to be offered, the impact of additional issuances on the rate of depreciation and the underlying cause thereof, Barclays' hidden profit business model undergirding VXX or the fact that as Barclays grew it VXX would tend to depreciate faster, Barclays  hidden model that leveraged the existence of small retail investors like Plaintiffs and the Rule 11 subclass in order to create a market for VXX for the benefit of large institutional investors, and all other misrepresentations pled herein.[19]

198.    Each of the Plaintiffs explicitly and/or implicitly relied on the market integrity for VXX and the registration statements as having properly registered the VXX shares and was unaware of the material omissions listed above when they made their acquisitions of the shares.

---

[19] Even the predecessor to the current VXX, called VXX-B, was registered on January 17, 2018, and shortly thereafter the ticker was changed to "VXX". https://www.sixfigureinvesting.com/2018/12/vxx-maturity-vxxb-replacement/. The Registration statement for VXX-B likewise contained all the same false statements (other than the number of shares to be registered) and omissions. See https://www.sec.gov/Archives/edgar/data/312070/0001104659 18002717/a18-3279_9424b2.htm.

199.    The securities are void because they were sold without an effective registration statement, and no exemption from registration was in effect or would be available. Moreover, Barclays is estopped from asserting any exemption.

200.    Any person who acquired VXX in 2019 or later purchased shares issued under the 2018 or 2019 registration statements, and so such person will be able to trace their share to a false registration statement and is entitled to sue for damages under Section 11(a) of the Securities Act.

201.    Any person who acquired VXX after April 23, 2021, but on or prior to May 23, 2022, will be able to trace their share to a false registration statement (either the 2019 or 2018 shelf) and is entitled to sue for damages under Section 11(a) of the Securities Act.

202.    Each of the Plaintiffs acquired VXX shares issued pursuant to either the 2018 or 2019 registration statements (there is not another registration statement), both of which contained the same or similar materially false statements and/or omissions. Therefore, Plaintiffs can easily trace their shares as would a Section 11 subclass.

203.    Barclays and the Individual Securities Act Defendants are liable pursuant to Section 11(a)(1)-(5) to Plaintiffs and the Class for damages as provided in Section 11(e).

204.    Barclays Bank PLC is the issuer of the securities and is therefore liable, and Barclays PLC is the control person and is therefore liable under Section 15 of the Securities Act.

## COUNT THREE
### SECTION 12(a)(2) OF THE SECURITIES ACT [15 U.S.C. § 77l(a)(2)]
### Against Barclays & Does 1-12

205.    Plaintiffs incorporate all factual averments in this Consolidated Class Action Complaint as if fully set forth herein.

206.    On February 22, 2018, Barclays filed a registration statement with the SEC for its 2018 shelf statement, which was declared effective on March 30, 2018, and included a

specification of the maximum aggregate offering price of securities available to be offered or sold off that registration statement.

207.    On June 14, 2019, Barclays filed a registration statement with the SEC for its 2019 shelf statement, which was declared effective on August 1, 2019, and included a specification of the maximum aggregate offering price of securities available to be offered or sold off that registration statement.

208.    The 2018 and 2019 Shelf Registrations [and their amendments and supplements] included material misrepresentations.

209.    The 2018 and 2019 Shelf Registrations [and their amendments and supplements] falsely stated the aggregate amount of securities intended to be registered and sold.

210.    The 2018 and 2019 Shelf Registrations [and their amendments and supplements] omitted the material fact of the true amount to be issued and/or that no internal controls were in place around the real-time tracking of securities being offered or sold off them.

211.    The 2018 and 2019 Shelf Registrations [and their amendments and supplements] contained other false statements and/or omissions about Barclays internal controls, the number of registered shares to be offered, the impact of additional issuances on the rate of depreciation and the underlying cause thereof, Barclays' hidden profit business model undergirding VXX or the fact that as Barclays grew it VXX would tend to depreciate faster, Barclays hidden model that leveraged the existence of small retail investors like Plaintiffs in order to create a market for VXX for the benefit of large institutional investors, and all other misrepresentations pled herein.

212.    Each of the Plaintiffs explicitly and/or implicitly relied on the market integrity for VXX when purchasing the shares and/or acquiring them from Barclays, and on registration

statements as having properly registered the VXX shares and was unaware of the material omissions listed above when they made their acquisitions of the shares.

213.    Beginning on June 26, 2019, Barclays offered and sold securities in excess of what had remained on the 2018 Shelf.

214.    On July 23, 2019, Barclays issued 23,227,018 unregistered shares of VXX into the market bearing CUSIP 06746P621.

215.    On August 1, 2019, Barclays' new 2019 Shelf Registration statement went effective.  Beginning in January 2021, BBPLC offered and sold securities in excess of what was registered on the 2019 Shelf.

216.    On February 18, 2021, Barclays issued 50 million new unregistered shares of VXX into the market bearing CUSIP 06746P621. The prospectus for this referenced the 2019 Shelf but by February 18, 2021, Barclays had exhausted the capacity in the 2019 Shelf.

217.    As of April 23, 2021, over 63 million unregistered shares of VXX were on the market—approximately 43% of the total number of shares then available.

218.    On April 23, 2021, Barclays did a one-for-four reverse split of VXX. Barclays issued 37,493,274 unregistered shares of VXX into the market, issuing one unregistered share of VXX bearing CUSIP 06747R477 in exchange for four shares of VXX bearing CUSIP 06746P621 (and paying out any fractional shares remaining).

219.    Just ten days later, on May 3, 2021, Barclays issued 12,500,000 unregistered shares (adjusted pre-split, this would have been tantamount to 50,000,000 new unregistered shares) bearing CUSIP 06747R477 into the market. There is no publicly available amended prospectus or pricing supplement for this issuance.

220.    On October 22, 2021, Barclays issued 25,000,000 unregistered shares (adjusted pre-split, this would have been tantamount to 100,000,000 new unregistered shares) bearing CUSIP 06747R477 into the market. The amended prospectus/pricing supplement for this referenced the 2019 Shelf but, again, by then Barclays had exhausted the capacity in the 2019 Shelf.

221.    Barclays thus offered and/or sold shares of VXX in violation of Section 5 of the Securities Act.

222.    The securities are void because they were sold without an effective registration statement and no exemption from registration was in effect or would be available. Moreover, Barclays is estopped from asserting any exemption.

223.    Based on the foregoing, every person who held Barclays shares prior to April 23, 2021, and held through the following day, received unregistered shares from Barclays and is entitled to rescind them for the consideration paid (e.g., the value of four shares paid to Barclays as consideration).

224.    Therefore, such persons are persons who "purchased [VXX] from" Barclays.

225.    Barclays cannot rely on an exemption for this Cause of Action. And based on the foregoing facts and the applicable law, Barclays cannot claim the benefit of any exemption under the Securities Act or under any SEC rule promulgated thereunder and is estopped from asserting same.

226.    Each of the Plaintiffs acquired VXX shares issued pursuant to either the 2018 or 2019 registration statements (there is not another registration statement), both of which contained the same or similar materially false statements and/or omissions.

227. Any person who acquired VXX after April 23, 2021, but on or prior to May 23, 2022, will be able to trace their share to a false registration statement (either the 2019 or 2018 shelf) and is entitled to sue for damages under Section 12(a)(2) of the Securities Act.

228. Each of the Lead Plaintiffs acquired their VXX shares prior to April 23, 2021, and held shares through the April 23, 2021, surrendering some or all of them for value in the reverse split in exchange for a new, post-split share with a new CUSIP number.

229. Accordingly, every Plaintiff and Class member who held VXX on April 23, 2021, and received a post-split share of VXX, received an unregistered share and acquired such shares of VXX from Barclays directly, and is entitled to rescission or rescissory damages under Section 12(a)(2).

230. Furthermore, throughout the Class Period, numerous sales of VXX were made on days where Barclays, through its Approved Participants, sold and delivered unregistered shares of VXX directly to Plaintiffs and/or the Class members in violation of Section of 5 of the Securities Act and by interstate means using the wires, pursuant to the false prospectuses.

231. And because on such days that Barclays sold more than 50% of the shares on the day(s) members made their purchases, there is a near 100% probability that some of the shares were purchased from Barclays, which will be borne out in discovery.

232. Plaintiffs pray for damages, restitution, and/or all other relief to which they are justly entitled.

## COUNT FOUR
### SECURITIES FRAUD SCHEME LIABILITY UNDER SECTION 10(b) AND RULE 10b-5 OF THE EXCHANGE ACT OF 1934
### Against Barclays, the Individual Exchange Act Defendants and Control Persons

233. Plaintiffs respectfully incorporate all factual averments in this Consolidated Class Action Complaint as if fully set forth herein. To the extent any factual allegation alleged in support

of this claim conflicts with any other, it should be deemed to have been pled in the alternative.

234.    The purpose in the Securities Act of requiring clear disclosures in plain English was "'to substitute a philosophy of full disclosure for the philosophy of caveat emptor . . . in the securities industry.'" *Basic Inc. v. Levinson*, 485 U.S. 224, 234 (1988) (quoting *SEC v. Capital Gains Research Bureau, Inc*., 375 U.S. 180, 186. (1963)).

235.    Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), provides that "[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange— (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange *or any security not so registered*, … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

236.    Rule 10b-5, 17 C.F.R. § 240.10b-5, states that "[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud,…or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." These "scheme liability" provisions of Rule 10b-5 do not require proof of a false statement or reliance thereon and are outside the prescriptions of the PSLRA.

237.    Based upon the facts alleged herein, Defendants violated Section 10(b) and Rule 10b-5 in that they, in connection with the purchase of Barclays VXX shares by the Plaintiffs and the Class, used or employed manipulative and deceptive devices or contrivances in contravention of rules and regulations set forth by the SEC, which operated as a fraud and deceit upon the

Plaintiffs and the Class during the Class Period.

238.    Defendants engaged in a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein into purchasing shares of VXX; (ii) cause Plaintiffs and other members of the Class to purchase shares of VXX under the misapprehension that all shares in the market were properly registered, (iii) cause Plaintiffs and other members of the Class to purchase VXX shares (whether or not registered) under the incorrect belief that it was an effective means to hedge the kinds of risk that they were taking and were able to manage, and (iv) cause Plaintiffs and other members of the Class to suffer losses directly due to Barclays scheme to enrich itself at the expense of retail investors, which increased every time Barclays issued new VXX shares, whether registered or not.

239.    Given that it takes a highly sophisticated investor to buy or sell the VIX Futures that undergird VXX, it is no big leap to conclude that retail investors were easily duped by Barclays into investing in VXX write-large. The underlying asset class of VXX cannot generally be traded by retailer investors; it generally requires one to have an ISDA membership or affiliation, and/or to be a Qualified Institutional Buyer or the like to have access. The reason for this restriction on certain highly complex securities, such as synthetic futures (which is what futures contracts on the VIX are), is because no amount of disclosure, no amount of warning, is sufficient to give notice to some investors what they are truly buying and what risk they are truly taking on.

240.    Upon information and belief, Barclays utilizes special affiliates called Approved Providers whose job it is to essentially serve as market makers. Their role? To buy VXX when it is below the indicative value (and it can sell to Barclays for an arbitrage profit) and buy VXX from Barclays at the money when VXX is above indicative value and sell into the market for an arbitrage

profit. None of this was disclosed to the average retail investing public and was only uncovered by highly sophisticated consultants retained by Lead Counsel.

241.    And only large investors can "put" the shares to Barclays 25,000 at a time. Retail VXX holders are slave to the market and wholly reliant on being able to find the "greater fool." Barclays' marketing of VXX to the retail investor public is a classic artifice because it *needs* those investors to hold VXX so that there is a large enough market to maintain sufficient liquidity. The retail investors are the prey for the institutional investor predators—without them, the market for VXX would collapse. ***So how does it come to be that a retail investor to whom Barclays could never sell either side of a VIX futures contract directly come to hold those interests indirectly?***

242.    That both the United Kingdom and Europe have prohibited VXX from being sold to retail investors is plausible proof that their regulators—who are far more proactive than the SEC in investor protection[20]--determined that no amount of disclosure is enough to apprise retail investors of the risks of VXX.

243.    In addition to the SEC rules already discussed herein, Barclays violated the Plain English rules issued by the SEC.[21] In particular, Barclays' failure also failed to disclose the complete business and conflicts of interest, or the complexity of the underlying roll of VIX futures and its impact on holders of VXX. The prospectuses and pricing supplements for VXX use vague disclosures and warnings that are incredibly unspecific, and insufficient to enable someone to properly evaluate their risk and to properly evaluate the proper use of VXX as an instrument. They use several complex terms and glossary definitions. That the disclosures are wholly inadequate to apprise the average investor of the mechanics, and therefore the true risks of VXX, is just another

---

[20] E.g., https://www.thomsonreuters.com/en-us/posts/investigation-fraud-and-risk/esg-gap-widens/
[21] *See, e.g.,* SEC discussion of Plain Writing Act of 2010 (https://www.sec.gov/plainwriting). *See* also Staff Legal Bulletin No. 7 (https://www.sec.gov/interps/legal/slbcf7.htm)

reason to find for Plaintiffs and the Class.

244.    Barclays also engaged in an egregious manipulative scheme by allowing VXX to balloon. At over a billion dollars in 2019, 2020, and 2021, Barclays' need to engage in VIX futures trades to support VXX represented a material percentage of the market for VIX futures. Once Barclays's VXX float grew to several billion dollars, it required hundreds of millions in constant purchasing and selling of VIX one-month and two-month futures to maintain the 30-day spread for the VXX. That contributed to the decline in the VXX price at an accelerated rate.

245.    Even if the above is not in itself a fraudulent scheme, that Barclays decided to sell over 150 million shares of VXX [unadjusted for splits]—worth upwards of $2 billion issued by Barclays without registration under Section 5 of the Securities Act is such a scheme. The issuance of these shares should never have occurred, but materially contributed to the accelerated depreciation suffered by the Plaintiffs and the members of the Class.

246.    In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them took the actions set forth herein.

247.    This scheme was in connection with the purchase or sale of a security. Plaintiffs and the other members of the Class, relying directly or indirectly on the Defendants' scheme, and upon the integrity of the market in which the VXX trade, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants (but not adequately disclosed in public statements by Defendants during the Class Period), purchased VXX during the Class Period and were damaged thereby.

248.    At the time of the purchases, Plaintiffs and other members of the Class were ignorant of Barclays's scheme. Had Plaintiffs and the other members of the Class and the marketplace known of the truth regarding (a) Barclays's misaligned incentives in managing the

VXX roll process and its undisclosed usage of arbitrageurs, (b) the extreme risks that awaited retail investors when investing in VXX, and (c) the accelerated depreciation of their shares every time Barclays issued new VXX—all of which were misrepresented by Defendants and none of which were disclosed by Defendants—Plaintiffs and other members of the Class would not have purchased VXX and/or would not have lost the same amount of money due to the scheme.

249.    Furthermore, an adjunct to this scheme is the fact that Barclays intentionally used the same CUSIP numbers for multiple issuances and without any means of tracking which shares were registered or not. Because of this, Barclays continued its deceit in the manner it went about handling the rescission offer and as a means of covering it up and avoiding accountability, thus victimizing Plaintiffs and the members of the Class further.

250.    As set forth herein, Defendants had actual knowledge, or, if not actually aware of the acts and omissions stated herein, Defendants were reckless in failing to obtain such knowledge by deliberately and recklessly failing to take the steps necessary to mitigate the scheme or end it.

251.    By virtue of the foregoing, Barclays and the Individual Exchange Act Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

252.    Defendants are liable both directly and indirectly for their violations of Section 10(b) and Rule 10b-5 and the wrongs complained of herein.

253.    Unlike in the decision in *In re Proshares Trust II Sec. Litig*., No. 19cv0886, 2020 U.S. Dist. LEXIS 1533, *1 (S.D.N.Y. Jan. 3, 2020), where the matter was not pled as a scheme liability theory but one of pure lack of disclosure, this Count involves a fraudulent scheme, the specific contours of which were not at issue in the prior case; nor did *In re Proshares* have the added exacerbation of the unregistered shares which makes this a materially different case.

254.    Plaintiffs demand damages equal to the specific losses they suffered due to the

scheme under Section 10(b) and Rule 10b-5(a) and (c).

## COUNT FIVE
### SECURITIES FRAUD MISSTATEMENT LIABILITY UNDER RULE 10b-5 OF THE EXCHANGE ACT OF 1934
### Against Barclays and Individual Exchange Act Defendants

255.    Plaintiffs respectfully incorporate all factual averments in this Consolidated Class Action Complaint as if fully set forth herein. To the extent any factual allegation alleged in support of this claim conflicts with any other, it should be deemed to have been pled in the alternative.

256.    Rule 10b-5, 17 CFR § 240.10b-5, states that "[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, …(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading,…in connection with the purchase or sale of any security."

257.    Based upon the facts alleged herein, Barclays and the Individual Exchange Act Defendants (together, for the purposes of this Count, "Defendants") violated Section 10(b) and Rule 10b-5 in that they, in connection with the purchase of VXX by the Plaintiffs and the Class, used or employed manipulative and deceptive devices or contrivances in contravention of rules and regulations set forth by the SEC and made untrue statements of material facts and/or omitted to state material facts necessary to make the statements not misleading, which operated as a fraud and deceit upon the Plaintiffs and the Class during the Class Period.

258.    Defendants engaged in a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and/or maintain the market price of VXX; and (iii) cause Plaintiffs and other members of the Class to purchase VXX at artificially

inflated and/or maintained prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

259.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Barclays' business, operations and prospects, as specified herein.

260.    As a result of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the price for VXX was inflated. Defendants' misrepresentations thus caused Plaintiffs to purchase VXX at prices above the ordinary discount that the market would have applied had it been aware that a substantial portion of the VXX shares were unregistered and therefore could not be sold in the public market.[22]

261.    The fact that there is a "market for lemons" does not preclude the fact that Plaintiffs who purchased VXX after June 26, 2019, and before March 28, 2022, were injured—rather, it is borne out by the fact the Approved Participants fled the market when Barclays revealed the truth about the unregistered VXX shares. Volume dropped precipitously and never recovered. Institutional investors flooded in to cover their short positions, which had an effect on price, but Barclays' rescission offer had the effect of depressing supply while all the retail investors held to their shares in the hopes of making their money back in the rescission offer.

262.    Thus, Plaintiffs maintain, the market price of VXX was artificially inflated and/or maintained, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the market in which the VXX trade, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not

---

[22] Accord *ONTI, Inc. v. Integra Bank*, 751 A.2d 904, 915 (Del. Ch. 1999) (unregistered shares cannot be sold in the public market ,but could be sold privately at a discount to public market valuation).

disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class who purchased VXX during the Class Period at artificially inflated and/or maintained prices and were damaged thereby.

263.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known of the truth regarding (a) the lack of processes or controls that could lead to over issuances, or (b) the over issuance of securities by BBPLC and the failure of Barclays' internal controls, all of which were misrepresented by Defendants and none of which were disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased VXX, or, if they had purchased VXX during the Class Period, they would not have done so at the artificially inflated and/or maintained prices that they paid.

264.    In addition to the SEC rules already discussed herein, Barclays violated the Plain English rules issued by the SEC.[23] In particular, Barclays also failed to disclose the complete business and conflicts of interest, or the complexity of the underlying roll of VIX futures and its impact on holders of VXX. The prospectuses and pricing supplements for VXX use vague disclosures and warnings that are incredibly unspecific and insufficient to enable someone to properly evaluate their risk and to properly evaluate the proper use of VXX as an instrument. They use several complex terms and glossary definitions. That the disclosures are wholly inadequate to apprise the average investor of the mechanics, and therefore the true risks of VXX, is just another reason to find for Plaintiffs and the Class.

265.    As set forth herein, Defendants had actual knowledge, or, if not actually aware of the acts and omissions stated herein, Defendants were reckless in failing to obtain such knowledge

---

[23] *See, e.g.,* SEC discussion of Plain Writing Act of 2010 (https://www.sec.gov/plainwriting). *See* also Staff Legal Bulletin No. 7 (https://www.sec.gov/interps/legal/slbcf7.htm)

by deliberately and recklessly failing to take the steps necessary to discover whether the statement being made were in fact true, and by failing to install the most basic and well-known protocols and internal controls to provide reasonable assurance of compliance.

266.    By virtue of the foregoing, Barclays and the Individual Exchange Act Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

267.    Defendants are liable both directly and indirectly for their violations of Section 10(b) and Rule 10b-5 and the wrongs complained of herein.

268.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the VXX shares during the Class Period.

**COUNT SIX**
**COMMON LAW FRAUD/ESTOPPEL**
**Against Barclays**

269.    Plaintiffs respectfully incorporate all factual averments in this Consolidated Class Action Complaint as if fully set forth herein. To the extent any factual allegation alleged in support of this claim conflicts with any other, it should be deemed to have been pled in the alternative.

270.    On March 28, 2022, Barclays announced it would be rescinding securities sales due to its issuance of 17.7 billion in unregistered shares.

271.    Each plaintiff learned of this opportunity sometime thereafter and relied on it— believing that they would be able to sell their VXX shares to Barclays.

272.    None of the Plaintiffs is a lawyer, and so none of them was aware of the tracing requirements or direct seller requirements in Sections 11 or 12 of the Securities Act.

273.    In fact, Barclays' multiple public statements, like this quoted in the Financial Times which was specifically discussing VXX, suggested that Barclays was well aware of which

securities were, and were not, going to be rescinded:

> As part of its structured products business, Barclays Bank PLC ("BBPLC"), a subsidiary of Barclays PLC ("BPLC"), is a frequent issuer of structured notes and exchange traded notes in the United States and elsewhere.
>
> These securities are often issued to meet actual and anticipated client demand for such securities. BBPLC has determined that the securities offered and sold under its US shelf registration statement during a period of approximately one year exceeded the registered amount (such excess, the "Affected Securities") giving rise to a right of rescission among certain purchasers of Affected Securities requiring BBPLC to repurchase the Affected Securities at their original purchase price. As a result, BBPLC has elected to conduct a rescission offer to eligible purchasers of the Affected Securities. Details of the rescission offer will be published by BBPLC in due course.
>
> Based on current market prices of the Affected Securities and the estimated pool of potentially eligible purchasers electing to participate in the rescission offer, Barclays expects the rescission losses (net of tax) to be c.£450mn.[24]

274.    The £450mn estimate is also misleading as it suggests that that is the value of all securities sold by Barclays in violation of the Registration Requirement under § 5 of the Securities Act—or what Barclays called the "Affected Securities." As noted above, Barclays issued over 50,000,000 in unregistered shares of VXX between the July 23, 2019 issuance, and the February 13, May 3, and October 22, 2021, issuances. These had a face value of over $1.3 billion.

275.    But nothing in Barclays' public statements disclaim that retail holders of VXX were ineligible for rescission. Nor did they specifically refer to any requirement for tracing or direct seller relationship for VXX.

276.    Buried in the formal rescission offer filed with the SEC was a statement that some holders of ETNs would likely not be able to rescind. But this was not in any of the public discourse which took root before the rescission offer was published. Meanwhile, it conflicted directly with the rest of Barclays' public statements which suggested that VXX holders would be able to rescind

---

[24] https://www.ft.com/content/386df3ee-4b9d-45c5-9ae1-d5dffb2a822e.

their purchases, and it conflicts with the balance of the rescission offer document which clearly contemplated an opportunity to rescind.

277.    The rescission offer's pithy disclaimer could only be read by lawyers—and even then it did not specify VXX or any of the requirements.

278.    Rather, the rescission offer itself, if one were to read it, was equivocal. It put VXX on its list of eligible rescindable transactions. Yet, Barclays knew—and did not say—that only a small handful of institutional investors would be able to take advantage of the offer, because anyone who purchased VXX in the open market would not be able to prove that their shares were unregistered.

279.    Plaintiffs and members of the Class relied on these misrepresentations and omissions by holding on to their shares while they worked through the rescission process, only to be summarily denied.

280.    Barclays also issued multiple issuances of VXX with the same CUSIP numbers and without individual identifiers making it impossible, according to Barclays, for it to identify which shares were registered and which ones were not. This was intentional and purposeful given that it knew that it would have to account for securities issuances as a non-WKSI issuer.

281.    But for Barclays' misrepresentations and omissions about VXX's potential eligibility for the rescission offer, Plaintiffs would have been able to sell when the market was up. Instead, they lost even more money.

282.    Because of that reliance, Plaintiffs and members of the Class were damaged.

283.    Plaintiffs and members of the Class are entitled to damages and punitive damages.

284.    Plaintiffs and members of the Class are entitled to seek estoppel against Barclays on the issue of their right to rescind.

## COUNT SEVEN
### CONTROL PERSON LIABILITY
### Against Control Person Defendants

285.    Plaintiffs respectfully incorporate all factual averments in this Consolidated Class Action Complaint as if fully set forth herein. To the extent any factual allegation alleged in support of this claim conflicts with any other, it should be deemed to have been pled in the alternative.

286.    The Control Person Defendants acted as controlling persons of Barclays within the meaning of Section 15 of the Securities Act and/or Section 20(a) of the Exchange Act as alleged herein.

287.    By virtue of their high-level positions with Barclays, participation in, and/or awareness of its operations, and intimate knowledge of the false statements filed by Barclays with the SEC and disseminated to the investing public, the Control Person Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Barclays, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.

288.    Each of the Control Person Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

289.    The Control Person Defendants were also responsible for creating and overseeing Barclays' internal controls over financial reporting, and failed to install controls that Defendants have admitted were "simple" and "not rocket science" that would have prevented the over-issuance.

290.    Further, the Control Person Defendants signed the Form 20-Fs and certifications,

and authorized the filing or dissemination of the Form 20-Fs, Form 6-Ks, and press releases that are alleged herein to contain materially false and misleading statements or material omissions.

291.    In particular, the Control Person Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

292.    As set forth above, Barclays and the Control Person Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons of Barclays, the Control Person Defendants are liable pursuant to Section 20(a) of the Exchange Act.

293.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of VXX during the Class Period.

## V.

## CLASS ACTION ALLEGATIONS

294.    Plaintiffs bring this action under Rule 23(b)(3) of the Federal Rules of Civil Procedure and seek to represent themselves and a class of similarly situated investors (the "Class").

295.    The class period shall be on or between June 26, 2019, and May 23, 2022, inclusive (the "Class Period").

296.    The putative Class shall be defined as:

> All purchasers of VXX during the Class Period. Excluded from the Class are (1) Defendants, their corporate parents, subsidiaries, affiliates, and officers, directors, agents, representatives, and assigns of any of the foregoing, (2) any entity which is controlled by any of the foregoing, (3) any successful claimants under the Barclays Bank PLC Rescission Offer,

and (4) Plaintiffs' attorneys, their employees, and immediate family members (hereinafter, the "Class").

297.    Plaintiffs anticipate the likely creation of subclasses for specific segments of the Class, for example: (A) a Section 12(a)(1) rescission subclass for Class members who purchased VXX prior and who held through April 23, 2021; (B) a Section 11 subclass for any person who purchased VXX between April 23, 2021 and May 22, 2022, inclusive; (C) a 10b-5 subclass for persons who purchased and sold VXX during the Class Period; (D) a common law fraud subclass of all persons who submitted rescission requests for any security to take advantage of the rescission offer, but were denied rescission and continued to hold their securities through the Rescission Period (March 28, 2022 through September 13, 2022), among other potential subclasses.

298.    Because Barclays' relevant acts and omissions were uniform and affect Class members uniformly throughout the United States, Plaintiffs seek certification of a nationwide class and subclasses under Rule 23(b)(3) and/or Rule 23(b)(2).

299.    Numerosity/Impracticability of Joinder: The Class members are so numerous that joinder of all members would be impracticable. The proposed Class and subclasses include thousands of members, but will require information solely in the possession of the Defendants to identify all of them.

300.    Commonality and Predominance: There are common questions of law and fact that predominate over any questions affecting only individual Class members. These common legal and factual questions include, but are not limited to, the following:

a.    Whether and when Defendants sold unregistered Securities;

b.    Whether the Securities were required to be registered under Section 5 of the Securities Act of 1933 (the "Securities Act");

c.    When unregistered Securities were sold into the market;

d.      Whether sales of the Securities were the result of Defendants' failure to put in place reasonable internal controls;

e.      Whether sales of the Securities violated Sections 5, 11 and 12 of the Securities Act and whether such failure was intentional, reckless, and/or negligent;

f.      Whether there have been violations of "scheme" liability provisions under Section 10(b) and Rule 10b-5 of the Exchange Act;

g.      Whether there have been violations of "material misstatement" liability provisions under Rule 10b-5 of the Exchange Act;

h.      Whether the Class is entitled to damages, rescission and/or other relief.

301.    <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the Class members. Plaintiffs' claims arise out of violations of the same laws and duties and out of Defendants' uniform acts and omissions. Under applicable law, the Securities' issuances are void ab initio for the same reason(s) that Plaintiffs' Securities issuances are void. Once deemed void, Plaintiffs and the absent Class members are entitled to all the incidences of voidness, including rescission.

302.    <u>Adequacy</u>: Plaintiffs will be adequate Class representatives and will fully and adequately assert and protect the interests of the Class. They have retained experienced and qualified counsel, and they do not have conflicting interests with other Class members.

303.    <u>Superiority</u>: A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the claims of all Class members is economically unfeasible and procedurally impractical. While the aggregate of dollars at stake is large, many members have relatively small sums at stake and would not have a significant interest in individually controlling the prosecution of a separate action or a significant

financial motivation to incur the necessary expense that would be involved. Moreover, individualized litigation would likely result in varying, inconsistent, or contradictory judgments and unnecessarily magnify the delay and expense to all the parties and the court system due to the necessity of multiple trials regarding the same factual and legal issues. Further, Plaintiffs do not anticipate any difficulty in managing this litigation.

304.    <u>Notice</u>: Upon information and belief, Plaintiffs allege that Defendants have, or have access to, addresses, phone numbers, e-mail addresses, and other contact information for members of the proposed Class, which may be used for the purpose of providing notice of the pendency of this action.

## VI.

## <u>JURY DEMAND</u>

305.    Plaintiffs demand a jury trial of all issues so triable to a jury.

## VII.

## <u>PRAYER FOR RELIEF</u>

306.    Plaintiffs pray for the following relief:

i.    Class certification under Rules 23(a), 23(b)(3) and 23(b)(2) on behalf of the Class as defined above;

j.    Certification of Plaintiffs as Class representatives and appointment of    Plaintiffs' counsel as lead counsel for the Class;

k.    Equitable relief in the form of rescission or restitution, or rescissory damages, with respect to Plaintiffs' and the Class's purchases of the Securities;

l.    An award of compensatory damages and if available,  punitive damages, in favor of Plaintiffs and the Class against Defendants, jointly and severally, for all losses

sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

m.  An award in favor of Plaintiffs and other members of the Class of  their costs and expenses in this litigation, including reasonable attorneys' fees, experts' fees, and other costs and disbursements; and,

n.  All other relief to which Plaintiffs may be entitled at law or in equity.


Dated: November 17, 2023                    **SBAITI & COMPANY PLLC**

                                            */s/ Mazin A. Sbaiti*
                                            **Mazin A. Sbaiti**
                                            New York Bar No. 4339057
                                            MAS@SbaitiLaw.com
                                            **Jonathan Bridges**
                                            *Pro Hac Vice*
                                            JEB@SbaitiLaw.com
                                            2200 Ross Avenue – Suite 4900W
                                            Dallas, TX  75201
                                            T: (214) 432-2899
                                            F: (214) 853-4367

                                            ***LEAD COUNSEL FOR LEAD
                                            PLAINTIFFS***

                                            **Kevin Colquitt** (Admitted *Pro Hac Vice*)
                                            KNC@SbaitiLaw.com
                                            **Griffin Rubin** (Admitted *Pro Hac Vice*)
                                            GSR@SbaitiLaw.com
                                            2200 Ross Avenue – Suite 4900W
                                            Dallas, TX  75201
                                            T: (214) 432-2899
                                            F: (214) 853-4367

                                            ***ADDITIONAL    COUNSEL    FOR    LEAD
                                            PLAINTIFFS***