## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

DR. RUTH C. MAY AND DR. DONNA E.
LEDGERWOOD, JUSTIN REED, MARK
HOWARTH and JEFFREY KNAPP, on behalf
of themselves and all others similarly situated,

    **Plaintiffs,**

v.

BARCLAYS PLC AND BARCLAYS BANK
PLC, JAMES E. STALEY, TUSHAR
MORZARIA, STEVEN EWART, C.S.
VENKATAKRISHNAN, TIM THROSBY,
ANNA CROSS, NIGEL HIGGINS, ALEX
THURSBY, HELEN KEELAN, HELENE VAN
DORT, JEREMY SCOTT, MARIA RICHTER,
and DOES 1-12,

    **Defendants.**

Cause No. 1:23-cv-02583-LJL

## PLAINTIFFS' CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs Ruth C. May, Donna E. Ledgerwood, Justin Reed, Jeffrey Cole Knapp, and Mark Howarth ("Plaintiffs") bring this action on behalf of themselves and all other similarly situated under Rule 23 of the Federal Rules of Civil Procedure, against Defendants Barclays PLC and Barclays Bank PLC, as well as James E. Staley, Tushar Morzaria, Steven Ewart, C. S. Venkatakrishnan, Tim Throsby, Anna Cross, Nigel Higgins, Alex Thursby, Helen Keelan, Helene Van Dort, Jeremy Scott, and Maria Richter, for violations of the securities laws of the United States, common law fraud, and for breaches of contract among other causes of action. Plaintiffs pray that this Court certify a nationwide class of purchasers and any subclasses, appoint them Lead Plaintiffs and appoint their counsel Lead Counsel, and enter judgment in their and the Class's favor for damages and all other relief to which they are justly entitled under law or equity.

# I

# PARTIES

1.     Plaintiff Dr. Ruth C. May ("May") is an individual citizen of the state of Texas.

2.     Plaintiff Dr. Donna E. Ledgerwood ("Ledgerwood") is an individual citizen of the state of Texas.

3.     Plaintiff Justin Reed ("Reed") is an individual citizen of the state of Idaho.

4.     Plaintiff Mark Howarth ("Howarth") is an individual citizen of the state of Maryland.

5.     Plaintiff Jeffrey Knapp ("Knapp") is an individual citizen of the state of California.

6.     Defendant Barclays PLC ("BPLC") is a bank holding company headquartered in London, United Kingdom. Through its subsidiaries, it provides various financial services, including investment banking, wealth management, and the offer and sale of securities in this district. Barclays PLC has registered the common shares underlying its American Depository Receipts, which trade on the New York Stock Exchange. It has an obligation to file periodic reports with the Commission pursuant to Section 13(a) of the Exchange Act.

7.     Defendant Barclays Bank PLC ("BBPLC," together with BPLC, "Barclays") is BPLC's wholly owned United States subsidiary, headquartered in New York, New York. BBPLC consists of a corporate and investment banking division, a consumer, cards, and payment division, and a private bank. BPLC and BBPLC between them issued all relevant securities that were the subject of this lawsuit. BBPLC has listed a series of corporate debt securities on U.S. exchanges, each class of which has to have been registered with the Securities Exchange Commission ("SEC",) pursuant to Section 12(b) of the Exchange Act. It has an obligation to file periodic reports with the Commission pursuant to Section 13(a) of the Exchange Act. BBPLC is the issuer

of the iPath Series B S&P 500 VIX Short-Term Futures ETN ("VXX"), a securitized derivative touted to provide retailer investors a hedge to market fluctuations. The VXX is supposedly supposed to mimic the S&P 500 VIX Short-Term Futures Index Total Return (the "VIX").

### Individual Securities Act Defendants

8.     Defendant James E. Staley ("Staley") is a resident of the state of New York. Staley has appeared in this matter by filing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). He signed the 2019 Shelf Registration (as defined below). He served as the chief executive officer ("CEO") of Barclays and a director from December 1, 2015, through October 31, 2021. From March 2019 through October 31, 2021, he also served as the CEO of BBPLC and a director on BBPLC's Board of Directors until January 31, 2019. During his tenure, Staley signed a certification pursuant to 17 C.F.R. § 240.13(A)-14(A) that was attached to the 2020 BPLC 20-F as Exhibit 12.1, and a certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. § 1350) that was attached to the 2020 BPLC 20-F as Exhibit 13.1, which contained materially false and misleading statements or omitted material information, and which were incorporated by reference into the 2019 Shelf Registration Statement. Staley was a direct and substantial participant in the scheme.

9.     Defendant Tushar Morzaria ("Morzaria") is an individual resident of London, England (United Kingdom). Morzaria has appeared in this matter by filing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). and may be served via personal service or by any means permitted under applicable law. Morzaria served as Barclays' finance director (the most senior finance position at Barclays), a member of its executive committee, and as a director on the BPLC and BBPLC Boards. Morzaria retired from Barclays' Boards and as Group Finance Director effective April 22, 2022.  During his tenure, Morzaria signed Barclays' annual reports

and certifications, pursuant to Sarbanes-Oxley Act of 2002 ("SOX"), stating that the financial information contained in Barclays's annual reports was accurate and disclosed any material changes to Barclays's internal controls over financial reporting, which were incorporated by reference into the 2019 Shelf Registration Statement. Morzaria was a direct and substantial participant in the scheme.

10.    Defendant C.S. Venkatakrishnan ("Venkatakrishnan" or "Venkat") has served as the CEO of BPLC, a member of its executive committee, and a director on the BPLC Board since November 1, 2021. Venkatakrishnan has also served as the CEO of BBPLC and as a director on the BBPLC Board since November 1, 2021. Prior to his position as CEO, Venkat served as Barclays' Global Head of Markets from October 2020 to October 2021, and Barclays's chief risk officer from March 2016 to October 2020, which included the entire time Barclays was an ineligible issuer (May 2017 to May 2020). Venkatakrishnan has appeared in this action by filing a motion to dismiss under Rule 12(b)(6). During his tenure as CEO, Venkat signed Barclays' annual reports and certifications, pursuant to the SOX, stating that the financial information contained in Barclays's annual reports was accurate and disclosed any material changes to Barclays's internal controls over financial reporting, which were incorporated by reference into the 2019 Shelf Registration. Statement. Venkat was a direct and substantial participant in the scheme.

11.    Defendant Steven Ewart ("Ewart") is an individual resident of Hartford, England (United Kingdom). He has appeared in this action by filing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). Following Defendant Ewart's appointment as chief financial officer ("CFO") of BBPLC and required regulatory approval, Defendant Ewart signed the 2019 Shelf Registration Statement. He has served as the CFO of BBPLC since August 10, 2018.

12.     Defendant Nigel Higgins ("Higgins") is an individual resident of London, England (United Kingdom). Higgins has appeared in this action by filing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). He has served as the "Group Chairman" at Barclays since May 2019 (a position known as the "chairman of the board" in the U.S.), and was a director on the Barclays Boards for three months prior to that appointment (starting in March 2019). Defendant Higgins signed the 2019 Shelf Registration Statement.[1] Higgins was a direct and substantial participant in the scheme.

13.     Defendant Tim Throsby ("Throsby") is an individual resident of London England (United Kingdom). Throsby has appeared in this action by filing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). According to his LinkedIn profile, Throsby served as President of Barclays Internation from January 2017 to January 2019 and as CEO of BBPLC from January 2019 until March 2019. Following Defendant Throsby's appointment as CEO of BBPLC and required regulatory approval, Defendant Throsby signed the 2019 Shelf Registration Statement. Throsby was a direct and substantial participant in the scheme.

14.     Defendant Alex Thursby ("Thursby") is an individual resident of Carlisle, England (United Kingdom). Thursby has appeared in this matter by filing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). He served as a BBPLC non-executive director from April 2018 through April 2021. Defendant Thursby signed the 2019 Shelf Registration Statement. Thursby was a direct and substantial participant in the scheme.

15.     Defendant Helen Keelan ("Keelan") is an individual resident of Dublin, Ireland (Republic of Ireland). Keelan has appeared in this matter by filing a motion to dismiss under

---

[1] In a proceeding related to the same underlying conduct, Higgins was dismissed as a Section 20(a) defendant because he "was not even alleged to have signed any of the offending SEC filings." *In re Barclays PLC Securities Litigation*, 22 Civ. 8172 (KPF), 2024 U.S. Dist. LEXIS _____, (S.D.N.Y. February 23, 2024). Here, Lead Plaintiffs allege that Higgins signed the 2019 Shelf Registration, which is one of the offending SEC filings in this case.

Federal Rule of Civil Procedure 12(b)(6). She served as a BBPLC non-executive director from February 2017 through March 2021. Defendant Keelan signed the 2019 Shelf Registration Statement. Keelan was a direct and substantial participant in the scheme.

16.    Defendant Hélène Vletter-van Dort ("Vletter-van Dort") is an individual resident of Amsterdam, Netherlands. Vletter-van Dort has appeared in this matter by filing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). She served as a BBPLC non- executive director from August 2017 until October 2019. Defendant Vletter-van Dort signed the 2019 Shelf Registration Statement. Vletter-van Dort was a direct and substantial participant in the scheme.

17.    Defendant Jeremy Scott ("Scott") is an individual resident of London, England (United Kingdom). Scott has appeared in this matter by filing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). He served as a BBPLC non-executive director from April 2018 until September 2019. Defendant Scott signed the 2019 Shelf Registration Statement. Scott was a direct and substantial participant in the fraud.

18.    Defendant Maria Richter ("Richter") is an individual resident of New York, New York. Richter has appeared in this matter by filing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). She was  a BBPLC non-executive director from April 2018 until September 2019. Defendant Richter signed the 2019 Shelf Registration Statement. Richter was a direct and substantial participant in the scheme.

**Individual Exchange Act Defendants**

19.    Defendants Staley, Venkatakrishnan, Morzaria, Ewart, Throsby and Cross are referred to herein as the "Individual Exchange Act Defendants" and, together with the Company and the Control Person Defendants (defined below), are collectively referred to herein as "Exchange Act Defendants."

20.     The Individual Exchange Act Defendants substantially participated in the scheme pled herein, and made, or caused to be made, material misstatements and omissions that either artificially inflated and/or artificially maintained the price of Barclays' VXX ETNs during the Class Period.

21.     The Individual Exchange Act Defendants, because of their positions within Barclays and the necessity of their putting their signatures on SEC filings, possessed the power and authority to control the contents of Barclays's reports to the SEC, shareholder letters, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. Each of these Individual Exchange Act Defendants was provided with copies of and/or contributed to Barclays's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

22.     Because of their positions and their access to material non-public information available to them but not to the public, the Individual Exchange Act Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations and omissions being made were materially misleading.

23.     Specifically, the Individual Exchange Act Defendants signed documents representing that Barclay's had implemented sufficient and effect internal controls to reasonably assure compliance with the securities laws—in this case, to ensure that unregistered securities were not issued and sold.

24.     Their signatures on the respective Sarbanes Oxley certificates, Form 20-F, Prospectuses and/or the 2019 and 2018 Shelf Registrations (which incorporated the former), were

their testimony that there were internal controls and that the controls were sufficient. However, the controls were non-existent.

25.     Thus, the Individual Exchange Act Defendants are liable for the misleading statements and material omissions pleaded herein.

26.     Each of the Individual Exchange Act Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, acquisition plans, and present and future business prospects, as alleged herein.

27.     In addition, the Individual Exchange Act Defendants were involved in drafting, producing, reviewing, and/or disseminating the misleading statements and information alleged herein, were aware of or recklessly disregarded the misleading statements being issued regarding the Company, and approved or ratified these statements in violation of the federal securities laws.

## Control Person Defendants

28.     Defendants Higgins, Staley, Venkatakrishnan, Ewart, Throsby, and Cross are together referred to as the "Control Person Defendants."

## Authorized Participant Defendants-Does 1-12

29.     Does 1-12 are "Authorized Participants" who, upon investigation and belief, are large financial institutions who contracted with BBPLC for the right to serve effectively as market makers, and to redeem shares in VXX, and routinely exercised those rights from the inception of VXX until March 14, 2022, when Barclays suspended further sales of VXX. Plaintiffs are at present unaware of the specific persons who served as Authorized Participants and therefore name Does 1-12.

## II.

## JURISDICTION & VENUE

30.    This Court has federal subject matter jurisdiction under 15 U.S.C. § 77v and under 28 U.S.C. §§ 1331, 1332, 1367(a).

31.    There is complete diversity of the parties, the amount in controversy exclusive of interest and costs exceeds $75,000, at least one member of the proposed class is diverse from at least one defendant, and the total amount in controversy for the class exceeds $5,000,000.

32.    Venue is proper in, and Defendants are subject to, the personal jurisdiction of this Court because Defendants transacted business in this district, otherwise maintain facilities and business operations in this district, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. See 15 U.S.C. § 77v, 28 U.S.C. § 1391(b); 42 U.S.C. § 2000e-5(f)(3).

## III.

## BACKGROUND FACTS

33.    In a September 29, 2022, SEC Consent Order, Barclays admitted that it had issued $17.7 billion worth of unregistered securities between June 26, 2019, and August 1, 2019, and again between January 28, 2021, and May 23, 2022(the "SEC Order" or "Consent Decree").[2]

34.    Included among them were a variety of exchange traded notes. One such note was the Barclays Bank PLC iPath Series B S&P 500 VIX Short-Term Futures (Ticker: VXX).

## A.  ABOUT VXX

BPLC, through its subsidiary BBPLC, is the issuer of the VXX security, which most people have been led to believe gives exposure to the CBOE Volatility Index, but as Barclays explains,

---

[2]  https://www.sec.gov/litigation/admin/2022/33-11110.pdf.

VXX is actually "designed to provide exposure to the S&P 500® VIX Short-Term Futures TM Index Total Return" or SPVIXSTR. This is technically a different index from the VIX, but is related, and Plaintiffs will generally refer to it as the "VIX" or the "index" hereinafter for shorthand.

35.    VXX is a securitized derivative—it is synthetic and uncollateralized.

36.    Because VXX is exchange traded on the New York Stock Exchange and is uncertificated, all purchases and sales of, and delivery of, VXX are electronic and necessarily involve the interstate wires.

37.    The VIX and the index generally estimate expected market volatility over the next 30 or 60 days by tracking options linked to the benchmark U.S. S&P 500 stock index. Historically, the VIX tends to be elevated in periods of market distress and lower under normal market conditions, and it often moves sharply higher when stock indices decline significantly.

38.    Underlying VXX is a portfolio composed of the front two-month /VX (VIX) futures that bear continuously changing weights. The potential payouts of these contracts yield an "implied value," which is trackable as the ticker "VXXIV".

39.    The market price of VXX and the implied value are not necessarily identical, much less correlated—and the implied value and the VIX itself are not always identical.

40.    When a holder redeems VXX for a payout, they are entitled to money equal to a calculation rather than their pro rata share of a pool of assets. To wit, Barclays explains that there are no assets to pay VXX holders in the event of a default or redemption, and "[a]ny payment to be made on the [VXX], including any payment at maturity or upon redemption, depends on the ability of Barclays Bank PLC to satisfy its obligations as they come due."[3]

---

[3] https://ipathetn.barclays/details.app;instrumentId=341408

41.    Because VXX is a balance between expiring and later VIX futures, Barclays is forced to sell futures contracts that are closest to their expiration dates and buy the next dated contracts, which is a process called "rolling." Barclays rolls the underlying portfolio on a daily basis and represents a material percentage of trading volume—as much as 30% of the end-of-day trades.

42.    Thus, every day, and in a completely predictable manner, Barclay's enters the VIX futures market to short front-month and go long second-month VIX futures at the market close. This daily futures rebalancing is systematic and predictable by market participants.

43.    Because redemptions of VXX are based on the indicative value at market close, Barclays has to trade towards the end of the day to ensure it meets redemptions through something called "TAS" or "Trade at Settlement".

44.    The larger the number of outstanding VXX shares, the larger and greater number of the trades Barclays has to do at day's end every day to maintain the roll.

45.    During the class period, VXX was the largest of the exchange-traded products keyed to the VIX—more than double the next largest issuer, ProShares.[4] Both Barclays's position size in the VIX futures markets and the knowledge in the VIX market that Barclays has to buy and sell—mean every player in the VIX futures market knows what Barclays is going to do every day and when it has to do it, which in turn makes Barclays a price taker while buying and selling.

46.    Based upon the investigation of Plaintiffs' counsel and their consultants (including a finance professor), Barclay's daily activities have a material and substantial effect on the implied value.[5]

---

[4] Source: https://etfdb.com/etfs/volatility/short-term-volatility/.

[5] The dynamic that Barclays suffers was examined by Patchara Santawisook in *Price Impact In The VIX Futures Market And Mean-Field Games In Two Order Books*, August 30, 2022 (dissertation of Worcestor Polytechnic Inst.).

47.    Barclays' having to go into the market every day to manage the portfolio comes with significant costs—both transactional and market-related. Since longer-dated futures contracts are often at higher prices than shorter-dated ones (during normal market conditions), the daily rolling activity more often than not results in portfolio losses as Barclays is forced to sell the lower-valued contracts and buy the higher-priced contracts to maintain the required mix for the VXX portfolio.

48.     The transactional and market costs combine to enhance the decline in the implied value of VXX, which in turn not only causes a depreciation of the VXX's implied value it accelerates the rate of depreciation the larger the VXX portfolio grows. Thus, the more VXX there is outstanding the more the underlying index and concomitant "indicative value" of VXX itself is negatively affected.

49.    In other words, every time Barclays issues more shares of VXX, it makes Barclays more money both from the inflows and the fees, but it has a material negative impact on VXX holders by *accelerating* the losses they incur.

50.    This dynamic should have to be disclosed under Barclays' prospectuses—but Barclays never discloses it.

51.    Only the most seasoned and highly sophisticated professional investors with visibility into the deep complexity of these derivative dynamics have the ability to protect themselves. Retail investors, even ones with some investing acumen, lack that ability.

52.    Given this complexity, it is notable that retail investors in the United Kingdom and Europe were not allowed to buy and sell VXX. Barclays was only allowed to market VXX to highly sophisticated or qualified institutional investors there.

53.    In the United States, sophisticated traders with special permissions from their brokerages and those who have ISDA membership or an affiliation with an ISDA member are generally the ones who can directly buy or sell VIX options or futures contracts. They use it to hedge the market and to hedge macro-economic or certain non-systemic risks. This specialized group may use VXX as a convenient, liquid substitute.

54.    Yet, Barclays has marketed VXX broadly in the United States even though it presents <u>more</u> risks than the underlying VIX derivatives because (1) VXX is not necessarily keyed to the VIX, creating an additional layer of unpredictability and volatility, and (2) VXX is subject to the costs discussed above and the fee Barclays charges, causing it to generally *underperform* direct ownership of the underlying futures contracts.

55.    Thus, Barclays' course of business that operates as a deceit on retail investors continues when one considers that VXX inherently preys upon retail investors—they are a necessary component to maintain the "float" whilst the professionals dive in and out of the product.

56.    For example, and as discussed above, the VXX indenture allows one to redeem shares of VXX for the implied value, and Barclays has to pay that amount if and when shares are redeemed. But the VXX indenture only allows someone to redeem VXX if they redeem 25,000 shares or more of VXX at a time.[6] Consequently, institutional investors have two exits: sell into the market or put the shares to Barclays in enormous blocks. But retail investors don't have that luxury.

---

[6]    *See, e.g.,*  https://www.sec.gov/Archives/edgar/data/312070/000110465921128505/tm2130761d1_424b2.htm (October 22, 2021, Pricing Supplement) ("Subject to the notification requirements set forth under "Specific Terms of the ETNs — Early Redemption Procedures" in this pricing supplement, you may redeem your [VXX shares] on any redemption date during the term of the [VXX shares]. If you redeem your [VXX shares], you will receive a cash payment in U.S. dollars per [VXX share] equal to the applicable closing indicative value on the applicable valuation date minus the redemption charge. You must redeem at least 25,000 [VXX shares] at one time in order to exercise your right to redeem your [VXX shares] on any redemption date. **If you hold fewer than 25,000 [VXX shares] of the same series or fewer than 25,000 [VXX shares] of a series are outstanding, you will not be able to exercise your right to redeem your ETNs of that series.**") (bolding added).

57.     Thus, the existence of a significant pool of retail investors is an integral feature of VXX. The following graphic shows that for the longest period of time, institutional buyers of VXX were few and far between:[7]



The green spikes are the degree of institutional owners—which spiked between March and June of 2022, right after Barclays said it would no longer be issuing new VXX—a declaration that caused institutions who had shorted VXX to scramble to buy VXX to cover their short positions.

58.     Nothing in the prospectuses warns non-institutional investors in a meaningful way. Instead, the warnings are general, boilerplate, and oblique.

59.     For example, Barclays' prospectuses warn that VXX is supposed to be a short-term investment. But what does "short term" mean? It is not defined. And to a retail investor, short term reasonably means months or a couple of years—e.g., until the event that it is supposed to hedge against.

---

[7] https://fintel.io/so/us/vxx.

60.    But that is apparently not what Barclays means at all. Institutional investors whom Lead Counsel consulted with who understood VXX referenced the fact that VXX is designed to be held for hours or a matter of days. Professional investors ump in and out of it regularly. Retail investors are not given that message at all. And it begs the question: who holds VXX the rest of the time when professional investors are not jumping in and out of the security? Barclays? Surely not. It is retail investors. They are the sin-eaters of the VXX security.

61.    Barclays's other abstract and generic warnings that VXX is essentially uncollateralized, unsecured debt, or that one can lose their entire investment are meaningless platitudes—the same warnings are on every single prospectus and offering memorandum filed with the SEC. When one warns someone of everything, one warns them of nothing.

62.    Equally critical, none of Barclays disclosures about VXX even begin to explain the underlying economics of how Barclays manages VXX (which only highly sophisticated traders with knowledge of how VIX futures work could even begin to understand), the extreme degree of VXX's riskiness, the fact that as large blocks of VXX shares are issued Barclays both makes more money but investor losses accelerate because each new issuance actually causes the underlying indicative value to depreciate more rapidly, thus causing the rate of depreciation to accelerate, or the fact that retail investors are only there as chum to support a liquid market for the sharks to swim in.

63.    Instead, Barclays markets it as a benign option for the average Joe to buy some insurance on their long equity positions.

64.    The fact is that there has to be market fodder to hold the shares both to have a sufficiently liquid market to buy from and sell into, but also to make the market large enough for Barclays to have economies of scale, charge its fees to cover the costs for managing the VIX

futures portfolio (most of which are relatively fixed) and still make a sizable profit. That is a fraudulent scheme.

**B.  B**ARCLAYS **L**OSES ITS **S**TATUS AS A **F**REQUENT **F**ILER

65.     For years, Barclays was a "well known seasoned issuer" ("WKSI") of securities.

66.     As such, Barclays was able to issue securities by filing an open-ended shelf registration statement. Whenever Barclays wanted to issue securities, all it had to do was pay the registration fee, file some simple papers, and the securities were deemed "effective" upon issuance. No prior SEC review or sign-off was otherwise necessary.

67.     Pursuant to this, Barclays offered and sold a variety of securities in the United States, including structured product, such as Exchange Traded Notes or ETNs, via an effective shelf registration statement on Form F-3 through BBPLC.

68.     SEC Rule 405 and Instruction I.A. on Form S-3 set forth the requirements for being a WKSI. However, under Rule 405, one can lose WKSI status in a variety of ways—including having been found liable for securities fraud in the prior three years. Having that happen makes one an "ineligible issuer."

69.     On May 10, 2017, the SEC instituted a public administrative and cease-and-desist proceedings against Barclays Capital Inc.—a subsidiary of Barclays. E.g., *In the Matter of Barclays Capital Inc*., Adm. Proc. File No. 3-17978 (May 10, 2017). Barclays settled with the SEC for $97 million to resolve  violations of the anti-fraud provisions of the Exchange Act and of the Advisers Act (15 U.S.C. § 206) related to hidden mutual fund fees.[8]

70.     This was at least Barclay's third securities fraud case in the prior few years.

---

[8] https://www.sec.gov/litigation/admin/2017/33-10355.pdf.

71.    Prior to these proceedings, Barclays had been able to retain its WKSI status because the SEC had issued WKSI waivers to Barclays. Barclay repeatedly filed requests to waive a threatened designation as an ineligible issuer between 2007 and 2017.

72.    In its Waiver Requests submitted on May 20, 2015 and January 27, 2016, Barclays noted that it had already been found liable or guilty of fraud on multiple occasions.[9]

73.    Barclays acknowledged that "Barclays PLC and Barclays Bank, the holding company and principal bank entity within Barclays, respectively, are frequent issuers of securities that are registered with the Commission and offered and sold under their current Form F-3 registration statements (the "WKSI shelf"), which provides an important means of accessing capital and funding for Barclays' global operations….[Since 2011], and including senior funding and securities issued under the Series A MTN program, the USD-equivalent value of all securities issued by Barclays off the WKSI shelf is approximately $68 billion. These figures demonstrate the importance of the WKSI shelf to Barclays in meeting its capital and funding requirements."

74.    Barclays implored the SEC to allow it to retain WKSI status because "[t]he WKSI shelf process allows access to the widest possible global investor base and provides an important means of accessing capital and funding for Barclays' global operations."[10]

75.    Barclays noted that its business centers around selling structured securities, and stressed "the importance of the WKSI shelf to Barclays in meeting its capital and funding requirements," because without being a WKSI it would:

> lose the flexibility (i) to offer additional securities of the classes covered by a registration statement without filing a new registration statement, (ii) to register additional classes of securities not covered by the registration statement by filing a post-effective amendment which becomes immediately effective, (iii)

---

[9] https://www.sec.gov/divisions/corpfin/cf-noaction/2016/barclays-plc-020116-405.pdf at p. 10.

[10] https://www.sec.gov/divisions/corpfin/cf-noaction/2015/barclays-plc-052015-405.pdf at pp. 10-12. https://www.sec.gov/divisions/corpfin/cf-noaction/2016/barclays-plc-020116-405.pdf.

to omit certain information from the prospectus, (iv) to take advantage of the pay-as-you go fees or (v) to qualify a new indenture under the Trust Indenture Act of 1939, as amended, should the need arise, without filing or having the Commission declare effective a new registration statement.[11]

76.     Barclays also expressed its concern that becoming an ineligible issuer would have an "impact on [Barclays'] speed to the market" relating to new securities because it would not be able to issue "new" structured securities quickly, and that "by the time Barclays could issue such new type of securities, market conditions may have become unfavorable or similar securities issued by other issuers in the intervening period may decrease the market demand for Barclays' securities, which could have a negative pricing effect on Barclays' securities."

77.     Critically, Barclays acknowledged –and projected—that its need to issue securities on an expedited basis in the future would likely *increase* given the "current regulatory and market conditions and uncertainties that are significantly transforming the landscape for financial institutions like Barclays."

78.     But the SEC refused to grant Barclays another waiver after the May 2017 settlement. Thus, Barclays lost its status as a WKSI.

## C. THE WORKING GROUP EXPERIMENT GONE WRONG

79.     As a WKSI, Barclays had no need to track the number of securities it issued because there was no cap under its blanket WKSI shelf registration. Thus, Barclays lacked any of the formalities and internal controls for doing so because, while it was a WKSI, it did not need them.

80.     This was all about to change, or should have, and Barclays knew it.

81.     As a WKSI, Barclays issued over $68 *b*illion in securities in the five years before

---

[11] Letter from Barclays PLC and Barclays Bank PLC to Eun Ah Choi, Division of Corporate Finance, Request for Waiver of "Ineligible Issuer" Status Under Rule 405 (January 27, 2016) (available at https://www.sec.gov/divisions/corpfin/ cf-noaction/2016/barclays-plc-020116-405.pdf)).

it lost its WKSI status.[12]

82.     Barclays and its management were well aware of the loss of its WKSI status—which was via public SEC Action.[13] Barclays attempted to reverse the WKSI withdrawal via several appeals to the SEC.[14]

83.     Following the May 2017 SEC cease-and-desist proceedings and order, Barclays needed to address its loss of WKSI status with respect to its ongoing securities offerings in the United States. As a non-WKSI, Barclays was required to define and designate the number of securities it planned to register and issue and pay the registration fee up before selling them.

84.     Barclays then needed to monitor how many securities had been issued so as not to exceed the limit. It is indisputable that Barclays's personnel were well aware of the need to accurately record relevant information about securities that were offered or sold on a real-time basis, thereby ensuring that Barclays did not offer or sell any securities in excess of what had been registered.

85.     To that end, in January 2018, Barclays announced that it would be implementing a Working Group to address its securities registration issues during its three-year penalty period.[15]

86.     Barclays self-reported to the SEC that, around January 2018 [which coincides with the launch of VXX Series B], it formed a working group "that included trading desk heads from the Structured Products Group, personnel from an administrative support function called business management, personnel from the product origination group, a member of the compliance department, and a member of the legal department." (the "Working Group").

---

[12] https://www.sec.gov/divisions/corpfin/ cf-noaction/2016/barclays-plc-020116-405.pdf.

[13] SEC Order, *In the Matter of Barclays Capital Inc.*, Adm. Proc. File No. 3-17978 (May 10, 2017).

[14] https://www.sec.gov/divisions/corpfin/ cf-noaction/2016/barclays-plc-020116-405.pdf.

[15] https://www.sec.gov/files/litigation/admin/2022/33-11110.pdf.

87.     The Working Group generally was supposed to ensure that non-registered securities were not issued (i.e., to make sure that more securities than what had been registered were not issued). And given the profligacy of its annual securities issuances prior to the loss of its WKSI status, the Working Group was aware of the dangers of issuing unregistered shares. The SEC reported its finding that "During the pendency of the Working Group's efforts, the need to track actual offers and sales of securities against the amount of registered securities on a real-time basis was understood by and discussed among members of the Working Group.

88.     Nevertheless, no internal controls were established to track offers and sales of securities, nor was any member of the Working Group or other BBPLC personnel performing that task….[Barclays failed] fail[ed] to put into place any internal control around the real-time tracking of securities being offered or sold off its Commission-registered shelf registration statement[s]."[16]

89.     The Working Group consulted with the trading desks that would be using the 2018 Shelf to issue their securities, as well as Group Treasury, and estimated the total amount of securities that they anticipated offering and selling over the next approximately 18 months.

90.     Given that, Barclays knew it would have to register the total amount of securities that it anticipated offering and selling during that period, and then pay the registration fees for that amount of securities in advance; it likewise knew that they were relying on mere estimates, and that there would be dire consequences if the estimates were exceeded.

91.     As part of making these estimations, the Working Group also determined an initial allocation of fees among the trading desks accessing the 2018 Shelf, with the expectation that these allocations would be revisited as data regarding actual offers and sales off of the 2018 Shelf became available. But no protocols were implemented to monitor those in real time.

---

[16] https://www.sec.gov/files/litigation/admin/2022/33-11110.pdf ¶ 24.

92.     On March 28, 2018, Barclays filed a post-effective amendment, which amended its prior registration statement on Form F-3 to go from a WKSI to a non-WKSI registration statement.

93.     On March 30, 2018, Barclays' post-effective amendment was declared effective as what Plaintiffs refer to as the "2018 Shelf."

94.     As reflected in the 2018 Shelf, Barclays anticipated issuing some $21.3 billion worth of securities in 18-months.

95.     Barclays may have assumed that its bankers would be selling securities at roughly the same pace as they had prior to 2017—but there was no reason for this assumption, and Barclays did nothing to ensure that the rate of issuance remained stable.

96.     As the 2018 Shelf approached its expiration in 2019, the Working Group, aware of this approaching deadline, reconvened apparently for only the second time and with largely the same membership as in 2018.

97.     As during the 2018 WKSI shelf conversion, the Working Group calculated the total amount of securities that they anticipated offering or selling during the three-year duration of what would become the 2019 Shelf and determined an initial allocation of fees among the trading desks accessing the 2019 Shelf.

98.     Unlike during its work in 2018, however, the Working Group's 2019 Shelf work required it to perform "Carry-Over Calculations." The Carry-Over Calculations were necessary because Barclays believed it still had some capacity left in the 2018 Shelf.

99.     Accordingly, the Working Group set about calculating how much capacity was actually left under the 2018 Shelf, estimating how much was available for offers or sales of securities from the 2018 Shelf during the time between when Barclays planned to file its next registration statement (what would become the 2019 Shelf) and when the 2019 Shelf would

become effective (the "Gap Period"), and how much capacity, if any, would be left over on the 2018 Shelf after accounting for the anticipated Gap Period offers or sales.

100.    These calculations and estimates were essentially performed manually and, as would later be admitted to the SEC, they were performed incorrectly.

101.    Based upon the incorrect manual calculations and estimates, Barclays de-registered a portion of the remaining 2018 Shelf in order to save on fees, and in order to apply some of those fee-savings from the 2018 Shelf to the 2019 Shelf registration costs.

102.    Plainly, members of the Working Group recognized, discussed and understood the importance of tracking actual offers and sales of securities against the amount of registered securities on a real-time basis.

103.    Nevertheless, no internal control was established to track offers and sales of securities. Neither was any member of the Working Group or other BBPLC personnel performing that task. Nor does it appear that the Working Group was ever specifically tasked with coming up with internal controls to track in real time.

104.    Plainly, Barclays decided not to invest in the development, training, infrastructure and technology necessary to establish and implement internal controls that are common to other non-WKSI issuers. Barclays calculated that it would be a WKSI again and such an investment would not be necessary in a few years. This was an intentional decision not to promulgate those controls and adopt any system for tracking issuances whatsoever.

105.    Remarkably, one only needed to have "asked" a question now and again to make sure that unregistered securities were not issued. Indeed, the SEC found that Barclays discovered that it had overissued securities on March 8, 2022, when a member of the Working Group was asked how much capacity was available under the 2019 Shelf. They were able to confirm within a

day that they had overshot by *billions*.[17]

106.    Thus, Barclays and the Individual Exchange Act Defendants and Control Person Defendants knowingly made multiple misrepresentations about the existence of sufficient internal controls to ensure accurate reporting and compliance.

## D.  BARCLAYS' AFFIRMATIVE MISREPRESENTATIONS & OMISSIONS

107.    Throughout the Class Period, Barclays made materially false and misleading statements about the existence of internal controls and procedures to prevent the issuance of unregistered securities.

108.    On February 22, 2018, Barclays filed a shelf registration for over $21.3 billion (the "2018 Shelf").

109.    The 2018 Shelf was exhausted by June 26, 2019, at the latest—months earlier than the working group anticipated.

110.    Earlier that year, Barclays serendipitously became aware of the impending exhaustion of the 2018 Shelf, and proactively filed a shelf registration statement registering an additional $20.7 billion worth of securities that could be sold over the ensuing three years (the "2019 Shelf"), which went effective on August 1, 2019.

111.    Barclays filed Form F-3 on February 22, 2018, stating that:

Pursuant to Rule 415(a)(6) under the Securities Act, this registration statement will include $25,000,000,000 in maximum aggregate offering price of unsold securities that were previously registered on the registration statement on Form F-3 (File No. 333-216377) filed on March 1, 2017."  It further committed that "The undersigned Registrant hereby undertakes: (1) To file, during any period in which offers or sales are being made, a post-effective amendment to this Registration Statement: …(ii) To reflect in the prospectus any facts or events arising after the effective date of the Registration Statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the

---

[17] https://www.sec.gov/files/litigation/admin/2022/33-11110.pdf at ¶¶ 29-31.

information set forth in the Registration Statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the SEC pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than 20 percent change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective Registration Statement; and (iii) To include any material information with respect to the plan of distribution not previously disclosed in the Registration Statement or any material change to such information in the Registration Statement . . . ."

A nearly identical representation was made by Barclays in its Form F-3, filed on June 14, 2019.

112.    These were false statements when made because Barclays knew that (a) it had issued over \$13 billion of securities every year prior to 2017; (b) issuing securities is the lifeblood of its business model; (c) it had lost its WKSI and so it needed the internal controls to manage and monitor issuances in real time; (d) it was likely to need to issue more securities in the future to keep up with the market; (e) because of these factors, there was a substantial likelihood that it would issue more than the prescribed amount; and (f) Barclays knowingly did not put in place the internal controls and other protections that other issuers have put in place to ensure that they do not over-issue securities, Instead, it relied upon a "Working Group" comprised of several of the individuals named herein as defendants who did nothing to monitor issuances in real time.

113.    BPLC also filed a Form 20-F in 2018.[18] It stated that the Company "is committed to operating within a strong system of internal control." Barclays described its "improved" internal controls "notably following the completion of the Barclays Internal Controls Enhancement Programme (BICEP)" and that the "Control Environment is monitored by senior management and the Board via various reports, dashboards, and deep dives." And it further stated that the

---

[18] Form 20-F is akin to a 10-K but for foreign issuers.

"programme facilitated the resolution of the most material control issues and implemented a system of tracking and reporting risk events and controls issues against a new Controls Maturity Model, which left Barclays's internal controls environment in a much stronger position." (p.70).

114.    Critically, BPLC's 2018 20-F went on to state that Barclays's "frameworks, policies and standards enable Barclays to meet regulators' expectations relating to internal control and assurance." (at 40).

115.    The 2018 BPLC 20-F, p. 40,  stated that the Barclays Board Audit Committee concluded that, "[t]hroughout the year ended 31 December 2018 and to date, the Barclays Group has operated a system of internal control that provides reasonable assurance of effective operations covering all controls including financial and operational controls and compliance with laws and regulations."

116.    The 2018 20-F, p. 41,  also stated that "Management has assessed the internal control over financial reporting as of 31 December 2018. In making its assessment, management utilized the criteria set out in the 2013 COSO framework and concluded that, based on its assessment, the internal control over financial reporting was effective as of 31 December 2018."

116.    All of these statements, it turned out, were false when made.

117.    None of the internal controls were even established, much less implemented in a meaningful way, and so the amount of securities that were issued was not being tracked in real time..

118.    The 2018 Form 20-F was signed by multiple individual Defendants, including Defendant Ewart. The 2018 BBPLC 20-F was incorporated by reference into the 2018 Shelf. Similar to Barclays, BBPLC represented that "[t]here have been no changes in the Barclays Bank Group's internal control over financial reporting which have materially affected or are reasonably

likely to materially affect the Barclays Bank Group's internal control over financial reporting during the year." 2018 BBPLC 20-F at 3.

119.    The July 23, 2019 pricing supplement for VXX—which Barclays used to issue unregistered VXX shares—states at pp. 42-43 that the market may be affected by Barclays' purchase/sale decisions, but omits the fact that Barclays' unregistered issuances are likely to cause the indicated value—and thereby the price—to depreciate. It also represented, relevantly, in pages 42-43 in the notes that Barclays could do whatever it wanted with VXX, reserving for itself all rights and powers to manage the VXX market however it wanted, whether directly or through its "affiliate, Barclays Capital, Inc."

120.    Again, the 2019 BPLC 20-F described Barclays's "robust internal controls," specifically stating that Company was on track to complete a three-year program at the end of March 2020, known as the Barclays Internal Control Environment Programme or "BICEP," that "was focus[ed] on strengthening the internal control environment," and had left Barclays's internal controls environment "in a much stronger position. 2018 BBPLC 20-F at 11.

121.    The 2019 BPLC 20-F further stated that the Company "is committed to operating within a strong system of internal control," and lays out eight "Principal Risks…: Credit risk, Market risk, Treasury and Capital risk, Operational risk, Model risk, Reputation risk, Conduct risk and Legal risk." The 2019 BPLC 20-F went on to state that Barclays's "frameworks, policies and standards enable Barclays to meet regulators' expectations relating to internal control and assurance." 2019 BPLC 20-F at 37.

122.    The 2019 BPLC 20-F stated that the Barclays Board Audit Committee "concluded that, throughout the year ended 31 December 2019 and to date, the Group has operated a sound system of internal control that provides reasonable assurance of financial and operational controls

and compliance with laws and regulations." The 2019 BPLC 20-F also stated that "Management has assessed the internal control over financial reporting as of 31 December 2019. In making its assessment, management utilized the criteria set out in the 2013 COSO framework and concluded that, based on its assessment, the internal control over financial reporting was effective as of 31 December 2019." 2019 BPLC 20-F at 38.

123.   Attached as Exhibit 12.1 to the 2019 BPLC 20-F were certifications, pursuant to 17 C.F.R. 240.13(A)-14(A), signed by Defendants Staley and Morzaria, which stated, in relevant part, that "[t]he company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company[.]"

124.   On February 14, 2020, BBPLC filed its 2019 20-F.  The 20-F was signed by Defendant Ewart.  The 2019 BBPLC 20-F was incorporated by reference into the 2018 and 2019 Shelf Registrations.  BBPLC represented that "[t]here been no changes in the Barclays Bank Group's internal control over financial reporting which have materially affected or are reasonably likely to materially affect the Barclays's internal control over financial reporting during the year." 2019 BBPLC 20-F at 15.

125.   Attached as Exhibit 12.1 to the 2019 BBPLC 20-F were certifications, pursuant to 17 C.F.R. 240.13(A)-14(A), signed by Defendants Staley and Ewart. The text of the certifications was identical to the certifications attached as Exhibit 12.1 to the 2019 Barclays 20- F, and were false for the same reasons.

126.   Attached as Exhibit 13.1 to the 2019 BBPLC 20-F was a certification, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, signed by Defendants Staley and Ewart. The text

of the certifications were identical to the certifications attached as Exhibit 13.1 to the 2019 BPLC
20-F, and were false for the same reasons.

127.    On February 18, 2021, after Barclays exceeded the limit of registered securities
under the August 2019 Shelf, Barclays filed the 2020 BPLC 20-F. The 2020 BPLC 20-F was
signed by Defendant Morzaria. It touted "robust internal controls" specifically stating that Barclays
had recently "successfully completed" a three-year program, known as the Barclays Internal
Control Environment Programme or "BICEP," that "was focus[ed] on strengthening the internal
control environment across the Group," and had left Barclays's internal controls environment "in
a much stronger position." 2020 BPLC 20-F at 14.

128.    The 2020 BPLC 20-F further stated that the Company "is committed to operating
within a strong system of internal control," and lays out eight "Principal Risks…: Credit risk,
Market risk, Treasury and Capital risk, Operational risk, Model risk, Reputation risk, Conduct risk
and Legal risk." The 2020 BPLC 20-F went on to state that Barclays's "frameworks, policies and
standards enable Barclays to meet regulators' expectations relating to internal control and
assurance." 2020 BPLC 20-F at 39.

129.    The 2020 BPLC 20-F stated that "management had assessed [BPLC's] internal
control over financial reporting as of 31 December 2020" and concluded that "[BPLC's] internal
control over financial reporting was effective as of 31 December 2020." It further stated that the
Barclays Board Audit Committee "concluded that, throughout the year ended 31 December 2020
and to date, the Group has operated a sound system of internal control that provides reasonable
assurance of financial and operational controls and compliance with laws and regulations." 2020
BPLC 20-F at 39.

130.    Attached as Exhibit 13.1 to the 2020 BPLC 20-F was a certification, pursuant to

Section 906 of the Sarbanes-Oxley Act of 2022, signed by Defendants Staley and Morzaria which attested to the truthfulness of the statements: "The Annual Report on Form 20-F for the year ended December 31, 2020 (the "Report") of Barclays fully complies with the requirements of section 13(a) of the Securities Exchange Act of 1934 and information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Barclays."

131.    Attached as Exhibit 12.1 to the 2020 BPLC 20-F were certifications, pursuant to 17 C.F.R. 240.13(A)-14(A), signed by Defendants Staley and Morzaria, which stated similar representations, as well representations about the veracity of the internal controls.

132.    Nearly identical disclosures were repeated in Barclays 2021 BPLC 20-F, 2021 BBPLC 20-F, and 2022 BPLC 20-F filings and 2022 BBPLC 20-F filings.

133.    In its 2022 Form 20-F filings, Barclays publicly stated that:

> Management has assessed internal control over financial reporting as at 31 December 2022. In making its assessment, management utilised the criteria set out in the 2013 COSO framework. Management has specifically assessed the controls put in place to address the material weakness in internal control over financial reporting relating to the Over-issuance of Securities, as further discussed below. Management has concluded that, based on its assessment, internal control over financial reporting was effective as at 31 December 2022.

Barclays repeated substantially similar promises in every Form 20-F filing since 2015. But plainly, Barclays had not even established the first building block of internal controls under the COSO protocols—adequate monitoring. Which shows that the representations were false when made, and knowingly so.

134.    There are thousands of non-WKSI issuers in all parts of the world who participate in the U.S. securities market.

135.    Barclays cannot claim mere negligence for failing to implement the most basic protocols and methods for monitoring issuances that are used by thousands of other issuers

worldwide who do not exceed their registration caps before filing for a new registration. Barclays's certified representations that it had implemented such controls—when faced with the knowledge of the need to do so and the means to do so—was plainly knowing and intentional.

136.    Barclays admitted that its staggering-in-scope violation of securities laws is the result of its failure to put into place any internal controls around the real-time tracking of securities being offered or sold off of its 2018 and 2019 Commission-registered Shelf Registration Statements. For a great read that describes the significance of Barclays' admissions, *see* Matt Levin's "Barclays Lost Track of Its Notes," Bloomberg, October 4, 2022.

## E. THE UNREGISTERED ISSUANCES

137.    Barclay's failure to have robust internal controls caused it to miscalculate how much room it had left on the 2018 and then 2019 Shelfs.

138.    On March 28, 2022, Barclays filed a Form 6-K disclosing that it had sold $15.2 billion worth of unregistered securities in excess of the maximum $20.8 billion registered by the 2019 Shelf and announcing a forthcoming rescission offer to purchasers of the over-issued securities.

139.    On May 23, 2022, Barclays filed amendments to its Form F-3 Registration Statement and supplemental prospectuses, registering all outstanding securities.

140.    On July 28, 2022, Barclays further disclosed that it had issued $1.3 billion in securities after June 26, 2019, that were also unregistered, relying on the 2018 Shelf in error before it switched over to relying on the 2019 Shelf (the "Gap Period").

141.    On August 1, 2022, Barclays published a "Rescission Offer." The Rescission Offer admitted:

> The Subject Securities offered and sold by the Issuer during the Relevant Period
> exceeded the maximum aggregate offering price of securities registered with

the U.S. Securities and Exchange Commission (the "SEC") by the Issuer on its registration statement on Form F-3 (File No. 333-232144) declared effective on August 1, 2019 (the "2019 F-3") and a prior registration statement on Form F-3, which was automatically effective on July 18, 2016 (File No. 333-212571) and subsequently amended by a post-effective amendment declared effective on March 30, 2018 (the "2018 F-3"). As such, these offers and sales of the Subject Securities were not made in compliance with the Securities Act of 1933, as amended (the "Securities Act"), giving rise to rights of rescission for certain purchasers of the Subject Securities.[19]

142.    On August 12, 2022, Barclays amended its Rescission Offer.

143.    The SEC requires an issuer like Barclays to have robust internal controls in place to ensure that it does not issue unregistered securities.

144.    BBPLC 2018 Annual Report on Form 20-F filed on February 21, 2019, BBPLC 2019 Annual Report on Form 20-F filed on February 14, 2020, BBPLC 2020 Annual Report on Form 20-F filed on February 18, 2021, and BBPLC 2021 Annual Report on Form 20-F filed on February 23, 2022, were incorporated by reference into the 2019 Shelf Registration Statement, and represented to investors that BBPLC maintained effective internal controls over financial reporting.

145.    BPLC 2018 Annual Report on Form 20-F filed on February 21, 2019, BPLC 2019 Annual Report on Form 20-F filed on February 13, 2020, BPLC 2020 Annual Report on Form 20-F filed on February 18, 2021, and BPLC 2021 Annual Report on Form 20-F filed on February 23, 2022, represented to investors that Barclays maintained effective internal controls over financial reporting.

146.    As it turned out, Barclays again started issuing billions in unregistered securities sometime in January 2021—but Barclays did not realize it for an entire year.

---

[19] https://www.sec.gov/Archives/edgar/data/312070/000119312522207620/d386666d424b5.htm.

147.    According to the SEC's Order Instituting Cease-And-Desist Proceedings Pursuant to Section 8a of The Securities Act of 1933 And Section 21c of The Securities Exchange Act of 1934, Making Findings, And Imposing A Cease-And-Desist Order:

> On March 8, 2022, a member of Group Treasury reached out to the member of the legal department who had been part of the Working Group, inquiring as to how many securities remained available to be offered and sold off of the 2019 Shelf because Group Treasury was planning on doing a sale of corporate debt securities.
>
> Over the course of that day and the next, various [Barclays] personnel attempted to calculate the cumulative amount of securities offered and sold from the 2019 Shelf in order to determine the amount of securities that remained available for sale. Over the course of these efforts, it became clear to all involved that there was no internal control in place to track in real time the amount of securities offered and sold against the amount of securities registered.
>
> On or around March 9, 2022, [Barclays] personnel concluded that securities had been offered and sold in excess of what had been registered on the 2019 Shelf. Shortly thereafter, [Barclays] halted new offers and sales of securities from the 2019 Shelf and, on March 14, 2022, alerted regulators about the over-issuance and disclosed to the market that [Barclays] did not have sufficient issuance capacity to support further sales from inventory and any further issuances of certain ETNs.

https://www.sec.gov/litigation/admin/2022/33-11110.pdf.

148.    The SEC further found that:

> At the time of the registration of both the 2018 Shelf and the 2019 Shelf, certain [Barclays] personnel recognized the need to accurately record relevant information about securities that were offered or sold so as to be able to track the aggregate amount of securities that were cumulatively offered and sold from each respective Shelf on a real-time basis, thereby ensuring that [Barclays] did not offer or sell any securities in excess of what had been registered. No internal control was established to address this issue, and the amount of securities that were offered and sold was not tracked.

. . . [B]eginning on or around June 26, 2019, [Barclays] offered and sold securities in excess of the amount remaining on the 2018 Shelf, ultimately leading to [Barclays] offering and selling approximately $1.3 billion of securities in excess of what was registered with the Commission on the 2018 Shelf. Id.

149.    The SEC further concluded that:

In addition, due to its failure to establish any internal control to track the amount of securities that were offered or sold on a real-time basis, beginning on or around January 28, 2021, [Barclays] offered and sold securities in excess of what was registered on the 2019 Shelf. These over-issuances continued until on or around March 9, 2022, when [Barclays] discovered this issue. Over the 14-month period of over-issuance, [Barclays] offered and sold approximately $16.37 billion of securities in excess of what was registered with the Commission on the 2019 Shelf.

On March 14, 2022, [Barclays] reported the issue to regulators and disclosed to the market that [BARCLAYS] did not have sufficient issuance capacity to support further sales from inventory and any further issuances of certain exchange-traded notes ("ETNs"). Id.

150.    The totality of the findings of fact and subsequent actions in the SEC Order and Consent Decree are incorporated herein by reference. Plaintiffs contend that Barclays is estopped from denying same in these proceedings.

151.    As a result of the investigation, Barclays paid the SEC penalties of $200,000,000 and disgorgement of $149,731,011 with pre-judgment interest.

152.    Nothing in the SEC's findings or any other filing suggested that the unregistered securities were somehow ripe for trading.

153.    Barclays/BPLC filed Form 8-A on January 18, 2018, which stated that "[t]he Securities [VXX], and any other Securities of this series and of like tenor, are issuable only in registered form without coupons in denominations as specified on the face hereof." (at 15).

154.    In fact, it appears that the SEC required Barclays to register all of its unregistered

securities, which Barclays announced it had done as of May 23, 2022.

155.    Given the dates, it indisputable that the following issuances of VXX were made without proper registration under Section 5 of the Securities Act:

| Date | Number of Shares | CUSIP | ISN |
|---|---|---|---|
| July 23, 2019 | 13,227,018[20] | 06746P621 | US06746P6218 |
| February 18, 2021 | 50,000,000[21] | 06746P621 | US06746P6218 |
| April 23, 2021 | 37,493,274[22] | 06747R477 | US06747R4772 |
| May 3, 2021 | 12,500,000[23] [50,000,000][24] | 06747R477 | US06747R4772 |
| October 22, 2021 | 25,000,000[25] [100,000,000][26] | 06747R477 | US06747R4772 |

156.    In other words, well over 150 million shares of VXX [unadjusted for splits]—worth upwards of $2 billion—were issued by Barclays without Registration under Section 5 of the Securities Act.

**The Reverse Split**

157.    On April 9, 2021, in a press release, Barclays announced a 4:1 reverse split for VXX to be consummated on April 23, 2021 (the "Reverse Split"). For every four shares that an investor held, Barclays would replace it with a single new share ostensibly worth four times the value. For any fractional shares leftover, Barclays would cash them out at a specific calculation roughly equivalent to the indicated value.[27]

---

[20] https://www.sec.gov/Archives/edgar/data/312070/000110465919026252/a19-9233_35424b2.htm (refers to and incorporates 2018 Shelf).

[21] https://www.sec.gov/Archives/edgar/data/312070/000110465921128505/tm2130761d1_424b2.htm (refers to and incorporates the 2019 Shelf).

[22] 4:1 Reverse split. https://ipathetn.barclays/cms/static/files/ipath/press/2021_VXX_Reverse_Split_Press_Release.

[23] https://www.sec.gov/Archives/edgar/data/312070/000110465921128505/tm2130761d1_424b2.htm (refers to and incorporates the 2019 Shelf).

[24] Split adjusted basis to compare pre-split of April 23, 2021.

[25] https://www.sec.gov/Archives/edgar/data/312070/000110465921128505/tm2130761d1_424b2.htm (refers to and incorporates the 2019 Shelf).

[26] Split adjusted basis to compare pre-split of April 23, 2021.

[27] https://ipathetn.barclays/cms/static/files/ipath/press/2021_VXX_Reverse_Split_Press_Release.pdf.

---

158.    Thus, in the initial distribution of the new VXX shares, Plaintiffs purchased one new share—under a new CUSIP number—in exchange for four old ones, effective on April 23, 2021. As a result, for example, Plaintiff Reed and persons similarly situated, went from being a holder of more than 25,000 shares, who could meet the minimum requirement for redemption, to a holder of less than 25,000 shares, who could not.

159.    This reverse split occurred after the June 26, 2019 and January 28, 2021 dates when Barclays had exhausted the securities available from the 2018 Shelf and the 2019 Shelf.

160.    On a split-adjusted basis, VXX traded at $27 per share one month after the close of the Barclays Rescission Offer on September 12, 2022. The shares hit a new low of $10.71 on March 6, 2023, one day prior to undergoing another one-for-four reverse split.

161.    In the April 23, 2021, reverse split, Plaintiffs purchased unregistered shares directly from Barclays, and so they will be able to trace their shares to Barclays and to an unregistered issuance.

162.    Plaintiffs further submit that discovery will allow them to trace their pre-split shares via Barclays internal documents and those of Approved Participants, and an analysis will show which VXX shares were sold without a valid registration statement, if same is necessary. However, Barclays has not published the information.

163.    Preceding April 23, 2021, the date of the reverse split, around 43% of the VXX shares in the market were unregistered.

164.    As of Barclays's announcement on March 14, 2022, it had issued billions in unregistered securities (but had not yet identified VXX shares as among them). Between the roughly 37.5 million [post-split] unregistered shares issued via the reverse split on April 23, 2021, and the 37,500,000 unregistered VXX shares issued in May and October of 2021, there were

roughly 75,000,000 unregistered VXX shares in the market in total by October 22, 2021. The market value of these shares approximated $2 billion.

165.    It is indisputable that the entire market for VXX contained unregistered VXX shares between April 23, 2021, and May 23, 2022, when Barclays purports to have registered the VXX shares [the "Traceable Period"].

## F.  THE AFTERMATH

166.    Because of its discovery on March 9, 2022, that it had blown past its 2019 Shelf limit, Barclays announced on March 28, 2022, that as of March 14, 2022, it had suspended new issuances of VXX.[28]

167.    On March 28, 2022, Barclays filed a Form 6-K with the SEC and publicly disclosed details around its internal control issues, Barclays announced it intended to make a rescission offer to buy back the unregistered securities at the "purchase price." and estimated the potential financial impact of the over-issuance at around £450 million ($590 million).[29]

168.    Barclays did not define what "eligible securities" meant, and it made no representations as to any limitations or conditions it would put on such an offer. Neither did Barclays disclose that it would require strict tracing from investors and holders of VXX for any securities they intended to tender.

169.    As a result of the announcement, the market for VXX went into the stratosphere as short-sellers scrambled to buy cover for their shorts.

170.    On April 28, 2022, before the market opened for the day, Barclays issued its Q1 2022 Results Announcement, which contained financial results for the three months ended March

---

[28] https://www.businesswire.com/news/home/20220314005483/en/Barclays-Suspends-Until-Further-Notice-Further-Sales-and-Issuances-of-Two-Series-of-iPath%C2%AE-ETNs-the%E2%80%9CETNs%E2%80%9D.

[29] https://www.bloomberg.com/news/articles/2022-03-28/barclays-expects-591-million-loss-on-bond-error-delays-buyback.

31, 2022. A copy of the Q1 2022 RA was filed by Barclays with the SEC as Exhibit 99.1 to a Form 6-K on April 28, 2022, in which Barclays admitted that the securities sold in excess of the maximum aggregate amount were unregistered, and that there was the potential for civil claims and regulatory enforcement actions to be brought against BBPLC.

171.    Critically, on page 31, Barclays confessed that: "Securities issued in excess of the limit are considered to be 'unregistered securities' for the purposes of US securities law with [] certain purchasers of those securities having the right to require [BBPLC] to repurchase those securities at their original purchase price with compensatory interest and the potential for the certain purchasers to bring civil claims and the SEC and other regulators to take enforcement actions against [BBPLC]."

172.    The Q1 2022 RA also confirmed that Barclays' internal controls were not effective and had a material weakness:

> …management has concluded that, by virtue of the fact that the over-issuance occurred and was not immediately identified, both BPLC and BBPLC had a material weakness in relation to certain aspects of their internal control environment and, as a consequence, their internal control over financial reporting for the year ended 31 December 2021 was not effective under the applicable Committee of Sponsoring Organizations (COSO) Framework. The material weakness that has been identified relates to a failure to monitor issuances of structured notes and ETNs under BBPLC's US Shelf during the period in which BBPLC's status changed from a "well-known seasoned issuer" to an "ineligible issuer" for US securities law purposes, and BBPLC was required to pre-register a set amount of securities to be issued under its US Shelf with the SEC. As a result of this failure, BBPLC issued securities in excess of that set amount.

173.    As part of its efforts to resolve the SEC proceedings, Barclays admitted to the over-issuances from the 2018 and 2019 Shelf Registrations, and it agreed to maintain auditable data.

174.    On May 4, 2022, Barclays held its 2022 Annual General Meeting (AGM), where Nigel Higgins, chairman of Barclays, and Defendant Venkatakrishnan addressed investors in their

2022 AGM Statements. Barclays 2022 AGM Statement. In his 2022 AGM Statement, Higgins addressed the over issuance:

> As I have said before, we do not get everything right. Let me say a few words about our recently reported failure to comply with SEC registration requirements, a failure which has cost us hundreds of millions of pounds, and more in reputation. First, all of us here were dismayed that, after so much progress, we had this entirely self-inflicted problem. We have not yet finished the review but I believe that we will find that, in all our complexities, we missed some simple tasks. This is not rocket science and we can and will do better, learning the lessons from this particular issue and applying discipline across all of our controls.   Barclays 2022 AGM Statement.

175.    On July 25, 2022, before the market opened for the day, Barclays issued a press release announcing that BBPLC was expected to commence the rescission offer on August 1, 2022 for a total of approximately "$17.6 billion of relevant securities issued in excess of amounts registered by BBPLC under its U.S. shelf registration statements. Such securities consist of U.S.$14.8 billion of structured notes and c.U.S.$2.8 billion of exchange traded notes."

176.    This statement repeated statements made previously in March and April 2022. The statements were materially misleading because they suggested that those with Exchange Traded Notes like VXX would be able to rescind, whereas Barclays had to have intended to deny any such rescission submission by anyone other than direct purchasers during one of the unregistered ETN issuances.

177.    On August 1, 2022, Barclays commenced a formal rescission offer for all securities that had been issued without the proper registration statement (the "Securities"). The offer expired on September 12, 2022.[30] The offer included an itemized list of the purported Securities that qualified for a rescission claim, including VXX. The offer did not, however, suggest that strict

---

[30] https://www.sec.gov/Archives/edgar/data/312070/000119312522207620/d386666d424b5.htm.

tracing for VXX holders would be required.

178.    However, while buried in the hundreds of pages of rescission filings, a single paragraph obliquely referenced the possibility that the rescission offer would not afford certain ETN holders a rescission, it did not specifically state that it applied to VXX holders, nor what that would even mean.

179.    Consequently, relying on their plain English understanding of the rescission offer that was publicly announced back in March, and having heard nothing publicly announced specifically as to VXX to contravene that understanding, every Plaintiff filed for rescission with Barclays to take advantage of the rescission offer—and did not try to dispose of their shares in the market. Every plaintiff stood to gain far more from rescission than they did from selling even in the then-inflated market for VXX.

**G.  PLAINTIFFS INVEST IN BARCLAYS' "VXX" AND TRY TO RESCIND**

180.    Plaintiff May invested via her IRA accounts the following VXX shares:

| Trade Date | Quantity | Share Price | Total |
|---|---|---|---|
| 11/14/2019 | 249 | $18.2520 | $4,544.75 |
| 1/28/2020 | 450 | $13.6600 | $6,147.00 |
| 7/13/2020 | 750 | $35.2177 | $26,413.28 |
| 10/19/2020 | 280 | $23.0674 | $6,458.87 |
| 3/17/2021 | 1,000 | $12.6389 | $12,638.90 |
| 3/19/2021 | 1,000 | $12.9495 | $12,949.50 |
| 4/1/2021 | 850 | $11.0050 | $9,354.25 |
| 4/1/2021 | 85 | $11.0350 | $937.98 |
| 4/12/2021 | 1,250 | $10.2258 | $12,782.25 |
| 6/4/2021 | 6 | $33.3681 | $200.21 |
| 6/4/2021 | 815 | $33.3537 | $27,183.27 |

181.    Plaintiff Ledgerwood invested via her IRA Rollover Account in the following VXX shares:

| Trade Date | Quantity | Share Price | Total |
|------------|----------|-------------|-------|
| 1/27/2020 | 7,000 | $15.5000 | $108,500.00 |
| 5/13/2020 | 1,500 | $38.8016 | $58,202.40 |
| 5/22/2020 | 1,500 | $34.5750 | $51,862.50 |
| 7/13/2020 | 1,500 | $34.4800 | $51,720.00 |
| 8/10/2020 | 4,000 | $5.8450 | $103,380.00 |
| 10/19/2020 | 3,000 | $23.0768 | $69,230.40 |
| 12/21/2020 | 5,000 | $18.5260 | $92,630.00 |
| 2/8/2021 | 3,500 | $16.3796 | $57,328.60 |
| 2/8/2021 | 2,500 | $16.3750 | $40,937.50 |
| 4/1/2021 | 10,000 | $11.0392 | $110,392.00 |
| 6/4/2021 | 400 | $33.3385 | $13,335.40 |

182.    Plaintiff May relied on the Barclays public statements and attempted to take advantage of the rescission offer by properly submitting nine separate claims to the Barclays portal well in advance of the stated deadline.  Plaintiff Ledgerwood followed the same process and submitted nine claims to the Barclays portal several days prior to the cutoff. On September 17, 2022, Plaintiffs May and Ledgerwood received identically worded emails, one for each claim submitted, notifying them that all of their claims had been rejected. Both May and Ledgerwood held their shares through the April 23, 2021 reverse split.

183.    Plaintiff Reed made the following purchases of VXX on his personal behalf:

| Trade Date | Quantity | Share Price | Total |
|---|---|---|---|
| 3/20/2020 | 2,000 | $62.21895 | $124,437.90 |
| 7/22/2020 | 8,520 | $29.3192958 | $249,800.40 |
| 7/22/2020 | 8,520 | $29.3158545 | $249,771.08 |
| 7/22/2020 | 8,520 | $29.3526995 | $250,085.00 |
| 7/22/2020 | 8,520 | $29.3177 | $249,786.80 |
| 12/31/2020 | 14,749 | $16.9 | $249,258.10 |

184.    Plaintiff Reed learned of the rescission offer through publicly available information and in reliance thereon submitted requests for rescission through the Barclays online rescission portal. All were denied on or about September 17, 2022.

185.    Reed held his shares through the April 23, 2021, reverse split.

186.    Plaintiff Howarth made the following purchases of VXX shares on his own behalf:

| Trade Date | Quantity | Share Price | Total |
|---|---|---|---|
| 7/22/2020 | 10 | $468.40 | $292.75 |
| 7/23/2020 | 15 | $465.28 | $436.43 |
| 7/24/2020 | 15 | $483.25 | $453.29 |
| 7/27/2020 | 20 | $473.44 | $591.80 |
| 7/28/2020 | 20 | $459.45 | $574.31 |
| 7/29/2020 | 20 | $457.36 | $571.70 |
| 7/31/2020 | 20 | $458.47 | $573.09 |
| 8/3/2020 | 20 | $454.19 | $567.74 |
| 8/4/2020 | 20 | $442.80 | $553.50 |
| 8/5/2020 | 20 | $432.27 | $540.34 |
| 8/6/2020 | 20 | $435.30 | $544.13 |

| 8/11/2020 | 20 | $423.12 | $528.90 |
|---|---|---|---|
| 8/12/2020 | 20 | $415.79 | $519.74 |
| 8/12/2020 | 20 | $406.67 | $508.34 |
| 8/14/2020 | 10 | $409.84 | $256.15 |
| 8/14/2020 | 10 | $409.86 | $256.16 |
| 9/14/2020 | 20 | $521.45 | $652.33 |
| 9/15/2020 | 20 | $402.53 | $503.16 |
| 9/16/2020 | 20 | $393.04 | $491.30 |
| 9/18/2020 | 20 | $382.40 | $478.00 |
| 9/21/2020 | 20 | $408.16 | $510.20 |
| 9/22/2020 | 20 | $410.32 | $512.90 |
| 9/24/2020 | 20 | $420.77 | $525.96 |
| 9/25/2020 | 20 | $420.14 | $525.18 |
| 9/25/2020 | 20 | $410.37 | $512.96 |
| 9/28/2020 | 20 | $409.20 | $511.50 |
| 9/29/2020 | 20 | $395.28 | $494.10 |
| 9/30/2020 | 20 | $393.36 | $491.70 |
| 9/30/2020 | 20 | $390.53 | $488.16 |
| 10/1/2020 | 20 | $396.20 | $495.25 |
| 10/2/2020 | 20 | $408.00 | $510.00 |
| 10/5/2020 | 20 | $406.05 | $507.56 |
| 10/6/2020 | 20 | $396.20 | $495.25 |
| 10/7/2020 | 20 | $396.93 | $496.16 |
| 10/8/2020 | 20 | $385.57 | $481.96 |
| 10/8/2020 | 20 | $378.36 | $472.95 |
| 10/12/2020 | 20 | $354.88 | $443.60 |
| 10/12/2020 | 100 | $354.03 | $2,212.69 |

| 10/13/2020 | 200 | $351.90 | $4,398.75 |
| 10/15/2020 | 100 | $366.37 | $2,289.81 |
| 10/15/2020 | 50 | $361.89 | $1,130.91 |
| 10/15/2020 | 50 | $353.25 | $1,103.91 |
| 10/16/2020 | 50 | $348.61 | $1,089.41 |
| 10/16/2020 | 50 | $353.71 | $1,105.34 |
| 10/16/2020 | 50 | $350.06 | $1,093.92 |
| 10/19/2020 | 50 | $357.91 | $1,118.47 |
| 10/20/2020 | 50 | $372.09 | $1,162.78 |
| 10/21/2020 | 50 | $366.14 | $1,144.19 |
| 10/22/2020 | 50 | $361.28 | $1,129.00 |
| 10/23/2020 | 50 | $358.17 | $1,119.28 |
| 10/23/2020 | 50 | $355.52 | $1,111.00 |
| 10/23/2020 | 50 | $354.47 | $1,107.72 |
| 10/26/2020 | 50 | $361.44 | $1,129.50 |
| 11/2/2020 | 40 | $407.02 | $1,017.55 |
| 11/2/2020 | 85 | $407.00 | $2,162.39 |
| 11/12/2020 | 500 | $324.11 | $10,128.44 |
| 11/12/2020 | 500 | $321.58 | $10,049.38 |
| 11/13/2020 | 500 | $305.26 | $9,539.38 |
| 11/16/2020 | 250 | $299.28 | $4,676.25 |
| 11/17/2020 | 250 | $295.41 | $4,615.78 |
| 11/18/2020 | 275 | $293.41 | $5,043.13 |
| 11/23/2020 | 275 | $293.48 | $5,044.33 |
| 2/5/2021 | 300 | $265.25 | $4,973.44 |
| 4/9/2021 | 1,000 | $163.28 | $10,205.00 |
| 4/9/2021 | 1,275 | $163.28 | $13,011.46 |

| 4/15/2021 | 1000 | $159.61 | $9,975.63 |
| 5/13/2021 | 400 | $181.48 | $4,537.00 |
| 5/13/2021 | 1,600 | $181.91 | $18,190.27 |

187.    Plaintiff Howarth learned of the rescission offer through publicly available information and, in reliance thereon, submitted 69 requests for rescission through the Barclays online rescission portal. All were denied on or about September 17, 2022.

188.    Howarth held his shares through the April 23, 2021, reverse split.

189.    Plaintiff Knapp made the following investments in the VXX shares:

| Trade Date | Quantity | Share Price | Total |
| --- | --- | --- | --- |
| 9/16/2020 | 16,100 | $24.8600 | $400,246.00 |
| 9/16/2020 | 5,593 | $24.8500 | $138,986.05 |
| 9/16/2020 | 1,200 | $24.8490 | $29,818.80 |
| 9/16/2020 | 2,600 | $24.8498 | $64,609.48 |
| 4/28/2021 | 829 | $39.3350 | $32,608.72 |

190.    Plaintiff Knapp had his trades submitted for rescission, and they too were denied by Barclays on or about September 17, 2022.

191.    Knapp held his shares held through the April 23, 2021, reverse split.

192.    Each Plaintiff contends that had they known before what they know now and understood VXX when they made purchases, and what they understand now, they never would have invested in VXX.

193.    Each Plaintiff has suffered damages due to the acts of the Defendants.

194.    The Securities Laws require Barclays and/or its affiliated persons to maintain documents of who purchases their shares. *See, e.g*., Trust Indenture Act of 1939 § 312 (a) and (b);

Section 13(b) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A) ("Every issuer which has a class of securities registered pursuant to section 78l of this title and every issuer which is required to file reports pursuant to section 78o(d) of this title shall…(A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer"); *and see* 17 CFR § 240.17a-4.

195.    Because the purchases of the shares tend to be through brokers and intermediaries on behalf of retail investors, between documents they retain and those Barclays is supposed to have retained, Plaintiffs and class members through discovery should be able to trace shares to determine whether they purchased shares from Barclays (giving rise to Section 12) liability, or, at the very least, whether they purchased unregistered shares (e.g., shares issued after the 2018 or 2019 Shelfs were exhausted) as would be required for Section 11 liability.

196.    Plaintiffs did not discover and, by the exercise of reasonable diligence, could not possibly have discovered that the shares they purchased were unregistered before, at the very earliest, March 28, 2022. Any action was further delayed by the Rescission offer, the full terms of which were not clear in the least.

197    The August 1, 2022 Prospectus Supplement Rescission Offer is clear as mud. It states that persons who are "Initial Investors," "Eligible Current Investors" (e.g., people who purchased unregistered securities and still held them) and "Eligible Former Investors" (e.g., people who purchased unregistered securities but sold them) could elect Rescission.[31] One plainly did not have to have bought the securities directly from Barclays. The "Evidence of Eligibility" states that one may rescind if Barclay's records reflect a direct sale of the subject securities to the applicant, *or* if Barclays deems the representations and evidence such as "Account statement(s) reflecting the

---

[31] https://www.sec.gov/Archives/edgar/data/312070/000119312522207620/d386666d424b5.htm, at Cover Page summary.

purchase and purchase price information of the relevant Subject Security, and demonstrating the continued holding of such Subject Security until at least the date of this prospectus supplement" was "satisfactory" to warrant rescission.[32]

198.    Each Plaintiff further forewent selling their shares until after their submissions for rescission were rejected in September 2022. Their reliance and forbearance on selling their shares was reasonable because any Plaintiff (or applicant) was either an Initial Investor (they had no way of knowing what Barclays's records showed or what Barclays considers the "period" specifically for VXX), or they were an Eligible Investor who submitted the required paperwork.

199.    Moreover, the subject VXX shares they purchased were neither sold nor bona fide offered to the public more than three years before the filing of this action.

## IV.

## CAUSES OF ACTION

### COUNT ONE
#### SECTION 12(a)(1) OF THE SECURITIES ACT [15 U.S.C. § 77l(a)(1)]
#### Against Barclays & Does 1-12

200.    Plaintiffs incorporate all factual averments in this Consolidated Second Amended Class Action Complaint as if fully set forth herein.

201.    Beginning on June 26, 2019, Barclays offered and sold approximately $1.3 billion of securities in excess of what had remained on the 2018 Shelf.

202.    On July 23, 2019, Barclays issued 23,227,018 unregistered shares of VXX into the market bearing CUSIP 06746P621.

203.    On August 1, 2019, Barclays' new 2019 Shelf Registration statement went effective.  Beginning in January 2021, BBPLC offered and sold securities in excess of what was

---

[32] https://www.sec.gov/Archives/edgar/data/312070/000119312522207620/d386666d424b5.htm, at p. S-28.

registered on the 2019 Shelf.

204.    On February 18, 2021, Barclays issued 50 million new unregistered shares of VXX into the market bearing CUSIP 06746P621. The prospectus for this referenced the 2019 Shelf—but by February 18, 2021, Barclays had already exhausted the capacity in the 2019 Shelf.

205.    As of April 23, 2021, over 63 million unregistered shares of VXX were on the market—approximately 43% of the total number of VXX shares then publicly available.

206.    On April 23, 2021, Barclays did a one-for-four reverse split of VXX. Barclays issued 37,493,274 unregistered shares of VXX into the market, issuing one unregistered share of VXX bearing CUSIP 06747R477 in exchange for four shares of VXX bearing CUSIP 06746P621 (and paying out any fractional shares remaining). This was a "sale" of VXX shares.

207.    Just ten days later, on May 3, 2021, Barclays issued 12,500,000 unregistered shares (adjusted pre-split, this would have been tantamount to 50,000,000 new unregistered shares) bearing CUSIP 06747R477 into the market. There is no publicly available amended prospectus or pricing supplement for this issuance.

208.    On October 22, 2021, Barclays issued 25,000,000 unregistered shares (adjusted pre-split, this would have been tantamount to 100,000,000 new unregistered shares) bearing CUSIP 06747R477 into the market. The amended prospectus/pricing supplement for this referenced the 2019 Shelf, but by then Barclays had exhausted the capacity in the 2019 Shelf.

209.    Barclays thus offered and/or sold shares of VXX in violation of Section 5 of the Securities Act. Barclays admitted in its amended 2021 Form 20-F that

> The securities that have been over issued in this period comprise structured notes and exchange traded notes (ETNs). Securities issued in excess of the limit are considered to be "unregistered securities" for the purposes of US securities law with certain purchasers of those securities having the right to

require Barclays [] to repurchase those securities at their original purchase price with compensatory interest[.][33]

210.    Based on the foregoing, every person who purchased Barclays shares prior to April 23, 2021, and held through opening that day, is a purchaser of an unregistered share from Barclays and is entitled to rescind such purchases for the consideration paid (e.g., the value of four shares paid to Barclays as consideration). Each of the Lead Plaintiffs acquired VXX shares prior to April 23, 2021, and held shares through April 23, 2021, surrendering some or all of them for value in the reverse split in exchange for a new, post-split share with a new CUSIP number or cash for any fractional shares. Accordingly, every Plaintiff and class member who held VXX shares on April 23, 2021, and received a post-split share of VXX, received an unregistered share and acquired such shares of VXX from Barclays directly in a "sale" as defined in the Securities Act.[34] They are therefore entitled to rescission or recessionary damages under Section 12(a)(1).

211.    In addition, every person who purchased Barclays' shares between April 23, 2021, and May 23, 2022, has a plausible claim for rescission under Section 12(a)(1) because Barclays and its agents, its Approved Participants, regularly sold shares into the market.

212.    Therefore, all buyers of those shares would be persons who "purchased [VXX] from" Barclays under Section 12(a)(1), and discovery will confirm which share sales those were. On the days that Barclays sold a substantial number of the shares and members made purchases, there is a more-than-plausible probability that some of the shares were purchased from Barclays which will be borne out in discovery.

213.    Barclays has the burden of proving that an exemption to registration applies— meaning, there is a presumption that a security must be registered unless the issuer has fully

---

[33] https://home.barclays/content/dam/home-barclays/documents/investor-relations/shareholder-information/BBPLC-2021-12-31-20F_A-Final.pdf at 168.

[34] 15 U.S.C. § 77b(a)(3).

complied with the terms of an exemption. Otherwise, the sales of those securities are presumptively void absent an effective registration statement and no exemption from registration was in effect or would be available.

214.    And based on the foregoing facts and the applicable law, Barclays cannot claim the benefit of any exemption under the Securities Act or under any SEC rule promulgated thereunder.

215.    Moreover, Barclays is estopped from asserting any exemption. Barclays issued a blanket unqualified rescission offer on March 28, 2022, that Plaintiffs relied on. Moreover its Rescission Offer filed on August 1, 2022, likewise pronounced that purchasers of unregistered shares had the right to rescind.

216.    Moreover, on May 23, 2022, Barclays purported to have registered all outstanding shares. Barclays would not have needed to do this if all shares were already deemed registered or were exempt from registration.

217.    Furthermore, throughout the Class Period, sales of VXX were made on days where Barclays, directly and through its Approved Participants, sold unregistered shares of VXX to Plaintiffs and/or the Class members in violation of Section of 5 of the Securities Act.

218.    Plaintiffs pray for damages, restitution, and/or all other relief to which they are justly and/or legally entitled.

219.    Barclays Bank PLC is the issuer of the securities and is therefore liable, and Barclays PLC is the control person and is therefore liable under Section 15 of the Securities Act.

### COUNT TWO
#### SECTION 11 OF THE OF THE SECURITIES ACT [15 U.S.C. § 77K]
#### Against Barclays, Individual Securities Act Defendants, & Does 1-12

220.    Plaintiffs incorporate all factual averments in this Consolidated Second Amended Class Action Complaint as if fully set forth herein.

221.    The 2018 and 2019 Shelf Registrations contained material misrepresentations.

222.    On February 22, 2018, Barclays filed a registration statement with the SEC for its 2018 Shelf, which was declared effective on March 30, 2018. It stated in no small measure that:

> Pursuant to Rule 415(a)(6) under the Securities Act, this registration statement will include $25,000,000,000 in maximum aggregate offering price of unsold securities that were previously registered on the registration statement on Form F-3 (File No. 333-216377) filed on March 1, 2017." "The undersigned Registrant hereby undertakes: (1) To file, during any period in which offers or sales are being made, a post-effective amendment to this Registration Statement: . . . (ii) To reflect in the prospectus any facts or events arising after the effective date of the Registration Statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the Registration Statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the SEC pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than 20 percent change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective Registration Statement; and (iii) To include any material information with respect to the plan of distribution not previously disclosed in the Registration Statement or any material change to such information in the Registration Statement . . . ." (emphasis added).

223.    On June 14, 2019, Barclays filed a registration statement with the SEC for its 2019 shelf statement, which was declared effective on August 1, 2019, and included a specification of the maximum aggregate offering price of securities available to be offered or sold off that registration statement. It also stated:

> "The maximum aggregate offering price of all securities issued by the Registrant pursuant to this Registration Statement shall not exceed $20,081,600,000 in U.S. dollars or the equivalent at the time of offering in any other currency . . . ." "The undersigned Registrant hereby undertakes: (1) To file, during any period in which offers or sales are being made, a post-effective amendment to this Registration Statement: . . . (ii) To reflect in the prospectus

any facts or events arising after the effective date of the Registration Statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the Registration Statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) *and any deviation from the* low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the SEC pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than 20 percent change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective Registration Statement; and (iii) To include any material information with respect to the <u>plan of distribution</u> not previously disclosed in the Registration Statement or <u>any material change</u> to such information in the Registration Statement . . . ." (emphasis added).

224.    Both the 2018 and 2019 registration statements falsely stated the aggregate amount of securities intended to be registered and sold.

225.    Both registration statements omitted the material fact of the true amount to be issued and/or that no internal controls were in place around the real-time tracking of securities being offered or sold off them.

226.    Plaintiffs acquired VXX securities that were issued pursuant to these registration statements.

227.    Beginning on June 26, 2019, Barclays offered and sold approximately $1.3 billion of securities in excess of what had remained on the 2018 Shelf.

228.    On July 23, 2019, Barclays issued 23,227,018 unregistered shares of VXX into the market bearing CUSIP 06746P621. The Pricing Supplement/Amended Prospectus incorporated the 2018 Shelf Registration to become a single Registration Statement under the Securities Act and therefore, for the purposes of this Count, the effective date of the 2018 Registration Statement was July 23, 2019.

229.    The prospectus referenced the 2018 Shelf, but by June 26, 2019, Barclays had

exhausted the capacity in the 2018 Shelf. Therefore, the registration statement for this issuance of VXX contained materially false information—primarily, that the VXX shares were registered and that Barclays had sufficient internal controls to ensure compliance with the registration requirements.

230.    On August 1, 2019, Barclays' new 2019 Shelf Registration statement went effective.  Beginning in January 2021, BBPLC offered and sold securities in excess of what was registered on the 2019 Shelf.

231.    On February 18, 2021, Barclays issued 50 million new unregistered shares of VXX into the Market bearing CUSIP 06746P621. The Pricing Supplement/Amended Prospectus incorporated the 2019 Shelf Registration to become a single Registration Statement under the Securities Act, and therefore, the effective date of the Registration statement for such shares was February 18, 2021. The prospectus for this referenced the 2019 Shelf but by February 18, 2021, Barclays had exhausted the capacity in the 2019 Shelf. Therefore, the registration statement for this issuance of VXX contained materially false information—primarily, that the VXX shares were registered and that Barclays had sufficient internal controls to ensure compliance with the registration requirements.

232.    As of April 23, 2021, over 63 million unregistered shares of VXX were on the market—approximately 43% of the total number of shares then available.

233.    On April 23, 2021, Barclays sold 37,493,274 unregistered shares of VXX, providing one unregistered share of VXX bearing CUSIP 06747R477 in exchange for four shares of VXX bearing CUSIP 06746P621 (and paying out any fractional shares remaining).  Therefore, the effective date of the Registration statement for such shares was April 23, 2021.

234,    The shares sold by Barclays to Plaintiffs on April 23, 2021, were issued pursuant

to the 2018 Shelf and/or the 2019 Shelf, both of which contain materially false and/or misleading statements and omissions—primarily, that the VXX shares were registered and that Barclays had sufficient internal controls to ensure compliance with the registration requirements.

235.    On May 3, 2021, Barclays issued into the market 12,500,000 unregistered shares (tantamount to 50,000,000 pre-split shares) bearing CUSIP 06747R477. There is no publicly available amended prospectus or pricing supplement for this issuance, but the October 21, 2021, Pricing Supplement for the October 22, 2021, issuance refers to this issuance and its date and references the 2019 Shelf Registration. Therefore, the registration statement for this issuance of VXX contained materially false information—primarily, that the VXX shares were registered and that Barclays had sufficient internal controls to ensure compliance with the registration requirements.

236.    On October 22, 2021, Barclays issued into the market 25,000,000 unregistered shares (tantamount to 100,000,000  pre-split shares) bearing CUSIP 06747R477. The Pricing Supplement/Amended Prospectus incorporated the 2019 Shelf Registration to become a single Registration Statement under the Securities Act, and therefore, the effective date of the Registration statement for such shares was October 22, 2021.

237.    The amended prospectus/pricing supplement for this referenced the 2019 Shelf but by then Barclays had exhausted the capacity in the 2019 Shelf. Therefore, the registration statement for this issuance of VXX contained materially false information—primarily, that the VXX shares were registered and that Barclays had sufficient internal controls to ensure compliance with the registration requirements.

238.    On May 23, 2022, Barclays purported to have registered all outstanding shares. Barclays would not have needed to do this if all shares were already deemed registered.

239.    Both the 2018 and 2019 registration statements contained other false statements and/or omissions about Barclays' internal controls, the number of registered shares to be offered, the impact of additional issuances on the rate of depreciation and the underlying cause thereof, Barclays' hidden profit business model undergirding VXX or the fact that as Barclays grew it VXX would tend to depreciate faster, Barclays hidden model that leveraged the existence of small retail investors like Plaintiffs and the Rule 11 subclass in order to create a market for VXX for the benefit of large institutional investors, and all other misrepresentations pled herein.[35]

240.    Each of the Plaintiffs explicitly and/or implicitly relied on the market integrity for VXX and the registration statements as having properly registered the VXX shares and was unaware of the material omissions listed above when they made their acquisitions of the shares.

241.    The securities are void because they were sold without an effective registration statement, and no exemption from registration was in effect or would be available. Moreover, Barclays is estopped from asserting any exemption.

242.    Any person who acquired VXX in 2019 or later purchased shares issued under the 2018 or 2019 registration statements, and so such person will be able to trace their share to a false registration statement and is entitled to sue for damages under Section 11(a) of the Securities Act.

243.    Any person who acquired VXX after April 23, 2021, but on or prior to May 23, 2022, will be able to trace their share to a false registration statement (either the 2019 or 2018 shelf) and is entitled to sue for damages under Section 11(a) of the Securities Act.

---

[35] Even the predecessor to the current VXX, called VXX-B, was registered on January 17, 2018, and shortly thereafter the ticker was changed to "VXX". https://www.sixfigureinvesting.com/2018/12/vxx-maturity-vxxb-replacement/. The Registration statement for VXX-B likewise contained all the same false statements (other than the number of shares to be registered) and omissions. See https://www.sec.gov/Archives/edgar/data/312070/000110465918002717/a18-3279_9424b2.htm.

244.    Each of the Plaintiffs acquired VXX shares issued pursuant to either the 2018 or 2019 registration statements (there is not another registration statement), both of which contained the same or similar materially false statements and/or omissions. Therefore, Plaintiffs can trace their shares as would a Section 11 subclass (defined below).

245.    The Individual Securities Act Defendants each signed the registration statements which contained false and misleading representations, making them personally liable under Section 11 of the Securities Act.

246.    Barclays and the Individual Securities Act Defendants are thus liable pursuant to Section 11(a)(1) through (5) to Plaintiffs and the Class for damages as provided in Section 11(e).

247.    Barclays Bank PLC is the issuer of the securities and is therefore liable, and Barclays PLC is the control person and is therefore liable under Section 15 of the Securities Act.

## COUNT THREE
### SECTION 12(a)(2) OF THE SECURITIES ACT [15 U.S.C. § 77l(a)(2)]
### Against Barclays & Does 1-12

248.    Plaintiffs incorporate all factual averments in this Consolidated Second Amended Class Action Complaint as if fully set forth herein.

249.    On February 22, 2018, Barclays filed a registration statement with the SEC for its 2018 shelf statement, which was declared effective on March 30, 2018, and included a specification of the maximum aggregate offering price of securities available to be offered or sold off that registration statement. The registration statement represented that Barclays had instituted internal controls to ensure compliance with all laws, rules and regulations.

250.    On June 14, 2019, Barclays filed a registration statement with the SEC for its 2019 shelf statement, which was declared effective on August 1, 2019, and included a specification of the maximum aggregate offering price of securities available to be offered or sold off that

registration statement. The registration statement represented that Barclays had instituted internal controls to ensure compliance with all laws, rules and regulations.

251.    The 2018 and 2019 Shelf Registrations [and their amendments and supplements] included material misrepresentations as discussed above.

252.    On July 23, 2019, Barclays issued 23,227,018 unregistered shares of VXX into the market bearing CUSIP 06746P621. The Pricing Supplement/Amended Prospectus incorporated the 2018 Shelf Registration to become a single Registration Statement under the Securities Act, and therefore, for the purposes of this Count, the effective date of the 2018 Registration Statement was July 23, 2019. The prospectus referenced the 2018 Shelf, but by June 26, 2019, Barclays had exhausted the capacity in the 2018 Shelf. Therefore, the registration statement for this issuance of VXX contained materially false information—primarily, that the VXX shares were registered and that Barclays had sufficient internal controls to ensure compliance with the registration requirements.

253.    On August 1, 2019, Barclays' new 2019 Shelf Registration statement went effective.  Beginning in January 2021, BBPLC offered and sold securities in excess of what was registered on the 2019 Shelf.

254.    On February 18, 2021, Barclays issued 50 million new unregistered shares of VXX into the market bearing CUSIP 06746P621. The Pricing Supplement/Amended Prospectus incorporated the 2019 Shelf Registration to become a single Registration Statement under the Securities Act, and therefore, the effective date of the Registration Statement for such shares was February 18, 2021. The prospectus for this referenced the 2019 Shelf, but by February 18, 2021, Barclays had exhausted the capacity in the 2019 Shelf. Therefore, the registration statement for this issuance of VXX contained materially false information—primarily, that the VXX shares were

registered and that Barclays had sufficient internal controls to ensure compliance with the registration requirements.

255.    On April 23, 2021, Barclays sold 37,493,274 unregistered shares of VXX, providing one unregistered share of VXX bearing CUSIP 06747R477 in exchange for four shares of VXX bearing CUSIP 06746P621 (and paying out any fractional shares remaining). Therefore, the effective date of the Registration Statement for such shares was April 23, 2021.

256.    The shares sold by Barclays to Plaintiffs on April 23, 2021, were issued pursuant to the 2018 Shelf and/or the 2019 Shelf, both of which contain materially false and/or misleading statements and omissions—primarily, that the VXX shares were registered and that Barclays had sufficient internal controls to ensure compliance with the registration requirements.

257.    On May 3, 2021, Barclays issued into the market 12,500,000 unregistered shares (tantamount to 50,000,000 pre-split shares) bearing CUSIP 06747R477. There is no publicly available amended prospectus or pricing supplement for this issuance, but the October 21, 2021 Pricing Supplement for the October 22, 2021 issuance refers to this issuance and its date and references the 2019 Shelf Registration. Therefore, the Registration Statement for this issuance of VXX contained materially false information—primarily, that the VXX shares were registered and that Barclays had sufficient internal controls to ensure compliance with the registration requirements.

258.    On October 22, 2021, Barclays issued into the market 25,000,000 unregistered shares (tantamount to 100,000,000 pre-split shares) bearing CUSIP 06747R477. The Pricing Supplement/Amended Prospectus incorporated the 2019 Shelf Registration to become a single Registration Statement under the Securities Act, and therefore, the effective date of the Registration statement for such shares was October 22, 2021. The amended prospectus / pricing

supplement for this referenced the 2019 Shelf, but by then Barclays had exhausted the capacity in the 2019 Shelf. Therefore, the Registration Statement for this issuance of VXX contained materially false information—primarily, that the VXX shares were registered and that Barclays had sufficient internal controls to ensure compliance with the registration requirements.

259.    Barclays thus offered and/or sold shares of VXX in violation of Section 5 of the Securities Act.

260.    On May 23, 2022, Barclays purported to have registered all outstanding shares. Barclays would not have needed to do this if all shares were already deemed registered.

261.    Both the 2018 and 2019 Registration Statements contained other false statements and/or omissions about Barclays's internal controls, the number of registered shares to be offered, the impact of additional issuances on the rate of depreciation and the underlying cause thereof, Barclays' hidden profit business model undergirding VXX or the fact that as Barclays grew it, VXX would tend to depreciate faster, Barclays hidden model that leveraged the existence of small retail investors like Plaintiffs and the Rule 11 subclass in order to create a market for VXX for the benefit of large institutional investors, and all other misrepresentations pled herein.[36]

262.    Each of the Plaintiffs explicitly and/or implicitly relied on the market integrity for VXX when purchasing the shares and/or acquiring them, and on registration statements as having properly registered the VXX shares and was unaware of the material omissions listed above when they made their acquisitions of the shares.

263.    The securities are void because they were sold without an effective registration

---

[36] Even the predecessor to the current VXX, called VXX-B, was registered on January 17, 2018, and shortly thereafter the ticker was changed to "VXX." https://www.sixfigureinvesting.com/2018/12/vxx-maturity-vxxb-replacement/. The Registration Statement for VXX-B likewise contained all the same false statements (other than the number of shares to be registered) and omissions. See https://www.sec.gov/Archives/edgar/data/312070/0001104659 18002717/a18-3279_9424b2.htm.

statement and no exemption from registration was in effect or would be available. Barclays cannot rely on an exemption for this Cause of Action. And based on the foregoing facts and the applicable law, Barclays cannot claim the benefit of any exemption under the Securities Act or under any SEC rule promulgated thereunder and is estopped from asserting same. Section 12(a)(2) expressly precludes reliance on any exemption under Section 3 of the Securities Act (save for Section 3(a)(2) or (14)).

264.    Based on the foregoing, every person who held Barclays shares prior to April 23, 2021, and held through the following day, received unregistered shares from Barclays and is entitled to damages.

265.    Therefore, such persons are persons who "purchased [VXX] from" Barclays. Moreover, each person who purchased shares after April 23, 2021, but before May 23, 2022, is substantially likely to have purchased shares from Barclays or its Approved Participants (who are its agents). Moreover, Plaintiffs who purchased during the Gap Period or between January 2021 and April 23, 2021, are also substantially likely to have purchased shares from Barclays not only due to the contemporaneous and large issuances in those periods, but because of the frequency of Barclays purchases and sales into the market as a market maker.

266.    Each of the Plaintiffs acquired VXX shares issued pursuant to either the 2018 or 2019 registration statements (there is not another registration statement), both of which contained materially false statements and/or omissions.

267.    Each of the Lead Plaintiffs acquired their VXX shares prior to April 23, 2021, and held shares through the April 23, 2021, surrendering some or all of them for value in the reverse split in exchange for a new, post-split share with a new CUSIP number.

268.    Accordingly, every Plaintiff and Class member who held VXX on April 23, 2021,

and received a post-split share of VXX, received an unregistered share and acquired such shares of VXX from Barclays directly, and is entitled to rescission or rescissory damages under Section 12(a)(2).

269.    And because on such days that Barclays sold more than 50% of the shares on the day(s) members made their purchases, there is a high probability that some of the shares were purchased from Barclays, which will be borne out in discovery.

201.    Plaintiffs pray for damages, restitution, and/or all other relief to which they are justly entitled.

**COUNT FOUR**
**SECURITIES FRAUD SCHEME LIABILITY UNDER SECTION 10(b)**
**AND RULE 10b-5(a) AND (c) OF THE EXCHANGE ACT**
**Against Barclays, the Individual Exchange Act Defendants and Control Persons**

271.    Plaintiffs respectfully incorporate all factual averments in this Consolidated Second Amended Class Action Complaint as if fully set forth herein. To the extent any factual allegation alleged in support of this claim conflicts with any other, it should be deemed to have been pled in the alternative.

272.    Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), provides that "[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange— (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

273.    Rule 10b-5, 17 C.F.R. § 240.10b-5, states that "[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the

mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud,…or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person … in connection with the purchase or sale of any security."

274.    This Rule 10b-5 claim rests on the deceptive nature of Barclay's acts and business,[37] and therefore, the provisions of the PSLRA, 15 U.S.C. § 78u(b)(1), do not apply here.

275.    Based upon the facts alleged herein, Barclays violated Section 10(b) and Rule 10b-5 in that they, in connection with the purchase of Barclays VXX shares by the Plaintiffs and the Class, used or employed manipulative and deceptive devices or contrivances in violation of the Securities laws and regulations, which operated as a fraud and deceit upon the Plaintiffs and the Class during the Class Period.

276.    In its Settlement with Barclays, the SEC found that Barclays "fail[ed] to put into place any internal control around the real-time tracking of securities being offered or sold off of its Commission-registered shelf registration statement. As a result of this failure, BBPLC offered and sold an unprecedented amount of securities—cumulatively totaling approximately $17.7 billion—in excess of what it had registered with the Commission, in violation of Sections 5(a) and (c) of the Securities Act."[38]

277.    Barclays issued and sold hundreds of millions of unregistered shares of VXX during the class period in violation of a myriad of provisions of the Securities Act as found by the SEC in the SEC's Consent Order.

278.    This caused the float of VXX to bloat by a factor of over a billion dollars.

---

[37] *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 158, 128 S. Ct. 761, 169 L. Ed. 2d 627 (2008) (there is no requirement under Rule 10b-5(a) or (c) of a "specific oral or written statement . . . . [c]onduct itself can be deceptive").

[38] https://www.sec.gov/files/litigation/admin/2022/33-11110.pdf at p. 2.

279.    During the period of 2019, 2020, 2021 and 2022, Barclays's need to engage in VIX futures trades to support the VXX outstanding represented a material percentage of the market for VIX futures.

280.    Once Barclays's VXX float grew to several billion dollars, it required hundreds of millions in constant purchasing and selling of VIX one-month and two-month futures to maintain the 30-day spread for the VXX.

281.    The increased float not only increased the fees Barclays could charge, it effectively increased the costs associated with maintaining the forward roll of VIX futures.

282.    The inflated fees and increased costs directly affected the price at which VXX was trading on the market. Barclays and its agents, called "Approved Participants," were the market makers of VXX and worked to maintain VXX at or near its implied value. The implied value of VXX, in turn, directly reflects, among other things, the costs associated with managing the underlying pool of derivatives.

283.    Therefore, as Barclays's fraudulent scheme brought in more and more unregistered and, thus, illegitimate shares of VXX into the float, Barclays effectively enriched itself at the expense of its noteholders like Plaintiffs and the Class.

284.    This scheme was in connection with the purchase or sale of VXX by Plaintiffs. Plaintiffs and the other members of the Class relied directly or indirectly on the integrity of the market for VXX. In the absence of material information that was known to Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the class purchased shares of VXX during the Class Period.

285.    But for Barclays's clandestine scheme that resulted in its issuing billions of dollars in unregistered securities during the class period, Plaintiffs would not have purchased VXX or they

would not have lost nearly as much over the course of that period of time.

286.    The scheme had class-wide and market-wide impact because every issuance of unlawful and unregistered shares of VXX caused the price and value of the shares to decline more rapidly than they otherwise would have.

287.    The value of VXX does not track VIX itself, but the prices of futures of the VIX, which often trade at very different price levels depending on the time to maturity, which is the indicative value. The market value of VXX tends to revert to the mean of the indicative value or net asset value. The indicative value or net asset value of VXX is tied to the weighted average of the one-month and two-month VIX futures.

288.    Every day, as underlying VIX futures contracts that Barclays holds age, Barclays has to "rebalance" them—e.g., it has to buy and sell VIX futures and must balance them to maintain its position VIX. Barclays buys two-month futures, holds them for thirty days, and then sells them as one-month VIX futures. Because the two-month contracts tend to trade, during normal market conditions, at a higher price than the one-month contracts tend to sell for (called "contango"), Barclays suffers a loss. That loss, combined with the standard 0.89% investor fee Barclays charges, results in what Barclays calls a "negative roll yield". This loss or negative roll yield is why VXX exhibits a seemingly persistent decline in value, under normal market conditions. This fundamental dynamic is admitted by Barclays.[39]

289.    What Barclays does not disclose is that, by adding hundreds of millions of dollars in unregistered VXX shares to its float, it (a) increased the fees it could charge and pocket (which

---

[39]    https://ipathetn.barclays/ipath/details/341408/download-content/7803048 PS-16 ("Absent stressed market conditions, VIX futures have historically traded in "contango" markets, and VIX futures have frequently exhibited very high contango in the past, resulting in a significant cost to "roll" the futures. **The existence of contango in the futures markets have resulted in the past and may result in the future in negative "roll yields", which could cause a significant and sustained decline in the level of the Index underlying your ETNs and, accordingly, significantly decrease the payment you receive at maturity or upon early redemption**.") (bolding added).

is a calculated percentage of price), but (b) widened the negative roll yield, thus accelerating the rate of decay in the VXX indicative value.

290.    This is due to the price impact of Barclays's predictable trading patterns in VIX futures. According to experts and researchers who examined the data, large institutions who have to manage a daily roll in VIX futures, of which Barclays is the largest by a substantial margin, end up trading at the end of the day predictably in large block trades, as the following graph shows.



The end of volume tends to be the largest trades by the largest players. As the largest player, Barclays ends up accepting lower prices to sell its one-month contracts than it otherwise would have because of the size of its position, the generally known fact Barclays HAS to sell the one-month contracts, and because everyone knows WHEN Barclays has to sell it (which is at the end of every trading day). Concomitantly, buying the two-month VIX futures, Barclays is generally paying a higher price than it otherwise would because of the size of their position, the generally

known fact that they HAVE to buy to stay hedged, and because everyone knows WHEN Barclays has to buy (which is in the last few minutes of every trading day).[40]

291.    At the time of the purchases, had Plaintiffs and the other members of the Class and the marketplace known of the truth regarding (a) Barclays's misaligned incentives in managing the VXX roll process, and (b) the accelerated depreciation of their shares every time Barclays issued unregistered shares of VXX, neither of which was ever disclosed by Defendants—Plaintiffs and other members of the Class would not have purchased VXX and/or would not have lost the same amount of money due to the scheme during the class period.

292.    Barclays acted with the requisite scienter.

293.    Barclays's public filings, signed by management, attributed to management as well as the Audit Committee and Risk Committee the responsibility for imposing sufficient internal controls to ensure that unregistered shares were not offered or sold into the market.

294.    As pleaded above, the members of Barclays management, the Board, the Audit Committee, and the Risk Committee were all aware that Barclays was not a WKSI. After it became an ineligible issuer, Barclays self-identified on its Forms 20-F during the three-year penalty period as a non-WKSI.

295.    For example, below is the statement filed by Barclays on its Form 20-F/A filed on March 19, 2018 for FY 2017:

> Indicate by check mark if each registrant is a well-known seasoned issuer as defined in Rule 405 of the Securities Act.   **Yes      No x**

---

[40] *See, e.g.,* S.B. Brøgger, *The market impact of predictable flows: Evidence from leveraged VIX products.* Journal of Banking & Finance, 133 ("empirical analysis reveals….that rebalancing flows from leveraged VIX products exert an economically significant impact on late-day futures returns that is completely reversed overnight. This generates an implicit cost to investors in leveraged products who are effectively "buying high and selling low" as a result of their own presence in the market."). *See also* Fernandez-Perez, A., Frijns, B., Tourani-Rad, A., and Webb, R. I. (2019) *Does increased hedging lead to decreased price efficiency? The case of VIX ETPs and VIX futures.* Financial Review, 54(3):477–500.

Notably, the above was filed as an amendment after Barclays initially filed its Form 20-F for FY

2017 on February 22, 2018, and self-identified as a WKSI even though it had become an ineligible

issuer in March 2017. This initial Form 20-F filing from Barclays following its loss of WKSI

privileges exposes that the Company and Defendants knew, or were totally reckless in not

knowing, that Barclays had lost its WKSI status and had become an ineligible issuer.

296.    Barclays management also was well aware of the need for internal controls to

prevent issuance of unregistered securities; they even implemented a Working Group to

accomplish the goal but never did anything to ensure that protocols were devised and implemented.

297.    Persons whose knowledge can be imputed to Barclays include James Staley, who

served as Barclays's CEO from December 2015 through October 2021 (almost the entire class

period), throughout which time he signed the SOX Certifications associated with Barclays's Form

20-F filings. He also functioned as the CEO of BBPLC (the Barclays subsidiary at which the Over-

Issuances occurred) from March 2019 through October 2021. His signature verifying that internal

controls were present and sufficient—when in fact they did not exist at all—verifies his and, by

extension, Barclays's knowledge of the manipulative scheme.

298.    C.S. Venkatakrishnan served as Barclays's Chief Risk Officer from May 2017 to

May 2020 (the entire time Barclays was an ineligible issuer), then as Co-President of BBPLC from

October 2020 to October 2021, (2022 Form 20-F) (February 15, 2023), and then as the CEO of

Barclays after October 2021. He signed the SOX Certifications associated with Barclays's Form

20-F filings in Staley's place. His signature verifying that internal controls were present and

sufficient—when in fact they did not exist at all—verifies his and, by extension, Barclays's

knowledge of the manipulative scheme.

299.    Morzaria was the Group Finance Director (the most senior finance position at

Barclays) throughout the time that Barclays was an ineligible issuer and when the bulk of the alleged misstatements were made. He signed the SOX Certifications associated with both the 2020 and 2021 Forms 20-F. His signature verifying that internal controls were present and sufficient—when in fact they did not exist at all—verifies his and, by extension, Barclays's knowledge of the manipulative scheme.

300.    Nigel Higgins was Chairman of Barclays PLC and served on the Board since 2019. He signed the 2019 Shelf Registration, which, among other things, incorporated the representations in the Form 20-F and its statements about the existence and adequacy of internal controls. He later admitted that the over-issuances were a "self-inflicted" injury, and that monitoring and avoiding over-issuances was not "rocket science" and was "simple." His signature verifying that internal controls were present and sufficient—when in fact they did not exist at all—verifies his and, by extension, Barclays's knowledge of the manipulative scheme.

301.    Anna Cross took over for Marzaria, and was responsible for internal controls. She also signed the Form 20-F and made the same representations as the others above. Her signature verifying that internal controls were present and sufficient—when in fact they did not exist at all—verifies her and, by extension, Barclays's knowledge of the manipulative scheme.

302.    After the investigation into the over-issuances, Barclays clawed back $1.2 million in compensation from the management team as a direct result of their malfeasance regarding the over-issuances.

303.    Furthermore, the fact that in 2015 and 2017, Barclays admitted to the SEC that securities issuance was its core business—and that the loss of its WKSI would injure its core business because complying with the SEC's registration requirements would inhibit its ability to issue securities in a competitive manner and timeline, and that doing so also was critical to its

ability to raise funding in the market—provides strong evidence that Barclays consciously disregarded its duties to track share issuances, because not doing so would injure its business.

304.    The scope of this malfeasance is astonishing. Barclays issued $17 billion in unregistered securities; whereas its annual operating income is usually only $5 billion or so—and it only had to pay a few hundred million in fines and rescission claims as a cost of doing business.[41] As if taking a victory lap, during Barclays's earnings call on February 15, 2023, CEO Venkatakrishnan stated, in part: "While our performance in 2022 was very gratifying overall, it was marred by the over-issuance of securities in the U.S., which I have discussed previously." On the same earnings call, Anna Cross, Barclays' Group Finance Director stated: "Our Corporate and Investment Bank delivered 10.2% despite the effects of the over-issuance of securities." In other words, Barclays was able to act as if it was still a WKSI at a substantial profit, fines and rescission notwithstanding.

305.    That Barclays treated its ineligible issuer period as "business as usual"—operating as if it had maintained WKSI status—evidences its device, design, scheme and plan.

306.    Alternatively, and at the very least, Defendants were reckless in failing to change their procedures to account for the issuances from the limited inventory, non-WSKI Registration Statements.

307.    Additionally, that the discovery of the over-issuances was itself the result of a Barclays banker merely *asking* a member of the Working Group whether there was room under the 2019 Shelf to issue more notes, makes plain that Barclays (a) knew the facts and/or had access to all the information it needed to know whether it was about to issue unregistered shares, but (b) simply failed to check the information they knew they were required by law to monitor.

---

[41] https://www.sec.gov/files/litigation/admin/2022/33-11110.pdf.

308.    By virtue of the foregoing, Barclays and the Individual Exchange Act Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

309.    Defendants are liable both directly and indirectly for their violations of Section 10(b) and Rule 10b-5 and the wrongs complained of herein.

310.    The Exchange Act Defendants' omissions of material information of which they were aware or were reckless in not knowing, combined with the surreptitious acts of issuing hundreds of millions of dollars' worth of unregistered shares of VXX, operated as a fraud or deceit on all persons and entities who purchased or otherwise acquired those VXX shares during the Class Period.

311.    The Exchange Act Defendants' representations about the integrity of its internal controls and the registered status came with the obligation not to mislead investors or omit material information. Because the Exchange Act Defendants concealed or improperly failed to disclose material facts with respect to Barclays's unregistered issuances and its failure to maintain adequate internal controls following its loss of WKSI privileges, Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128, 152-53 (1972).

312.    Plaintiffs demand damages equal to the specific losses they suffered due to the scheme under Section 10(b) and Rule 10b-5(a) and (c).

## COUNT FIVE
### SECURITIES FRAUD MISSTATEMENT LIABILITY UNDER
### RULE 10b-5(b) OF THE EXCHANGE ACT OF 1934
### Against Barclays and Individual Exchange Act Defendants

313.    Plaintiffs respectfully incorporate all factual averments in this Consolidated Second Amended Class Action Complaint as if fully set forth herein. To the extent any factual allegation alleged in support of this claim conflicts with any other, it should be deemed to have been pled in the alternative.

314.    Rule 10b-5, 17 CFR § 240.10b-5, states that "[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, …(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading,…in connection with the purchase or sale of any security."

315.    Based upon the facts alleged herein, Barclays and the Individual Exchange Act Defendants (together, for the purposes of this Count, "Defendants") violated Section 10(b) and Rule 10b-5 in that they, in connection with the purchase of VXX by the Plaintiffs and the Class, made untrue statements of material facts and/or omitted to state material facts necessary to make the statements not misleading, which operated as a fraud and deceit upon the Plaintiffs and the Class during the Class Period.

316.    Defendants (i) deceived the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflated and/or maintained the market price of VXX; and (iii) caused Plaintiffs and other members of the Class to purchase VXX at artificially inflated and/or maintained prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

317.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Barclays' business, operations and prospects, as specified herein.

318.    As a result of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the overall price for VXX was inflated, omitting the

market discount that one would normally find in a "lemon" asset such as an unregistered share.. Defendants' misrepresentations thus caused Plaintiffs to purchase VXX at prices above the ordinary discount that the market would have applied had it been aware that a substantial portion of the VXX shares were unregistered and therefore could not be sold in the public market.[42]

319.    The fact that there is a "market for lemons" does not deny the fact that Plaintiffs who purchased VXX after June 26, 2019, and before March 28, 2022, were injured to the tune of the discount that would have been applied had the market been aware that the shares were unregistered. This is borne out by the fact the Approved Participants fled the market when Barclays revealed the truth about the unregistered VXX shares, announced its intent to buy back the shares, and that it was no longer issuing any additional shares. This had the effect of masking the price correction that one would normally see after a revelatory correction. VXX's price rose while shortsellers covered their positions and arbitrageurs sought to take advantage of a rescission offer. At which point on May 23, 2022, Barclays registered the shares.

320.    Thus, Plaintiffs maintain, the market price of VXX was artificially inflated and/or maintained, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the market in which the VXX trade, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class who purchased VXX during the Class Period at artificially inflated and/or maintained prices and were damaged thereby.

321.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiffs and the other

---

[42] Accord *ONTI, Inc. v. Integra Bank*, 751 A.2d 904, 915 (Del. Ch. 1999) (unregistered shares cannot be sold in the public market ,but could be sold privately at a discount to public market valuation).

members of the Class and the marketplace known of the truth regarding (a) the lack of processes or controls that could lead to over issuances, or (b) the over issuance of securities by BBPLC and the failure of Barclays' internal controls, all of which were misrepresented by Defendants and none of which were disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased VXX, or, if they had purchased VXX during the Class Period, they would not have done so at the artificially inflated and/or maintained prices that they paid.

322.    In addition to the SEC rules already discussed herein, Barclays violated the Plain English rules issued by the SEC.[43] In particular, Barclays failed to disclose the complete business and conflicts of interest, or the complexity of the underlying roll of VIX futures and its impact on holders of VXX. The prospectuses and pricing supplements for VXX use abstract disclosures and warnings that are insufficient to enable someone to properly evaluate their risk and to properly evaluate the proper use of VXX as an instrument. They use several complex terms and glossary definitions. That the disclosures are wholly inadequate to apprise the average investor of the mechanics, and therefore the true risks of VXX, is borne out by the fact that Europe, for example, did not allow Barclays to sell VXX to the retail public.

323.    Barclays acted with the requisite scienter.[44]

324.    Barclays's public filings, signed by management,  attributed to management as well as the Audit Committee and Risk Committee the responsibility for imposing sufficient internal controls to ensure that unregistered shares were not offer or sold into the market.

325.    As pleaded above, the members of Barclays Management, the Board, the Audit Committee, and the Risk Committee all were aware of the need for internal controls to prevent

---

[43] *See, e.g.,* SEC discussion of Plain Writing Act of 2010 (https://www.sec.gov/plainwriting). *See* also Staff Legal Bulletin No. 7 (https://www.sec.gov/interps/legal/slbcf7.htm).

[44] Plaintiffs incorporate all other scienter averments to the extent not set forth herein.

issuance of unregistered securities; they even implemented a Working Group to accomplish the goal, but never did anything to ensure that protocols were devised and implemented.

326.    Persons whose knowledge can be imputed to Barclays include James Staley, who served as Barclays's CEO from December 2015 through October 2021 (almost the entire class period), throughout which time he signed the SOX Certifications associated with Barclays's Form 20-F filings. He also functioned as the CEO of BBPLC (the Barclays subsidiary at which the over-issuances occurred) from March 2019 through October 2021. His signature verifying that internal controls were present and sufficient—when in fact they did not exist at all—verifies his and, by extension, Barclays's knowledge of the misrepresentations.

327.    C.S. Venkatakrishnan served as Barclays's Chief Risk Officer from May 2017 to May 2020 (the entire time Barclays was an ineligible issuer), then as Co-President of BBPLC from October 2020 to October 2021, (2022 Form 20-F) (February 15, 2023), and then as the CEO of Barclays after October 2021. He later admitted that the entire debacle was "entirely avoidable." He signed the SOX Certifications associated with Barclays's Form 20-F filings in Staley's place. His signature verifying that internal controls were present and sufficient—when in fact they did not exist at all—verifies his and, by extension, Barclays's knowledge of the misrepresentations.

328.    Morzaria was the Group Finance Director (the most senior finance position at Barclays) throughout the time that Barclays was an ineligible issuer and when the bulk of the alleged misstatements were made. He signed the SOX Certifications associated with both the 2020 and 2021 Forms 20-F. His signature verifying that internal controls were present and sufficient—when in fact they did not exist at all—verifies his and, by extension, Barclays's knowledge of the misrepresentations.

329.    Nigel Higgins was Chairman of Barclays PLC and served on the Board since 2019.

He signed the 2019 Shelf Registration, which among other things, incorporated the representations in the prior years' Form 20-F and its statements about existence and adequacy of internal controls. He later admitted that the over-issuances were a "self-inflicted" injury, and that monitoring and avoiding over-issuances was not "rocket science" and was "simple." His signature verifying that internal controls were present and sufficient—when in fact they did not exist at all—verifies his and, by extension, Barclays's knowledge of the misrepresentations.

330.    After the investigation into the over-issuances, Barclays clawed back $1.2 million in compensation from the management team as a direct result of their malfeasance regarding the over-issuances.

331.    Furthermore, the fact that in 2015 and 2017, Barclays admitted to the SEC that securities issuance was its core business—and that the loss of its WKSI  would injure its core business because complying with the SEC's registration requirements would inhibit its ability to issue securities in a competitive manner and timeline, and that doing so also was critical to its ability to raise funding in the market—provides strong evidence that Barclays consciously disregarded its duties to track share issuances, because not doing so would injury its business.

332.    The scope of this malfeasance is astonishing. Barclays's 2018, 2019, 2020, and 2021 Form 20-F each apparently represented that it still was a WKSI. Not only that, but Barclays issued $17 billion in unregistered securities whereas its annual operating income is usually only $5 billion or so—and it only had to pay a few hundred million dollars in fines and rescission claims as a cost of doing business.[45]

333.    That Barclays treated its ineligible issuer period as "business as usual"—operating as if it had maintained WKSI status—evidences its device, design, scheme and plan.

---

[45] https://www.sec.gov/files/litigation/admin/2022/33-11110.pdf.

334. Alternatively, at the very least, Defendants were reckless in failing to change their procedures to account for the issuances from the limited inventory, non-WSKI Registration Statements.

335. Additionally, that the discovery of the over-issuances was itself the result of a Barclays banker merely *asking* a member of the Working Group whether there was room under the 2019 Shelf to issue more notes, makes plain that Barclays (a) knew the facts and/or had access to all the information it needed to know whether it was about to issue unregistered shares, but (b) simply failed to check the information they were required by law to monitor.

336. Thus, as a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the VXX shares during the Class Period.

337. The Individual Exchange Act Defendants each signed the relevant documents and sponsored the material misstatements as pled above. They also profited from it to the extent they were paid handsomely for ensuring that Barclays continued to operate as if it were a WKSI, even if it was not, and by failing to ensure the proper controls were in place, despite knowing or recklessly ignoring the fact that, absent such controls, unregistered securities would be issued.

338. By virtue of the foregoing, Barclays and the Individual Exchange Act Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

339. The Exchange Act Defendants' omissions of material information of which they were aware or were reckless in not knowing, combined with the surreptitious acts of issuing hundreds of millions of dollars' worth of unregistered shares of VXX, operated as a fraud or deceit on all persons and entities who purchased or otherwise acquired those VXX shares during the Class Period. The Exchange Act Defendants' representations about the integrity of its internal

controls and the registered status came with the obligation not to mislead investors or omit material information. Because the Exchange Act Defendants concealed or improperly failed to disclose material facts with respect to Barclays's unregistered issuances and its failure to maintain adequate internal controls following its loss of WKSI privileges, Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128, 152-53 (1972).

340.    At all relevant times, the market for VXX was an efficient market for at least the following reasons: First and foremost, VXX was listed on and actively traded on the CBOE|BZX exchange, which has robust capitalization, pricing and liquidity demands and is considered a highly efficient and automated market.[46] Second, the value of the VXX was in part due to the implied value, which itself was publicly available via the ticker symbol VXXIV. Third, Barclays had at any given time, between fifty and a hundred million shares outstanding and several million VXX shares traded daily during the class period. Fourth, Barclays filed periodic public reports with the SEC and supplemental prospectuses. Fifth, Barclays maintained a website that disclosed certain matters about the VXX and related securities, https://ipathetn.barclays/etn-universe.app;themeId=2. Sixth, Barclays was generally followed by several securities analysts employed by major brokerage firms, including RBC Capital Markets, Jefferies, Morgan Stanley, Goldman Sachs, and UBS. And critically, the inflows from VXX were tracked on public data sites, e.g., https://www.etf.com/VXX. Finally, when Barclays announced on March 28, 2022, that it would no longer issue any more VXX, foreshadowing that Approved Participants would leave the market and cause market prices of VXX to dislocate from implied value, that is exactly what happened almost immediately. Therefore, there is a highly liquid market for VXX.

341.    Defendants are liable both directly and indirectly for their violations of Section

---

[46] *See* https://www.cboe.com/tradable_products/vix/.

10(b) and Rule 10b-5 and the wrongs complained of herein.

342.    Plaintiffs demand damages equal to the specific losses they suffered due to the scheme under Section 10(b) and Rule 10b-5(a) and (c).

**COUNT SIX**
**COMMON LAW FRAUD / ESTOPPEL**
**Against Barclays [BPLC and BBPLC]**

343.    Plaintiffs respectfully incorporate all factual averments in this Consolidated Second Amended Class Action Complaint as if fully set forth herein. To the extent any factual allegation alleged in support of this claim conflicts with any other, it should be deemed to have been pled in the alternative.

344.    On March 28, 2022, Barclays announced it would be rescinding securities sales due to its issuance of 17.7 billion in unregistered shares

345.    Each Plaintiff learned of this opportunity sometime thereafter and reasonably relied on it—believing that they would be able to sell their VXX shares to Barclays.

346.    None of the Plaintiffs is a lawyer, and so none of them was aware of the tracing requirements or direct seller requirements in Sections 11 or 12 of the Securities Act.

347.    In fact, Barclays's multiple public statements, like this one quoted in the Financial Times on March 28, 2022, specifically discussing VXX, show that Barclays had to have been well aware of which securities were and were not going to be rescinded—but it kept it to itself:

> As part of its structured products business, Barclays Bank PLC ("BBPLC"), a subsidiary of Barclays PLC ("BPLC"), is a frequent issuer of structured notes and exchange traded notes in the United States and elsewhere.
>
> These securities are often issued to meet actual and anticipated client demand for such securities. BBPLC has determined that the securities offered and sold under its US shelf registration statement during a period of approximately one year exceeded the registered amount (such excess, the "Affected Securities") giving rise to a right of rescission among certain purchasers of Affected

Securities requiring BBPLC to repurchase the Affected Securities at their original purchase price. As a result, BBPLC has elected to conduct a rescission offer to eligible purchasers of the Affected Securities. Details of the rescission offer will be published by BBPLC in due course.

Based on current market prices of the Affected Securities and the estimated pool of potentially eligible purchasers electing to participate in the rescission offer, Barclays expects the rescission losses (net of tax) to be c.£450mn.[47]

348.    The £450mn ($600 million) estimate is also misleading as it suggests that that is the value of all under-water (and therefore rescindable) securities sold by Barclays in violation of the Registration Requirement under § 5 of the Securities Act—or what Barclays called the "Affected Securities." As noted above, Barclays issued over 50,000,000 (adjusted) in unregistered shares of VXX between the July 23, 2019, issuance, and the February 13, May 3, and October 22, 2021, issuances. These had a face value of over $1.4 billion.

349.    This mirrored an April 1, 2022, Bloomberg news article that stated that Barclays would have to buy back some $600 million in securities.[48] The article reported Barclays's statements on the matter, but never mentioned any limitations on who could rescind.

350.    Nothing in Barclays's public statements between March 28, 2022, and August 1, 2022, disclaimed that retail holders of VXX—or any ETNs for that matter—were ineligible for rescission. Nor did they specifically refer to any requirement for tracing or direct seller relationship for VXX.

351.    The terms of Barclays's formal rescission offer were filed on August 1, 2022, as a Prospectus Supplement to its May 23, 2022 Prospectus.[49] As discussed previously, the Rescission

---

[47] https://www.ft.com/content/386df3ee-4b9d-45c5-9ae1-d5dffb2a822e (March 28, 2022).

[48] https://www.bloomberg.com/news/articles/2022-04-01/behind-barclays-blunder-sit-years-of-u-s-regulatory-run-ins.

[49] https://www.sec.gov/Archives/edgar/data/312070/000119312522207620/d386666d424b5.htm#toc386666_20.

Offer indicated that even those who did not purchase directly from Barclays (i.e., they were not an "Initial Purchaser" but were instead an "Eligible Current Investors" or "Eligible Former Investors.") would be able to rescind. The Rescission Offer also represented that Barclays would pay claims that would otherwise be time barred under Section 12(a)(1) of the Securities Act.[50]

352.    Granted, buried in the August 1, 2022, Rescission Offer filed with the SEC was a statement that some holders of ETNs would likely not be able to rescind because they would face an evidentiary challenge. But this ran directly contrary to Barclays's representation elsewhere in the Rescission Offer that even one who did not purchase directly from Barclays would be allowed to rescind upon presentation of "satisfactory evidence," including "[a]ccount statement(s) reflecting the purchase and purchase price information of the relevant Subject Security, and demonstrating the continued holding of such Subject Security until at least the date of this prospectus supplement."[51] This, as it turned out, was not sufficient for Barclays as it rejected every Plaintiff's submission writ-large, and upon information and belief, did so for every other ETN holder who submitted a rescission claim.

353.    Moreover, the foregoing warning to ETN holders about their potential evidentiary burdens was not in any of the public discourse which took root before August 1, 2022. It conflicted directly with the rest of Barclays' public statements which suggested that VXX holders would be able to rescind their purchases, and it conflicts with the balance of the rescission offer document which clearly contemplated an opportunity to rescind.

354.    The rescission offer's pithy disclaimer could only be read by lawyers—and even then it did not specify VXX or any of the requirements.

---

[50] See, e.g., https://www.sec.gov/Archives/edgar/data/312070/000119312522207620/d386666d424b5.htm at S-26.

[51] https://www.sec.gov/Archives/edgar/data/312070/000119312522207620/d386666d424b5.htm, at pp. S-28.

355.    The Rescission Offer itself, if one were to read it, was equivocal. It put VXX on its list of eligible rescindable transactions. Yet, Barclays knew—and did not say—that only a small handful of institutional investors would be able to take advantage of the offer, because anyone who purchased VXX in the open market would not be able to prove to Barclays's satisfaction that their shares were unregistered.

356.    That Barclays retained the subjective right to determine what was "satisfactory" evidence, and that it would not treat participation in the April 23, 2021 reverse split as adequate proof of the right to rescind, speaks directly to its fraudulent intent.

357.    Barclays reported on September 15, 2022, that $7 billion of securities had been offered for rescission, but Barclays only rescinded about 5% of those, denying 95% of rescission claims, leaving everyone else out in the cold…including Plaintiffs and the Class. That Barclays had originally estimated that it would only need $600 million to handle some $17 billion in potential rescission claims[52] speaks to its knowledge at the time it made the general rescission statement in March 2022, and thereafter, that it would not be honoring an overwhelming majority of the rescission claims that it expected would be made.

358.    Barclays plainly intended for Plaintiffs and the Class to rely on these statements that were made in March through July of 2022. That was the entire purpose of the offer, and it would stave off litigation while Barclays squared itself with the SEC and designed its ideal rescission offer: one that sounded like contrition but was really little more than an empty promise.

359.    Plaintiffs and members of the Class did rely on Barclays's misrepresentations and omissions. They did not sell into the market between March 28, 2022, and September 12, 2022, despite the favorable, albeit temporary, trajectory of the VXX share price.  Nor did they seek legal

---

[52]    https://www.bloomberg.com/news/articles/2022-04-01/behind-barclays-blunder-sit-years-of-u-s-regulatory-run-ins.

advice on the (mistaken) belief that Barclays would set things right without a lawsuit.

360.    Plaintiffs and members of the Class held on to their shares while they waited for and then worked through the rescission process, offering their shares to Barclays, only to be summarily denied.

361.    Compounding the fraud is the fact that Barclays issued multiple issuances of VXX with the same CUSIP numbers and without individual identifiers, making it difficult if not impossible, according to Barclays, for it to identify which shares were registered and which ones were not. That Barclays leveraged this when it came time for it to be held accountable suggests that, at least in part, using the same CUSIP was an intentional and purposeful strategy, or alternatively reckless, given that Barclays knew that it would have to account for securities issuances as a non-WKSI issuer.

362.    But for Barclays' misrepresentations and omissions about VXX's potential eligibility for the rescission offer, Plaintiffs would have been able to sell when the market was up (as high as $121.88 on March 28, 2022). Instead, they lost even more money waiting on further information (down to the low to mid-$80s by July 25, 2022). And even more for participating in the offer itself (low $70s by the offer's expiration date, September 12, 2022).

363.    Therefore, Plaintiffs and the class were damaged as a direct result of Barclays's omissions, and they are allowed to rely on the *Affiliated Ute* presumption of class-wide reliance.

364.    Plaintiffs and members of the Class are also entitled to seek estoppel against Barclays on the issue of their right to rescind and denial of their rescission requests in bad faith.

**COUNT SEVEN**
**CONTROL PERSON LIABILITY**
**Against Control Person Defendants**

365.    Plaintiffs respectfully incorporate all factual averments in this Consolidated Second

Amended Class Action Complaint as if fully set forth herein. To the extent any factual allegation alleged in support of this claim conflicts with any other, it should be deemed to have been pled in the alternative.

366.    Defendants Higgins, Staley, Venkatakrishnan, Ewart, Throsby, and Cross are together referred to as the "Control Person Defendants."

367.    The Control Person Defendants acted as controlling persons of Barclays within the meaning of Section 15 of the Securities Act and/or Section 20(a) of the Exchange Act as alleged herein.

368.    Barclays's 2021 Form 20-F states that:

> The BBPLC Matters Reserved to the Board ensures that appropriate coordination with the governance of the partially consolidated boards is in place. The Matters Reserved to the Board specifies those decisions to be taken by the Board, including but not limited to material decisions relating to strategy, risk appetite, medium term plans, capital and liquidity plans, **risk management and controls frameworks**, approval of financial statements, approval of large transactions, approval of share allotments and dividends.

> The Board has delegated the responsibility for making and implementing operational decisions and running Barclays's business on a day-to-day basis to the Chief Executive and his senior management team.

369.    By virtue of their high-level positions with Barclays, as already alleged, their signing of SEC documents that made material misstatements, their roles on Board of Directors, and/or on the Audit or Risk Committees to whom responsibility included ensuring compliance with the Securities laws and regulations was delegated, their participation in, and/or awareness of its operations, and intimate knowledge of the false statements filed by Barclays with the SEC and disseminated to the investing public, the Control Person Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Barclays, including the content and dissemination of the various statements that Plaintiffs contend are false

and misleading.

370.    Each of the Control Person Defendants was provided with or had unlimited access to copies of the Barclays's data, reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

371.    They further had the ability to prevent the issuance of unregistered securities, apparently by simply periodically asking whether the shelf registration had been exhausted.

372.    The Control Person Defendants were also responsible for creating and overseeing Barclays' internal controls over financial reporting, and failed to install controls that Defendants have admitted were "simple" and "not rocket science" that would have prevented the over-issuance.

373.    For example, in the 2019 Form 20-F filed in 2020, the Board represented, in material part, that "[w]e are also responsible for ensuring that management maintains an effective system of internal control. An effective system of internal control should provide assurance of effective and efficient operations, internal financial controls and compliance with law and regulation. In meeting this responsibility, we consider what is appropriate for Barclays's business and reputation, the materiality of financial and other risks and the relevant costs and benefits of implementing controls." It further outlined the duties of the Audit Committee as including "[e]valuating the effectiveness of the Barclays Bank Group's internal controls, including financial controls" and "evaluating the status of the most material control issues identified by management[.]"

374.    The 2020 Form 20-F filing likewise noted that "[e]ffectiveness of risk management and internal controls is reviewed regularly by the Risk Committee (responsible for providing oversight on current and potential future risk exposures) and the Audit Committee (responsible for controls,

including reviewing audit reports, internal controls and risk management systems)."

375.    Further, the Control Person Defendants signed the Form 20-Fs and certifications, and authorized the filing or dissemination of the Form 20-Fs, Form 6-Ks, and press releases that are alleged herein to contain materially false and misleading statements or material omissions.

378.    In particular, the Control Person Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. This is demonstrated by their signatures on the Registration Statements, pricing supplements, Form 20-F and/or Prospectus filings, any of which is a demonstration of their right to control and influence the operations of the company.

379.    Barclays recognized the liability of several of these Defendants, because it clawed back $1.2 million in pay. On February 15, 2023, Barclays announced in the 2022 Form 20-F, that it decreased the 2022 bonuses for Defendant Venkat by 403,000 British pounds and Defendant Cross by 106,000 British pounds. Barclays also clawed back prior compensation awards from Defendant Morzaria.

380.    In the Remuneration Report from the Barclays' Board of Directors in the 2022 Form 20-F, the Chair of the Remuneration Committee stated:

> The Over-issuance of Securities under BBPLC's US shelf registration statements was a deeply disappointing feature of 2022. A review of the facts and circumstances was completed by external counsel and the Committee has taken the findings of that review seriously. We have thoughtfully and deliberately adjusted our remuneration decisions to ensure that this over-issuance matter is reflected.

Additionally, the Barclays Board stated, "[t]he [Remuneration] Committee exercised its discretion not to exclude the impacts associated with the Overissuance of Securities in the US or the monetary

penalties imposed by the SEC and CFTC for the use of unauthorized business communications channels. As a result, the 2022 annual bonus awards were £403,000, £166,000 and £76,000 lower than they would otherwise have been, for Venkat, Anna and Tushar respectively (after pro-rating for Anna and Tushar)."

381.    Barclays's actions to clawback compensation from several Individual Defendants as a direct result of the expenses related to addressing the legal and regulatory issues stemming from the over-issuance evidence that Defendants were, at a minimum, reckless in failing to implement internal controls to account for the aggregate amount of securities issued once Barclays became an ineligible issuer.

382.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of VXX during the Class Period.

## V.

## <u>TOLLING AND CONCEALMENT</u>

383.    Plaintiffs respectfully incorporate the previous factual allegations and allegations of fraud and scienter as if fully set forth herein.

384.    Through a series of misrepresentations and omissions, Defendants concealed from Plaintiffs the following facts: (a) that as of late January 2021, it had exhausted the capacity in the 2018 Shelf and the 2019 Shelf, (b) that the 50 million VXX shares it issued on February 18, 2021, were not registered, (c) that the 37,493,274 new VXX shares exchanged 1 for 4 in the April 23, 2021 reverse split were not registered, (d) that the 12.5 million VXX shares issued on May 3, 2021, were not registered, (e) that the 25 million VXX shares issued on October 22, 2021, were not registered, (f) that Barclays's statements that it had properly instituted internal controls to ensure

compliance with federal securities laws were false and that it was not tracking in real time the amount of securities offered and sold against the amount registered; and (g) that Barclays's rescission offer would not be honored as to Plaintiffs as holders of VXX.

385.    None of these facts were disclosed, despite Defendants' duty to disclose them.

386.    Moreover, Defendants' extraordinary misrepresentations (a) that VXX would only be issued in registered form (e.g., Form 8-A January 18, 2018), (b) that the 2018 Shelf would include a maximum aggregate offering price of $25 billion (Form F-3 February 22, 2018), (c) that the 2019 Shelf would include a maximum aggregate offering price of $20,081,600,000 (Form F-3 June 14, 2019), (d) that Barclays would file post-effective amendments to the Registration Statements disclosing any material changes, including changes to the total dollar value of the offered securities (aforementioned Form F-3s), (e) that Barclays' internal controls and compliance efforts were sufficient (*supra*) to ensure compliance; (f) that Barclays' new VXX issuances during the Gap Period and after January 1, 2021, through May 23, 2022, (including the reverse split) were properly registered—all concealed the truth despite Plaintiffs' diligence in monitoring their shares.

387.    Barclays not only failed to provide the Plaintiffs or the Class with any reason to question the representations, but Barclays concealed every means for Plaintiffs to discover the truth without Barclays disclosing it.

388.    Barclays issued shares of VXX—both those it allegedly issued as registered and those issued as unregistered, under the same CUSIP number until the Reverse Split of April 23, 2021. When combined with the other misrepresentations, it continues to conceal from every Plaintiff—without the tools available through formal discovery—whether they owned a registered share or not prior to April 23, 2021.

389.    As described above, Barclays's misrepresentations and omissions that concealed

the truth were intentional and purposeful. To wit, Barclays cannot dispute that issuing securities is a fundamental and core function of its business. *Letter from Barclays PLC and Barclays Bank PLC to Eun Ah Choi, Division of Corporate Finance, Request for Waiver of "Ineligible Issuer" Status Under Rule 405* (January 27, 2016).[53]  Thus, Barclays was well aware of the need to maintain its ability to issue securities in a compliant manner, as part of its core business.

390.    The SEC required Barclays to disclose in its annual filings under Form 20-F whether it was a WKSI. Therefore, the loss of the WKSI is not something that Barclays Management was unaware of—and thus, the need to adopt safeguards and internal controls to avoid issuing unregistered securities was plainly obvious to Barclays. Barclays clawed back $1.2 million in executive compensation from certain management whom it deemed responsible for the over-issuances.

391.    Barclays management represented that they had implemented internal controls to ensure compliance and had set up a Working Group to ensure compliance with the issuance limits. The facts that (a) the Working Group only attempted to forecast the issuances and never actually adopted any internal controls to track issuance in real time, (b) that no one at Barclays made sure that the Working Group fulfilled its mandate of ensuring compliance with the law, yet (c) Barclays continually represented that it had instituted  show the required reckless if not specific intent to conceal the truth.

392.    Barclays management knew that they regularly issued tens of *b*illions in securities every year. Barclays management knew that they had lost WKSI status and needed to implement internal controls to ensure that they would not issue unregistered securities. When the over-issuances came to light, Barclays's senior management C.S. Venkatakrishnan admitted to the

---

[53] https://www.sec.gov/divisions/corpfin/cf-noaction/2016/barclays-plc-020116-405.pdf.

Times U.K. that the whole thing was "entirely avoidable."[54] Nigel Higgens admitted that the internal controls needed to avoid the issue would have been a "simple task," that the over-issuance was a "self-inflicted" wound and that avoiding the over-issuance was "not rocket science." Therefore, Barclays management admitted their awareness of the need for internal controls and admitted that their decision not to implement them was intentional, if not reckless given how simple it would have been to do so.

393.    Nonetheless, Barclays's misrepresentations and omissions during the class period prevented Plaintiffs and the market from discovering the fact that some or all of their VXX shares were unregistered—and therefore, concealed the existence and nature of Plaintiffs' claims.

394.    On July 28, 2022, Barclays announced that, beginning on June 26, 2019, it had offered and sold approximately $1.3 billion worth of unregistered securities in excess of the amount that had actually remained on the 2018 Shelf, bringing the total value of the over-issuances to $17.7 billion. This is the first time Barclays made a full disclosure of the scope of malfeasance.

395.    While March 28, 2022 was the first time VXX had been mentioned as part of the over-issuance, it did not include any information that would allow one to determine which of their shares (if any) had been unregistered, and it did not include the various disclosures made through July 28, 2022, when Barclays finally disclosed it had sold unregistered securities pursuant to the 2018 Shelf. Thus, any reasonable investigation that might have been underway would have had to have been extended after such a disclosure.

396.    The March 28, 2022 disclosures also suggested that Plaintiffs and the Class would be allowed to sell their shares to Barclays in a rescission. Multiple outlets in the finance media, including Bloomberg and the Financial Times, noted Barclays's rescission offer announced

---

[54]https://www.thetimes.co.uk/article/barclays-latest-scandal-proves-its-still-britains-most-accident-prone-bank-csb9stlq3

(without any details) on March 28, 2022.

397.    Barclays put no limitation or qualification on this promise at the time. To the ordinary person, a "rescission" suggests that they can get back what they paid. This was a far superior prospect for Plaintiffs and the Class than selling back into the market would have been. Thus, Barclays's publicly disseminated statements were not specific as to scale and timeframe, strongly suggesting the likelihood that *anyone* who purchased VXX since July 2019 had purchased unregistered shares, and that Barclays would buy those back from them for what they paid (irrespective of whether they purchased the shares directly from Barclays). Thus, there is a question of fact as to what a reasonable investor would understand from the March 28, 2022 public disclosures.[55]

398.    Not until at least March 28, 2022, when Barclays disclosed its internal controls failures and the resulting issuance of unregistered shares (Form-6) could any Plaintiff possibly have discovered the concealed facts or the nature of the claims asserted here.  Even then, the formal and specific terms of the Rescission Offer did not come to light until August 1, 2022. And Plaintiffs' requests for rescission would not be decided until on or about September 12, 2022.

399.    Moreover, Plaintiffs diligently monitored and participated in Barclays's rescission offer. Each Plaintiff submitted rescission claims as directed by Barclays and provided the paperwork requested by Barclays. When Barclays summarily rejected all of their claims in September 2022, Plaintiffs promptly engaged counsel to investigate and file this action.[56]

---

[55] To the extent Barclays suggests that the disclosures cited frequently from financial newspapers and not from Barclays's own press release or SEC filings, Plaintiffs plead in response that sophisticated financial reporters' interpretation of Barclays's disclosures are credible yardsticks for what the average investor would have taken away from the disclosure and filings.

[56] "Time limits for filing a securities fraud action must account for the time it takes to uncover and investigate a securities fraud scheme." M. Kaufman and J. Wunderlich, *Leave Time for Trouble: The Limitations Periods Under the Federal Securities Laws*, 40 J. Corp. L. 143, 145 (2015). The tolling doctrines include after getting notice of a cause of action, a reasonable time to investigate whether one has a claim.

400.    Therefore, any claims should have been tolled until, at least, one year past September 12, 2022. Barclays's pointing to the confusing terms of the Rescission Offer in its May 23, 2022 Prospectus Supplement and the later amendments thereto, at best, cuts the equitable tolling off as of that date. Each Plaintiff would have acted promptly had Barclays clearly disclosed the truth sooner.

401.    For these reasons, the statute of limitations should be tolled, and Defendants estopped from asserting limitations as a defense.

**V.**

**CLASS ACTION ALLEGATIONS**

402.    Plaintiffs bring this action under Rule 23(b)(3) of the Federal Rules of Civil Procedure and seek to represent themselves and a class of similarly situated investors (the "Class").

403.    The class period shall be on or between June 26, 2019, and May 23, 2022, inclusive (the "Class Period").

404.    The putative Class shall be defined as:

> All purchasers of VXX during the Class Period. Excluded from the Class are (1) Defendants, their corporate parents, subsidiaries, affiliates, and officers, directors, agents, representatives, and assigns of any of the foregoing, (2) any entity which is controlled by any of the foregoing, (3) any successful claimants under the Barclays Bank PLC Rescission Offer, and (4) Plaintiffs' attorneys, their employees, and immediate family members (hereinafter, the "Class").

405.    Plaintiffs anticipate the likely creation of subclasses for specific segments of the Class, for example: (A) a Section 12(a)(1) rescission subclass for Class members who purchased VXX prior to and who held through April 23, 2021; (B) a Section 11 subclass for any person who purchased VXX between April 23, 2021 and May 22, 2022, inclusive; (C) a 10b-5 subclass for persons who purchased and sold VXX during the Class Period; (D) an estoppel or fraud subclass

comprised of all persons who submitted rescission requests to take advantage of the rescission offer, but were denied rescission and continued to hold their securities through the Rescission Period (March 28, 2022 through September 13, 2022), among other potential subclasses.

406. Because Barclays' relevant acts and omissions were uniform and affect Class members uniformly throughout the United States, Plaintiffs seek certification of a nationwide class and subclasses under Rule 23(b)(3) and/or Rule 23(b)(2).

407. <u>Numerosity/Impracticability of Joinder</u>: The Class members are so numerous that joinder of all members would be impracticable. The proposed Class and subclasses include thousands of members, but will require information solely in the possession of the Defendants to identify all of them.

408. <u>Commonality and Predominance</u>: There are common questions of law and fact that predominate over any questions affecting only individual Class members. These common legal and factual questions include, but are not limited to, the following:

    a.    Whether and when Defendants sold unregistered Securities;

    b.    Whether the Securities were required to be registered under Section 5 of the Securities Act of 1933 (the "<u>Securities Act</u>");

    c.    When unregistered Securities were sold into the market;

    d.    Whether sales of the Securities were the result of Defendants' failure to put in place reasonable internal controls;

    e.    Whether sales of the Securities violated Sections 5, 11 and 12 of the Securities Act and whether such failure was intentional, reckless, and/or negligent;

    f.    Whether there have been violations of "scheme" liability provisions

under Section 10(b) and Rule 10b-5 of the Exchange Act;

g.    Whether there have been violations of "material misstatement"
      liability provisions under Rule 10b-5 of the Exchange Act;

h.    Whether the Class is entitled to damages, rescission and/or other
      relief.

409.    <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the Class members. Plaintiffs' claims arise out of violations of the same laws and duties and out of Defendants' uniform acts and omissions. Under applicable law, the Securities' issuances are void ab initio for the same reason(s) that Plaintiffs' Securities issuances are void. Once deemed void, Plaintiffs and the absent Class members are entitled to all the incidences of voidness, including rescission.

410.    <u>Adequacy</u>: Plaintiffs will be adequate Class representatives and will fully and adequately assert and protect the interests of the Class. They have retained experienced and qualified counsel, and they do not have conflicting interests with other Class members.

411.    <u>Superiority</u>: A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the claims of all Class members is economically unfeasible and procedurally impractical. While the aggregate of dollars at stake is large, many members have relatively small sums at stake and would not have a significant interest in individually controlling the prosecution of a separate action or a significant financial motivation to incur the necessary expense that would be involved. Moreover, individualized litigation would likely result in varying, inconsistent, or contradictory judgments and unnecessarily magnify the delay and expense to all the parties and the court system due to the necessity of multiple trials regarding the same factual and legal issues. Further, Plaintiffs do not anticipate any difficulty in managing this litigation.

412.    <u>Notice</u>: Upon information and belief, Plaintiffs allege that Defendants have, or have access to, addresses, phone numbers, e-mail addresses, and other contact information for members of the proposed Class, which may be used for the purpose of providing notice of the pendency of this action.

**VI.**

**<u>JURY DEMAND</u>**

413.    Plaintiffs demand a jury trial of all issues so triable to a jury.

**VII.**

**<u>PRAYER FOR RELIEF</u>**

414.    Plaintiffs pray for the following relief:

 a. Class certification under Rules 23(a), 23(b)(3) and 23(b)(2) on behalf of the Class as defined above;

 b. Certification of Plaintiffs as Class representatives and appointment of Plaintiffs' counsel as lead counsel for the Class;

 c. Equitable relief in the form of rescission, restitution, and/or rescissory damages, with respect to Plaintiffs' and the Class's purchases of the Securities;

 d. An award of compensatory damages and if available, punitive damages, in favor of Plaintiffs and the Class against Defendants, jointly and severally, for all losses sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

e.    An award in favor of Plaintiffs and other members of the Class of  their

costs and expenses in this litigation, including reasonable attorneys' fees,

experts' fees, and other costs and disbursements; and,

f.    All other relief to which Plaintiffs may be entitled at law or in equity.

Dated: March 13, 2024                    **SBAITI & COMPANY PLLC**

/s/ Mazin A. Sbaiti
Mazin A. Sbaiti
New York Bar No. 4339057
MAS@SbaitiLaw.com
Jonathan Bridges (Admitted *Pro Hac Vice)*
JEB@SbaitiLaw.com
2200 Ross Avenue – Suite 4900W
Dallas, TX  75201
T: (214) 432-2899
F: (214) 853-4367

***LEAD COUNSEL FOR LEAD
PLAINTIFFS***

Kevin Colquitt (Admitted Pro Hac Vice)
KNC@SbaitiLaw.com
2200 Ross Avenue – Suite 4900W
Dallas, TX  75201
T: (214) 432-2899
F: (214) 853-4367

***ADDITIONAL   COUNSEL   FOR   LEAD
PLAINTIFFS***