UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

DR. RUTH C. MAY AND DR. DONNA E.
LEDGERWOOD, JUSTIN REED, MARK HOWARTH
and JEFFREY KNAPP, *on behalf of themselves and all*
*others similarly situated,*

                             Plaintiffs,

          -v-

BARCLAYS PLC AND BARCLAYS BANK PLC,
JAMES E. STALEY, TUSHAR MORZARIA,
STEVEN EWART, C.S. VENKATAKRISHNAN,
TIM THROSBY, ANNA CROSS, NIGEL HIGGINS,
ALEX THURSBY, HELEN KEELAN, HELENE
VAN DORT, JEREMY SCOTT, MARIA RICHTER,
and DOES 1-12,

                           Defendants.

------------------------------------------------------------------X

23-cv-2583 (LJL)

<u>OPINION AND ORDER</u>

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___3/21/2025___

LEWIS J. LIMAN, United States District Judge:

      This is a companion case to *Puchtler v. Barclays PLC*, Case No. 24-cv-1872-LJL

(S.D.N.Y.), *and In re Barclays PLC Securities Litigation*, 22-cv-8172-KPF (S.D.N.Y.).   The

Second Amended Complaint (the "SAC") alleges claims for violations of Sections 11 and 12 of

the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(1)–(2); Section 10(b) of

the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5

promulgated thereunder, 17 C.F.R. § 240.10b-5; common-law fraud and estoppel; and control

person liability under Section 20(a) of the Exchange Act.   Dkt. No. 80.   Defendants Barclays PLC

("BPLC"), Barclays Bank PLC ("Barclays Bank" and, with BPLC, "Barclays"), James E. Staley

("Staley"), Tusha Morzaria ("Morzaria"), Steven Ewart ("Ewart"), C.S. Venkatakrishnan

("Venkatakrishnan"), Tim Throsby ("Throsby"), Anna Cross ("Cross"), Nigel Higgins

("Higgins"), Alex Thursby ("Thursby"), Hellen Keelan ("Keelan"), Helene Vletter-dan Dor

("Dor"), Jeremy Scott ("Scott"), and Maria Richter ("Richter") (collectively, "Defendants") move,

pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), for an order dismissing with prejudice the Consolidated Second Amended Class Action Complaint.  Dkt. No. 84.[1]

For the reasons that follow, the motion to dismiss is granted.

## BACKGROUND

The Court accepts as true for purposes of this motion the well-pleaded allegations of the complaint as supplemented by the documents incorporated by reference.  The Court may also consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also Turquoise Hill*, 2024 WL 4711185, at *9 (S.D.N.Y. Nov. 7, 2024) (such documents may not be considered for their truth, but to establish what statements they contain).

### A.    The Relevant Parties

BPLC is a bank holding company headquartered in London, United Kingdom.  Dkt. No. 80 ¶ 6.  Through its subsidiaries, it provides various financial services, including investment banking, wealth management, and the offer and sale of securities.  *Id.*  Barclays Bank is a wholly-owned subsidiary of BPLC and is a bank.  *Id.* ¶ 7.

The Individual Defendants are directors or officers of Barclays.  *Id.* ¶¶ 8–18.  Staley was Chief Executive Officer ("CEO") of BPLC from December 1, 2015 through October 31, 2021.  *Id.* ¶¶ 8, 297, 326.[2]  Venkatakrishnan served as Barclays Bank's Chief Risk Officer from May 2017 to May 2020, Co-President of BPLC from October 2020 to October 2021, and as CEO of BPLC

---

[1] The Court refers to Staley, Morzaria, Ewart, Venkatakrishnan, Throsby, Cross, Higgins, Thursby, Dor, Scott, and Richter as the "Individual Defendants."
[2] Staley was also CEO of Barclays Bank from March 2019 through October 2021.  *Id.* ¶ 326.

starting on November 1, 2021.  *Id.* ¶¶ 10, 298, 327.  Morzaria served as Finance Director of BPLC

until April 22, 2022, *id.* ¶¶ 9, 299, 328, when Cross took over that position, *id.* ¶ 301.  Higgins has

served as Group Chairman of BPLC since May 2019.  *Id.* ¶¶ 12, 300, 329.  Throsby served as CEO

of Barclays Bank from January 2017 until March 2019.  *Id.* ¶ 13.  Ewart has served as Barclays

Bank's Chief Financial Officer ("CFO") since August 10, 2018.  *Id.* ¶ 11.  Thursby, Scott, Keelan,

Dor, and Richter served as Board Members of Barclays Bank between April 2018 and September

2019.  *Id.* ¶¶ 14–18.

### B.    The VXX Exchange Traded Note

Barclays Bank is the issuer of an exchange-traded note ("ETN"), the Barclays Bank PLC

iPath Series B S&P 500 VIX Short-Term Futures ("VXX").  *Id.* ¶ 34.[3]  An ETN is an unsecured

debt obligation of a financial institution that trades on a securities exchange and whose payment

terms are linked to the performance of a reference index or benchmark.  *See Rubinstein v. Credit*

*Suisse Grp. AG*, 457 F. Supp. 3d 289, 293 (S.D.N.Y. 2020).   VXX is a complex financial

instrument.  It is a securitized derivative; it is synthetic and uncollateralized.  Dkt. No. 80 ¶ 35.  It

is designed to provide a return based on market volatility as measured by the performance of the

S&P 500 VIX Short-Term Futures Index Total Return ("VIX").  *Id.* ¶¶ 7, 34.[4]  In particular, the

VXX offers exposures to futures contracts of specified maturities on the VIX Index.  The VIX

Index measures the 30-day forward volatility of the S&P 500 as calculated based on the prices of

certain put and call options on the S&P 500.  *Id.* ¶¶ 37, 287.  VXX was the largest of the exchange-

traded products keyed to the VIX—more than double the next largest issuer.  *Id.* ¶ 45.

---

[3] The Barclays Bank PLC iPath Series B S&P 500 VIX Short-Term Futures trades on the New
York Stock Exchange under the ticker symbol "VXX."  *Id.* ¶¶ 34, 36.
[4] The SAC notes that, according to BPLC, "VXX is actually designed to provide exposure to the
S&P 500® VIX Short-Term Futures TM Index Total Return" which is technically a different index
from the VIX, but is related."  *Id.* ¶ 34 (quotation omitted).

The value of VXX does not track VIX itself, but the prices of futures of the VIX, which often trade at very different price levels depending on the time to maturity, which is the indicative value. *Id.* ¶ 287. Every day, as underlying VIX futures contracts that BPLC holds age, BPLC has to buy and sell VIX futures to maintain its position. *Id.* ¶¶ 41, 288.[5] BPLC buys two-month futures, holds them for thirty days, and then sells them as one-month VIX futures. *Id.* ¶ 288. During normal market conditions, the two-month contracts tend to trade at a higher price than the one-month contracts tend to sell for, thereby causing BPLC to suffer a loss. *Id.* ¶ 47, 288.[6] That loss, combined with the standard 0.89% investor fee BPLC charges, results in what BPLC calls a

---

[5] Defendants dispute Plaintiffs' description of how the VXX ETNs and the underlying S&P Vix Index work. According to Defendants, "Barclays itself does not manage a portfolio of futures contracts" and instead the pricing supplement sets forth a formula by which the ETNs' value is calculated that reflects the daily change in the level of the S&P Vix Index, which itself is based on a "formula" that is "determined, composed and calculated by S&P Dow Jones Indices LLC without regard to Barclays Bank PLC or the ETNs." Dkt. No. 85 at 7, 9 n.5. In general, Defendants' competing factual account of how the ETNs function cannot be credited on the motion to dismiss as the Court is limited to the factual allegations that appear on the face of the complaint. *See L.C. v. LeFrak Org., Inc.*, 987 F. Supp. 2d 391, 398 (S.D.N.Y. 2013). Although the Court may take judicial notice of the VXX pricing supplement, including its representations concerning the formulas used to calculate VIX and VXX, Dkt. No. 86-1 at 29, 35–36, the Court may only do so for the fact that such representations were made, not for their truth. *See In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 238–39 (S.D.N.Y. 2023). Defendants' contention is, however, bolstered by the allegations in the SAC that "VXX is a securitized derivative—it is synthetic and uncollateralized" and that redeeming holders "are entitled to money equal to a calculation rather than their pro rata share of a pool of assets," Dkt. No.80 ¶¶ 35, 40, which tend to contradict the allegations that Barclays manages a portfolio of futures contracts that underly VXX.

[6] The phenomenon wherein the prices of futures contracts are higher the further out the maturities are is known as "contango." *See U.S. Commodity Futures Trading Comm'n v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 238 (S.D.N.Y. 2012). According to Plaintiff, this contango occurs due to the size of BPLC's position, the generally known fact that BPLC must purchase the two-month contracts and sell the one-month contracts to stay balanced, and the generally known fact that BPLC will undertake this buying and selling towards the end of each trading day. Dkt. No. 80 ¶¶ 41–45, 290.

"negative roll yield." *Id.*[7]  Under normal market conditions, VXX exhibits a seemingly persistent decline in value.  *Id.* ¶ 288.

The pricing supplement for the VXX discloses:

You may lose all or a substantial portion of your investment if you invest in the ETNs. …

THE ETNS OFFEFR EXPOSURE TO FUTURES CONTRACTS OF SPECIFIED MATURITIES ON THE VIX INDEX AND NOT DIRECT EXPOSURE TO THE VIX INDEX OR ITS SPOT LEVEL.  These futures contracts will not track the performance of the VIX Index.  In addition, the nature of the VIX futures market has historically resulted in a significant cost to "roll" a position in the VIX futures contracts underlying the Indices.  As a result, the levels of the Indices, which each track a rolling position in specified VIX futures contracts, may experience significant declines as a result of these roll costs, especially over a longer period.  The VIX Index will perform differently than the Indices and, in certain cases, may have positive performance during periods where the Indices underlying your ETNs are experiencing negative performances.  In turn, an investment in the ETNs may experience a significant decline in value over time, the risk of which increases the longer that the ETNs are held.

The ETNs are intended to be trading tools for sophisticated investors to manage daily trading risks and are only suitable for a very short investment horizon.  The ETNs may not be suitable for all investors and should be used only by investors with the sophistication and knowledge necessary to understand the risks inherent in the relevant Index, the futures contracts that the relevant Index tracks and investments in volatility as an asset class generally.

Dkt. No. 86-1 at 2, 6–7 (emphasis omitted).[8]  The pricing supplement further discloses:

**If You Hold Your ETNs as a Long Term Investment, it is Likely That You Will Lose All or a Substantial Portion of Your Investment.**

The ETNs are only suitable for a very short investment horizon.  The relationship between the level of the VIX Index and the underlying futures on the VIX Index will begin to break down as the length of an investor's holding period increases, even within the course of a single index business day.  The relationship between the level of the applicable underlying Index and the closing indicative value and

---

[7] "Roll yield is the amount of return generated in the futures market after an investor rolls a short-term contract into a longer-term contract and profits from the convergence of the futures price toward a higher spot or cash price" or alternatively incurs losses when the market is in contango. *What is Roll Yield and When is it Positive or Negative*, Investopedia, https://www.investopedia.com/terms/r/roll-yield.asp.
[8] ECF pagination.

> intraday indicative value of the ETNs will also begin to break down as the length of an investor's holding period increases due to the effect of accrued fees. The long term expected value of your ETNs is zero. If you hold your ETNs as a long term investment, it is likely that you will lose all or a substantial portion of your investment.

Dkt. No. 86-1 at 18.

Holders could redeem VXX for a payout equal to a calculation of the implied value. Dkt. No. 80 ¶¶ 40, 56. But the VXX indenture only allows someone to redeem VXX if they redeem 25,000 shares or more of VXX at a time. *Id.* ¶ 56.

### C. Barclays Bank's Offering of Structured Products and Its Loss of WKSI Status

Historically, Barclays Bank was able to issue securities as a Well-Known Seasoned Issuer ("WKSI"). *Id.* ¶¶ 65–66. WKSI status gives the most widely followed issuers "greater flexibility in accessing the United States public capital markets than most other institutions." *In re Barclays Bank PLC Sec. Litig.*, 2024 WL 757385, at *2 (S.D.N.Y. Feb. 23, 2024). A WKSI may issue securities by filing an open-ended shelf registration statement and paying the registration fee, whereupon the securities are deemed "effective" upon issuance without prior SEC review or sign-off. Dkt. No. 80 ¶ 66.

A bank which does not have WKSI status must (i) register a shelf registration statement[9] with the SEC for the issuance of securities covering a maximum of three years; (ii) estimate the amount of securities it will issue during those three years; and (iii) pay filing fees in advance to the SEC for the total amount of those securities. 17 C.F.R. § 230.415(a). If a non-WKSI issuer exceeds the amount of securities it estimated at the beginning of the three-year period, it must register a new shelf. Thus, a non-WKSI issuer must track the offers and sales of securities off of

---

[9] A shelf registration statement is a filing to register a public offering of securities which permits an issuer to make multiple offerings based on the same registration statement.

any non-WKSI shelf to ensure that all of the securities it sells are registered and that it does not offer any securities in excess of those covered by the registration statement. Dkt. No. 80 ¶¶ 83–84.

By contrast, an issuer with WKSI status can file a single so-called "shelf" registration statement that becomes effective immediately upon filing and can be used to register securities for offerings that are to be made on a continuous or delayed basis over a specific time frame without waiting for the SEC's Division of Corporation Finance to review the offering and declare it to be effective. *Id.* ¶ 66. The WKSI need not identify the total number of securities it plans to sell from each shelf during the specified duration, as most issuers without WKSI status must do. *Id.* ¶¶ 83–84.

An issuer can lose its WKSI status by becoming "ineligible," including if it or a subsidiary have been made the subject of a judicial or administrative decree prohibiting it from violating the antifraud provisions of the federal securities laws. 17 C.F.R. § 230.405. Between 2007 and 2017, BPLC was repeatedly threatened with designation as an ineligible issuer and had been able to retain its WKSI status because the SEC had issued it WKSI waivers. Dkt. No. 80 ¶ 71. BPLC ultimately lost its WKSI status after the SEC instituted a public administrative cease-and-desist proceeding against its subsidiary Barclays Capital Inc. on May 10, 2017. *Id.* ¶ 69. BPLC requested that the SEC issue a waiver allowing it to retain WKSI status because "[t]he WKSI shelf process allows access to the widest possible global investor base and provides an important means of accessing capital and funding for Barclays' global operations." *Id.* ¶ 74. Barclays noted that its business centered around selling structured securities and expressed the concern that becoming an ineligible investor would impact its speed to the market relating to new securities because it would

not be able to issue new structured securities quickly. *Id.* ¶¶ 75–76. As a WKSI issuer, Barclays had issued over $68 billion in securities in the five years before it lost its WKSI status. *Id.* ¶ 81.

Following the May 2017 SEC cease-and-desist proceeding and Barclays's loss of WKSI status, Barclays was required to define and designate the number of securities it planned to register and issue and pay the registration fee up front before selling the securities. *Id.* ¶ 83. Barclays was then required to monitor how many securities it had issued so as not to exceed the limit. *Id.* ¶ 84.

In January 2018, BPLC announced that it was forming a working group to address securities registration issues in the wake of the loss of WKSI status. *Id.* ¶ 85. The working group included trading desk heads from the Structured Products Group, personnel from an administrative support function called business management, personnel from the product origination group, a member of the compliance department, and a member of the legal department. *Id.* ¶ 86. The working group focused on the need to file a new registration statement and the calculation of the total amount of securities that Barclays Bank anticipated offering and selling over the eighteen months after Barclays Bank lost WKSI status. *Id.* ¶ 89, 91. While the working group understood the need to track actual offers and sales of securities against the amount of registered securities on a real-time basis, no internal control was established to track offers and sales of securities nor was any member of the working group or any other Barclays Bank personnel assigned to perform that task. *Id.* ¶¶ 87–88.

On February 22, 2018, Barclays Bank filed an amended registration statement to convert its existing WKSI shelf to a non-WKSI Shelf for the eighteen months Barclays had remaining until the expiration of that registration statement, estimating it would sell over $21.3 billion of securities in that 18-month period ¶¶ 94, 108. On March 28, 2018, Barclays Bank filed a post-effective amendment, amending its prior registration statement on Form F-3 to convert from a WKSI to a

non-WKSI registration statement. *Id.* ¶ 92. On March 30, 2018, Barclays' post-effective amendment was declared effective (the "2018 Shelf"). *Id.* ¶ 93.

As the 2018 Shelf was nearing expiration, it still had securities remaining for additional offers or sales. *Id.* ¶ 98. Therefore, as part of the process of preparing for a new shelf registration (the "2019 Shelf"), the working group calculated (1) the amount of securities needed for offers or sales from the 2018 Shelf during the period between Barclays Bank's filing of the shelf registration statement for the 2019 Shelf and the date when the 2019 Shelf would become effective (the "Gap Period") and (2) the amount of securities that would be left over on the 2018 Shelf after accounting for the projected Gap Period offers or sales, which were to be deregistered with the registration fee originally assessed on those securities to be used to offset a portion of the registration fee associated with the 2019 Shelf. *Id.* ¶¶ 99, 101.

On June 14, 2019, near the end of that 18-month period, Barclays Bank prepared and filed the registration statement for the 2019 Shelf. *Id.* ¶¶ 223, 250. The 2019 shelf registration statement was declared effective on August 1, 2019. *Id.* ¶ 110. The filing fees for the 2019 Shelf covered the offer or sale of approximately $20.08 billion of securities for a period of three years. *Id.* ¶¶ 138, 223, 386.

### D.    The Reverse Split

The terms of the VXX ETN permitted Barclays Bank, at its discretion, to conduct a split or reverse split of the ETNs. Dkt. No. 86-1 at 41. The pricing supplement disclosed: "On any business day we may elect to initiate a split of your ETNs or a reverse split of your ETNs. *Id*.

On April 9, 2021, BPLC issued a press release announcing a 4:1 reverse split for VXX to be consummated on April 23, 2021. Dkt. No. 80 ¶ 157. For every four shares that an investor held, BPLC would replace it with a single new share ostensibly worth four times the value, and

for any fractional shares left over, BPLC would cash them out at a specific calculation roughly equivalent to the indicated value. *Id.*

Barclays Bank executed the four-for-one reverse split on April 23, 2021. Dkt. No. *Id.* ¶ 206. It issued 37,493,274 shares of VXX—one share for every four shares of VXX then trading. *Id.*

### E. Barclays Bank Discovers that It Sold VXX In Excess of Those Registered Under the 2018 and 2019 Shelf Registration Statements

On March 8, 2022, a member of the group treasury function of Barclays asked personnel in the legal department how much capacity remained available to be offered and sold off of the 2019 Shelf. *Id.* ¶ 147. Over the course of that day and the next, various Barclays personnel tried to calculate the 2019 Shelf's remaining capacity and ultimately realized that: (i) there was no internal control in place to track in real time the amount of securities offered and sold against the amount of securities registered, and (ii) "securities had been offered and sold in excess of the amount registered under the 2019 Shelf." *Id.* Shortly thereafter, BPLC halted new offers and sales of securities from the 2019 Shelf and, on March 14, 2022, it alerted regulators to the over-issuance and disclosed to the market that Barclays Bank did not have sufficient issuance capacity to support further sales from inventory and any further issuances of the ETNs. *Id.* ¶¶ 147, 166.

On March 28, 2022, Barclays filed a Form 6-K disclosing that it had sold $15.2 billion worth of unregistered securities in excess of the maximum $20.08 billion registered by the 2019 Shelf and announcing a forthcoming rescission offer to purchasers of the over-issued securities. ¶¶ 138, 167; Dkt. No. 86-4. The Form 6-K states that Barclays bank "has elected to conduct a rescission offer to eligible purchasers of the Affected Securities" and "[d]etails of the rescission offer will be published by BBPLC in due course." Dkt. No. 86-4 at 5.[10] In response to that

---

[10] ECF pagination.

announcement, the price for VXX skyrocketed as short sellers scrambled to buy cover for their shorts.  Dkt. No. 80 ¶ 169.

On July 28, 2022, BPLC further disclosed that from June 26, 2019 to August 1, 2019, it had issued $1.3 billion of securities in excess of what had remained on the 2018 Shelf.  *Id.* ¶¶ 140, 201.

The 2018 Shelf had been exhausted by June 26, 2019, at the latest—months earlier than the working group anticipated.  *Id.* ¶ 109.  The 2019 Shelf had been exhausted by January 28, 2021.  *Id.* ¶ 159.  Nonetheless, Barclays sold $17.7 billion worth of unregistered securities, including VXX, between June 26, 2019 and August 1, 2019 and again between January 28, 2021 and May 23, 2022.  Dkt. No. 80 ¶ 33.

- On July 23, 2019, Barclays Bank had issued 13,227,018 unregistered shares of VXX into the market.  *Id.* ¶ 202.

- On February 18, 2021, Barclays Bank had issued 50 million new unregistered shares of VXX into the market.  *Id.* ¶ 204.

- On May 3, 2021, Barclays Bank issued 12,500,000 unregistered shares of VXX into the market.  *Id.* ¶ 207.

- On October 22, 2021, Barclays Bank issued 25,000,000 unregistered shares of VXX into the market.  *Id.* ¶ 208.

**F.    The Rescission Offer**

On July 25, 2022, Barclays Bank issued a press release announcing that it expected to commence a rescission offer on August 1, 2022, for a total of approximately "17.6 billion of relevant securities issued in excess of amounts registered by BBPLC under its U.S. Shelf registration statements," consisting of "U.S. $14.8 billion of structured notes and U.S. $2.8 billion of exchange traded notes."  *Id.* ¶ 175; Dkt. No. 86-5 at 2[11].  Plaintiffs allege that the July 25, 2022

---

[11] ECF pagination.

press release suggested that all those with ETNs like VXX would be able to rescind. *Id.* ¶ 176. In fact, however, an annex to the press release summarizing the expected key terms of the proposed rescission offer explicitly stated that the only persons who would be eligible to participate in the proposed rescission offer would be those who had acquired the subject securities in a distribution through an underwriter or other distributor and who would be able to offer evidence to that effect. Dkt. No. 86-5 at 4–7.

Barclays Bank conducted the rescission offer from August 1, 2022, to September 12, 2022. Dkt. No. 80 ¶¶ 141, 177. The series of VXX subject to rescission included those issued on July 23, 2019, February 18, 2021, May 3, 2021, and October 22, 2021. *Id.* ¶¶ 141, 155. Consistent with the annex to the press release, Barclays Bank stated in the recission offer that to be eligible to participate, an investor had to have purchased the relevant subject security "in a distribution from the Issuer through an underwriter or other distributor" and had to produce evidence to that effect. Dkt. No. 86-6, at 1, 5–6, 8–11.[12] The prospectus supplement warned: "***Investors in our Subject Securities that are ETNs may face significant evidentiary issues that are likely to make it difficult, if not impossible, for such investors to present sufficient evidence to prove that they meet the eligibility requirements to be considered an Eligible Investor and participate in this Rescission Offer***." *Id.* at 7.[13]

---

[12] ECF pagination.

[13] The prospectus supplement explained:

> Certain of the Subject Securities are ETNs that are not readily distinguishable from ETNs of the same series that were properly offered and sold pursuant to an effective registration statement. When new issuances of these Subject Securities that are ETNs occurred in excess of the maximum aggregate offering price set forth in the 2019 F-3 and 2018 F-3, such Subject Securities were placed in Barclays' DTC accounts alongside properly registered ETNs. Within a DTC account, the ETNs of a given type exist as a fungible pool with the same CUSIP number. Thus, with respect to any given transaction in ETNs, Barclays may be unable to determine

On August 12, 2022, Barclays Bank amended its Rescission Offer.  Dkt. No. 80 ¶ 142.

### G.    The SEC Order

On September 29, 2022, the SEC issued an order instituting cease-and-desist proceedings against BPLC and Barclays Bank.  Dkt. No. 86-3.  The SEC found that Barclays Bank had violated Sections 5(a) and 5(c) of the Securities Act of 1933 by offering securities that were not registered with the SEC and that BPLC and Barclays Bank had violated the books and records, internal controls, and annual reports provisions of the Securities Act and the Exchange Act.  *Id.* ¶¶ 44–45. Barclays paid the SEC penalties of $200,000,000 and disgorgement of $149,731,011 with pre-judgment interest.  *Id.* ¶ 151.

After the investigation into the over-issuances, Barclays clawed back $1.2 million in compensation from the management team.  *Id.* ¶¶ 302, 330, 379, 390.

### H.    The Plaintiffs' Purchase of VXX

Ruth C. May, Donna E. Ledgerwood, Justin Reed, Jeffrey Knapp, and Mark Howarth (the "May Group" or "Plaintiffs") purchased VXX ETNs between November 2019 and June 4, 2021.

---

whether the ETNs it sold or otherwise transferred out of its DTC account were Subject Securities.  Further, underwriters, distributors, or others who transact through DTC accounts or other similar mechanisms may be similarly situated. Additionally, because many ETNs are sold in transactions over an exchange, the identification of buyers and sellers who participated in relevant transactions can present additional challenges.

In light of the above, if you are an investor in our ETNs that are Subject Securities and you wish to accept this Rescission Offer, you may face significant evidentiary issues that will likely make it difficult, if not impossible, for you to present sufficient evidence to prove that you meet the eligibility requirements to be considered an Eligible Investor pursuant to this prospectus supplement.  As a result, we may refuse your acceptance due to the foregoing evidentiary issues, thus precluding you from participating in the Rescission Offer.

*Id.* at 7.

Dkt. No. 80 ¶¶ 180–189.   They contend they purchased VXX ETNs based on Defendants' misrepresentations.  *Id.* ¶ 192.

Each Plaintiff held VXX through the April 2021 reverse split.  *Id.* ¶¶ 182, 185, 188, 191. Each Plaintiff submitted a claim for rescission in response to the Rescission Offer.  *Id.* ¶¶ 182, 184, 187, 190.  Each Plaintiff's submissions were denied by BPLC.  *Id.*

Plaintiffs bring this action on behalf of a putative class defined as all purchasers of VXX during the class period from on or between June 26, 2019 and May 23, 2022, inclusive.  *Id.* ¶¶ 403– 404.

## I.    The Alleged False Statements

Plaintiffs allege that Defendants made three separate sets of false or misleading statements in their SEC filings.

First, Plaintiffs allege that BPLC's statements in its registration statements filed on February 22, 2018, and June 14, 2019 that the VXX securities were registered and that it intended only to issue $25 billion of securities on its 2018 Shelf and approximately $20.08 billion of securities on its 2019 Shelf were false and misleading.  *Id.* ¶¶ 111–112, 153.  Barclays' Form 8-A filed on January 18, 2018 also stated that "[t]he Securities [VXX], and any other Securities of this series and of like tenor, are issuable only in registered form without coupons in denominations as specified on the face hereof."  *Id.* ¶ 153.  Plaintiffs claim that the statements were false when made because Barclays knew it would end up issuing millions of unregistered securities absent some disciplined approaching to monitoring issuance.  *Id.* ¶ 112; Dkt. No. 87 at 10–11.

Second, Plaintiffs claim that Barclays made false and misleading statements regarding its internal controls and processes.  Dkt. No. 87 at 10.  In BPLC's annual statement on Form 20-F filed in 2018, the company stated that it was "committed to operating within a strong system of internal control," and described its internal controls as "improved" "following the completion of

Barclays Internal Controls Enhancement Programme." Dkt. No. 80 ¶ 113. It also stated that its "Control Environment is monitored by senior management and the Board via various reports, dashboards, and deep dives" and that the "programme facilitated the resolution of the most material control issues and implemented a system of tracking and reporting risk events and controls issues against a new Controls Maturity Model, which left Barclays' internal controls environment in a much stronger position." *Id.* The 2018 Form 20-F further stated that BPLC's "frameworks, policies and standards enable Barclays to meet regulators' expectations relating to internal control and assurance," *id.* ¶ 114, and that "[t]hroughout the year ended 31 December 2018 and to date, the Barclays Group has operated a system of internal control that provides reasonable assurance of effective operations covering all controls including financial and operational controls and compliance with laws and regulations," *id.* ¶ 115. It additionally stated that "[m]anagement has assessed the internal control over financial reporting as of 31 December 2018" and that "[i]n making its assessment, management utilized the criteria set out in the 2013 COSO framework and concluded that, based on its assessment, the internal control over financial reporting was effective as of 31 December 2018." *Id.* ¶ 118. Barclays made similar statements in its Form 20-F for 2019, describing its internal controls as "robust" and stating that it "was focus[ed] on strengthening the internal control environment," and BICEP had left Barclay's internal controls environment "in a much stronger position." *Id.* ¶¶ 120, 122–123. Staley and Marzaria signed certifications attached to the BPLC's 2019 Form 20-F stating that "[t]he company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting." *Id.* ¶ 123.

On February 14, 2020, Barclays Bank filed its 20-F for 2019. *Id.* ¶ 124. It was incorporated by reference into the 2018 and 2019 Shelf Registrations. *Id.* It stated that "[t]here have been no

changes in the Barclays Bank Group's internal control over financial reporting which have materially affected or are reasonably likely to materially affect the Barclays's internal control over financial reporting during the year." *Id.* ¶ 124. It also contained certifications signed by Staley and Ewart similar to those in the 2018 Form 20-F. *Id.* ¶¶ 125–126. BPLC's 2020 Form 20-F was filed on February 18, 2021 and contained similar statements. *Id.* ¶¶ 127–131.

Plaintiffs allege that the statements were false and misleading because "[n]one of the internal controls were even established, much less implemented in a meaningful way, and so the amount of securities that were issued was not being tracked in real time." *Id.* ¶¶ 117, 133.

Third, Plaintiffs allege that the July 23, 2019 Pricing Supplement for VXX contains an actionable omission because it states that the market may be affected by Barclays' purchase or sale decisions but omits the fact that Barclays' unregistered issuances are likely to cause the indicated value—and thereby the price—to depreciate. *Id.* ¶ 119.

## PROCEDURAL HISTORY

This case was initiated by complaint filed on March 27, 2023. Dkt. No. 1.

On June 3, 2024, the Court signed an order, pursuant to the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(a)(3)(B)(iii), appointing the May Group as lead plaintiff and appointing Mazin A. Sbaiti and Jonathan Bridges of Sbaiti & Company PLLC, as lead counsel. Dkt. No. 60. The Court also consolidated this case with the later-filed *Baker v. Barclays*, Case No. 23-cv-4881-LJL (S.D.N.Y.). *Id.*

On November 20, 2023, Plaintiff filed the First Amended Complaint. Dkt. No. 69. Pursuant to a stipulation between the parties, Plaintiff filed the Second Amended Complaint, which is presently the operative complaint, on March 13, 2024. Dkt. No. 80.

On April 8, 2024, Defendants filed the instant motion to dismiss the SAC pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). Dkt. No. 84. Defendants filed a memorandum

of law and a declaration of counsel attaching exhibits in support of the motion to dismiss. Dkt. Nos. 85–86. On May 8, 2024, Plaintiff filed a memorandum of law in opposition to the motion to dismiss. Dkt. No. 87. On May 29, 2024, Defendants filed a reply memorandum of law in further support of the motion to dismiss. Dkt. No. 88.

On Friday, March 14, 2025, the Court heard oral argument from the parties as well as from the parties in related case *Puchtler v. Barclays PLC*, Case No. 24-cv-1872-LJL (S.D.N.Y.).

## LEGAL STANDARD

On a 12(b)(6) motion to dismiss, the court must accept as true all factual allegations in the complaint and draw all possible inferences from those allegations in favor of the plaintiff. *See York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002), *cert. denied*, 537 U.S. 1089 (2002). This requirement "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

A complaint must offer more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action" or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007). The ultimate question is whether "[a] claim has facial plausibility, [i.e.] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives v. Siracusano*, 563 U.S. 27, 46 (2011).

A claim for fraud is subject to the particularity requirements of Federal Rule of Civil Procedure 9(b). A plaintiff must: "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent; (2) identify the speaker; (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004); *see also Caputo v. Pfizer, Inc.*, 267 F.3d 181, 191 (2d Cir. 2001) (stating that to plead fraud with particularity, a complaint must "specify the time, place, speaker, and content of the alleged misrepresentations" and "should explain how the misrepresentations were fraudulent"). Allegations that are "conclusory and unsupported by assertions of fact" are not sufficient to meet the Rule 9(b) standard. *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986).

The PSLRA imposes additional requirements on a plaintiff bringing a private securities fraud action. Plaintiff must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). Plaintiff cannot plead "the materiality of the alleged misstatements or omissions . . . in a conclusory or general fashion." *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 626 (S.D.N.Y. 2005) (citation omitted); *see In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 367 (E.D.N.Y. 2013) ("The materiality of allegedly false financials may not be pled in a conclusory or general fashion."). "[P]laintiffs must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 564 (S.D.N.Y. 2018) (citation omitted), *aff'd sub nom. Ark. Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019).

In addition, where scienter is at issue, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C.

§ 78u–4(b)(2). Under this heightened pleading standard for scienter, a "complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). In determining whether a strong inference exists, the allegations are not to be reviewed independently or in isolation, but the facts alleged must be "taken collectively." *Id.* at 323.

## DISCUSSION

Plaintiffs bring the following claims: (1) liability under Section 12(a) of the Securities Act, Dkt. No. 80 ¶¶ 200–219; (2) liability under Section 11 of the Securities Act, *id.* ¶¶ 220–247; (2) liability under Section 12(a)(2) of the Securities Act, *id.* ¶¶ 248–270; (3) securities fraud scheme liability under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, *id.* ¶¶ 271–312; (5) securities fraud misrepresentation liability under Section 10(b) of the Exchange Act and Rule 10b-5, *id.* ¶¶ 313–342; and (6) common-law fraud and estoppel, *id.* ¶¶ 343–364; and (7) control person liability under Section 20(a) of the Exchange Act, *id.* ¶¶ 365–382.

## I.    Plaintiffs' Section 12(a)(1) Claim

In Count One of the SAC, Plaintiffs allege that Barclays issued shares of VXX into the market in exchange for cash on four occasions in 2019 and 2021, specifically July 23, 2019, February 18, 2021, May 3, 2021, and October 22, 2021, and that each of those shares was unregistered. *Id.* ¶¶ 202, 204, 207–208. They also allege that Barclays' issuance of shares as part of the four-for-one reverse split on April 23, 2021, constituted an issuance of shares for purposes of Section 5 of the Securities Act. *Id.* ¶ 206. Plaintiffs allege that these offerings violated Section 5 of the Securities Act because they were made without an effective registration statement and that, as a result, every person who purchased VXX "shares between April 23, 2021, and May 23, 2022 has a plausible claim for rescission under Section 12(a)(1)" of the Securities Act. *Id.* ¶¶ 210–211.

19

Defendants move to dismiss Count One.  They argue that Plaintiffs' Section 12(a)(1) claim fails because Plaintiffs do not allege that they themselves purchased unregistered VXX ETNs from Barclays.  In response, Plaintiffs argue that the issuance of shares pursuant to the April 23, 2021 four-for-one reverse split constitutes a sale of unregistered securities pursuant to Section 5 of the Securities Act, and they assert that because they exchanged their pre-April 23, 2021 shares for new shares pursuant to the reverse split, they have a claim for rescission.  Dkt. No. 87 at 19–30.[14]  The question raised here is thus whether Barclays' reverse stock split constituted a "sale" for purposes of the Securities Act, giving rise to a right of rescission if no registration statement was in effect for those securities.  Plaintiffs' argument is without merit; the reverse stock split did not constitute a sale.

The objective of the Securities Act is to ensure that investors who purchase securities from an offeror or underwriter have the information necessary to make an informed decision.  *See Pinter v. Dahl*, 486 U.S. 622, 638 (1988).  Section 5 of the Act, Section 77e, prohibits the sale of unregistered securities.  15 U.S.C. § 77e(a).  Under Section 5 of the Securities Act, "[u]nless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to . . . sell such security through the use or medium of any prospectus *or otherwise* . . ." *Id.* (emphasis added).  Section 12(a)(1) gives a person who purchases a security that has been sold without a registration statement what is, in effect, a private right of rescission.  Section 12(a)(1) provides, in relevant part:

> Any person who . . . offers or sells a security in violation of section 77e of this title,
> . . . shall be liable . . . to the person purchasing such security from him, who may

---

[14] Plaintiffs do not address Defendant's arguments with respect to the offerings on July 23, 2019, February 18, 2021, May 3, 2021, and October 22, 2021.  Plaintiffs are thus deemed to have abandoned their claim with respect to those offerings. *See Youmans v. Schriro*, 2013 WL 6284422, at *5 (S.D.N.Y. Dec. 3, 2013) ("A plaintiff's failure to respond to contentions raised in a motion to dismiss claims constitutes an abandonment of those claims.").

sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

15 U.S.C. § 77l(a)(1).  "A prima facie case of a section 5 violation requires a showing: (1) that no registration statement was in effect or filed; (2) defendant offered or sold a security; and (3) the offer or sale took place in interstate commerce."  *Owen v. Elastos Found.*, 2021 WL 5868171, at *9 (S.D.N.Y. Dec. 9, 2021) (quotations omitted).  Section 12(a)(1) "imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers."  *Pinter*, 486 U.S. at 644 n.21.  "Thus, a buyer cannot recover against his seller's seller." *Id.*

"The primary purpose of the Securities Act is to protect investors by requiring publication of material information thought necessary to allow them to make informed investment decisions concerning public offerings of securities in interstate commerce."  *Id.* at 638; *accord Eur. & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 126 (2d Cir. 1998) (noting that Congress passed the Securities Act's registration provisions "to assure full and fair disclosure in connection with the public distribution of securities" (quotation omitted)), *abrogated on other grounds by Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010).  "Through mandatory disclosure, Congress sought to promote informed investing and to deter the kind of fraudulent salesmanship that was believed to have led to the market collapse of 1929."  *Eur. & Overseas Commodity*, 147 F.3d at 126; *see also* H.R. Rep. No. 85, 73d Cong., 1st Sess. 1 (1933).  The Supreme Court has also noted that "Congress left little doubt that its purpose in imposing the prospectus and registration requirements of the 1933 Act was to prevent the '(h)igh pressure salesmanship rather than careful counsel,' causing inflated new issues, through direct limitation by the SEC of 'the selling arguments hitherto employed.'"  *Blue Chip Stamps v. Manor Drug*

*Stores*, 421 U.S. 723, 752–53 (1975) (quoting H.R. Rep. No. 85).  The Securities Act "does not affect transactions beyond the need of public protection in order to prevent recurrences of demonstrated abuses."  *SEC v. Ralston Purina Co.*, 346 U.S. 119, 123 & n. 5 (1953) (noting that Congress exempted transactions by an issuer not with or through an underwriter because "[t]his was thought to be one of those transactions 'where there is no practical need for (the bill's) application or where the public benefits are too remote.'" (quoting H.R. Rep. No. 85)).

Importantly, the registration provisions are "aim[ed] at certain conduct with the potential for discernible effects."  *Eur. & Overseas*, 147 F.3d at 126.  Where a potential investor is faced with an investment decision such as whether to purchase a security, Congress determined that such investor should not have to make the decision blindly, relying on unscrupulous stock sellers.  Instead, Congress legislated to allow potential investors to make "informed investment decisions" by obligating issuers to file a registration statement that the SEC has declared effective and to provide a prospectus.  *Pinter*, 486 U.S. at 638.  As the Supreme Court has highlighted, the enacting legislators noted that "[a]ny objection that the compulsory incorporation in selling literature and sales argument of substantially all information concerning the issue, will frighten the buyer with the intricacy of the transaction states[] one of the best arguments for the provision."  *Blue Chip Stamps*, 421 U.S. at 753 (quoting H.R. Rep. No. 85)).

The Securities Act defines the term "sale" or "sell," to which the statute is addressed, to "include every contract of sale or disposition of a security or interest in a security, *for value*."  15 U.S.C. § 77b(a)(3) (emphasis added).  It similarly defines "offer" to "include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, *for value*."  *Id.* (emphasis added).  Congress's use of the term "for value" in 15 U.S.C. § 77b(a)(3) was advised.  Where a grant of securities is made gratuitously, there is no sale.  *See Shaw v. Dreyfus*, 172 F.2d

140, 142 (2d Cir. 1949) (holding that "a bona fide gift is not a transaction similar to a sale"), *cert. denied*, 337 U.S. 907 (1949).  In that instance, the receiving investor has no investment decision to make and thus there is no need to provide information to make such nonexistent decision an informed one.  However, where an offeror or underwriter receives value for a security, *i.e.* where a person provides value for the security, a registration statement must be filed and be effective, subject only to limited exceptions.

Barclays' decision to exercise its right to demand the exchange of four shares of VXX held by investors for one share of the same value did not constitute a "sale" within the meaning of the Securities Act.  It has been held that no new consideration is involved in a stock split.  "A stock split, in spite of the enthusiasm with which it is generally greeted, is simply the distribution of two or more pieces of paper for one." *Gurvitz v. Bregman & Co.*, 379 F. Supp. 1283, 1286 (S.D.N.Y. 1974) (citing *Hafner v. Forest Labs., Inc.*, 345 F.2d 167 (2d Cir. 1965)).  "Stock splits do not involve a 'sale' under the Securities Act of 1933." *Id.*[15]  No value is compromised, and no new value is exchanged.

Likewise, an investor who exercises an option, exchanging the right to obtain a share of stock in exchange for the actual share, does not purchase or sell the share of stock under Section 5. The option itself has value, but "[a]n option's exercise ordinarily does not involve additional value since the value of the security is built into the option."  Thomas Lee Hazen, *Treatise on the Law*

---

[15] Plaintiffs seek to distinguish *Gurvitz* on the basis that it involved common stock rather than an exchange-traded note and that it concerned the purchase or sale language of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Dkt. No. 87 at 25 n.7.  But that is a distinction without a difference.  *Gurvitz* similarly applied the Securities Act's definition the term "sale" or "sell" to "every contract of sale or disposition of a security or interest in a security, for value," *Gurvitz*, 379 F. Supp. at 1286 (quoting 15 U.S.C. § 77b(a)(3)), and Plaintiff does not identify any relevant contextual differences that would warrant a different meaning of "for value" in the Securities Act.

*of Securities Regulation* ("Hazen") § 5:3 (2024).  In other words, where an option-holder purchases an option and later exercises it, only the original purchase is a transfer for value; the option-holder does not convey value when she exchanges her contract right for the stock itself.

For the same reason, the exercise of a conversion right by one who holds a convertible security does not ordinarily give rise to a "sale" of the new security under Section 5.  *See id.* ("[W]hen an exchange of securities is involuntary and does not significantly alter the rights of the securities holders, the exchange will not be treated as a sale.").  "When a conversion right is exercised, the holder of the security merely is receiving something he or she had a right to all along—the underlying security."  *Id.* § 5:6.  "Hence, it would seem to follow that a conversion ordinarily will not be a disposition 'for value' since the owner already had those rights prior to exercising the right of conversion."  *Id.*; *see also id.* (stating that "[t]he SEC's safe harbor exemption from 1933 Act registration for resales of restricted securities takes the position that an exercise of a conversion right is not a sale and thus does not require registration (citing 17 C.F.R. § 230.144(d)(4))); *Gilligan, Will & Co. v. SEC*, 267 F.2d 461 (2d Cir. 1959) (the Circuit did not construe the conversion to be a sale even though sale of the underlying common stock after conversion was held to require registration).

Similarly, the SEC has noted that in a merger effected in part through the issuance of additional shares—much like a stock split—where the additional shares are not being offered or sold to shareholders but "are merely a means of adjusting percentage ownership," such issuance does not constitute a "sale."  *The Harwood Cos., Inc.*, SEC No Action Letter, Fed. Sec. L. Rep. P 77, 375 (March 15, 1983).  In that case, the SEC explained, the "issuance of the [a]dditional [s]hares is similar to the payment of a stock dividend which in the view of the House conferees on

the [Securities] Act '[does] not constitute a sale, not being given for value.'" *Id.* (quoting H.R. Rep. No. 152, at 25 (1933)).

The fact that a plaintiff may have originally obtained the option, convertible shares, or pre-split shares "for value" is irrelevant. "It is axiomatic that past consideration cannot support the formation of a new contract." *Pennolino v. Cent. Prods. LLC*, 2023 WL 3383034, at *15 (S.D.N.Y. May 11, 2023). Thus, "[g]ratuitous transfers in consideration of past service are not transfers for value." *Johnson v. Shearson Loeb Rhoades, Inc.*, 1984 WL 1028, at *7 (S.D.N.Y. Oct. 18, 1984); *see also Apfel v. Prudential-Bache Sec. Inc.*, 616 N.E.2d 1095, 1097 (N.Y. 1993) (Although "the adequacy of consideration is not a proper subject for judicial scrutiny," it must be "something of real value in the eye of the law." (quotation omitted)). In particular, the Supreme Court has observed that "[a] release is not supported by sufficient consideration unless something of value is received *to which the creditor had no previous right*." *Maynard v. Durham & S. Ry. Co.*, 365 U.S. 160, 163 (1961) (emphasis added).

Barclays' exercise of its right to exchange one new share of VXX for every four previously-issued shares of VXX is indistinguishable from those transactions such as stock splits and the exercise of an option or conversion right that the courts, the SEC, and commentators have held do not give rise to a Section 5 sale. Barclays exercised a right that it retained when it originally issued the notes. Dkt. No. 86-1 at 41. It did not require or convey new consideration for that transaction and Plaintiffs did not provide new consideration. Plaintiffs had no investment decision to make— VXX noteholders' participation in the reverse split was mandatory. Once Barclays made the decision to engage in the reverse split, Plaintiffs' economic interests in the VXX that were

previously split in four parts were automatically combined into one, the only difference being a new CUSIP number.[16]  The transaction was tantamount to Barclays' exercise of an option.

Plaintiffs argue that the reverse split did involve new consideration such that Barclays obtained value because the reverse split acted to encumber holders' redemption abilities.  Because the 25,000-share redemption threshold was not adjusted after the reverse split, many holders, including Plaintiffs, "who previously could redeem were suddenly unable to—and it would cost them an incredible amount, for some, close to a million dollars, to accumulate or aggregate enough notes to be able to exercise the redemption right."  Dkt. No. 87 at 23; Dkt. No. 80 ¶¶ 56 & n.6, 158.

However, that encumbrance was not something "of value" that Barclays obtained as a result of the split.  It was a contractual right that Barclays already had and that preexisted the split.  When Barclays sold each of the VXX ETNs held by the Plaintiffs, it retained the right as a matter of contract to conduct a split or a reverse split and to retrieve each of those notes for new VXX notes.  Dkt. No. 86-1 at 41.  That right would have been priced into the securities' original sale price.  Thus, even assuming that the exchange provided a business benefit to Barclays and a detriment to certain holders who found themselves suddenly unable to redeem holdings that they previously could, Barclays already had that benefit and the right to inflict that detriment in the form of an exercisable contractual right.  The SEC has acknowledged that in this context, "[t]he essential characteristic of a 'sale' is that a 'purchaser' parts with something in exchange for a security."  *Re: Int'l Leisure Enters. Inc.*, SEC No Action Letter, 1992 WL 723450, at *3 (April 21, 1922) (quoting 11 Hugh Sowards, Business Organizations: The Federal Securities Act, § 2.02[1]

---

[16] A CUSIP number is a serial number used to identify a particular financial instrument.  *See Dinosaur Fin. Grp. LLC v. S&P Glob., Inc.*, 2023 WL 4562031, at *1 & n.2 (S.D.N.Y. July 14, 2023).

(A.A. Sommer, Jr. ed. 1991)).  In light of Barclays' preexisting right, Plaintiffs did not "part" with anything specifically in exchange for the reverse split.  *Cf. Greenberg v. Greenberg*, 646 F. App'x 31, 32 (2d Cir. 2016) (summary order) ("Generally, past consideration is no consideration and cannot support an agreement because the detriment did not induce the promise." (quoting *Samet v. Binson*, 996 N.Y.S.2d 149, 150 (2d Dep't 2014))); *Pennolino*, 2023 WL 3383034, at *15.  Put otherwise, the reverse split did not alter Plaintiffs' ownership percentage of some asset.  *See Reiss v. Fin. Performance Corp.*, 764 N.E.2d 958, 960 (N.Y. 2001) (explaining that a reverse split does not alter a shareholder's asset share); *see also* Dkt. No. 80 ¶ 40 (Plaintiffs allege that "[w]hen a holder redeems VXX for a payout, they are entitled to money equal to a calculation rather than their pro rata share of a pool of assets.").  Because the holder's beneficial interest was not altered, the holder has "relinquished nothing in the exchange." *Int'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1343 (2d Cir. 1974), *cert. denied,* 417 U.S. 932 (1974).

Contrary to Plaintiffs' argument, this case is not analogous to those in which both the Fourth Circuit and this Court have found that the "for value" requirement was met when the issuance resulted in the creation of a new public market for securities.  Dkt. No. 87 at 23 (citing *SEC v. Datronics Engrs. Inc.*, 490 F.2d 250, 253 (4th Cir. 1973); *SEC v. Harwyn Indus. Corp.*, 326 F. Supp. 943, 952 (S.D.N.Y. 1971) (Mansfield, J.)).  *Datatronics* and *Harwyn.* both involved the same fact pattern and the same question: whether "a company, by 'spinning-off' its subsidiary's shares to the parent's stockholders without registration, [can] convert the subsidiary into a public corporation whose unregistered shares would be actively traded on the market." *Harwyn*, 326 F. Supp. at 945; *see Datronics*, 490 F.2d at 252–53.

As Judge Mansfield described the facts in *Harwyn*, "[t]he scheme involved three coordinated steps: (1) the acquisition by the subsidiaries of assets of other corporations in exchange

for issuance of controlling interests in the subsidiaries to those contributing such assets, (2) the 'spin-off' distribution by the parent . . . to its stockholders of the unregistered shares of its subsidiary owned by it, and (3) the development of an over-the-counter trading market in the unregistered shares thus spun off." *Harwyn*, 326 F. Supp. at 945–46.  By collapsing each of the steps of the scheme, the parent corporation had made an unlawful sale of securities without filing a registration statement.  *See id.* at 954–55.  The court saw "no reason to construe §§ 2(3) and 5 as requiring that the 'value' requiring registration must flow from the immediate parties who received the stock," *i.e.*, the shareholders of the parent corporation.  *Id.* at 954.  The parent corporation received value "in the form of the contribution of substantially new assets to each subsidiary and the creation of a public market in the shares with its resulting benefits to the defendants, including insiders."  *Id.* at 954.  In effect, for a fee, the parent corporation converted a private company into a publicly-traded company "without the investing public having the benefit of disclosures that would be required under the 1933 Act."  *Id.* at 952.

*Datatronics Engineers* involved similar facts and is to similar effect.  The defendant acquired shares of a private company "[w]ithout any business purpose of its own," and then, in exchange for a fee in the form of both cash and the shares of the subsidiary which it retained, it distributed the shares of the newly-acquired subsidiary to the parent's shareholders, creating a publicly-traded market for the subsidiary's shares where previously there was none.  *Datronics*, 490 F.2d at 252.  The Fourth Circuit noted that "[v]alue accrued to Datronics" in part because "a market for the stock was created by its transfer to so many new assignees."  *Id.* at 253–54.

The Second Circuit has specifically limited the holdings in *Datatronics*, *Harwyn*, and their progeny to spin-off transactions.  In *International Controls Corp. v. Vesco*, the Second Circuit discussed *Harwyn* and *Datronics* and noted that "[i]n each instance, the court held that the parent

corporation had received 'value' or consideration for the 'disposition' of its subsidiary through the creation of a public market in the subsidiary's shares, an 'aftermarket' which substantially increased the value of the spun-off subsidiary's shares retained by the parent corporation or by the insiders in control of the parent."  490 F.2d at 1344; *see In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*, 676 F. Supp. 458, 475 (S.D.N.Y. 1987) (noting that the Second Circuit's treatment of *Harwyn* is "limited to its particular facts"); *accord* Hazen, § 5:17 (observing that those "decisions dealing with spin-offs and shell corporations that found violations arose in the limited context of transactions in which there was no other bona fide business purpose other than creating a public market").

This case is unlike the spin-offs in *Harwyn* and *Datatronics* in several key respects. Barclays did not receive new value when it engaged in the four-for-one reverse split.  As stated, it merely exercised a right that it had retained when it issued the securities in the first place, so the four-for-one reverse split conveyed no value to Barclays that it did not already have.

Nor did Barclays create a new market for VXX securities that did not previously exist.  *Cf. Harwyn*, 326 F. Supp. at 954 (noting that "the spin-off, distribution of shares, and trading in the after-market, were inextricably bound together, with benefits flowing to all defendants").  In *Harwyn* and *Datatronics*, investors were deprived of the disclosure required by the Securities Act, through the contrivance of the purchase of a private company and the subsequent spin-off of its shares to the public company investors which then provided value to the public company.  In this case, by contrast, the Plaintiffs were not deprived of the information to make an investment decision.  Plaintiffs ask the Court to hold that the forced exchange of an economic interest that was split in four parts for a single share combining those parts constituted an impermissible sale of unregistered securities.

Plaintiffs do not argue, because they cannot, that the shares that they were forced to exchange were unregistered such that the traceability of the pre-split shares would entitle them to the rescission remedy. At the time of the reverse split, approximately 43% of the total number of shares of VXX that were then available in the market were unregistered, totaling about 63 million shares. Dkt. No. 80 ¶¶ 163, 205, 232. The remaining 57%, approximately 83.5 million shares of VXX, were issued pursuant to a registration statement. Plaintiffs offer no reason to believe that the shares that they purchased and held were not among those 83.5 million registered shares.[17] But if that is so then Plaintiffs and the putative class that they ask to represent request a windfall. At the only time that they made an investment decision, they did so pursuant to a registration statement that had been declared effective. They were not deprived of any of the rights assured to them by the Securities Act. And, when those shares were forcibly exchanged as part of the reverse split that they had previously agreed, they did not give Barclays anything that Barclays did not already have—there is nothing to rescind. Put another way, Barclays might be liable to that limited class of persons who purchased a share of VXX that was not sold pursuant to an effective registration statement in one of the offerings in which Barclays exceeded the amount of shares it was permitted to offer on a claim based on those purchases. But if Plaintiffs' argument was correct here, Barclays would be liable not just to those persons who at the time of their purchase were deprived of the registration statement to make the investment decision but to every person who subsequently held a share of VXX regardless whether that person bought pursuant to an effective registration statement, simply because Barclays exercised what was, in effect, its conversion right.

---

[17] For the same reason, Plaintiffs' argument that a company may not use a mechanism such as a reverse split to launder unregistered shares into registered shares is correct but unavailing. Dkt. No. 87 at 26–27. There is no allegation that is what occurred here.

Because Barclays already had that right and there was no decision for the investor to make, the Securities Act does not lead to that result.

The remainder of Plaintiffs' arguments may be readily dispatched. Plaintiffs argue that Defendants admitted that the VXX was being "offered" as part of the reverse split because the press release announcing the reverse split noted that Barclays Bank had filed a registration statement (including a prospectus), Dkt. No. 86-2, and because Barclays' April 23, 2021 Pricing Supplement (referred to in the press release) likewise stated that VXX was being "offer[ed]," Dkt. No. 87-1 at 48. Dkt. No. 87 at 20–21. Plaintiffs grasp at straws. The press release did not say that the reverse split was itself an offering, but merely contained a disclaimer that informed the reader that "Barclays Bank PLC has filed a registration statement (including a prospectus) with the SEC for the offering to which this communication relates"—*i.e.* the 2019 Shelf registration statement—and that before making an investment, the investor "should read the prospectus and other documents Barclays Bank PLC has filed with the SEC for more complete information about the issuer and this offering." Dkt. No. 86-2. Plaintiffs do not explain why the fact that Barclays had previously filed a registration statement for the securities at issue transformed the reverse split into a disposition for value. The pricing supplement issued under the same registration statement similarly does not represent an admission that the split functioned as a sale—it stated that "[w]e may use this pricing supplement in the initial sale of the ETNs" and thus indicated that the pricing supplement related to ETNs that Barclays Bank "may issue from time to time." Dkt. No. 87-1 at 6, 47–48. It further stated that "[w]e may use this pricing supplement in the initial sale of the

ETNs." *Id.* at 5.  Barclays did not admit or represent that the reverse split was an initial sale.[18]  It

was not.

Plaintiffs further argue that if a reverse split is not considered a sale, Section 3(a)(9) of the

Securities Act would be surplusage.  Dkt. No. 87 at 24.  Section 3(a)(9) of the Securities Act

includes as a security exempt from registration, "[e]xcept with respect to a security exchanged in

a case under title 11, any security exchanged by the issuer with its existing security holders

exclusively where no commission or other remuneration is paid or given directly or indirectly for

soliciting such exchange."  15 U.S.C. § 77c(a)(9).[19]  According to Plaintiffs, if transactions such

as the one in which Barclays Bank engaged was not a sale "in the first instance," there would be

no reason for them to be exempted by Section 3(a)(9).  Dkt. No. 87 at 24.  Plaintiffs misread

Section 3(a)(9).  Congress noted that the exemption is "considered necessary to permit certain

voluntary readjustment of obligations."  J. William Hicks, 7A Exempted Trans. Under The

Securities Act Of 1933 ("Hicks") *Id.* § 2:4 n.4 (quoting H.R. Rep. No. 152, 73d Cong., 1st Sess.

---

[18] Plaintiff argues that "Barclays explicitly undertook, as it is required to do by 17 C.F.R. § 229.512, that any offering of securities in connection with Rule 424(b)(2) filings, such as the Pricing Supplement quoted above, would be deemed 'sales' 'for purposes of liability under the Securities Act.'"  Dkt. No. 87 at 21.  But 17 C.F.R. § 229.512 requires a registrant to undertake that "[f]or purposes of determining any liability under the Securities Act of 1933, the information omitted from the form of prospectus filed as part of this registration statement in reliance upon Rule 430A and contained in a form of prospectus filed by the registrant pursuant to Rule 424(b)(1) or (4) or 497(h) under the Securities Act shall be deemed to be part of this registration statement as of the time it was declared effective."  17 C.F.R. § 229.512(i).  It does not transform a reverse-split of securities issued pursuant to a prior registration statement into a sale.

[19] The exemption is available when four prerequisites have been satisfied:

(1) The securities for exchange must be offered by the same entity that issued the outstanding ones.  (2) The security holder must not be asked to part with anything of value besides the outstanding security.  (3) The exchange must be offered exclusively to the issuer's existing security holders.  (4) The issuer must not pay any compensation for the solicitation of the exchange.

*Id.* § 2:22.

25 (1933)). The provision does not apply to every transaction in which one security is exchange

for another. The "threshold" question before Section 3(a)(9) is to apply at all "is whether an

intended recapitalization involves an offer or sale for purposes of Section 5." Hicks §§ 2:5 n.1;

2.22. That question is not answered by the language of Section 3(a)(9); it is answered by the

Securities Act's definition of "sale." Thus, reorganizations and recapitalizations where an issuer

changes its capital structure by substituting one form of obligation for another, *e.g.*, equity for debt

or one class of equity for another, are considered sales. *See* Hicks § 2:21. The investor exchanges

one instrument for another of a different character and with different rights and accordingly has an

investment decision to make. The registration statement serves a purpose.[20] By contrast, where

there is "an exchange of a new security for one that is substantially identical or economically

inferior," Section 3(a)(9) might not apply, "since, the issuer would argue, no sale was involved."

Hicks § 2:23. It thus does not answer Barclays' argument for Plaintiffs to say that Section 3(a)(9)

---

[20] On a few occasions, the SEC has applied Section 3(a)(9) to reverse splits. For example, the SEC issued a no-action letter in *Roy F. Weston, Inc.*, where the company proposed to submit to its shareholders a proposal that the company's charter be amended to effect a recapitalization which if approved, would result in a reverse split of the shares of its common stock. SEC No Action Letter, 1979 WL 14453 (Oct. 22, 1979). Relying on Section 3(a)(9), the SEC found that the transaction was exempt, noting that no commission or other form of remuneration would be paid to any person or entity in connection with the solicitation of shareholder approval or the subsequent acceptance of the proposed exchange. *Id.*; *see also Lacy Sales Inst., Inc.*, SEC No Action Letter, 1979 WL 13183 (Dec. 10, 1979) (SEC issued no-action letter where company contemplated merger by exchanging each of its shares for one of the merged company's shares); *Federated Communications Corp.*, SEC No Action Letter, 1975 WL 11275 (Sept. 29, 1975) (SEC issued no-action letter where management contemplated a one-for-ten reverse split and shareholders not participating in the exchange would be deemed to have exercised their option to sell in exchange for issuance of a seven-year promissory note). But in each of those foregoing cases, the reverse split was not contemplated by a preexisting contractual right but was instead contingent on shareholders' investment decisions—whether to participate in the split or to approve the split in the first place. They thus fit more comfortably into the notion of a sale.

applies to recapitalizations. Section 3(a)(9) applies only to those recapitalizations that are also sales.[21]

The reverse split did not constitute a sale, and Plaintiffs thus fail to allege that they purchased unregistered VXX ETNs from Barclays. Defendants' motion to dismiss Plaintiff's Section 12(a)(1) claim is granted.

## II.    Plaintiffs' Section 11 and 12(a)(2) Claims

In Count Two of the SAC, Plaintiffs allege that Barclays and certain Individual Defendants violated Section 11 of the Securities Act, 15 U.S.C. § 77k, by making material misrepresentations in the 2018 and 2019 Shelf Registrations. Dkt. No. 80 ¶¶ 220–247. In Count Three, Plaintiffs allege that Defendants violated Section 12(a)(2) of the Securities Act by making misrepresentations in the 2018 and 2019 Shelf Registrations and in their amendments and supplements thereto. *Id.* ¶¶ 248–270.

Section 11 of the Securities Act prohibits materially misleading statements or omissions in registration statements filed with the SEC. *See* 15 U.S.C. § 77k(a). "To state a claim under section 11, the plaintiff must allege that: (1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358–59 (2d Cir. 2010) (quotation omitted).

---

[21] This interpretation is consistent with Rule 145(a)(1) which states that "[a]n offer, offer to sell, offer for sale or sale, shall be deemed to be involved, within the meaning of section 2(a) of the Act," where a plan or agreement for reclassification is submitted for shareholder vote "other than a stock split, reverse stock split, or change in par value, which involves the substitution of a security for another security." 17 C.F.R. § 230.145(a)(1).

Section 12(a)(2) of the Securities Act provides a remedy for a person who purchases a security from another person who offered or sold such security "by means of a prospectus . . . which includes an untrue statement of material fact" or a material omission. 15 U.S.C. § 77*l*(a)(2). It thus "provides similar redress where the securities at issue were sold using prospectuses or oral communications that contain material misstatements or omissions." *Morgan Stanley Info.*, 592 F.3d at 358–59. "[T]he elements of a *prima facie* claim under section 12(a)(2) are: (1) the defendant is a 'statutory seller'; (2) the sale was effectuated 'by means of a prospectus or oral communication'; and (3) the prospectus or oral communication 'include[d] an untrue statement of a material fact or omit[ted] to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.'" *Id.* (quoting 15 U.S.C. § 77*l*(a)(2)).

"Because Sections 11 and 12(a)(2) are 'Securities Act siblings with roughly parallel elements,' courts typically analyze the two claims together." *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 401 (S.D.N.Y. 2020) (Nathan, J.) (quoting *Wachovia*, 753 F.Supp.2d at 368). "Together, Sections 11 and 12(a)(2) create "three potential bases for liability based on registration statements and prospectuses filed with the SEC: (1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; and (3) a material omission of information that is necessary to prevent existing disclosures from being misleading." *Id.* (quoting *Wachovia*, 753 F.Supp.2d at 368).

Both causes of action include a traceability requirement. "To bring a claim under § 11, the securities held by the plaintiff must be traceable to the particular registration statement alleged to be false or misleading." *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 768 (2023). "Only those who purchase securities that are subject to allegedly false registration statement, and not those who buy

identical stocks already being traded, can sue under section 11." *In re Glob. Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 207 (S.D.N.Y. 2003) (Lynch, J.). "In order to have standing under § 12(a)(2) . . ., [the] plaintiff must have purchased directly from the defendants." *Freidus v. Barclays Bank PLC*, 734 F.3d 132, 141 (2d Cir. 2013); *accord Garnett v. RLX Technology Inc.*, 632 F. Supp. 3d 574, 614 (S.D.N.Y. 2022).

Defendants argue that Plaintiffs have failed to state a claim under either Section 11 or Section 12(a)(2) of the Securities Act because (1) Plaintiffs lack statutory standing because they cannot trace their purchases of securities to a registration statement or allege a direct purchase pursuant to a misleading prospectus and (2) Plaintiffs do not allege an untrue statement of material fact. Dkt. No. 85 at 21–29.

Plaintiffs do not have statutory standing to assert a claim under Section 12(a)(2). Outside of the reverse split, Plaintiffs identify four dates on which Defendants sold shares to the public: July 23, 2019, February 18, 2021, May 3, 2021, and October 22, 2021. Dkt. No. 80 ¶¶ 202, 204, 207–208. Plaintiffs do not allege that they purchased shares on any of those dates. *Id.* ¶¶ 181, 183, 186, 189. They thus do not have standing with respect to any of those sales. Plaintiffs argue only that they have statutory standing with respect to the reverse split. Dkt. No. 87 at 30–32.

Plaintiffs assert that their "Section 12(a)(2) claim largely mirrors the standing/statutory seller arguments in favor of their 12(a)(1) claim." *Id.* at 32. Defendants' motion to dismiss Plaintiffs' Section 12(a)(2) claim is therefore granted for the same reasons the motion to dismiss Plaintiffs' Section 12(a)(1) claim was granted. *See supra.*

With respect to Section 11, Plaintiffs argue that the statute uses the word "acquired," 15 U.S.C. § 77k, and not sale, and thus "includes any means of obtaining ownership." Dkt. No. 87 at 31. However, the Second Circuit has noted that "[t]he natural reading of 'any person

acquiring such security' is simply that the buyer must have purchased a security *issued under the registration statement at issue*, rather than some other registration statement." *DeMaria v. Andersen*, 318 F.3d 170, 176 (2d Cir. 2003) (emphasis added) (quoting *Joseph v. Q.T. Wiles*, 223 F.3d 1155, 1159 (10th Cir. 2000)). Thus, while it is immaterial whether the plaintiff acquired the shares directly from the issuer or in the aftermarket, the plaintiff must still show that the shares in question were issued under or registered to the allegedly defective registration statement. *See Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*, 338 F.R.D. 205, 214 (S.D.N.Y. 2021) (Nathan, J.); *Smart Techs.*, 295 F.R.D. at 61.

The Supreme Court has explained that its approach to the traceability requirement arises in part from the understanding that the Securities Act is "limited in scope." *Slack Techs.*, 598 U.S. at 769 (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983)). The Securities Act's "main liability provision imposes strict liability on issuers for material falsehoods or misleading omissions in the registration statement" which may be contrasted with the fact that the Exchange Act "requires ongoing disclosures for publicly traded companies and its main liability provision allows suits involving any sale of a security but only on proof of scienter." *Id.* at 769–70. In light of that design, the Supreme Court found it "possible that Congress sought a balanced liability regime that allows a narrow class of claims to proceed on lesser proof but requires a higher standard of proof to sustain a broader set of claims." *Id.* at 770. Judge Lynch has similarly recognized that "[t]he cause of action inheres in the faulty registration statement that put the shares in question on the market; it is on the basis of the flaw in the underlying registration that section 11 dispenses with the requirements of scienter." *Glob. Crossing*, 313 F. Supp. 2d at 207–08; *accord Barnes v. Osofsky*, 373 F.2d 269, 272 (2d Cir. 1967). "Thus, plaintiffs who purchased securities

not issued pursuant to the misleading registration statement lack standing as surely as the purchasers of other securities entirely." *Glob. Crossing*, 313 F. Supp. 2d at 208.

The SAC alleges that that when Barclays undertook the reverse split, it announced a new CUSIP number and all subsequent issuances of VXX through May 2022 were of unregistered shares under the same CUSIP. Dkt. No. 80 ¶¶ 155 & nn. 20–27, 210. Plaintiffs further argue that the reverse split incorporated statements made in the 2018 and 2019 Shelves. Dkt. No. 87 at 30 (citing Dkt. No. 87-1 at 8). Plaintiff argues that the traceability requirement is met "[b]ecause all VXX ETNs in existence between April 23, 2021, and May 13, 2022, bear a different CUSIP than prior issuances, and trace back to the reverse split." *Id.* at 30–31 (quoting *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 31 n.1 (2d Cir. 2006) ("Tracing may be established . . . through proof that the [plaintiff] bought her shares in a market containing only shares issued pursuant to the allegedly defective registration statement.")).

However, Plaintiffs do not allege that prior to the reverse split they purchased their notes from either the 2018 or 2019 Shelves as opposed to some previous WKSI issuance. *See In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 31 n.1 (2d Cir. 2006) ("Tracing may be established either through proof of a direct chain of title from the original offering to the plaintiff or through proof that the plaintiff bought her shares in a market containing only shares issued pursuant to the allegedly defective registration statement." (cleaned up)), *decision clarified on denial of reh'g sub nom. In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70 (2d Cir. 2007); *see also City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 403 (S.D.N.Y. 2020) ("To establish standing under § 11 at the motion-to-dismiss stage . . . Plaintiffs need [to] assert that they purchased shares issued pursuant to, or traceable to the public offerings.").

Even if Plaintiffs had statutory standing, they fail to allege an actionable misstatement or omission.  To satisfy the second prong of the inquiry, a plaintiff must allege a false "statement or omission that a reasonable investor would have considered significant in making investment decisions."  *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 717 (2d Cir. 2011) (quotation omitted).  For the reasons stated below with respect to Plaintiffs' Section 10(b) claims, Plaintiffs fail to allege a material misrepresentation or omission.

Ultimately, because Plaintiffs allege neither traceability nor a material misrepresentation or omission, Defendants' motion to dismiss the Section 11 and Section 12(a)(2) claims is granted.

### III.  Plaintiffs' Section 10(b) Claims

Plaintiffs assert both scheme liability and misstatement liability pursuant to Section 10(b) of the Exchange Act.  Dkt. No. 80 ¶¶ 271–342.  To state a claim for scheme liability pursuant to Section 10(b) of the Exchange Act, "a plaintiff must show: '(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance.'"  *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021) (quoting *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 216 (S.D.N.Y. 2020)); *see also In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 247 (S.D.N.Y. 2022).  To state a claim for misrepresentation liability under Section 10(b) of the Exchange Act, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 461 (2013); *accord Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014).  The SAC falters at the first prong.

Both causes of action fail because Plaintiffs fail to allege a deceptive or manipulative act, a material misrepresentation or omission, or scienter.

### A.      Manipulative Act

"[M]isstatements and omissions—without more—cannot form the basis for scheme liability." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005).  Plaintiffs must allege "something more."  *SEC v. Rio Tinto plc*, 41 F.4th 47, 54 (2d Cir. 2022).  "[C]ourts have found that plaintiff successfully stated a claim for scheme liability [when] the defendants performed an inherently deceptive act that was distinct from an alleged misstatement: *i.e.*, sham agreements, sham transactions, sham companies, or undisclosed payments to doctors who appeared independent." *Turquoise Hill*, 625 F. Supp. 3d at 253; *see, e.g.*, *SEC v. Penn*, 225 F. Supp. 3d 225, 236 (S.D.N.Y. 2016) ("By disguising the ultimate recipient of the funds through sham transactions, [defendant] engaged in an inherently deceptive act."); *SEC v. Lee*, 720 F. Supp. 2d 305, 334 (S.D.N.Y. 2010) (defendant engaged in an inherently deceptive act by fabricating purportedly independent price quotes to obtain higher trading limits).

Plaintiffs claim that Barclays "hatched a scheme to avoid the costs of monitoring its issuances and evading Section 5 of the Act."  Dkt. No. 87 at 34–36; Dkt. No. 80 ¶¶ 137–156, 172, 275–277.  Plaintiffs allege that, in furtherance of that scheme, Barclays "power[ed] forward with its aggressive 'speed to market' business model, which it admitted was highly profitable to itself, eschew[ed] any discipline in tracking its issuances, and then issu[ed] millions of unregistered shares of VXX without any disclosure of the truth or even the risks."  Dkt. No. 87 at 34–36; Dkt. No. 80 ¶¶ 275–285.

Plaintiffs' Section 10(b) scheme liability claims are predicated on the assertion that Barclays engaged in VIX futures trades to support the VXX outstanding.  Dkt. No. 80 ¶¶ 279–292.  The claim starts with the unexceptional and undisputed (for this motion) observation that "Barclays

issued and sold hundreds of billions of unregistered shares of VXX during the class period in violation of a myriad of provisions of the Securities Act," causing the float of VXX to "bloat by a factor of over a billion dollars." *Id.* ¶¶ 277–78.  Plaintiffs then jump from that proposition to the assertion that Barclays was required to engage in "hundreds of millions in constant purchasing and selling of VIX one-month and two-month futures to maintain the 30-day spread for the VXX," and that, "[e]very day, as underlying VIX futures contracts that Barclays holds age, Barclays has to 'rebalance' them, by buying two month futures and selling them as one-month VIX futures. *Id.* ¶¶ 280, 288, 290.  Accordingly, Plaintiffs allege, the increased float not only increased the fees Barclays could charge, it also increased the costs associated with maintaining the forward roll of VIX futures, which in turn increased the implied value of VXX, which "directly reflects, among other things, the costs associated with managing the underlying pool of derivatives." *Id.* ¶¶ 280–282.

Plaintiffs have not alleged anything clandestine about Defendants' issuance of VXX.  The Pricing Supplement disclosed that Barclays Bank "may issue additional ETNs frequently," and that the "fees" Barclays Bank earned would have a "negative effect" on the value of each VXX ETN it sold.  Dkt. No. 86-1 at 2, 8, 9, 16–17, 47.  "Deception is the gravamen of a claim for market manipulation, and the market is not misled when a transaction's terms are fully disclosed." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 77 (2d Cir. 2021) (quotation omitted); *accord In re Garrett Motion Inc. Sec. Litig.*, 2022 WL 976269, at *17 (S.D.N.Y. Mar. 31, 2022).  "Post-hoc objections to contractual terms disclosed to and agreed upon by the parties do not constitute cognizable [scheme liability] claims." *Walsh v. Rigas*, 2019 WL 294798, at *11 (S.D.N.Y. Jan. 23, 2019).  The fact that Barclays issued unregistered shares in excess of the 2018 and 2019 Shelves does not change this determination.  Barclays' disclosed right to issue more VXX ETNs

was not constrained to a specific quantity—it could register and issue as many shares as it pleased simply by paying the required fee.

### B.     Material Misrepresentation or Omission

"The definition of materiality is the same for [Sections 11 and 12(a) of the Securities Act] as it is under section 10(b) of the Exchange Act: [W]hether the defendants' representations, taken together and in context, would have misled a reasonable investor." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010) (quotation omitted); *see I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991) (concurrently analyzing whether a prospectus is materially misleading under both Section 10(b) and Section 11 under the same standard); *Donovan v. Am. Skandia Life Assur. Corp.*, 96 F. App'x 779, 780–81 (2d Cir. 2004) (summary order) (same). "Certain categories of statements are immaterial as a matter of law, such as 'puffery.'" *Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 250 (S.D.N.Y. 2019). Puffery is "an optimistic statement that is so vague, broad, and non-specific that a reasonable investor would not rely on it, thereby rendering it immaterial as a matter of law." *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 384 (S.D.N.Y. 2012).

Plaintiffs allege several categories of misrepresentations and omissions they argue support their Securities Act and/or Exchange Act claims. None suffice.

### 1.     Internal Controls

Plaintiffs first argue that they have alleged material misrepresentations or omissions in the form of "all of the certifications and statements that Barclays made (or others made on its behalf) regarding the acknowledged need for internal controls, the formation of the 'working group' and the need to ensure compliance with the registration requirements and to avoid over-issuances and, the existence and functioning of those protocols, and later acknowledgement that those protocols

and controls not only did not work, they did not exist whatsoever, resulting in the over issuances."

Dkt. No. 87 at 31, 35.  Plaintiffs identify the following representations as the statements at issue:

- The representations in BPLC's Form 20-F filed in 2018 that it "is committed to operating within a strong system of internal control," the Barclays Internal Controls Enhancement Programme ("BICEP") "facilitated the resolution of the most material control issues and implemented a system of tracking and reporting risk events and controls issues against a new Controls Maturity Model, which left Barclays's internal controls environment in a much stronger position," that the "Control Environment is monitored by senior management and the Board via various reports, dashboards, and deep dives," and that "frameworks, policies and standards enable Barclays to meet regulators' expectations relating to internal control and assurance," that "[t]hroughout the year ended 31 December 2018 and to date, the Barclays Group has operated a system of internal control that provides reasonable assurance of effective operations covering all controls including financial and operational controls and compliance with laws and regulations," and that "Management has assessed the internal control over financial reporting as of 31 December 2018. In making its assessment, management utilized the criteria set out in the 2013 COSO framework and concluded that, based on its assessment, the internal control over financial reporting was effective as of 31 December 2018[;]"

- The representation in Barclays Bank's 2018 and 2019 Form 20-Fs that "[t]here have been no changes in the Barclays Bank Group's internal control over financial reporting which have materially affected or are reasonably likely to materially affect the Barclays Bank Group's internal control over financial reporting during the year[;]"

- The omission in the July 23, 2019 pricing supplement for VXX that Barclays' unregistered issuances were likely to cause the indicated value of VXX—and thereby the price—to depreciate[;]"

- The representations in BPLC's Form 20-F filed in 2019 that BICEP "was focus[ed] on strengthening the internal control environment," and had left BPLC's internal controls environment "in a much stronger position, that it "is committed to operating within a strong system of internal control," that BPLC's "frameworks, policies and standards enable Barclays to meet regulators' expectations relating to internal control and assurance," that the Barclays Board Audit Committee "concluded that, throughout the year ended 31 December 2019 and to date, the Group has operated a sound system of internal control that provides reasonable assurance of financial and operational controls and compliance with laws and regulations," and that "management utilized the criteria set out in the 2013 COSO framework and concluded that, based on its assessment, the internal control over financial reporting was effective as of 31 December 2019[;]"

- The representations in BPLC's Form 20-F filed in 2020 touting BPLC's "robust internal controls" and successful completion of BICEP, that BPLC "is committed to operating within a strong system of internal control," that its "frameworks, policies and standards enable Barclays to meet regulators' expectations relating to internal control and assurance," that "management had assessed [BPLC's] internal control over financial reporting as of 31 December 2020" and concluded that "[BPLC's] internal control over financial reporting was effective as of 31 December 2020," and that the Barclays Board Audit Committee "concluded that, throughout the year ended 31 December 2020 and to date, the Group has operated a sound system of internal control that provides reasonable assurance of financial and operational controls and compliance with laws and regulations."

- "Nearly identical" disclosures repeated in the 2021 BPLC 20-F, 2021 Barclays Bank 20-F, and 2022 BPLC 20-F filings and 2022 Barclays Bank 20-F filings; and

- The representation in the SOX certifications signed by several Individual Defendants stating that the signor was responsible for establishing and maintaining disclosure controls and procedures and internal control over financial reporting.

Dkt. No. 80 ¶¶ 8–12, 111–133, 222–223, 250–251, 297–301.  Plaintiffs allege these statements were false because Barclays knew it was at risk of over-issuing VXX and because "[n]one of the internal controls were even established, much less implemented in a meaningful way, and so the amount of securities that were issued was not being tracked in real time."  *Id.* ¶¶ 112, 117, 224–225.

None of these statements concerning Barclays' internal controls are actionable.  Plaintiffs' allegations fall squarely into the paradigm the Second Circuit has consistently found insufficient to support a federal securities claim: "first, point to banal and vague corporate statements affirming the importance of regulatory compliance; next, point to significant regulatory violations; and *voila*, you have alleged a prima facie case of securities fraud!"  *Singh v. Cigna Corp.*, 918 F.3d 57, 60 (2d Cir. 2019).  "The problem with this equation, however, is that such generic statements do not invite reasonable reliance."  *Id.*  "They are not, therefore, materially misleading, and so cannot form the basis of a fraud case."  *Id.*

Certain of the statements purportedly reflect Barclays' commitment to "operating within a strong system of internal control." Dkt. No. 80 ¶¶ 113, 121, 128. The Second Circuit has described such statements of "commitment to regulatory compliance" as "a textbook example of 'puffery.'" *Singh*, 918 F.3d at 63; *see also id.* (holding that "general declarations about the importance of acting lawfully and with integrity, fall squarely within this category" of nonactionable statements (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014)); *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 396 (S.D.N.Y. 2016) (holding that defendant's statement that "[o]ur strategy focuses on establishing and enforcing clear rules that are consistent with the legislative framework and are aligned with the industry's best practices, while seeking to go beyond regulatory compliance" was mere corporate puffery); *Salim v. Mobile Telesystems PJSC*, 2021 WL 796088, at *4 (E.D.N.Y. Mar. 1, 2021) (statements touting defendant's "commitment to compliance" were puffery), *aff'd*, 2022 WL 966903 (2d Cir. Mar. 31, 2022).

Plaintiff fails to show that Barclays' other generic references to the existence and "robust" nature of its internal controls were material misrepresentations. A company's "generalizations regarding [its] business practices" are "precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 205 (2d Cir. 2009) (quotation omitted); *see also id.* (holding that defendant's assertion that it had "risk management processes [that] are highly disciplined and designed to preserve the integrity of the risk management process" was not a material misstatement); *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 170 (2d Cir. 2021) ("Vague positive statements regarding a corporate entity's risk management strategy, asset quality, and business practices are too general to cause a reasonable investor to rely upon them" (quotation omitted)).

Plaintiff does not allege that Barclays made any specific representation of what internal controls it had implemented to prevent the possibility of inadvertently overissuing ETNs or about the efficacy of such controls.[22] *Singh*, 918 F.3d at 64 ("simple and generic assertions about having 'policies and procedures'" were too vague to prompt investor reliance); *cf. Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) (holding there was a material misrepresentation where defendant made extensive detailed statements describing compliance programs that were then-failing).

The SOX certifications cannot support Plaintiffs' claim. Plaintiffs allege that the certifications represented certain of the Individual Defendants had evaluated Barclays' internal controls when in fact such controls did not exist at all. Dkt. No. 80 ¶¶ 123, 125–126, 131. However, Plaintiffs do not allege that the SOX certifications made representations about the existence or sufficiency of Barclays' internal controls for the issuance of ETNs. The certifications, as alleged, were made with respect to Barclays' internal controls across the entire entity. *Id.* Plaintiffs accordingly fail to show that such representations were false simply because the controls failed in one aspect of financial monitoring. *See Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227 (2d Cir. 2014) (holding that controls failures relating to one practice do not make statements about the overall existence of controls false). Plaintiffs' argument that Defendants subsequently discovered there were *no* controls over such issuances rests on impermissible fraud-by-hindsight. *See Glantz v. James River Grp. Holdings, Ltd.*, 2025 WL 278440, at *7 (S.D.N.Y. Jan. 23, 2025); *Diabat v. Credit Suisse Grp. AG*, 2024 WL 4252502, at *132 (S.D.N.Y. Sept. 19, 2024).

---

[22] Although Barclays allegedly claimed that BICEP had "strengthened" its internal controls, Plaintiff do not allege that Barclays' internal controls were not, in fact, strong after completion of the program than they had been before.

### 2. Share Count

Plaintiffs take issue with the statement in BPLC's Form F-3s filed on February 22, 2018 that "this registration statement will include $25,000,000,000 in maximum aggregate offering price of unsold securities that were previously registered" and the statement in the June 14, 2019 filing that "[t]he maximum aggregate offering price of all securities issued by the Registrant pursuant to this Registration Statement shall not exceed $20,081,600,000 in U.S. dollars." Dkt. No. 80 ¶¶ 222–223; Dkt. No. 87 at 31. But Barclays' statements concerning the number of securities to be registered under the 2018 and 2019 Shelves were indisputably truthful when made. Barclays did in fact register approximately $25 billion of securities under the 2018 Shelf and $20 billion of securities under the 2019 Shelf. Dkt. No. 80, ¶¶ 222–223. "[W]ithout contemporaneous falsity, there can be no fraud." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015). The allegation that it later issued unregistered shares in excess of those limits does not make the counts of shares to be registered false.

Plaintiffs allege that "[b]oth the 2018 and 2019 registration statements falsely stated the aggregate amount of securities *intended* to be registered and sold." *Id.* ¶ 224 (emphasis added). But "[a]bsent any factual allegation that Defendants did not intend to" comply with stated plans, such allegations are insufficient to plead falsity. *Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 488 (S.D.N.Y. 2021).

### 3. Issuance of Unregistered Shares

Plaintiffs allege that Barclays failed to disclose anywhere that its issuances of tens of millions of unregistered shares of VXX would accelerate the decay rate of the security. Dkt. No. 87 at 16, 35 (citing Dkt. No. 80 ¶¶ 119–121). But this is a mere extension of Plaintiffs' scheme

liability argument.  Plaintiffs fail to allege that (1) Defendants had a duty to disclose or (2) Barclays in fact omitted information concerning the impact of additional issuances on the price of VXX.

"Disclosure of an item of information is not required . . . simply because it may be relevant or of interest to a reasonable investor."  *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002); *see Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257 (2024) ("Rule 10b–5(b) does not proscribe pure omissions.").  "For an omission to be actionable, the securities laws must impose a duty to disclose the omitted information."  *Resnik*, 303 F.3d at 154; *see Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) ("[W]e have consistently held that an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." (quotation omitted)), *abrogated on other grounds by Macquarie Infrastructure*, 601 U.S. 257.  "Such a duty may arise when there is 'a corporate insider trad[ing] on confidential information,' a 'statute or regulation requiring disclosure,' or a corporate statement that would otherwise be 'inaccurate, incomplete, or misleading.'"  *Stratte-McClure*, 776 F.3d at 101 (quoting *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992)).  Plaintiffs do not allege what, if anything, could have given rise to a duty to disclose and therefore fail to plead an actionable omission.  *See Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 434 (S.D.N.Y. 2010); *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 246–47 (S.D.N.Y. 2010).  Plaintiffs do not allege, for example, that any statement made in connection with the registration statement filed on June 14, 2019, gave rise to a duty to disclose.  That registration statement merely stated that the "maximum aggregate offering price of all securities issued by the Registrant *pursuant to this Registration Statement* shall not exceed $20,081,600,000 in U.S. dollars . . ."  Dkt. No. 80 ¶ 223.  It made no representation about Barclays' prior issuances that would have been misleading absent a more complete disclosure.

Furthermore, Barclays stated in the pricing supplement that it could issue shares at any time and that the "fees" Barclays Bank earned would have a "negative effect" on the value of each VXX ETN it sold. Dkt. No. 86-1 at 2, 8, 9, 16–17, 47. The pricing supplement also explains in detail that the value of the S&P Vix Index underlying VXX ETNs decays as a consequence of selling the expiring futures contracts for a lower price and buying later futures at a higher price— even giving a hypothetical example to illustrate the impact of contango. Dkt. No. 86-1 at 14. It prominently discloses on the cover that "the nature of the VIX futures market has historically resulted in a significant cost to 'roll' a position in the VIX futures contracts underlying the Indices." *Id.* at 2. "The fact that the . . . ETNs' value was likely to erode was thus made obvious to a reasonable investor." *In re TVIX Sec. Litig.*, 25 F. Supp. 3d 444, 452 (S.D.N.Y.), *aff'd sub nom. Elite Aviation LLC v. Credit Suisse AG*, 588 F. App'x 37 (2d Cir. 2014). The only undisclosed attribute is the unregistered nature of the additional shares. But there is no allegation that Barclays' issuance of unregistered shares would have had any impact on the price of VXX beyond the impact of its issuance of registered shares as disclosed in the pricing supplement.

Plaintiffs also allege that "VXX was represented by Barclays to be freely tradable and, therefore, would be 'only issuable in registered form.'" Dkt. No. 87 at 37 (citing Dkt. No. 80 ¶ 153). Plaintiffs allege such statement was false because "Barclays omitted information that millions of VXX ETNs were being issued unregistered" and "[a]ny reasonable investor would have never purchased these notes had they known they were unregistered." *Id.* Barclays made that statement in a Form 8-A filed on January 18, 2018. Dkt. No. 80 ¶ 153. Plaintiffs do not allege that any issuances of unregistered VXX were made until June 26, 2019. *Id.* ¶¶ 109, 148, 201. Nor do Plaintiffs allege that Barclays did not, at the time of that statement, intend to comply with the registration requirement. Defendants' representation that the VXX was only issuable in registered

form was thus not false when made. *See In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 290 (S.D.N.Y. 2014) ("An allegedly material misstatement must have been false at the time that it was made."), *aff'd*, 616 F. App'x 442 (2d Cir. 2015); *In re Nokia Corp. Sec. Litig.*, 1998 WL 150963, at *9 (S.D.N.Y. Apr. 1, 1998) (Chin, J.) (statement was not actionable where there was no showing of contemporaneous falsity).

### C.    Scienter

Even if Plaintiffs had pleaded a material misrepresentation or omission, Plaintiffs' claim would still fail due to lack of scienter.

To plead scienter under the PSLRA, a plaintiff must allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *JP Morgan Chase Co.*, 553 F.3d at 198 (quoting 15 U.S.C. § 78u–4(b)(2)). The scienter required under Section 10(b) and Rule 10b-5 to sustain a private civil claim is an "an intent to deceive, manipulate or defraud." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting *Ganino*, 228 F.3d at 168). "A plaintiff may establish scienter by alleging facts that either (1) show that the defendant had both the 'motive and opportunity' to commit the alleged fraud, or (2) constitute 'strong circumstantial evidence of conscious misbehavior or recklessness.'" *Francisco v. Abengoa, S.A.*, 559 F. Supp. 3d 286, 317 (S.D.N.Y. 2021) (quoting *JP Morgan Chase Co.*, 553 F.3d at 198). To be a strong inference, however, the inference of scienter must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Ivanhoe Inv. Partners, L.P. v. Windsor Sec., LLC*, 2025 WL 573497, at *2 (2d Cir. Feb. 21, 2025) (quoting *New Eng. Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 122 F.4th 28, 48 (2d Cir. 2023)). In assessing whether an inference of scienter is strong, courts consider both the inferences urged by plaintiffs as well as any reasonable competing inferences. *See Francisco*, 559 F. Supp. 3d at 317; *see also Tellabs*, 551 U.S. at 314 ("[T]o

determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court . . . must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged.").

### 1.    Motive and Opportunity

To plead scienter through motive and opportunity, a plaintiff must establish both "concrete benefits that could be realized by one or more of the false statements . . . alleged" as well as "the means and likely prospect of achieving concrete benefits by the means alleged." *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994)); *accord Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297 (2d Cir. 2015). Goals that "are possessed by virtually all corporate insiders" are insufficient to show a motive to commit fraud and that the defendant had a fraudulent intent. *S. Cherry Street, LLC v. Hennessee Group*, 573 F.3d 98, 109 (2d Cir. 2009); *accord In re Shanda Games Ltd. Sec. Litig.*, 128 F.4th 26 at 52 (2d Cir. 2025).

Plaintiffs "point to Barclays' public admissions that its business model depends on its ability to quickly issue complex securities (as a well-known seasoned issuer) and bypass the usual regulatory prerequisites for issuing securities." Dkt. No. 87 at 1–2, 34 ("Barclays' letters to the SEC admitted that it stood a lot to gain in maintaining its business free of the shackles that compliance would impose both in terms of direct compliance costs and opportunity cost—that its business was predicated on speed of issuances and that losing its WKSI would slow it down and cost it money."). Barclays, like just about all public companies, would have wanted to conduct business in the most cost-free manner. But this generalized desire to avoid the costs and inconvenience of regulatory compliance is "possessed by virtually all corporate insiders" and thus "does not qualify as a 'motive' for purposes of the scienter analysis." *Saraf v. Ebix, Inc.*, 2023

WL 4561655, at *5 (S.D.N.Y. July 17, 2023) (quotation omitted) (subsequent history omitted); *see Feiner Fam. Tr. v. VBI Corp.*, 352 F. App'x 461, 464 (2d Cir. 2009) (summary order) (holding that the nonfraudulent, "and more cogent, inference to be drawn from the pleaded facts is that defendants decided that the costs of regulatory compliance were too high for a company experiencing languishing share price and trading volume").

### 2.    Conscious Misbehavior or Recklessness

Because Plaintiffs cannot make a showing of motive, the strength of the SAC's circumstantial allegations of conscious misbehaviors or recklessness "must be correspondingly greater." *Kalnit*, 264 F.3d at 142.  Conscious misbehavior "encompasses deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information, or knowing sale of a company's stock at an unwarranted discount," *Novak*, 216 F.3d at 308, while recklessness is "a state of mind approximating actual intent, and not merely a heightened form of negligence," *S. Cherry*, 573 F.3d at 109 (emphasis omitted).  To show conscious misbehavior or recklessness, "the complaint must 'allege[] that defendants . . . had access to non-public information contradicting their public statements.'" *Wilbush v. Ambac Fin. Grp., Inc.*, 271 F. Supp. 3d 473, 485 (S.D.N.Y. 2017) (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001)).  The plaintiff must specifically identify the sources from which the defendants obtained contrary information. *See In re Adient plc Sec. Litig.*, 2020 WL 1644018, *27 (S.D.N.Y. April 2, 2020) (concluding that scienter was insufficiently pled where plaintiffs "fail to show what 'specific contradictory information' was available to any Defendant at the time they made any alleged false or misleading statement").

To show conscious misbehavior or recklessness, Plaintiff relies exclusively upon the SAC's allegations that Defendants were aware of the loss of WKSI status. Dkt. No. 87 at 32–36; ¶¶ 79–106, 294–296, 306. Plaintiffs argue that in the wake of Barclays' transition from WKSI to

non-WKSI, Barclays had a "conscious understanding that it had to implement compliance measures and internal controls" and, given Barclays' later admissions that such controls were not implemented, "plainly made the decision not implement those features." Dkt. No. 87 at 34–35. But there is a key difference between Barclays' alleged awareness that it needed to implement internal controls sufficient to track ETN issuances and Barclays awareness that such controls had not in fact been implemented. Plaintiffs allege only the former, whereas the latter would be required to establish conscious misbehavior or recklessness. Plaintiffs do not allege, for example, that any member of the working group who knew that no controls existed ever communicated as much to the individuals responsible for the allegedly false statements or manipulative acts. *See Patel v. L-3 Commc'ns Holdings Inc.*, 2016 WL 1629325, at *10 (S.D.N.Y. Apr. 21, 2016) (no scienter where the complaint did not specify what information was transmitted from lower-level employees to the company's headquarters); *see also e.g.*, *Thomas v. Shiloh Indus., Inc.*, 2018 WL 4500867, at *4 (S.D.N.Y. Sept. 19, 2018) (low-level employee's scienter not imputed where the employee did not report to senior management and was not involved in making disclosures to the market nor in formulating controls for those disclosures).

Plaintiffs argue that despite knowing the requirements, "Barclays did nothing to make sure that it complied—it did not even ask how much room was left on the issuance shelf." Dkt. No. 87 at 35. However, just because a defendant could have easily discovered a controls failure does not mean that the defendant was in fact aware of such failure. At best, such allegations support the inference that the defendant was "negligent in failing to discover the truth." *S. Cherry*, 573 F.3d at 113. But they do not suffice to show a state of mind approximating actual intent. *See id.* (complaint failed to allege scienter where it alleged that "[i]f Hennessee Group had asked various questions earlier, it would have further questioned the Bayou Accredited financial records or

recognized the need to ask further questions"). Even if "there was certainly a monster under the bed[,] the question is whether anyone had a reason to look there." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007); *see Stephenson v. PricewaterhouseCoopers, LLP*, 768 F. Supp. 2d 562, 574 (S.D.N.Y. 2011), *aff'd*, 482 F. App'x 618 (2d Cir. 2012). Plaintiffs do not allege Barclays was aware of any red flags that could have given rise to a duty to investigate. *See Defer LP v. Raymond James Fin., Inc.*, 2010 WL 3452387, at *6 (S.D.N.Y. Sept. 2, 2010) (A plaintiff must "show that the defendant contemporaneously was faced with specific facts or information—so called 'red flags'—contradicting its allegedly false and misleading statements or imposing a duty to investigate further.").

Plaintiffs allege nothing to suggest that the lost WKSI status was itself a red flag that made Defendants aware of the lack of controls. *See Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, 2021 WL 1199035, at *25 (S.D.N.Y. Mar. 30, 2021) ("For ignorance of supposed 'red flags' to rise to the level necessary to demonstrate conscious recklessness under the PSLRA's rigorous pleading standards, the warning signs must have been particularized, specific, and together, egregious to alert defendants to the precise misconduct that was occurring." (quotation and punctuation omitted)), *aff'd sub nom. Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 49 F.4th 790 (2d Cir. 2022), *and aff'd sub nom. Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82 (2d Cir. 2022); *Meyer v. Organogenesis Holdings Inc.*, 727 F. Supp. 3d 368, 397 (E.D.N.Y. 2024) (loss of pass-through status not a red flag requiring defendants to investigate a subsequent rise in revenue. Plaintiffs allege no other red flags that would have required Barclays to investigate its compliance at an earlier date than March 8, 2022, the ultimate date of discovery.

The SAC raised other—now abandoned—theories of scienter including that the certifications by certain Individual Defendants "verifying that internal controls were present and

sufficient—when in fact they did not exist at all—verifies the [Individual Defendant's] and, by extension, Barclays's knowledge of the manipulative scheme."    Dkt. No. 80  ¶¶ 297–301. Defendants note that "generalized allegations predicated on what the Defendants must have known by virtue of their responsibilities are precisely the kind of conclusory allegations that fail to satisfy the PSLRA's heightened pleading standard."  Dkt. No. 85 at 40 (quoting *In re Renewable Energy Grp. Sec. Litig.*, 2022 WL 14206678, at *3 (2d Cir. Oct. 25, 2022)) (punctuation omitted).  The mere allegation that some Individual Defendants were responsible for reviewing Barclays' internal controls across the board does not suffice to identify what information about the company's lack of controls over issuances they obtained in the course of such review that would have proved Barclays' contemporaneous statements false.  *See Woodley v. Wood*, 2022 WL 103563, at *8 (S.D.N.Y. Jan. 11, 2022) (a defendant's duty to review the company's internal controls "is not a substitute for specific allegations that he was provided with information that demonstrated the inadequacy of those internal controls"), *aff'd sub nom. Rotunno v. Wood*, 2022 WL 14997930 (2d Cir. Oct. 27, 2022).  Defendants are correct.  Such certifications cannot support scienter. Regardless, Plaintiffs abandoned that theory of scienter by failing to address Defendants' arguments in their memorandum of law in opposition to the motion to dismiss.  *See Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014) ("A plaintiff abandons a claim where he raises it in the complaint but remains silent on the issue elsewhere in the record.").

Similarly, the SAC invokes the core operations doctrine, alleging that "Barclays cannot dispute that issuing securities is a fundamental and core function of its business. . . . Thus, Barclays was well aware of the need to maintain its ability to issue securities in a compliant manner, as part of its core business."  Dkt. No. 80 ¶¶ 303, 331, 389.  "Under the core operations doctrine, a court

may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of income." *Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*, 2023 WL 3569068, at *17 (S.D.N.Y. May 19, 2023) (quoting *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 423 (S.D.N.Y. 2020) (Nathan, J.)). The core operations doctrine, however, "has been thrown into doubt by the enactment of the PSLRA in 1995." *Turquoise Hill*, 625 F. Supp. 3d at 239; *see In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018) (Sullivan, J.). "As a result of these doubts as to the doctrine's continuing import, the core operations inference may be considered as part of a court's holistic assessment of the scienter allegations, but it is not independently sufficient to raise a strong inference of scienter." *Turquoise Hill*, 625 F. Supp. 3d at 239 (quoting *In re Rockwell Med.*, 2018 WL 1725553, at *14). Put differently, "core-operations allegations are supplementary; that is, they are not independently sufficient means to plead scienter." *Saraf*, 632 F. Supp.3d at 398 (quotation omitted). Where Plaintiff's other allegations fall short of supporting a compelling inference of scienter, allegations that a misstatement affected a core operation generally cannot fill the gap. *See AppHarvest*, 684 F. Supp. 3d at 246; *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011) (Sullivan, J.).

Here, not only do Plaintiff's other allegations fall short but Plaintiff does not even establish that tracking and issuing structured notes and ETNs was "core" to Barclays' overall business. *See Glantz*, 2025 WL 278440, at *8; *Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at *18 (S.D.N.Y. July 23, 2018). According to the SAC, Barclays was ordered to disgorge slightly under $150 million in connection with the over-issuance—a miniscule amount in comparison to Barclays' alleged annual profits of $5.02 billion for fiscal year 2022. Dkt. No. 80 ¶¶ 151, 331–332. "[C]ourts applying the core operations doctrine generally require that the operation in

question constitute nearly all of a company's business before finding scienter." *Rockwell Med.*, 2018 WL 1725553, at *14 (quotation omitted). Ultimately, Plaintiffs do not address any of Defendants' arguments concerning the core operations doctrine and Plaintiffs thus have abandoned that (losing) argument as well. *See Hanig v. Yorktown Cent. Sch. Dist.*, 384 F. Supp. 2d 710, 723 (S.D.N.Y. 2005) ("[B]ecause plaintiff did not address defendant's motion to dismiss with regard to this claim, it is deemed abandoned.").

### 3. Competing Inferences

Plaintiffs' allegations of scienter are neither cogent nor as compelling as the nonfraudulent inference available. *See Tellabs*, 551 U.S. at 324. Scienter is measured as of the time of the statement alleged to be false. *See Bd. of Trs. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853 (S.D.N.Y. 2011) (Sullivan, J.) (holding the complaint must allege that the defendant "engaged in deliberately illegal behavior or acted with a reckless disregard for the truth at the time of the alleged statements sufficient to plead scienter" (quotations and emphasis omitted)), *aff'd sub nom.*, *Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012).

There is no basis to presume that Barclays knew at the time it filed the registration statements, on February 22, 2018 and June 14, 2019, that it was aware it had no system for tracking the amount of shares of VXX it had issued. Dkt. No. 80 ¶¶ 222–223. It would have been easy enough for it to implement such a system. *Id.* ¶ 176 (Higgins admitted after the fact that "I believe that we will find that, in all our complexities, we missed some simple tasks. This is not rocket science.") It also would have been easy enough to register a greater amount of shares had it suspected that it would have issued and sold more shares than were registered. There was no limit on the amount of shares it could register. Barclays could have simply paid the fee and registered a greater amount of shares. By erring on the side of registering more rather than less, it could have

avoided the burden of filing a future registration statement. If Barclays filed a registration statement for a greater amount of shares than it planned to issue, it could always later de-register the unissued shares that were still on the shelf and ask to have the fee apply to new shares. *Id.* ¶ 101. And, even if Barclays only learned after the fact that it did not have a process in place to monitor the issuance of shares and that it had issued more shares than were allowed under the registration statements, it would have made little economic sense for Barclays to stay silent and keep issuing unregistered shares only to disclose the over-issuances later on. If it knew it was at risk of exceeding the amount of shares issued, it could have controlled what securities it sold. And if it knew that it had exceeded that amount, it could have easily enough stopped selling temporarily and filed a new registration statement.

Indeed, the most powerful inference regarding Barclays' knowledge and intent can be drawn from the allegations of what Barclays' executives in fact did when it was brought to their attention in March 2022 that Barclays had no system in place for monitoring its share issuances and had over-issued securities. Barclays halted new offers and sales, informed regulators, disclosed the over-issuance to the market, and announced a voluntary buy-back. *Id.* ¶¶ 147, 166–167. There is no allegation that the issue was on the brink of being discovered—it is not clear that the over-issuances would have been detected but for Barclays' self-reporting. An alternate inference that may be drawn is that Barclays made the decision to halt new offers and sales as soon as it realized the truth because it did not know previously that it could not continue to make new offers and sales. Such remedial efforts are "a prudent course of action that weakens rather than strengthens an inference of scienter." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 777 (2d Cir. 2010) (quotation omitted)); *accord Kasilingam v. Tilray, Inc.*, 2024 WL 4350118, at *13 (S.D.N.Y. Sept. 30, 2024); *Lululemon Sec. Litig.*, 14 F. Supp. 3d at 583.

Ultimately, the latter is the more compelling inference: Defendants' failure to institute a process for tracking ETN issuances was one of oversight rather than resulting from some intent to defraud investors out of no particular benefit to Defendants.  Upon becoming aware of the over-issuance, Barclays acted promptly to mitigate, disclose, and remedy the problem.

Because Plaintiffs fail to plead a manipulative act, a material misrepresentation or omission, or scienter, Defendants' motion to dismiss both of Plaintiffs' Section 10(b) claims is granted.

## IV.    Common Law Fraud/ Promissory Estoppel

Plaintiffs' Count Six asserts a claim for common-law fraud and promissory estoppel based on Barclays's rescission offer.  Dkt. No. 80 ¶¶ 343–364.  Plaintiffs assert that Barclays' public statements between March 28, 2022 and August 1, 2022 led them to believe that all "retail holders of VXX—or any ETNs for that matter" were eligible for rescission.  *Id.* ¶¶ 350, 353.

"The four elements of common law fraud in New York are: (1) a factual misrepresentation or an omission that is factual; (2) defendant's knowledge that the statement or omission was false; (3) defendant's intent to defraud; (4) plaintiff's reasonable reliance; and (5) causation of loss to the plaintiff."  *Ashland Inc. v. Morgan Stanley & Co.*, 700 F. Supp. 2d 453, 471 (S.D.N.Y. 2010) (citing *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006)) , *aff'd*, 652 F.3d 333 (2d Cir. 2011).  "A cause of action for promissory estoppel under New York law requires the plaintiff to prove three elements: 1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result of the reliance."  *Id.* (quoting *Kaye v. Grossman*, 202 F.3d 611, 615 (2d Cir. 2000)).  Plaintiffs fail to show the reasonable reliance necessary to establish either common-law fraud or promissory estoppel.

On March 28, 2024, Barclays filed a Form 6-K disclosing the over-issuance and announcing a forthcoming rescission offer to purchasers of the over-issued securities.  Dkt. No. 80

¶ 138; Dkt. No. 86-4.  The Form 6-K stated that Barclays Bank "has elected to conduct a rescission offer to eligible purchasers of the Affected Securities" and that "[d]etails of the rescission offer will be published by BBPLC in due course."  Dkt. No. 80 ¶ 347; Dkt. No. 86-4 at 5.

The terms of Barclays's formal rescission offer were filed on August 1, 2022, as a supplement to its May 23, 2022 prospectus.  Dkt. No. 80 ¶ 351.  The rescission offer contained a heading titled "Am I eligible to participate in the Rescission Offer?"  Dkt. No. 86-6 at 5.  Underneath that heading, Barclays Bank stated that to be eligible, an investor must have purchased the relevant security "in a distribution from the Issuer through an underwriter or other distributor" and would have to produce evidence to that effect.  *Id.*  It stated that an investor who is not an initial investor in structured notes must provide:

> Satisfactory evidence that you purchased the Subject Security in a distribution from the Issuer through an underwriter or other distributor during the Relevant Period, and that you continue to hold such Subject Security as of the date of this prospectus supplement, and will continue to hold it (unless and until tendered by way of a secondary market trade pursuant to the Rescission Offer) until 5:00 p.m., Eastern Daylight Time, on the Expiration Date.  For such purposes, the Issuer is prepared to accept the following evidence:

> (a) Account statement(s) reflecting the purchase and purchase price information of the relevant Subject Security, and demonstrating the continued holding of such Subject Security until at least the date of this prospectus supplement; and/or

> (b) Receipt, transaction or trade confirmation statement reflecting the Issuer, or an underwriter or other distributor who purchased the Subject Security in a distribution from the Issuer, as a principal seller of the relevant Subject Security, and evidencing that such Subject Security was acquired during the Relevant Period.

*Id.* at 11.  The prospectus supplement warned: "***Investors in our Subject Securities that are ETNs may face significant evidentiary issues that are likely to make it difficult, if not impossible, for***

*such investors to present sufficient evidence to prove that they meet the eligibility requirements*
*to be considered an Eligible Investor and participate in this Rescission Offer.*"  *Id.* at 7.[23]

According to Plaintiffs, the Form 6-K misled them into believing that they would be able
to sell their shares to Barclays.  Dkt. No. 80 ¶¶ 345, 350, 353.  Plaintiffs allege that in reliance on
Barclays' statement, they did not sell their shares between March 28, 2022, and September 12,
2022, despite the favorable, albeit temporary, trajectory of the VXX share price and instead opted
to go through the rescission process whereupon they were denied.  *Id.* ¶¶ 359–360.  Plaintiffs allege
that they were induced to "hold onto VXX in anticipation of recission rather than sell before the
market price for VXX eroded from a high of $121.88 on March 28, 2022, to mid-$80's in July
2022 to the low $70s by the time the rescission offer had expired."  Dkt. No. 87 at 40 (citing Dkt.
No. 80 ¶¶ 345, 362).

Plaintiffs first argue that they relied on the Form 6-K because "[n]othing in Barclays's
public statements between March 28, 2022, and August 1, 2022, disclaimed that retail holders of
VXX—or any ETNs for that matter—were ineligible for rescission[,] [n]or did they specifically
refer to any requirement for tracing or direct seller relationship for VXX."  Dkt. No. 80
¶¶ 168, 350.  But the Form 6-K stated that rescission would be available only for "eligible"
purchasers and that more details were to follow.  Dkt. No. 86-4 at 5.  Such language indicated that
it was not the case that every ETN holder would be entitled to rescission but only some smaller
subset with the requirements to be announced at a later date.  Plaintiffs could not have reasonably
relied on the statements in the Form 6-K where the language indicated that Barclays could impose
various conditions on eligibility.  *See Prestige Foods, Inc. v. Whale Sec. Co., L.P.*, 663 N.Y.S.2d

---

[23] Plaintiffs claim that this warning was "buried" in the rescission offer, but not only did it appear
earlier in the document than other language upon which Plaintiffs claim to have relied, but it was
also set off from the rest of the text as the only italicized and bolded sentence on the page.  *Id.*

14, 15 (1st Dep't 1997) (holding that reliance was not reasonable where a "provision of the letter agreements permit[ed] defendant to withdraw, in its sole judgment, upon the existence of various conditions, the nonexistence of which is not addressed by plaintiffs"); *Levantino v. Starwood Mortg. Cap. LLC*, 2015 WL 7430860, at *5 (S.D.N.Y. Nov. 20, 2015) (similar).  Plaintiffs had no reason to believe they would satisfy yet-unannounced eligibility criteria and thus would be able to claim rescission.

Plaintiffs next argue that the rescission offer itself was misleading because it indicated that rescission was still available for holders who were not initial investors who had purchased directly from Barclays.  Dkt. No. 80 ¶ 351.  They claim that the rescission offer stated that even one who did not purchase directly from Barclays would be allowed to rescind upon presentation of "satisfactory evidence," including "[a]ccount statement(s) reflecting the purchase and purchase price information of the relevant Subject Security, and demonstrating the continued holding of such Subject Security until at least the date of this prospectus supplement."  *Id.* ¶ 352.  But the rescission offer clearly stated that an investor who had not purchased from Barclays would have to provide "[s]atisfactory evidence that you purchased the Subject Security in a distribution from the Issuer through an underwriter or other distributor during the Relevant Period."  Dkt. No. 86-6 at 10.  The statement that Barclays would accept an account statement as proof of eligibility does not obviate the requirement that such account statement actually prove Plaintiffs purchased the notes from BPLC through an underwriter or other distributor during the relevant period.  Under New York law, it is well established that where a term sheet lists conditions precedent to receiving some benefit, and the plaintiff does not allege that the conditions precedent were satisfied, the plaintiff "could not reasonably have relied" on any other assurance that the plaintiff would receive the benefit.  *511 9th LLC v. Credit Suisse USA, Inc.*, 894 N.Y.S.2d 385, 385 (1st Dep't 2010); *see,*

*e.g.*, *King Penguin Opportunity Fund III, LLC v. Spectrum Grp. Mgmt. LLC*, 135 N.Y.S.3d 363, 363 (1st Dep't 2020) ("[A]s the term sheet explicitly requires 'satisfactory completion of Lender's due diligence and execution of written loan documents' before the parties are contractually bound, it was 'unreasonable as a matter of law' for plaintiff to rely upon the representations in the term sheet to proceed with the transaction.").

Plaintiffs' claims for common-law fraud and promissory estoppel are dismissed for failure to plead reasonable reliance.

## V.   Control Person Liability

Plaintiffs assert control person claims under Section 15 of the Securities Act and Section 20(a) of the Exchange Act against certain of the Individual Defendants.  Dkt. No. 80 ¶¶ 365–382.

To establish control person liability under either the Securities Act or the Exchange Act, Plaintiffs must show: (a) a primary violation by the controlled person; and (2) control of the primary violator by the defendant.  *See Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 490 (2d Cir. 2011) (Securities Act); *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011) (Securities Act);  *ATSI*, 493 F.3d at 108 (Exchange Act).[24]

Because Plaintiffs fail to allege any primary violation, they cannot establish control person liability.  Therefore their claims under Section 15 of the Securities Act and Section 20(a) of the Exchange Act is dismissed.

---

[24] In addition, to establish control person liability under the Exchange Act, Plaintiff must show "that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI*, 493 F.3d at 108.

## CONCLUSION

Defendants' motion to dismiss is GRANTED. "Although Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend 'shall be freely given when justice so requires,' it is within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (quoting Fed. R. Civ. P. 15(a)). "A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *Id.* Plaintiffs have not "proffered the content of any proposed amendment or given any clue as to how the complaint's defects would be cured." *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 530 n.19 (S.D.N.Y. 2020) (citation omitted). Plaintiffs' failure to state a claim to relief does not appear to be the product of inartful pleading but rather substantive issues with Plaintiff's claims that would make repleading futile. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). The amended complaint is therefore dismissed with prejudice.

The Clerk of Court is respectfully directed to close this case.

SO ORDERED.

Dated: March 21, 2025
      New York, New York

                                     LEWIS J. LIMAN
                            United States District Judge