```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  6/3/2025
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
DR. RUTH C. MAY AND DR. DONNA E.                                  :
LEDGERWOOD, JUSTIN REED, MARK HOWARTH                             :
and JEFFREY KNAPP, *on behalf of themselves and all*              :
*others similarly situated*,                                      :
                                                                  :
                              Plaintiffs,                         :
                                                                  :            23-cv-2583 (LJL)
              -v-                                                 :
                                                                  :            OPINION AND ORDER
BARCLAYS PLC AND BARCLAYS BANK PLC,                               :
JAMES E. STALEY, TUSHAR MORZARIA,                                 :
STEVEN EWART, C.S. VENKATAKRISHNAN,                               :
TIM THROSBY, ANNA CROSS, NIGEL HIGGINS,                           :
ALEX THURSBY, HELEN KEELAN, HELENE                                :
VAN DORT, JEREMY SCOTT, MARIA RICHTER,                            :
and DOES 1-12,                                                    :
                              Defendants.                         :
------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

On March 21, 2025, the Court granted the motion by Defendants Barclays PLC ("BPLC"), Barclays Bank PLC ("Barclays Bank" and, with BPLC, "Barclays"), James E. Staley, Tusha Morzaria, Steven Ewart, C.S. Venkatakrishnan, Tim Throsby, Anna Cross, Nigel Higgins, Alex Thursby, Hellen Keelan, Helene Van Dort, Jeremy Scott, and Maria Richter (collectively, "Defendants") to dismiss the Consolidated Second Amended Class Action Complaint with prejudice. Dkt. No. 96; *May v. Barclays PLC*, 2025 WL 887300 (S.D.N.Y. Mar. 21, 2025) (the March 21 Opinion and Order). Lead Plaintiffs Dr. Ruth C. May, Dr. Donna E. Ledgerwood, Justin Reed, Mark Howarth, and Jeffrey Knapp (collectively, "Plaintiffs") move for partial reconsideration of the March 21 Opinion and Order. Dkt. No. 100.

For the reasons that follow, Plaintiffs' motion for reconsideration is denied.

## BACKGROUND

The background of this case is set forth in the March 21 Opinion and Order. *See May*, 2025 WL 887300, at *1–9. Plaintiffs do not dispute the March 21 Opinion and Order's recitation of the factual allegations.

In short, and as is relevant to the motion for reconsideration, Plaintiffs alleged that Barclays Bank issues the Barclays Bank PLC iPath Series B S&P 500 VIX Short-Term Futures ("VXX"), an exchange-traded note ("ETN"). Dkt. No. 80 ¶ 34. In 2018 and 2019, Barclays filed shelf registration statements that included VXX. *Id.* ¶¶ 93, 110. On April 23, 2021, Barclays conducted a reverse split of VXX such that for every four shares that an investor held, Barclays replaced those shares with a single new share. *Id.* ¶¶ 157–160. Barclays issued a VXX pricing supplement on April 23, 2021. Dkt. Nos. 87-1, 101-1 ("April 23 Pricing Supplement").

Since mid-2017, Barclays has been required to define, designate, and pay a registration fee for the amount of securities, including the number of VXX notes, that it planned to register and issue. Dkt. No. 80 ¶ 83. Barclays failed to accurately track the amount of notes it issued and, in March of 2022, discovered that it had issued over one billion dollars' worth of unregistered securities, including VXX. *Id.* ¶¶ 105, 136–140, 148–149, 164–166.

Plaintiffs asserted claims for violations of Sections 11 and 12 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(1)–(2); Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; common-law fraud and estoppel; and control person liability under Section 20(a) of the Exchange Act. *Id.* ¶¶ 200–382.

## PROCEDURAL HISTORY

The March 21 Opinion and Order dismissed all of Plaintiffs' claims with prejudice. *See May*, 2025 WL 887300.[1]

On April 18, 2025, Plaintiff moved for partial reconsideration of the March 21 Opinion and Order. Dkt. No. 100. Plaintiffs filed a memorandum of law in support of the motion. Dkt. No. 101. On May 2, 2025, Defendants filed a memorandum of law in opposition to the motion for reconsideration. Dkt. No. 102. Plaintiffs filed a reply memorandum of law in further support of reconsideration on May 9, 2025. Dkt. No. 103.

## LEGAL STANDARD

"A motion for reconsideration should be granted only if the movant identifies an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Spin Master Ltd. v. 158*, 2020 WL 5350541, at *1 (S.D.N.Y. Sept. 4, 2020) (quotation omitted). "Reconsideration of a court's previous order is an 'extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.'" *Id.* (quoting *In re Health Mgmt. Sys., Sec. Litig.*, 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000)). "A motion for reconsideration is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple." *HDI Glob. Ins. Co. v. Kuehne + Nagel, Inc.*, 2024 WL 4555759, at *1 (S.D.N.Y. Oct. 23, 2024) (quotation omitted). It does not provide a plaintiff with the opportunity

---

[1] On the same day, the Court issued an Opinion and Order dismissing with prejudice all of the claims in a companion case captioned *Puchtler v. Barclays PLC*, 24-cv-1872 (S.D.N.Y.). *See Puchtler v. Barclays PLC*, 2025 WL 887502 (S.D.N.Y. Mar. 21, 2025). In April of 2025, the *Puchtler* plaintiffs appealed the dismissal to the Second Circuit. The appeal is captioned *Puchtler v. Barclays PLC*, 25-995 (2d Cir.). The appeal is still pending in the Circuit and is not yet fully briefed.

to "present new allegations that could have been pleaded but were not pleaded." *Travelers Indem. Co. v. Axis Ins. Co.*, 2024 WL 3849183, at *3 (S.D.N.Y. Aug. 16, 2024).

## DISCUSSION

Plaintiffs ask the Court to reconsider the portions of the March 21 Opinion and Order dismissing Plaintiffs Section 11 and 12 claims or, in the alternative, to reconsider the portion of the March 21 Opinion and Order denying Plaintiffs leave to amend. Dkt. No. 101 at 1.

In particular, Plaintiffs ask the Court to reconsider the following conclusions stated in the March 21 Opinion and Order: (1) the April 23, 2021 reverse split is not a sale or offer under the Securities Act; (2) Barclays' April 23, 2021 Pricing Supplement is not the relevant registration statement upon which Plaintiffs' Section 11 claims are predicated; and (3) dismissal should be with prejudice because amendment would be futile. *Id.* at 1–8. The Court reviews each in turn.

**I.     Section 12(a)**

In the March 21 Opinion and Order, the Court dismissed Plaintiffs' Section 12(a) claim on the ground that the reverse split did not constitute a sale or offer within the meaning of the Securities Act and therefore Plaintiffs failed to allege that they purchased unregistered VXX ETNs from Barclays. *See May*, 2025 WL 887300, at *9–16. The Court noted that:

> The Securities Act defines the term "sale" or "sell," to which the statute is addressed, to "include every contract of sale or disposition of a security or interest in a security, *for value*." 15 U.S.C. § 77b(a)(3) (emphasis added). It similarly defines "offer" to "include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, *for value*." *Id.* (emphasis added).

*Id.* at *11. The Court therefore reasoned that the reverse split did not constitute a "sale" because no new consideration was exchanged. *See id.* at *11–14. "When Barclays sold each of the VXX ETNs held by the Plaintiffs, it retained the right as a matter of contract to conduct a split or a reverse split and to retrieve each of those notes for new VXX notes." *Id.* at *13 (citing Dkt. No. 86-1 at 41). In light of Barclays' preexisting right to undertake the split, the Court determined that

4

Barclays did not receive anything of value as a result of the reverse split. *See id.* For illustrative purposes, the Court compared Barclays' contractual right to an options contract, explaining that "where an option-holder purchases an option and later exercises it, only the original purchase is a transfer for value; the option-holder does not convey value when she exchanges her contract right for the stock itself." *Id.* at *11.

Plaintiffs ask the Court to reconsider its conclusion that the statute requires new value. Dkt. No. 101 at 6–8; Dkt. No. 103 at 5–6. They claim that it should instead suffice that Barclays received value in the form of Plaintiffs' "pre-split ETN's and/or cancelation of Barclays' obligations under them." Dkt. No. 101 at 6. In effect, Plaintiffs argue that because the relinquished shares had value, Barclays should be viewed as having sold or disposed of the post-split shares in exchange for that value, regardless whether Barclays already possessed the contractual right to force the split. *Id.* at 6–8; Dkt. No. 103 at 5. This argument is unavailing for the reasons stated in the March 21 Opinion and Order. *See May*, 2025 WL 887300, at *9–12.

The Securities Act seeks to ensure that investors who are giving something up in exchange for a security do so in an informed manner aided by a registration statement. *Id.* at *10–11 (citing *Pinter v. Dahl*, 486 U.S. 622, 638 (1988); *Eur. & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 126 (2d Cir. 1998); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 752–53 (1975); *SEC v. Ralston Purina Co.*, 346 U.S. 119, 123 & n.5 (1953)); *see also Slack Techs., LLC v. Pirani*, 598 U.S. 759, 762 (2023) (noting that under Section 11 "a company must prepare a registration statement that includes detailed information about the firm's business and financial health *so prospective buyers may fairly assess whether to invest*" (emphasis added)). The statute's specification that a sale or offer must be "for value" cabins the Securities Act to circumstances in which an investment decision must be made. Where an investor receives a

security gratuitously or as a result of a prior agreement, there is no investment decision to make and thus no need for a registration statement. *Id.* at *11. Thus, the simple fact that the pre-split shares had value does not mean that Barclays' exchange of every four of those shares for one of the post-split shares is a sale within the meaning of the Securities Act. In purchasing the pre-split VXX ETNs, Plaintiffs gave Barclays the contractual right to effectuate the split and thus had no decision to make and no new value to give up when the split occurred. *Id.* at *11–12; *see Gurvitz v. Bregman & Co.*, 379 F. Supp. 1283, 1286 (S.D.N.Y. 1974) (holding that a stock split is not a sale because it "is simply the distribution of two or more pieces of paper for one").

To the extent Plaintiffs argue that they did give up something of new value in the split, they point only to arguments that the Court expressly rejected. *Compare* Dkt. No. 101 at 7 (arguing that Plaintiffs gave up "economic interests related to liquidity and redeemability), *and* Dkt. No. 103 at 4–6 (similar), *with May*, 2025 WL 887300, at *12–13 (holding that the reverse split's encumbrance of Plaintiffs' redemption right and reduction of shares held "was not something 'of value' that Barclays obtained as a result of the split" because "even assuming that the exchange provided a business benefit to Barclays and a detriment to certain holders who found themselves suddenly unable to redeem holdings that they previously could, Barclays already had that benefit and the right to inflict that detriment in the form of an exercisable contractual right"). Those arguments fail again for the same reasons. *See Rivas v. Banks*, 2024 WL 292276, at *1 (S.D.N.Y. Jan. 25, 2024) ("The standard for granting a motion for reconsideration is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the Court." (quoting *Justice v. City of New York*, 2015 WL 4523154, at *1 (E.D.N.Y. July 27, 2015)).

Plaintiffs' motion for reconsideration is denied with respect to their Section 12(a) claim.

## II.   Section 11

The March 21 Opinion and Order explained that Plaintiffs' Section 11 claim failed because Plaintiffs failed to plead that their VXX notes "were issued under or registered to [an] allegedly defective registration statement," a necessary element of the claim. *May*, 2025 WL 887300, at *17–18; *see DeMaria v. Andersen*, 318 F.3d 170, 176 (2d Cir. 2003) ("[T]he buyer must have purchased a security issued under the registration statement at issue, rather than some other registration statement." (quotation omitted)). As part of that determination, the Court rejected the contention that Plaintiffs satisfied the traceability requirements by pleading that all post-split ETNs trace back to the reverse split. *See May*, 2025 WL 887300, at *18.

Plaintiffs argue that their Section 11 claim was wrongly dismissed because the Court erred in declining to treat the April 23 Pricing Supplement as the deficient registration statement serving as the predicate for Plaintiffs' Section 11 claim. *See* Dkt. No. 101 at 1–4; Dkt. No. 103 at 1–4. Plaintiffs point to SEC Item 512 which provides that "[f]or the purpose of determining any liability under the Securities Act of 1933, each . . . post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof." Dkt. No. 101 at 3 (emphases omitted) (quoting 17 C.F.R. § 229.512(i)(2)). Therefore, Plaintiffs argue, the Court should find that the April 23 Pricing Supplement is a registration statement and Plaintiffs' post-split shares were issued pursuant to that registration statement. *Id.*

However, although Item 512 provides that post-effective amendments containing a form of prospectus shall be deemed a new registration statement, that is only with respect to "the securities offered therein." 17 C.F.R. § 229.512(i)(2). Where the amendment does not herald a new offering, Item 512 has no application. *See Finkel v. Stratton Corp.*, 962 F.2d 169, 174 (2d

7

Cir. 1992) (explaining that Item 512 acts to reset the statute of limitations for investors who acquire securities in a shelf offering years after the initial registration statement in reliance on a fraudulent, post-effective amendment to the registration); *see also Fed. Hous. Fin. Agency v. UBS Americas, Inc.*, 2012 WL 2400263, at *3 (S.D.N.Y. June 26, 2012) (explaining that Item 512 requires that the registrant make additional filings "before securities may be *bona fide* offered for sale").

"[T]he operative event for purposes of determining traceability is . . . the entrance into the market of securities issued pursuant to a particular registration statement." *In re Arqit Quantum Inc. Sec. Litig.*, 2025 WL 977995, at *13 (E.D.N.Y. Mar. 28, 2025) (citing *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 117–18 (S.D.N.Y. 2004))); *see Gustafson v. Alloyd Co.*, 513 U.S. 561, 571 (1995) (recognizing that "the liability imposed by § 11 flows from the requirements imposed by §§ 5 and 7 providing for the filing and content of registration statements"). The question, therefore, is whether the post-split shares entered the market after the reverse split was conducted or should instead be viewed as mere transformations of the shares that had entered the market—and that Plaintiffs acquired—prior to the reverse split. For the reasons explained in the March 21 Opinion and Order, the reverse split does not constitute a distribution into the market of new shares distinct from the pre-split shares. *See May*, 2025 WL 887300, at *10–16 (rejecting arguments that "Barclays' issuance of shares as part of the four-for-one reverse split on April 23, 2021, constituted an issuance of shares for purposes of Section 5 of the Securities Act" and that any registration statement was required for the post-split shares). Because Plaintiffs acquired their shares pursuant to whatever pre-split registration statement was operative at the time of the acquisition, they may not invoke the April 23 Pricing Supplement as a basis for traceability (or material falsity). *See DeMaria*, 318 F.3d at 176.

Plaintiffs argue that certain attributes of the April 23 Pricing Supplement indicate that it was intended to act as the registration statement for the post-split shares. *See* Dkt. No. 101 at 1–4; Dkt. No. 103 at 1–4. But the April 23 Pricing Supplement does not represent that it governs issuance of the shares transformed by the reverse split. As the Court noted in the March 21 Opinion and Order, the April 23 Pricing Supplement "stated that '[w]e may use this pricing supplement in the initial sale of the ETNs' and thus indicated that the pricing supplement related to ETNs that Barclays Bank 'may issue from time to time.'" *See May*, 2025 WL 887300, at *15 (quoting Dkt. No. 87-1 at 1, 5, 7). The April 23, 2021 Pricing Supplement further states:

> We may use this pricing supplement in the initial sale of the ETNs. In addition, Barclays Capital Inc. or another of our affiliates may use this pricing supplement in market-making transactions in any ETNs after the initial sale of ETNs. ***Unless we or our agent informs you otherwise in the confirmation of sale or in a notice delivered at the same time as the confirmation of sale, this pricing supplement is being used in a market-making transaction.***

Dkt. No. 101 at 5.[2]

Plaintiffs now respond with five reasons why the Court should find that the post-split ETNs were first registered in the April 23 Pricing Supplement. Dkt. No. 101 at 2–4; Dkt. No. 101-1 at 1. None are availing.

First, Plaintiffs argue that the post-split ETNs match the volume referenced in the April 23 Pricing Supplement. Dkt. No. 101 at 2; Dkt. No. 103 at 2. But the language in the April 23 Pricing

---

[2] Plaintiffs argue that "[t]o hold that the April 2021 pricing supplement was not a new registration statement, this Court had to credit unsworn factual statements in Defendants' briefing" including that "[t]he pricing supplement addressed the registration of ETNs separate from the reverse split shares." Dkt. No. 103 at 2. But, as Plaintiffs acknowledge, the Court may take judicial notice of SEC filings including the April 23 Pricing Supplement. *See* Dkt. No. 101 at 2 n.1; *In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 238–39 (S.D.N.Y. 2023). The Court does not accept the April 23 Pricing Supplement's statements as truth, but only for the fact that the representations were made. The supplement's contemplation of ETNs other than the shares transformed by the reverse split is apparent on its face. The Court draws no conclusions as to whether there were in fact market-making transactions based on the April 23 Pricing Supplement.

9

Supplement referencing the volume of the post-split ETNs actually supports the inference that the post-split shares were not issued pursuant to the supplement. It states:

> 36,772,982 ETNs, principal amount $27.1939 per ETN, were issued on January 19, 2018; 23,227,018 ETNs, principal amount $27.1939 per ETN, were issued on July 23, 2019; 15,000,000 ETNs, principal amount $27.1939 per ETN, were issued on November 20, 2019: 25,000,000 ETNs, principal amount $27.1939 per ETN, were issued on February 10, 2020 and an additional 50,000,000 ETNs, principal amount $27.1939 per ETN, were issued on February 18, 2021. On April 9, 2021, Barclays Bank PLC announced a 1 for 4 reverse split of the iPath® Series B S&P 500® VIX Short-Term Futures TM ETNs, effective April 23, 2021. Following the reverse split, 37,500,000 ETNs, principal amount $108.7755 per ETN shall be outstanding.

Dkt. No. 101-1 at 1. The April 23 Pricing Supplement thus lists the occasions, going back to 2018, on which ETNs "were issued" while notably not referring to the reverse split as an additional issuance. *Id.*

Second, Plaintiffs argue that the post-split ETNs had a different CUSIP number than the pre-split ETNs and subsequent issues of VXX bore the post-split CUSIP number. Dkt. No. 101 at 2. Plaintiffs cite no authority stating that a change in CUSIP number requires reissuance pursuant to a new registration statement. The change in CUSIP number does not transform the April 21 Pricing Supplement into a registration statement; nor does it not show that Plaintiffs' shares were issued pursuant to the April 23 Pricing Supplement as opposed to whatever registration statement was operative at the time Plaintiffs acquired the pre-split shares.

Third, Plaintiffs point to the fact that Barclays filed a new pricing supplement on April 30, 2021, regarding a May 3, 2021 issuance of VXX and another pricing supplement on October 21, 2021, for an October 22, 2021 issuance. *Id.* at 2; Dkt. Nos. 101-2, 101-3. But the fact that Barclays filed new pricing supplements shortly after the April 23 Pricing Supplement, does not, as Plaintiffs claim, demonstrate that "the April 23, 2021, Pricing Supplement could only have one purpose: registering the ETNs in the reverse split." Dkt. No. 101 at 2. The April 23 Pricing Supplement states an alternative purpose upon its face: "Unless we or our agent informs you otherwise in the

10

confirmation of sale or in a notice delivered at the same time as the confirmation of sale, this pricing supplement is being used in a market-making transaction." Dkt. No. 101-1 at 5.  Plaintiffs did not allege—and even now do not now contend—that they were ever "inform[ed] otherwise." Regardless, the existence of later pricing supplements for later issuances does not support the inference that the April 23 Pricing Supplement governed issuance of the post-split notes.

Fourth, Plaintiffs now claim, for the first time, that a heading on the April 23 Pricing Supplement labels the filing, "IPATH - VXX Reverse Split."  *Id.* at 1; Dkt. No. 101 at 2–3; Dkt. No. 103 at 2.  The Consolidated Second Amended Complaint made no reference to such a header and the heading was missing from the version of the April 23 Pricing Supplement that Plaintiffs submitted as an exhibit to their opposition to the motion to dismiss.  Dkt. Nos. 80, 87-1.  This always-available but newly-presented evidence is not a sufficient basis for reconsideration.  *See Travelers Indem.*, 2024 WL 3849183, at *3 (collecting cases).  Even if considered, the heading shows nothing more than that the April 23 Pricing Supplement was associated with the reverse split such as for market-making transactions—not that it was a registration statement for shares issued through the split.

Finally, Plaintiffs argue that SEC Rule 416(b) requires Barclays to have registered all of the VXX ETNs issued in the reverse split, and thus "constitutes an additional reason to believe the pricing supplement attempted to do just that."  Dkt. No. 103 at 3–4; *see* Dkt. No 101 at 3.  But the Rule contains no such requirement.  Rule 416 states in relevant part:

> (a) If a registration statement purports to register securities to be offered pursuant to terms which provide for a change in the amount of securities being offered or issued to prevent dilution resulting from stock splits, stock dividends, or similar transactions, such registration statement shall, unless otherwise expressly provided, be deemed to cover the additional securities to be offered or issued in connection with any such provision.
>
> (b) If prior to completion of the distribution of the securities covered by a registration statement, additional securities of the same class are issued or issuable

>as a result of a stock split or stock dividend, the registration statement shall, unless otherwise expressly provided therein, be deemed to cover such additional securities resulting from the split of, or the stock dividend on, the registered securities. If prior to completion of the distribution of the securities covered by a registration statement, all the securities of a class which includes the registered securities are combined by a reverse split into a lesser amount of securities of the same class, the amount of undistributed securities of such class deemed to be covered by the registration statement shall be proportionately reduced. If paragraph (a) of this section is not applicable, the registration statement shall be amended prior to the offering of such additional or lesser amount of securities to reflect the change in the amount of securities registered.

17 C.F.R. § 230.416(a)–(b). Rule 416(b) thus provides that where a company has registered a certain number of shares and has distributed fewer shares than the number registered, if the company undertakes a reverse stock split, the number of undistributed shares shall be proportionately reduced as if they too were subject to the reverse split. *See id.*; SEC Release No. 4806, 1965 WL 89082 (Oct. 26, 1965). It further states that before the company can offer the now-reduced number of registered but undistributed shares, the registration statement shall be amended to reflect the new volume. *See id.*; 17 C.F.R. § 230.416(a)–(b). To illustrate, if a company registered 300 shares and distributed 200 before conducting a 4-for-1 reverse stock split, the effect of the reverse split would be that 50 shares are outstanding and 25 shares are registered but not yet distributed. Before the company may offer any of those 25 shares, it must amend the registration statement to reflect that the total amount of registered shares is 75 shares. An investor who later acquires any of the previously undistributed post-split shares may thus trace their shares to the amendment reflecting the change in the amount of registered securities caused by the reverse split. *See* 17 C.F.R. § 229.512(i)(2). But Rule 416 does not suggest in any way that an investor who held shares that were distributed prior to the split may trace their shares to the post-split amendment.

Plaintiffs' motion to reconsider dismissal of Plaintiffs' Section 11 claim is denied.[3]

## III. Amendment

Plaintiffs state that "[t]o the extent Plaintiffs' arguments here rely on facts this Court deems beyond the pleadings or its ability to take judicial notice, Plaintiffs respectfully request reconsideration of the dismissal with prejudice and seek leave to amend the Complaint." Dkt. No. 101 at 8. In particular, Plaintiffs request leave to add the following allegations: (a) the allegation that the April 23 Pricing Supplement referenced the VXX reverse split in its header on EDGAR, (b) allegations discussing other VXX pricing supplements, (c) the allegation that "the post-split VXX ETNs are 'deemed' to be related to a new registration statement as of April 23, 2021, and that this date is deemed to be the initial bona fide offering of such ETNs," and (d) the allegation that Barclays' false statements were "incorporated into that new registration statement and thus repeated as of April 23, 2021." *Id.* For the reasons outlined above, permitting amendment to add those allegations would be futile.

## CONCLUSION

Plaintiffs' motion for reconsideration is DENIED.

The Clerk of Court is respectfully directed to close Dkt. No. 100.

SO ORDERED.

Dated: June 3, 2025
New York, New York

_____
LEWIS J. LIMAN
United States District Judge

---

[3] Plaintiffs argue that "[w]hen viewed through the lens of April 2021 rather than July 2019, the statements itemized in Plaintiffs' [opposition to the motion to dismiss] are patently false." Dkt. No. 101 at 4–5 (quoting Dkt. No. 87 at 10–16). Because the Court rejects Plaintiffs' argument that their shares trace to the April 23 Pricing Supplement as opposed to an earlier registration statement, this argument fails as well.