25-1631
*Knapp v. Barclays*

# United States Court of Appeals
## For the Second Circuit

August Term 2025

Argued:   March 16, 2026
Decided:   March 24, 2026

No. 25-1631

| |
|---|
| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: ___4/14/2026___ |

JEFFREY KNAPP, MARK HOWARTH, JUSTIN REED, DR.
RUTH C. MAY, and DR. DONNA E. LEDGERWOOD, on
behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants,*

*v.*

BARCLAYS PLC, BARCLAYS BANK PLC, ANNA CROSS,
STEVEN EWART, NIGEL HIGGINS, HELEN KEELAN, TUSHAR
MORZARIA, MARIA RICHTER, JEREMY SCOTT, JAMES E.
STALEY, TIM THROSBY, ALEX THURSBY, C.S.
VENKATAKRISHNAN, HELENE VAN DORT,

*Defendants-Appellees,*

DOES 1–12,

*Defendants.*[*]

---

[*] The Clerk of Court is respectfully directed to amend the official case caption as set forth above.

---

Appeal from the United States District Court
for the Southern District of New York
No. 23-cv-2583, Lewis J. Liman, *Judge*.

---

Before:  WALKER, SULLIVAN, and BIANCO, *Circuit Judges*.

Plaintiffs appeal from a judgment of the United States District Court for the Southern District of New York (Liman, *J.*) dismissing their claims under the Securities Act of 1933 (the "Securities Act") against Defendants, a bank holding company, its subsidiary, and its executives (collectively, "Barclays").  Barclays issued complex debt securities called exchange-traded notes ("ETNs"), which it subsequently condensed through a 4:1 "reverse split" that swapped every four outstanding notes for a single note of equal value.   Plaintiffs, who held such post-split ETNs (collectively, the "Investors"), assert that Barclays violated section 12 of the Securities Act by selling the ETNs without registering them with the Securities and Exchange Commission ("SEC") and section 11 by tying the ETNs to a registration statement that included allegedly misleading statements.

The district court dismissed the complaint because it concluded that (i) the reverse split did not constitute a "sale" under the Securities Act – a prerequisite for liability under section 12 – and (ii) the Investors failed to trace the post-split ETNs to a particular registration statement, as required for section 11 liability.   On these issues of first impression, we agree with the district court and accordingly **AFFIRM** the judgment in full.

AFFIRMED.

> JONATHAN BRIDGES (Mazin A. Sbaiti, *on the brief*), Sbaiti & Company PLLC, Dallas, TX, *for Plaintiffs-Appellants*.
>
> MATTHEW J. PORPORA (Jeffrey T. Scott, Julia A. Malkina, Jacob E. Cohen *on the brief*), Sullivan & Cromwell, New York, NY, *for Defendants-Appellees*.

PER CURIAM:

Plaintiffs appeal from a judgment of the United States District Court for the Southern District of New York dismissing their claims under the Securities Act of 1933 (the "Securities Act") against Defendants, a bank holding company, its subsidiary, and its executives (collectively, "Barclays"). Barclays issued complex debt securities called exchange-traded notes ("ETNs"), which it subsequently condensed through a 4:1 "reverse split" that swapped every four outstanding notes for a single note of equal value. Plaintiffs, who held such post-split ETNs (collectively, the "Investors"), assert that Barclays violated section 12 of the Securities Act by selling the ETNs without registering them with the Securities and Exchange Commission ("SEC") and section 11 by tying the ETNs to a registration statement that included allegedly misleading statements.

The district court dismissed the complaint because it concluded that (i) the reverse split did not constitute a "sale" under the Securities Act – a prerequisite for liability under section 12 – and (ii) the Investors failed to trace the post-split ETNs to a particular registration statement, as required for section 11 liability. On these issues of first impression, we agree with the district court and accordingly affirm the judgment in full.

## I.   BACKGROUND

This case relates to Barclays' use of complex debt instruments called ETNs. In a nutshell, ETNs are debt securities that derive their value from underlying indices.   Here, Barclays issued certain ETNs – under the ticker "VXX" – that tracked expected future market volatility and thus enabled "sophisticated investors to manage daily trading risks."   J. App'x at 247–48.   Investors could (i) hold VXX to maturity and receive a cash payout at that time, *id.* at 248; (ii) redeem them in blocks of 25,000 notes at an earlier date, *id.*; or (iii) trade them on the New York Stock Exchange via an "efficient" and "highly liquid" secondary market, *id.* at 222.

When distributing these ETNs, Barclays relied on its status as a "well-known seasoned issuer" ("WKSI"), *i.e.*, a proven, trustworthy, and experienced financial institution.   *See* Securities Offering Reform, Securities Act Release No. 8591, 70 Fed. Reg. 44,721 (Aug. 3, 2005).   Unlike normal issuers, WKSIs do not have to register each new batch of securities with the SEC and obtain the agency's approval; instead, they can file "open-ended shelf registration statement[s]," J. App'x at 162, with "unspecified amounts of . . . securities," *id.* at 312.   Then, whenever they want to access capital, they can issue as many securities as they

4

would like, selling them immediately, and "pay[ing] filing fees on a 'pay-as-you-go' basis." *Id.*

Barclays lost this ability, however, in 2017, when it gave up its WKSI status after settling cease-and-desist proceedings brought by the SEC. *Id.* In the confusion that followed, Barclays, which was accustomed to the pay-as-you-go model, inadvertently issued more securities than it had pre-registered with the SEC. There was thus a period, between July 2019 and October 2021, when Barclays was issuing unregistered VXX.

During that span – on April 23, 2021 – Barclays "consummated" a "4:1 reverse split for VXX." *Id.* at 180. This reverse split meant that Barclays would "replace" "every four [ETNs] that an investor held . . . with a single new [ETN] ostensibly worth four times the value." *Id.* That exchange conformed to the terms of the original pricing supplement for VXX, which had warned investors that Barclays might "[o]n any business day . . . elect to initiate a split . . . or a reverse split of your ETNs" and described a 4:1 reverse split as an example. *Id.* at 286–87.

On the same day as the reverse split, Barclays circulated a new pricing supplement (the "April Supplement"). That supplement disclosed that Barclays

had "implemented" the split, *id.* at 437, and indicated that Barclays might "use this pricing supplement in the initial sale" of any post-split ETNs that Barclays still held, *id.* at 439, and in "market-making transaction[s]," namely, sales to "dealers [who would] resell such ETNs to the public," *id.* at 439, 492.

The Investors subsequently sued Barclays under the Securities Act. They first alleged that the reverse split violated section 12(a)(1), which prohibits the sale of unregistered securities. 15 U.S.C. § 77*l*(a)(1). They then asserted that the split contravened section 11 – which bans misleading registration statements, 15 U.S.C. § 77k – because the split could be "trace[d] to" the April Supplement, and that supplement incorporated earlier, allegedly inaccurate disclosures. J. App'x at 200.

The district court dismissed both claims. It held first that the section 12 claims failed because the "reverse . . . split did not constitute a sale" under the Securities Act. Sp. App'x at 20. It then dismissed the section 11 claims because the Investors had failed to show that "the [ETNs] in question were issued under . . . [an] allegedly defective registration statement." *Id.* at 37. The Investors timely appealed.

## II.    STANDARD OF REVIEW

We review *de novo* a district court's dismissal for failure to state a claim, "accepting all factual allegations in the complaint as true and drawing all reasonable inferences in favor of the plaintiff." *In re Nine W. LBO Sec. Litig.*, 87 F.4th 130, 142 (2d Cir. 2023). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A claim is plausible if the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" and establishes "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

## III.    DISCUSSION

Both of the Investors' claims fall short. The Investors cannot prevail under section 12 because a split does not qualify as a statutory "sale" unless it meaningfully changes the nature of the asset underlying the securities holders' investment. And the Investors lose under section 11 because Barclays did not issue the relevant ETNs pursuant to the April Supplement.

7

## A.    Section 12 Claim

Section 5 of the Securities Act prohibits the interstate sale of securities "[u]nless a registration statement [governing them] is in effect."    15 U.S.C. § 77e(a).    Section 12, in turn, allows purchasers of unregistered securities to sue anyone who "sells a security in violation of [section 5]."    15 U.S.C. § 77*l*(a). "Sells" is a term of art:    the statute expressly defines "[t]he term 'sale' or 'sell'" as "every . . . disposition of a security . . . for *value*."    15 U.S.C. § 77b(a)(3) (emphasis added).

While a cash purchase of a security clearly qualifies as a "disposition for value," a security-for-security swap might not.    *Id.*    "In determining whether changes in the rights of a security holder involve a purchase or sale" – as opposed to a not-for-value re-shuffling of assets – "courts must decide whether there has occurred such significant change in the nature of the investment or in the investment risks as to amount to a new investment."    *Gelles v. TDA Indus., Inc.*, 44 F.3d 102, 104 (2d Cir. 1994) (internal quotation marks omitted).    Garden-variety splits, which merely recast the *number* of securities the investor holds, will rarely bring about such "significant changes" because they do not "modif[y] the underlying assets," *id.*, and instead alter "[o]nly the form" of the securities, *Isquith*

8

*by Isquith v. Caremark Int'l, Inc.*, 136 F.3d 531, 536 (7th Cir. 1998) (Posner, J.).   For

that reason, "a reverse . . . split" generally does "not even arguably . . . involve[]

any purchase or sale."   *Gelles*, 44 F.3d at 105; *see also* J. William Hicks, 7A

Exempted Trans. Under Securities Act 1933 § 10.86 (2026) (explaining that a "split

does not require distributees to give any value in exchange," and that "such

distributions do not constitute a[] . . . sale."); *cf.* 17 CFR § 230.145 (explaining that

"[a] reclassification of securities" shall not "be deemed" to involve a sale if it is

merely a "stock split [or] reverse stock split").

This conclusion neatly matches the purposes of the Securities Act.   *See Sec.

& Exch. Comm'n v. Ralston Purina Co.*, 346 U.S. 119, 124–25 (1953) ("The natural way

to interpret the [Securities Act] is in light of the statutory purpose.").   "The design

of th[at] statute is to protect investors by promoting full disclosure of information

thought necessary to informed investment decisions."   *Id.* at 124.   But when an

issuer announces a mandatory split, as happened here, investors "ha[ve] no

choice" and "ma[ke] no investment decision."   *Isquith*, 136 F.3d at 534; Thomas

Lee Hazen, 2 Law Sec. Reg. § 5:3 (2025) (hereinafter "Hazen") ("The presence of

an investment decision is crucial to the finding of a purchase or sale.").   Subjecting

such compulsory splits to the Securities Act thus would do nothing to advance its

"purpose of . . . protect[ing] public investors through disclosure." *Pinter v. Dahl*, 486 U.S. 622, 638 n.14 (1988).

These straightforward principles show why the reverse split at issue here is not a sale. Barclays had an ironclad right to split the ETNs "[o]n any business day." J. App'x at 287. And when it exercised that right, the Investors did not lose, or gain, anything: they simply traded in four ETNs for one ETN worth the same amount. Although "[w]ords are protean in the hands of lawyers," even the most skilled verbal manipulation cannot transform such an involuntary and immaterial swap into a "sale." *Isquith*, F.3d at 534.

The Investors nevertheless attempt to rise to the challenge. They begin by pointing to authorities explaining or implying that "[w]here securities are exchanged for other securities, a sale takes place." Reply Br. at 3 (internal quotation marks omitted). But not all securities-for-securities swaps are created equal: as the Investors' own preferred treatise points out, while Congress intended to define *some* "exchanges of securities as sales," "when an exchange of securities is involuntary and does not significantly alter the rights of the securities holders, the exchange will not be treated as a sale." Hazen at § 5:3; *see also Gelles*, 44 F.3d at 104 (same).

10

The Investors' own caselaw illustrates the difference. They rely, for instance, on *In re Hub Cyber Sec. Ltd.*, which involved a so-called de-SPAC transaction, where shareholders of a publicly traded shell company vote to approve a merger with "an existing operating company," and then their shares are "automatically converted" to the "newly registered" securities of the post-merger entity. No. 23-CV-5764 (AS), 2025 WL 872078, at *1, *8 (S.D.N.Y. Mar. 20, 2025) (internal quotation marks omitted) (quoted by Investors' Br. at 21). Such a transaction clearly involves a securities-for-securities "sale"; the issuance of newly registered securities as a result of the (voluntary) merger fundamentally changes the nature of the shareholders' investment. By contrast, the obligatory combination of four notes into one larger note is exactly the kind of non-substantive exchange that "will not be treated as a sale." Hazen at § 5:3.

Perhaps sensing the weakness of their main argument, the Investors fall back on the "distinction between equity and debt." Reply Br. at 12. In their view, cases like *Gelles* and *Isquith* "rest on the premise that the shareholder's proportional ownership of the same pool of assets persist[s] unchanged" – which might hold true for shares in a company (equity), but which does not accurately describe a shift in an issuer's contractual obligations to pay (debt). *Id.* at 11–12.

11

But *Gelles* and *Isquith* discuss "securities" generally and focus on whether there was a "significant change in the nature of the investment or in the investment risks," not whether the security at issue was equity or debt.    *Gelles*, 44 F.3d at 104; *see also Isquith*, 136 F.3d at 534.    Furthermore, the Investors' own favorite treatise again contradicts their arguments by linking the *Gelles* test to *both* equity and debt cases.    *See* Hazen at § 5:3 (citing *Sanderson v. Roethenmund*, 682 F. Supp. 205, 209 (S.D.N.Y. 1988) (analyzing "automatic rollover" of certificates of deposit)).

The Investors nonetheless contend that even if debt splits can qualify as "sales" only when they significantly change the nature of the investment, such a change *did* occur here.    In particular, the Investors claim that "the post-split ETNs were not of equivalent value to the pre-split notes" because "holder[s] had the right to redeem" the ETNs only "in blocks of 25,000 or more," and "[a]fter the Reverse Split, many holders who previously could redeem . . . were suddenly unable to."    Investors' Br. at 24.    But the Investors do not explain why this obstacle to redemption would have drastically changed their investment.    As the Investors themselves allege, the secondary market for VXX is "efficient" and "highly liquid" – meaning that the Investors could simply sell their notes on the New York Stock Exchange, without needing to exercise their redemption rights.

12

J. App'x at 222.  Furthermore, as the district court explained, Barclays had the right to split the ETNs at any moment, and the possibility of a suddenly reduced ability to redeem them was therefore "priced into [their] original sale price."  Sp. App'x at 26.[1]

Finally, the Investors argue that the April Supplement served as an "attempted registration of the VXX ETNs issued via the Reverse Split," which proves that Barclays intended to offer those ETNs for sale.  Investors' Br. at 32. But, as discussed in the next section, the April Supplement did no such thing.

### B.      Section 11 Claims

The Investors' section 11 claims fare no better than their section 12 ones. Under section 11, investors who have "acquir[ed]" securities pursuant to a "registration statement . . . contain[ing] . . . an untrue statement of material fact," 11 U.S.C. § 77k(a), may "sue certain enumerated parties" involved in the issuance of those securities, *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 (1983). Because section 11 focuses on securities issued under a "particular registration

---

[1] The Investors also contend that "many of the . . . post-split securities" were unregistered, therefore harder to sell on the secondary market, and thus "devalu[ed]."  Investors' Br. at 25. But the Investors never raised this argument before the district court, and "we decline to consider it in light of the well-established general rule that a court of appeals will not consider an issue raised for the first time on appeal."  *Otal Invs. Ltd. v. M/V CLARY*, 673 F.3d 108, 120 (2d Cir. 2012).

statement," plaintiffs must first plead that they acquired securities "*traceable* to [that] allegedly defective . . . statement." *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 767, 770 (2023) (emphasis added).

Here, the Investors attempt to trace the post-split ETNs to the April Supplement. Under SEC rules, such a supplement may be "deemed to be a new registration statement relating to the securities offered therein." 17 C.F.R. § 229.512(a)(2). The Investors therefore argue that "the Pricing Supplement was a new registration statement," that it "incorporate[ed] . . . previous [misleading] prospectuses," and that Barclays is thus liable under section 11. Investors' Br. at 39, 43–44.

But that logic only works if "the securities offered []in" the April Supplement, 17 C.F.R. § 229.512(a)(2), included the ETNs transferred to the Investors via the reverse split. And the supplement's own terms show that it does *not* cover those ETNs but rather governs the "initial sale of the [post-split] ETNs" that Barclays still held in its inventory, and which it had thus not distributed via the split. J. App'x at 439. That is why the supplement also expressly provides that, "[u]nless" Barclays indicates otherwise, "this pricing supplement is being used in . . . market-making transaction[s]," which it defines as sales from Barclay's own cache of post-

14

split ETNs to "dealers [who would] resell such ETNs to the public."  *Id.* at 439, 492.

Context confirms this commonsense reading of the April Supplement.  The supplement (i) refers to the split in the past tense, *see id.* at 437; *Givaudan SA v. Conagen Inc.*, 128 F.4th 485, 506 (2d Cir. 2025) (explaining that "[t]he past tense of [a] statement . . . is irreconcilable with the notion" that the statement governs future events); (ii) does *not* list the reverse split among a series of previous "issu[ances]," and instead simply notes that Barclays had "announced" the split two weeks before, J. App'x at 751, and (iii) was followed soon after by *another* pricing supplement – covering yet another batch of ETNs – that once again did not mention the reverse split as a previous issuance, *id.* at 814.

The Investors attempt to cover up this mountain of evidence with an avalanche of irrelevant details.  *First*, the Investors note that the April Supplement refers to the reverse split and correctly identifies the number of post-split ETNs.  But that is hardly surprising because, as discussed above, that supplement simply disclosed and described the previously announced split. *Second*, the Investors point out that the April Supplement mentioned the post-split ETNs' new electronic identifying number – without explaining why that reference

to this administrative tag would somehow transform the supplement into a registration statement governing the ETNs swapped in the reverse split. *Finally*, the Investors point out that SEC Rule 416(b) requires issuers to "amend[]" the registration statement after reverse splits. 17 CFR § 230.416(b). The Investors argue that Barclays circulated the April Supplement to comply with this rule, and that the supplement thus "concerned" the ETNs exchanged in the reverse split. Investors Br. at 34.

But the Investors misread Rule 416(b), which provides that (i) "the amount of *undistributed* [post-split] securities . . . deemed to be covered by the registration statement shall be proportionately reduced," and (ii) "the registration statement shall be amended prior to the offering of *such* . . . lesser amount of securities to reflect the change in the amount of securities registered." *Id.* (emphases added). In other words, Rule 416(b) requires issuers to amend the registration statement before issuing any undistributed securities following a split – not before effecting the split itself. *See Sec. & Exch. Comm'n Release Notice*, Release No. 4806, 1965 WL 89082 (Oct. 26, 1965) ("The rule also provides that when all the securities of a class [that] *includes undistributed registered* securities are combined by a reverse split into a lesser number of shares, the amount of

16

*undistributed* securities of such class covered by the registration statement shall be proportionately reduced. The rule requires that the registration statement be amended prior to the offering of such . . . securities." (emphases added)).   The Investors have thus failed to plead any facts tracing *their* ETNs – which they acquired via the reverse split – to the April Supplement.   On the contrary, their allegations suggest that Barclays did not view the reverse split as a sale, and that it accordingly used the April Supplement to sell post-split securities from its own inventory.

## IV.   CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court dismissing the Investors' claims.